**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ION GEOPHYSICAL CORPORATION, *et al.*,[1] | ) | Case No. 22-30987 (MI) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | (Emergency Hearing Requested) |

**DEBTORS' <u>EMERGENCY</u> MOTION FOR ENTRY OF INTERIM AND FINAL
ORDERS (A) AUTHORIZING THE DEBTORS TO (I) OBTAIN POSTPETITION
FINANCING, (II) USE CASH COLLATERAL, (III) GRANT SENIOR SECURED LIENS
AND PROVIDE CLAIMS WITH SUPERPRIORITY ADMINISTRATIVE EXPENSE
STATUS, AND (IV) GRANT ADEQUATE PROTECTION TO THE PREPETITION
SECURED PARTIES, (B) MODIFYING THE AUTOMATIC STAY, (C) SCHEDULING
<u>A FINAL HEARING, AND (D) GRANTING RELATED RELIEF</u>**

> **Emergency relief has been requested. A hearing will be conducted on this matter on April 13, 2022 at 1:30 p.m. (prevailing Central Time) in Courtroom 404, 4th floor, 515 Rusk Avenue, Houston, Texas 77002. You may participate in the hearing either in person or by audio and video connection.**
>
> **Audio communication will be by use of the Court's dial-in facility. You may access the facility at 832-917-1510. Once connected, you will be asked to enter the conference room number. Judge Isgur's conference room number is 954554. Video communication will be by use of the GoToMeeting platform. Connect via the free GoToMeeting application or click the link on Judge Isgur's home page. The meeting code is "JudgeIsgur". Click the settings icon in the upper right corner and enter your name under the personal information setting.**
>
> **Hearing appearances must be made electronically in advance of both electronic and in-person hearings. To make your appearance, click the "Electronic Appearance" link on Judge Isgur's home page. Select the case name, complete the required fields and click "Submit" to complete your appearance.**
>
> **If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing, or file a written response prior to the hearing. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are: ION Geophysical Corporation (6646); I/O Marine Systems, Inc. (3230); ION Exploration Products (U.S.A.), Inc. (1394); and GX Technology Corporation (0115). The location of the Debtors' service address is 4203 Yoakum Blvd., Suite 100, Houston, Texas 77006.

The above-captioned debtors and debtors in possession (collectively, the "Debtors") respectfully state the following in support of this motion (this "Motion"):[2]

## Preliminary Statement

1.     The Debtors commenced these chapter 11 cases with a restructuring support agreement with 100% of their first lien revolving lenders and a majority of their second lien noteholders and a commitment for postpetition financing to provide liquidity to support the Debtors' business and fund the administration of these chapter 11 cases.

2.     To allow the Debtors to fund these chapter 11 cases, by this Motion, the Debtors seek approval of a superpriority secured debtor-in-possession term loan in an aggregate principal amount of up to $2.5 million (the "DIP Facility") provided by financing sources within the Debtors' existing capital structure—specifically an ad hoc group of certain cross-holders of the Debtors first lien and second lien debt (collectively, the "Ad Hoc Group").

3.     If approved, the Debtors will use the proceeds of the DIP Facility to, among other things, honor employee wages and benefits, procure goods and services, and fund general and corporate operating needs and the administration of these chapter 11 cases, all in accordance with the initial DIP budget, which is attached as Exhibit C to the Interim DIP Order (the "Initial DIP Budget").

4.     Pursuant to this Motion, the Debtors also seek the Court's authorization to use Cash Collateral (as defined in section 363(a) of the Bankruptcy Code).  The nature of the Debtors'

---

[2] In support of this Motion, the Debtors submit the *Declaration of Jakub Mleczko in Support of (I) Motion for Entry of Order Authorizing Debtors to Obtain Senior Secured Superpriority Postpetition Financing and Use of Cash Collateral and (II) Motion for Entry of Order Approving Bid Procedures* (the "Mleczko Declaration") and the *Declaration of Mike Morrison, Executive Vice President and Chief Financial Officer of ION Geophysical Corporation, in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), each filed contemporaneously herewith.  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Interim DIP Order (as defined herein).

business requires the Debtors to have immediate use of Cash Collateral, without which the Debtors would be unable to operate their business and administer their estates, immediately and irreparably harming their stakeholders.  By having access to Cash Collateral, the Debtors will be able to continue their operations and preserve value for the benefit of their estates and stakeholders.  The Debtors' prepetition lenders have consented to the continued use of Cash Collateral under the terms included in the Interim DIP Order (and as summarized in detail below), which includes, among other forms of adequate protection, (a) replacement liens, (b) superpriority claims, (c) reporting requirements, and (d) payment of professional fees for certain of the prepetition secured parties.

5.       As further detailed below and in the Mleczko Declaration, the DIP Facility is the product of a marketing process that resulted in the best presently available debtor-in-possession financing option for the Debtors under the facts and circumstances of these chapter 11 cases.  For the reasons set forth in this Motion, the First Day Declaration, the Mleczko Declaration, the Debtors believe that the DIP Facility and continued use of Cash Collateral, on the terms set forth in the Interim DIP Order, are necessary to avoid immediate and irreparable harm and are in the best interest of the Debtors, their estates, and all stakeholders.  Accordingly, the Debtors request that the Court grant the relief requested in this Motion.

## Jurisdiction and Venue

6.       The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  The Debtors confirm their consent, pursuant to rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to the entry of a final order by the Court.

7.       Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

8.      The bases for the relief requested herein are sections 105, 361, 362, 363, 364, 503, and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), Bankruptcy Rules 2002 and 4001, and rule 9013-1 of the Bankruptcy Local Rules for the Southern District of Texas (the "Local Rules").

**Background**

9.      ION Geophysical Corporation ("ION Geophysical" and, together with its Debtor and non-debtor subsidiaries, collectively, "ION") is an innovative, asset light global technology company that delivers data-driven decision-making offerings to offshore energy and maritime operations markets.  Headquartered in Houston, Texas with regional offices around the world, ION operates through two key business segments—Exploration and Production Technology & Services ("EPTS") and Operations Optimization ("OO").  Within the EPTS segment, ION creates digital data assets on a proprietary and multi-client basis and delivers services to help exploration and production companies improve decision-making, reduce risk, and maximize value.  The OO segment develops mission-critical software and technology that enable operational control and optimization offshore.  In that regard, ION provides survey design, command and control software systems and related services for marine towed and seabed operations and develops intelligent hardware and devices to optimize operations.

10.      On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  Concurrently with the filing of this Motion, the Debtors have requested procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b).

## **Relief Requested**

11.     The Debtors seek entry of an interim order, substantially in the form attached hereto

as **Exhibit A** (the "Interim DIP Order") and a final order (the "Final DIP Order," and, together

with the Interim DIP Order, the "DIP Orders"):

| DIP Facility Terms | Relief Requested |
|---|---|
| **DIP Facility** | Authorizing the Debtors to enter into a $2.5 million DIP Facility, pursuant to the terms and conditions set forth in that certain term sheet (as the same may be amended, restated, supplemented, waived, or otherwise modified from time to time, the "DIP Term Sheet"), attached as Exhibit A to the Interim DIP Order. |
| **DIP Documents** | Authorizing the Debtors to execute, deliver, and enter into (a) the DIP Term Sheet by and among the Debtors, the lenders party thereto (collectively, the "DIP Lenders"), and Ankura Trust Company, LLC, as administrative agent and collateral agent under the DIP Facility (in such capacity, the "DIP Agent" and, together with the DIP Lenders, the "DIP Secured Parties") and (b) any other agreements, instruments, pledge agreements, mortgages, guarantees, security agreements, intellectual property security agreements, control agreements, financing statements, notes, and documents related thereto (as each document may be amended, supplemented, or otherwise modified from time to time in accordance with the terms hereof and thereof, collectively, the "DIP Documents"); |
| **Cash Collateral** | Authorizing the Debtors to continue to use, as defined by section 363(a) of the Bankruptcy Code, Cash Collateral, subject to the restrictions set forth in the DIP Documents and the DIP Orders. |
| **Security and Priority** | Authorizing the Debtors to grant liens to the DIP Agent (as defined herein), for themselves and for and on behalf of the DIP Lenders (as defined herein), including: <br><br>(a)     Liens on Unencumbered Property:  Pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority senior security interest in and lien on all tangible and intangible prepetition and postpetition property of the Debtors, whether existing on the Petition Date or thereafter acquired, and the proceeds, products, rents, and profits thereof, that, on or as of the Petition Date, is not subject to a valid, perfected, and non-avoidable lien or is not subject to a valid and non-avoidable lien in existence as of the Petition Date that is perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code, including, without limitation, any and all unencumbered cash of the Debtors and any investment of such cash, inventory, accounts receivable, other rights to payment whether arising before or after the Petition Date, contracts, properties, plants, fixtures, machinery, equipment, general intangibles, payment intangibles, documents, instruments, securities, investment property, chattel paper, electronic chattel paper, interests in leaseholds, real properties, deposit accounts, patents, copyrights, trademarks, trade names, rights under license agreements and other intellectual property, capital stock of subsidiaries, and all other interests in capital stock, wherever located, and the proceeds, products, rents, and profits of the foregoing, whether arising under section 552(b) of the |

<table>
<tr>
<td></td>
<td>

Bankruptcy Code or otherwise, of all the foregoing, but in each case subject and subordinate in all respects to the Carve-Out and Permitted Encumbrances as of the Petition Date;

(b) <u>Liens Priming Prepetition Liens</u>:  Pursuant to section 364(d)(1) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority priming security interest in and lien upon the DIP Collateral, regardless of where located and whether or not any liens on the DIP Collateral are voided, avoided, invalidated, lapsed, or unperfected, which security interest and lien shall prime the Prepetition Liens (the "<u>DIP Priming Liens</u>").  Notwithstanding anything herein to the contrary, the DIP Priming Liens shall be (A) subject and subordinate to the Carve-Out in all respects, (B) subject to Permitted Encumbrances as of the Petition Date, and (C) senior in all respects to the Prepetition Liens, the Adequate Protection Liens, and any lien, security interest, or mortgage that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code.  The Prepetition Liens shall be primed by and made subject and subordinate to the Carve-Out and the DIP Priming Liens only;

(c) <u>Liens Junior to Certain Other Liens</u>:  Pursuant to section 364(c)(3) of the Bankruptcy Code, and subject and subordinate in all respects to the Carve-Out and the Permitted Encumbrances as of the Petition Date, a valid, binding, continuing, enforceable, fully-perfected junior security interest in and lien on the DIP Collateral that, on or as of the Petition Date, is subject to (a) valid, binding, perfected, and non-avoidable senior liens in existence immediately prior to the Petition Date and (b) valid and unavoidable liens in existence immediately prior to the Petition Date that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code, in each case other than the Prepetition Liens; *provided*, that nothing in the foregoing shall limit the rights of the DIP Secured Parties under the DIP Documents to the extent such liens are not permitted thereunder; and

(d) <u>Liens Senior to Certain Other Liens</u>:  The DIP Liens shall not be (a) subject or subordinate to or made *pari passu* with (I) any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code, unless otherwise provided for in the DIP Documents or the Interim DIP Order, (II) any liens or security interests arising after the Petition Date, or (III) any intercompany or affiliate liens of the Debtors or security interests of the Debtors, or (b) subordinated to or made *pari passu* with any other lien or security interest under sections 363 or 364 of the Bankruptcy Code.

</td>
</tr>
<tr>
<td>**Adequate Protection**</td>
<td>

Authorizing the Debtors to grant the following as adequate protection:

(a) <u>Adequate Protection Liens</u>:  The Prepetition Agents, for the benefit of their respective Prepetition Secured Parties, are hereby granted (effective and perfected upon the date of the Interim DIP Order and without the necessity of the execution of any mortgages, security agreements, control agreements, pledge agreements, financing statements, or other agreements) a valid, perfected security interest in and lien on all of the DIP Collateral, in each case subject and subordinate only to (i) the Carve-Out and (ii) the DIP Liens and any liens to which the DIP Liens are junior (the Permitted Encumbrances) (the "<u>Adequate Protection Liens</u>").

</td>
</tr>
</table>

| | |
|---|---|
| | (b) <u>507(b) Claims</u>:  The Prepetition Agents, for the benefit of their respective Prepetition Secured Parties, are hereby granted an allowed superpriority administrative expense claim under section 507(b) of the Bankruptcy Code with priority in payment over any and all administrative expenses of the kind specified or ordered pursuant to any provision of the Bankruptcy Code (the "<u>507(b) Claims</u>"), which 507(b) Claims shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof.  The 507(b) Claims shall be subject and subordinate only to the DIP Superpriority Claims granted in respect of the DIP Obligations and the Carve-Out.  Except to the extent expressly set forth in the Interim DIP Order or the DIP Documents, as applicable, the Prepetition Secured Parties shall not receive or retain any payments, property, or other amounts in respect of the 507(b) Claims unless and until the DIP Obligations (other than contingent indemnification obligations as to which no claim has been asserted) and any claims having a priority senior to or *pari passu* with the DIP Superpriority Claims have indefeasibly been paid in cash in full, and all DIP Commitments have been terminated.<br><br>(c) <u>Fees and Expenses</u>:  The Debtors shall accrue, as adequate protection, (i) for the benefit of the Prepetition 1L Lenders, interest (at the default rate) due under the Prepetition Credit Documents and (ii) for the benefit of the Prepetition Secured Parties, the reasonable and documented prepetition and postpetition fees and out-of-pocket expenses of the Prepetition Agents and the Prepetition Secured Parties, including, but not limited to, the reasonable and documented fees and out-of-pocket expenses of (A) Ropes & Gray and (B) any other advisors (including local and foreign local legal counsel) retained by the requisite Prepetition Lenders (the "<u>Adequate Protection Fees and Expenses</u>").<br><br>(d) <u>Information Rights</u>:  The Debtors shall promptly provide the Prepetition Agents and the Prepetition Secured Parties all required written financial reporting and other periodic reporting that is required to be provided to the DIP Agent or the DIP Lenders under the DIP Term Sheet. |
| **Surcharge Waiver** | Subject to entry of the Final Order, waiving (a) the Debtors' right to surcharge the DIP Collateral pursuant to section 506(c) of the Bankruptcy Code and (b) the "equities of the case" exception under section 552(b) of the Bankruptcy Code. |
| **Marshalling Waiver** | Subject to entry of the Final Order, waiving the equitable doctrine of "marshalling" and other similar doctrines with respect to (a) the DIP Collateral and (b) the Prepetition Collateral. |
| **Automatic Stay** | Modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and conditions of the DIP Orders. |
| **Final Hearing** | Scheduling a final hearing to consider entry of the Final DIP Order. |

## Concise Statement Pursuant to
## Bankruptcy Rule 4001 and the United States Bankruptcy
## Court for the Southern District of Texas Procedures for Complex Chapter 11 Cases

12.     The following chart contains a summary of the material terms of the proposed DIP

Facility, together with references to the applicable sections of the relevant source documents, as

required by Bankruptcy Rules 4001(b)(1)(B) and 4001(c)(1)(B) and the *Procedures for Complex*

*Cases in the Southern District of Texas* (the "Complex Case Procedures").[3]

| Bankruptcy Rule | Summary of Material Terms/Significant Provisions |
|---|---|
| **Parties to the DIP Credit Agreement** Bankruptcy Rule 4001(c)(1)(B) | **Borrowers**: Each of the Debtors. **DIP Agent**: Ankura Trust Company, LLC. **DIP Lenders**: Each of the lenders party to the DIP Term Sheet, which includes 100% of the lenders under the Debtors' prepetition revolving credit facility. *See* Interim DIP Order, Preamble. |
| **Term** Bankruptcy Rule 4001(b)(l)(B)(iii), 4001(c)(1)(B) | All DIP Obligations shall be due and payable in full and in cash, and the commitments shall terminate, on the earlier to occur (the "Maturity Date") of (i) October 11, 2022 (the "Initial Maturity Date"), (ii) the effective date and the date of the substantial consummation (as defined in section 1102(2) of the Bankruptcy Code) of a Plan of Reorganization that has been confirmed by an order of the Bankruptcy Court (the "Plan Effective Date") and (iii) the closing of a sale of all or substantially all of the assets of the Debtors. *See* DIP Term Sheet, page 6. |
| **Commitment** Bankruptcy Rule 4001(c)(1)(B) | A $2.5 million superiority senior secured term loan. *See* Interim DIP Order, Preamble. |
| **Conditions of Borrowing** Bankruptcy Rule 4001(c)(1)(B) | The DIP Orders and DIP Documents include standard and customary conditions of borrowing, the satisfaction of which is a condition precedent to the obligations of each DIP Lender to provide the DIP Facility. *See* DIP Term Sheet, pages 6-8. |
| **Interest Rates** Bankruptcy Rule 4001(c)(1)(B) | The DIP Loans will bear interest at the rate of 6.0% per annum.  During the continuance of an Event of Default, all DIP Obligations  will bear interest at an additional 2% *per annum* above the interest rate otherwise applicable. |

---

[3] The summaries contained in this Motion are qualified in their entirety by the provisions of the documents referenced. To the extent anything in this Motion is inconsistent with such documents, the terms of the applicable documents shall control.

| Bankruptcy Rule | Summary of Material Terms/Significant Provisions |
|---|---|
| | *See* DIP Term Sheet, Annex III. |
| **Use of DIP Facility and Cash Collateral** Bankruptcy Rule 4001(b)(l)(B)(ii) | The proceeds of the DIP Facility shall be used in accordance with and subject to the Interim DIP Order, the DIP Documents, and the Approved Budget (subject to the Carve-Out and permitted variances provided in the DIP Term Sheet). *See* Interim DIP Order, ¶ 18. |
| **Entities with Interests in Cash Collateral** Bankruptcy Rule 4001(b)(l)(B)(i) | The following secured parties have an interest in Cash Collateral: (a)   DIP Secured Parties; and (b)   Prepetition Secured Parties. *See* Interim DIP Order, ¶ F(vii). |
| **Fees** Bankruptcy Rule 4001(c)(1)(B) | Upon entry of the Interim DIP Order, the payment to the DIP Agent and the DIP Lenders, as the case may be, of all fees, including any agency fee  and any amounts due (or that may become due) in respect of the reimbursement and indemnification obligations, in each case referred to in the DIP Term Sheet (and in any separate letter agreements between any or all Debtors, on the one hand, and any of the DIP Agent or DIP Lenders, on the other, in connection with the DIP Facility) and the costs and expenses as may be due from time to time, including, without limitation, fees and expenses of Ropes & Gray LLP ("Ropes & Gray"), counsel to the DIP Agent and the DIP Lenders, in each case, as provided for in the DIP Documents. *See* Interim DIP Order, ¶ 2(b)(ii). |
| **Budget** Bankruptcy Rule 4001 (c)(1)(B) | The use of cash and proceeds from the DIP Facility is subject to the Initial DIP Budget, a copy of which is attached as **Exhibit C** to the Interim DIP Order, or any subsequent Approved Budget. *See* Interim DIP Order, ¶ G(vi). |
| **Chapter 11 Milestones** Bankruptcy Rule 4001(c)(1)(B) | The Debtors shall comply with the following milestones: (a)   at or before 11:59 p.m. prevailing Central Time on April 12, 2022, the Company shall commence the chapter 11 cases and file the Plan, the Disclosure Statement, a motion seeking approval of the Disclosure Statement, and the Bidding Procedures Motion; (b)   at or before 11:59 p.m. prevailing Central Time on May 3, 2022, the Bankruptcy Court shall have entered the Disclosure Statement Order and the Bidding Procedures Order; |

| Bankruptcy Rule | Summary of Material Terms/Significant Provisions |
|---|---|
| | (c)   at or before 11:59 p.m. prevailing Central Time on May 10, 2022, the Company, either directly, or through their designated voting agent, shall have commenced the solicitation;<br><br>(d)   at or before 11:59 p.m. prevailing Central Time on June 13, 2022, the auction, if any, on the terms set forth in Bidding Procedures Order, shall have occurred;<br><br>(e)   at or before 11:59 p.m. prevailing Central Time on the date that is eighty-seven (87) days after the Petition Date, the Bankruptcy Court shall have entered the Confirmation Order and Sale Order, if any, in a form and substance reasonably satisfactory to the Required Supporting Creditors;<br><br>(f)   at or before 11:59 p.m. prevailing Central Time on the date that is one-hundred and one (101) days after the Petition Date, the Sales Transaction(s), if any, shall have closed and the Effective Date shall have occurred; and.<br><br>(g)   at or before 11:59 p.m. prevailing Central Time on the date that is (i) five (5) days after the Petition Date, the Bankruptcy Court shall have entered the Interim DIP Order and (ii) thirty-five (35) days after the Petition Date, the Bankruptcy Court shall have entered the Final DIP Order.<br><br>*See* DIP Term Sheet, page 9; Restructuring Support Agreement, §7. |
| **Liens and Priorities**<br>Bankruptcy Rule<br>4001(c)(l)(B)(i) | The liens contemplated by the Interim DIP Order and the DIP Term Sheet shall follow the priorities set forth in <u>Exhibit B</u> to the Interim DIP Order.<br><br>*See* Interim DIP Order, Exhibit B. |
| **Carve-Out**<br>Bankruptcy Rule<br>4001(c)(1)(B) | The Interim DIP Order provides a "Carve-Out" of certain statutory fees and allowed professional fees of the Debtors<br><br>*See* Interim DIP Order, ¶ 3. |
| **Challenge Period**<br>Bankruptcy Rule<br>4001(c)(l)(B) | The Interim DIP Order provides for a standard and customary challenge by the earlier of:<br><br>(a)   if a Creditors' Committee has been appointed, by the Creditors' Committee within sixty (60) calendar days after the appointment of the Creditors' Committee;<br><br>(b)   if no Creditors' Committee has been appointed, by any party in interest with requisite standing within seventy-five (75) calendar days of entry of the Interim DIP Order; and<br><br>(c)   the date that is established as the deadline for filing objections to confirmation of a chapter 11 plan in any of the chapter 11 cases;<br><br>provided however, that if, prior to the end of the challenge period, (x) the cases convert to a chapter 7, or (y) a chapter 11 trustee is appointed, then, in each such case, the |

| Bankruptcy Rule | Summary of Material Terms/Significant Provisions |
|---|---|
| | challenge period shall be extended for a period of sixty (60) days solely with respect to any such trustee.<br><br>*See* Interim DIP Order, ¶ 33. |
| **Adequate Protection**<br>Bankruptcy Rules 4001(b)(l)(B)(iv), 4001(c)(1)(B)(ii) | The adequate protection provided to the Prepetition Secured Parties shall be in accordance with the Interim DIP Order, including the granting of replacement liens, superpriority claims, reporting requirements, and payment of professional fees for certain of the prepetition secured parties.<br><br>*See* Interim DIP Order, ¶ 24. |
| **Events of Default**<br>Bankruptcy Rule 4001(c)(l)(B) | The DIP Term Sheet contains events of default that are usual and customary for debtor-in-possession financing, including, without limitation, the termination of the Restructuring Support Agreement<br><br>*See* DIP Term Sheet, pages 11-14. |
| **Sections 506(c) and 552(b) Waivers**<br>Bankruptcy Rule 4001(c)(1)(B) | Subject to entry of the Final DIP Order, the Debtors seek waiver of (a) their right to surcharge the DIP Collateral pursuant to section 506(c) of the Bankruptcy Code, (b) the "equities of the case" exception under section 552(b) of the Bankruptcy Code, and (c) the equitable doctrine of "marshalling" and other similar doctrines with respect to (i) the DIP Collateral and (ii) the Prepetition Collateral.<br><br>*See* Interim DIP Order, ¶¶ 14-15. |
| **Waiver / Modification of the Automatic Stay**<br>Bankruptcy Rule 4001(c)(1)(B)(iv) | Pursuant to the Interim DIP Order, the automatic stay provisions of section 362 of the Bankruptcy Code are modified to the extent necessary to implement and effectuate the terms of the Interim DIP Order.<br><br>*See* Interim DIP Order, ¶ 9. |

## Statement Regarding Significant Provisions

13.     The Interim DIP Order contains certain of the provisions (the "Significant Provisions")[4] identified in paragraph 8 of the Complex Case Procedures as detailed below:

---

[4] Significant Provisions refer to those provisions that contain: (a) sale or plan confirmation milestones; (b) cross-collateralization; (c) roll ups (including (i) provisions deeming prepetition debt to be postpetition debt; and (ii) provisions requiring the proceeds of postpetition loans to be used to repay prepetition debt); (d) liens on avoidance actions or proceeds of avoidance actions; (e) default provisions and remedies that are self-executing or preclude court oversight, including:  (i) provisions terminating the automatic stay without further order, (ii) provisions waiving rights to challenge lenders' ability to exercise post-default remedies; and (iii) provisions limiting required proof or altering the burden of proof at post-default hearings; (f) releases of claims; (g) limitations on the use of cash collateral or DIP proceeds (other than general "carve-outs") to pay approved fees and expenses of advisors to official committees or

a.   ***Sale or Plan Confirmation Milestones***.  As set forth above, the DIP Term Sheet contains sale and plan confirmation milestones.  *See* DIP Term Sheet, page 9; Restructuring Support Agreement, §7.

b.   ***Default Provisions and Remedies***.  Unless the occurrence and continuation of such Event of Default is cured prior to the expiration of the Remedies Notice Period or the Court orders otherwise, the automatic stay, as to the DIP Secured Parties, shall automatically be terminated at the end of the Remedies Notice Period without further notice or order.  Upon expiration of the Remedies Notice Period, the DIP Secured Parties shall be permitted to exercise all remedies set forth in the Interim DIP Order, in the DIP Documents, and as otherwise available at law without further order of or application or motion to the Court.  *See* Interim DIP Order, ¶ 10(d).

c.   ***Release of Claims***.  Subject to entry of the Final DIP Order, the Debtors shall release claims existing prior to entry of the Interim DIP Order against the DIP Secured Parties, the Prepetition Secured Parties, and their respective former, current, or future officers, partners, directors, managers, members, principals, employees, agents, related funds, affiliates, investors, financing sources, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals and the respective successors and assigns thereof, in each case solely in their capacities as such from any and all claims related to the Debtors or their estates, the extent, amount, validity, enforceability, priority, security, and perfection of the DIP Facility, the DIP Obligations, the DIP Liens, the DIP Documents, the RSA, the Prepetition Facilities, the Prepetition Secured Obligations, the Prepetition Liens, and the Prepetition Credit Documents. *See* Interim DIP Order, ¶ F(ix).

d.   ***Limitations on Use of DIP Financing Proceeds and Collateral***.  As more fully set forth in the Interim DIP Order, no DIP Loans, DIP Collateral, or any portion of the Carve-Out, may be used (a) in connection with the investigation, initiation, or prosecution of any claims, causes of action, adversary proceedings, or other litigation (i) against any of the DIP Agent, the DIP Lenders, or the Prepetition Secured Parties, or their respective predecessors in interest, officers, directors, employees, agents, affiliates, representatives, attorneys, or advisors in respect of the Prepetition Secured Obligations, the Prepetition Liens, the DIP Obligations, the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, the Adequate Protection Obligations, or the 507(b) Claims granted to the Prepetition Secured Parties under the Interim DIP Order, or (ii) challenging the amount, validity, perfection, priority or enforceability of or asserting any defense, counterclaim or offset with respect to, the Prepetition Secured Obligations, the DIP Obligations, the DIP Superpriority Claims, the Adequate Protection

---

future trustees; (h) non-consensual priming liens; or (i) any other provision that limits the ability of estate fiduciaries to fulfill their duties under the Bankruptcy Code and applicable law.  *See Complex Case Procedures*, ¶ 8.

Obligations, or the 507(b) Claims or the liens, claims, rights, or security interests granted under the Interim DIP Order, the DIP Documents, or the Prepetition Credit Documents; (b) to prevent, hinder, or otherwise delay the Prepetition Secured Parties', the DIP Agent's, or the DIP Lenders', as applicable, enforcement or realization on the Prepetition Secured Obligations, DIP Obligations, DIP Superpriority Claims, Adequate Protection Obligations, 507(b) Claims, DIP Collateral, and the liens, claims, and rights granted to such parties under the Interim DIP Order, each in accordance with the DIP Documents, the Prepetition Credit Documents, or the Interim DIP Order; (c) to seek to modify any of the rights and remedies granted to the Prepetition Secured Parties, the DIP Agent, or the DIP Lenders under the Interim DIP Order, the Prepetition Credit Documents, or the DIP Documents, as applicable; (d) to apply to the Court for authority to approve superpriority claims or grant liens (other than the liens permitted pursuant to the DIP Documents) or security interests in the DIP Collateral or any portion thereof that are senior to, or *pari passu* with, the DIP Liens, DIP Obligations, DIP Superpriority Claims, Adequate Protection Liens, the Adequate Protection Obligations, and 507(b) Claims, unless all DIP Obligations, Prepetition Secured Obligations, Adequate Protection Obligations, and claims granted to the DIP Agent, DIP Lenders, or Prepetition Secured Parties under the Interim DIP Order, have been paid in full in cash or as otherwise agreed to in writing by the Required DIP Lenders and the requisite Prepetition Secured Parties, (e) to seek to pay any amount on account of any claims arising prior to the Petition Date unless such payments are agreed to in writing by the Required DIP Lenders and the requisite Prepetition Secured Parties or are otherwise included in the Approved Budget (as initially attached to the Motion, and as updated in accordance with the terms of the DIP Documents and the Interim DIP Order), or (f) for any purpose specified in the "DIP Facility; Use of Proceeds" section of the DIP Term Sheet; *provided*, that notwithstanding anything to the contrary herein, the Creditors' Committee (if appointed) may use the proceeds of the DIP Loans, DIP Collateral (including Cash Collateral), and the Carve-Out in an amount not to exceed $50,000 (the "Investigation Budget Cap") only to investigate, but not prosecute, (y) the claims and liens of the Prepetition Secured Parties, and (z) potential claims, counterclaims, causes of action or defenses against the Prepetition Secured Parties. *See* Interim DIP Order, ¶ 29.

14.     The DIP Facility is critical to the Debtors' continuing operations and essential to facilitating a value-maximizing restructuring transaction. In light of the foregoing, the Significant Provisions are appropriate under the facts and circumstances of these chapter 11 cases. Accordingly, the Significant Provisions in the Interim DIP Order should be approved.

**The Debtors' Prepetition Capital Structure**

15.     As of the Petition Date, the Debtors have approximately $138,890,000 million in

aggregate principal amount of funded debt obligations.

| Funded Debt | Maturity | Outstanding Principal Amount as of April 12, 2022 |
|---|---|---|
| Revolving Credit Facility | August 16, 2023 | $15,600,000 |
| Second Lien Notes | December 15, 2025 | $116,193,000 |
| Unsecured Notes | December 15, 2021 | $7,097,000 |
| **Total Funded Debt** | | **$138,890,000** |

**A.     The Revolving Credit Facility.**

16.     On August 22, 2014, each of the Debtors and GX Geoscience Corporation, S.de

R.L. de C.V. ("GX Mexico"), as borrowers, entered into that certain credit agreement (as amended,

restated, supplemented, or otherwise modified from time to time, the "Revolving Credit

Agreement") with PNC Bank, National Association ("PNC"), as agent, and the lenders from time

to time party thereto.  Obligations arising under the Revolving Credit Agreement are secured by

first priority liens on substantially all of the Debtors' assets, subject to customary exceptions and

exclusions.  The security interest in GX Mexico, however, is capped at $5,000,000 in accordance

with the Revolving Credit Agreement and related credit documents. The Revolving Credit

Agreement matures on August 16, 2023.

17.     On March 7, 2022, PNC, as agent under the Revolving Credit Facility, sold and

assigned to the Ad Hoc Group all of PNC's advances, rights, duties, obligations, and commitments

under the Revolving Credit Agreement, pursuant to the terms and conditions of that certain Master

Commitment Transfer Supplement, among PNC and the Ad Hoc Group.  In connection with such

transfer, ION Geophysical, certain of its affiliates, PNC, and Ankura Trust Company, LLC

("Ankura") entered into an  Agent Transfer Agreement, dated as of March 8, 2022, pursuant to which Ankura replaced PNC as agent under the Revolving Credit Agreement.

18.     As of the Petition Date, there is approximately $15,600,000 in outstanding principal amount of borrowings under the Revolving Credit Agreement, in addition to approximately $30,559 of accrued and unpaid interest.

**B.     Second Lien Notes.**

19.     On April 20, 2021, the Debtors entered into that certain Indenture (as amended, restated, supplemented, or otherwise modified from time to time, the "Second Lien Notes Indenture"), by and among ION Geophysical, as issuer, the other Debtors and GX Mexico, as guarantors, and UMB Bank, National Association, as trustee (the "Second Lien Notes Trustee"). The notes thereunder (the "Second Lien Notes") are secured by second priority liens on substantially all of the Debtors' assets, subject to customary exceptions and exclusions.  The Second Lien Notes bear interest at a rate of 8.00% per annum, payable on June 15th and December 15th of each year, and mature on December 15, 2025.  As of the Petition Date, approximately $116,193,000 remains outstanding under the Second Lien Notes Indenture, in addition to approximately $7,804,684 of accrued and unpaid interest.

**C.     Unsecured Notes.**

20.     On April 28, 2016, the Debtors entered into that certain Indenture, by and among ION Geophysical, as issuer, the other Debtors and GX Mexico, as guarantors, and Wilmington Savings Funds Society, FSB, as trustee (the "Original Second Lien Indenture").  The notes thereunder (the "Old Second Lien Notes") were originally secured by second priority liens on substantially all of the Debtors' assets, subject to customary exceptions and exclusions, and bore interest at a rate of 9.125% per annum.

21.     On April 20, 2021, ION Geophysical completed (a) an offer to exchange a majority of its existing Old Second Lien Notes for the Second Lien Notes and other consideration in the form of cash and common stock (the "Exchange Offer").  In connection therewith, the Original Second Lien Indenture was amended by that certain First Supplemental Indenture, dated as of April 20, 2021, which, among other things, provided for the release of the second priority security interest in the collateral (the "Supplemental Notes Indenture").  Accordingly, the holders of the Old Second Lien Notes that did not participate in the Exchange Offer, continued to hold notes under the Supplemental Notes Indenture on an unsecured basis (the "Unsecured Notes").  The Unsecured Notes in the aggregate principal amount of approximately $7,097,000 matured on December 15, 2021, in addition to approximately $902,447 of accrued and unpaid interest.  As of the Petition Date, the Unsecured Notes remain unpaid.

**The Debtors Have an Immediate Need for
Debtor-in-Possession Financing and Use of Cash Collateral**

22.     The Debtors require immediate access to the DIP Facility in addition to the continued use of Cash Collateral.  As of the Petition Date, the Debtors' unrestricted cash balance is insufficient to operate their business and continue paying debts as they become due.  The Debtors' business is cash intensive, with daily costs required to fund ongoing projects and the Debtors' operations and to satisfy obligations to vendors and employees.  As such, the Debtors will need immediate use of Cash Collateral and access to the additional liquidity provided by the DIP Facility to, among other things, administer their estates during these chapter 11 cases, honor employee wages and benefits, procure goods and services integral to the Debtors' ongoing business operations, fund operational expenses, and maintain favorable relationships with their vendors, suppliers, employees, and customers.

23.     Absent the use of Cash Collateral and access to the proposed DIP Facility, the Debtors would face a value-destructive interruption in their business and likely lose support from important stakeholders on which the Debtors' business depends, including vendors, suppliers, customers, and employees.  This, in turn, would hinder the Debtors' ability to maximize the value of their estates, and the Debtors would be forced to curtail their operations significantly, to the detriment of all stakeholders.

### Alternative Sources of Financing Are Not Available on Better Terms

24.     The Debtors do not believe it would be prudent, or even possible, to administer these chapter 11 cases on a "cash collateral" basis, rendering postpetition financing a necessity.  In parallel with the discussions with the Ad Hoc Group, the Debtors' investment banker, Perella Weinberg Partners LP (together with its corporate advisory affiliates, "PWP"), initially solicited proposals for DIP financing from 51 potential third-party lenders, including large commercial and investment banks and other sophisticated, alternative investment institutions.  Of the 51 potential third-party lenders, only 11 executed a non-disclosure agreement.  Each was given access to the Debtors' diligence materials, and two made a DIP financing proposal.

25.     The Debtors ultimately did not receive any actionable proposals from third parties. The contacted parties were simply unwilling to provide liquidity to the Debtors on a junior basis or on terms comparable to or better than those proposed by the Ad Hoc Group.  In light of the pricing and terms received from the DIP marketing process, the Debtors concluded, in consultation with PWP, that the best and least costly approach was to continue negotiating the terms of a DIP facility with the Debtors' prepetition lenders.

26.     The DIP Facility is the product of extensive good-faith, arm's-length negotiations and is necessary for the Debtors to complete a successful restructuring.  Alternative sources of financing with better, or even as favorable, terms as those of the proposed DIP Facility are not

available to the Debtors.  The economic terms of the proposed DIP Facility are competitive and reflect the market interest in providing the Debtors with postpetition financing.  Accordingly, approval of the DIP Facility is in the best interests of the Debtors' estates and the Debtors respectfully request entry of the DIP Orders approving the DIP Facility.

**Basis for Relief**

**I.      The Debtors Should Be Authorized to Obtain Postpetition Financing through the DIP Documents.**

      **A.      Entering into the DIP Documents Is an Exercise of the Debtors' Sound Business Judgment.**

27.      The Court should authorize the Debtors, as an exercise of their sound business judgment, to enter into the DIP Documents, obtain access to the DIP Facility, and continue using the Cash Collateral. Courts grant considerable deference to a debtor's business judgment in obtaining postpetition secured credit, so long as the agreement to obtain such credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code.  *See, e.g., In re N. Bay Gen. Hosp., Inc*., No. 08-20368 (Bankr. S.D. Tex. July 11, 2008) (order approving postpetition financing on an interim basis as exercise of debtors' business judgment); *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Ames Dep't Stores, Inc*., 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.").

28.      To determine whether a debtor has met this business judgment standard, a court need only "examine whether a reasonable business person would make a similar decision under similar circumstances." *In re Exide Techs*., 340 B.R. 222, 239 (Bankr. D. Del. 2006); *see also In*

*re Curlew Valley Assocs*., 14 B.R. 506, 513–14 (Bankr. D. Utah 1981) (noting that courts should not second guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code").

29.     To evaluate whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender. *In re Farmland Indus., Inc*., 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Elingsen McLean Oil Co., Inc.*), 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard bargains" to acquire funds for its reorganization).

30.     The Debtors' determination to move forward with the DIP Facility is a sound exercise of their business judgment following a thorough process and careful evaluation of alternatives.  Specifically, the Debtors and their advisors determined that the Debtors would require additional postpetition financing to support the administration of their chapter 11 cases and their ongoing operations.  The Debtors negotiated the DIP Documents with the DIP Lenders in good faith, at arm's length, and with the assistance of their advisors, and the Debtors believe that they have obtained the best financing available under the circumstances.  As discussed, the Debtors, through negotiations, ultimately determined that the DIP Facility was the best available alternative under the circumstances.  Accordingly, the Court should authorize the Debtors' entry into the DIP Documents as a reasonable exercise of the Debtors' business judgment.

> **B.     The Debtors Should Be Authorized to Grant Liens and Superpriority Claims to the DIP Lenders.**

31.     The Debtors propose to obtain financing under the DIP Facility, in part, by providing superpriority claims and liens pursuant to section 364(c) of the Bankruptcy Code.

Significantly, the Debtors propose to provide first priority liens on substantially all of the Debtors'

assets, including "priming" liens on all of the prepetition first lien lenders' prepetition collateral.

32.     In the event that a debtor demonstrates that it is unable to obtain unsecured credit

allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, section

364(c) provides that a court:

> [M]ay authorize the obtaining of credit or the incurring of debt
> (1) with priority over any or all administrative expenses of the kind
> specified in section 503(b) or 507(b) of [the Bankruptcy Code];
> (2) secured by a lien on property of the estate that is not otherwise
> subject to a lien; or (3) secured by a junior lien on property of the
> estate that is subject to a lien.

See also In re Crouse Group, Inc., 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (secured credit under

section 364(c) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that

unsecured credit cannot be obtained).   Courts have articulated a three-part test to determine

whether a debtor is entitled to financing pursuant to section 364(c) of the Bankruptcy Code.

Specifically, courts look to whether:

> a.     the debtor is unable to obtain unsecured credit under section
>        364(b) of the Bankruptcy Code, i.e., by allowing a lender
>        only an administrative claim;
>
> b.     the credit transaction is necessary to preserve the assets of
>        the estate; and
>
> c.     the terms of the transaction are fair, reasonable, and
>        adequate, given the circumstances of the debtor-borrower
>        and proposed lenders.

See In re Ames Dep't Stores, 115 B.R. 34, 37–40 (Bankr. S.D.N.Y. 1990); see also In re St. Mary

Hosp., 86 B.R. 393, 401–02 (Bankr. E.D. Pa. 1988).

33.     No party contacted as part of the above-described process was willing to provide

postpetition financing to the Debtors on an unsecured basis or provide a priming facility on a

nonconsensual basis.   Further, the Debtors do not have sufficient unencumbered assets to secure

debtor-in-possession financing to fund a non-consensual chapter 11 case.  Accordingly, the DIP Facility's structure is appropriate in light of the Debtors' financing needs and the lack of viable non-priming debtor-in-possession financing alternatives.

34.     Further, section 345(d) provides that a debtor may obtain credit secured by a senior or equal lien on property of the estate already subject to a lien where the debtor is "unable to obtain such credit otherwise" and "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted."  11 U.S.C. § 364(d)(1).  Accordingly, the Debtors may incur "priming" liens under the DIP Facility if they are unable to obtain unsecured or junior secured credit and either (a) the prepetition secured lenders have consented or (b) the prepetition secured lenders' interests in collateral are adequate protected. Here, the requisite prepetition secured lenders have consented to the priming liens securing the DIP Facility.  Further, the prepetition secured lenders will receive adequate protection of the prepetition collateral under the DIP Orders.  Accordingly, the relief requested pursuant to section 364(d)(1) of the Bankruptcy Code is both warranted and appropriate under the circumstances. Accordingly, the relief requested pursuant to section 364(d)(1) of the Bankruptcy Code is both warranted and appropriate under the circumstances.

### C.     No Comparable Alternative to the DIP Facility Is Reasonably Available.

35.     A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by sections 364(c) of the Bankruptcy Code. *In re Snowshoe Co., Inc*., 789 F.2d 1085, 1088 (4th Cir. 1986); *see also In re Plabell Rubber Prods., Inc*., 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992).  Moreover, in circumstances where only a few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing."  *Sky Valley, Inc*., 100 B.R. at 113; *see also In re Snowshoe Co*., 789 F.2d 1085, 1088 (4th Cir. 1986)

(demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area); *In re Ames Dep't Stores*, 115 B.R. at 37–39 (debtor must show that it made reasonable efforts to seek other sources of financing under section 364(a) and (b)).

36.    Here, the Debtors conducted a debtor-in-possession marketing process that confirmed the best actionable option under the circumstances was the DIP Facility. Following arm's-length negotiations, the Debtors determined that the DIP Facility is the best, and only, actionable alternative available under the circumstances to fund these chapter 11 cases. The DIP Facility is supported by a majority of the prepetition secured lenders, will avoid expensive litigation at the outset of these cases, provides the Debtors with the ability to pursue their restructuring strategy, and represents the lowest cost alternative available to the Debtors.

**II.    The Debtors Should Be Authorized to Continue to Use the Cash Collateral.**

37.    The Debtors' use of property of their estates, including the Cash Collateral, is governed by section 363 of the Bankruptcy Code,[5] which provides in relevant part that:

> If the business of the debtor is authorized to be operated under section . . . 1108 . . . of this title and unless the court orders otherwise, the [debtor] may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

---

[5] Section 363(a) of the Bankruptcy Code defines "cash collateral" as follows:

Cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest and includes the proceeds, products, offspring rents, or profits of property and the fees, charges, accounts or other payments for the use or occupancy of rooms and other public facilities in hotels, motels, or other lodging properties subject to a security interest as provided in section 552(b) of this title, whether existing before or after the commencement of a case under this title.

11 U.S.C. § 363(a).

11 U.S.C. § 363(c)(1).  Pursuant to section 363(c)(2) of the Bankruptcy Code, a debtor may not use cash collateral unless "(A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section."

38.     Generally, what constitutes adequate protection is decided on a case-by-case basis. *See In re Columbia Gas Sys., Inc.*, No. 91-803, 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992); *In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) ("the determination of adequate protection is a fact-specific inquiry . . . left to the vagaries of each case"); *see also In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986) (the application of adequate protection "is left to the vagaries of each case, but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process") (citation omitted).

39.     The Debtors intend to provide the prepetition first lien lenders with adequate protection in the form of:  a) replacement liens, (b) superpriority claims, (c) reporting requirements, and (d) payment of professional fees for certain of the prepetition secured parties.  Further, the prepetition first lien lenders will inherently benefit from the Debtors' proposed use of the Cash Collateral, which will prevent avoidable diminution in value of the Cash Collateral and enhance the likelihood of preserving the Debtors' overall going concern value as the Debtors continue to negotiate with all of their key stakeholders.  Preservation of the Debtors' business as a going concern in and of itself serves to provide such parties "adequate protection" for Bankruptcy Code purposes.  *See 495 Cent. Park Ave. Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992) (nothing that, in determining whether protection is "adequate," courts consider "whether the value of the debtor's property will increase as a result of the" use of collateral or provision of financing); *In re Sky Valley, Inc.*, 100 B.R. 107, 114 (Bankr. N.D. Ga. 1988) ("an increase in the value of the

collateral . . . resulting from superpriority financing could result in adequate protection.") (citation omitted)), *aff'd sub nom. Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117 (N.D. Ga. 1989).

40.      The proposed adequate protection in the proposed Interim DIP Order is necessary and sufficient for the Debtors to continue to use Cash Collateral.  Accordingly, the adequate protection is (a) fair and reasonable, (b) necessary to satisfy the requirements of section 363(c)(2) and 363(e) of the Bankruptcy Code, and (c) in the best interests of the Debtors and their estates.

## III.   The DIP Agent and the DIP Lenders Should Be Afforded Good-Faith Protection under Section 364(e).

41.      Section 364(e) of the Bankruptcy Code protects a good-faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal.  Section 364(e) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

42.      The DIP Facility is the result of (a) the Debtors' reasonable and informed determination that the DIP Lenders offered the most favorable terms on which to obtain vital postpetition financing, and (b) extensive arm's-length, good-faith negotiations with the DIP Lenders.  The terms and conditions of the DIP Facility are reasonable and appropriate under the circumstances, and the proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code.  Further, the Debtors market-tested the terms of the DIP Facility before determining that the DIP Facility provided the best terms available under the circumstances. Accordingly, the Court should find that the obligations arising under the DIP

Facility and other financial accommodations made to the Debtors have been extended by the DIP

Agent and the DIP Lenders in "good faith" within the meaning of section 364(e) of the Bankruptcy

Code and therefore the DIP Secured Parties are entitled to all of the protections afforded thereby.

**IV.    The Automatic Stay Should Be Modified on a Limited Basis.**

43.    The Interim DIP Order provides that the automatic stay provisions of section 362

of the Bankruptcy Code will be modified to allow the DIP Lenders to file any financing statements,

security agreements, notices of liens, and other similar instruments and documents in order to

validate and perfect the liens and security interests granted to them under the DIP Orders. The

proposed Interim DIP Order further provides that the automatic stay is modified to the extent

necessary to implement and effectuate the terms of the Interim DIP Order.  Stay modifications of

this kind are ordinary and standard features of debtor-in-possession financing arrangements, and,

in the Debtors' business judgment, are reasonable and fair under the circumstances of these chapter

11 cases.

**V.    Failure to Obtain Immediate Interim Access to the DIP Facility and Cash Collateral
        Would Cause Immediate and Irreparable Harm.**

44.    Bankruptcy Rule 4001(b) provides that a final hearing on a motion to use cash

collateral pursuant to section 363 of the Bankruptcy Code may not be commenced earlier than 14

days after the service of such motion.  Upon request, however, the court is empowered to conduct

an interim expedited hearing on the motion at which it may authorize a debtor to use cash collateral

to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.  *See*

Bankruptcy Rule 4001(b)(2).  Section 363(c)(3) of the Bankruptcy Code authorizes the court to

conduct a preliminary hearing and to authorize the use of cash collateral "if there is a reasonable

likelihood that the [debtor] will prevail at the final hearing under [section 363(e) of the Bankruptcy

Code]." 11 U.S.C. § 363(c)(3).  Furthermore, the Complex Case Procedures provide that "[o]n

motion by the debtors, a hearing . . . will routinely be conducted as a first-day hearing to consider either cash collateral and use and/or interim debtor-in-possession financing" Complex Case Procedures, § C, ¶ 5.

45.     The Debtors require immediate access to the DIP Facility and use of Cash Collateral.  As of the Petition Date, the Debtors' total unrestricted cash balance is insufficient to operate their business and continue paying their debts as they come due.  The Debtors' business is cash intensive, with daily costs required to satisfy obligations to vendors and employees.  As such, and due to their current limited liquidity, the Debtors require immediate access to postpetition financing and the use of Cash Collateral to operate their business, preserve value, and avoid irreparable harm pending the Final Hearing.

46.     Prior to the Petition Date, and with the assistance of their advisors, the Debtors reviewed and analyzed their projected cash needs and prepared projections (as updated from time to time in accordance with the terms of the DIP Facility, the "Approved Budget") of postpetition cash needs for the Debtors' business in the initial 13 weeks of these chapter 11 cases, including detailed line items for categories of cash flows anticipated to be received or disbursed during this period.  The Approved Budget, along with longer term monthly forecasts, was utilized to determine the amount of postpetition financing required to administer these chapter 11 cases.  The Approved Budget and projections provide an accurate reflection of the Debtors' likely funding requirements over the identified period, respectively, and are reasonable and appropriate under the circumstances.

47.     The Debtors are seeking relief to, among other things, satisfy payroll, pay suppliers, meet overhead, and make any other payments that are essential for the continued management, operation, and preservation of the Debtors' business.  The ability to satisfy these expenses when

due is essential to the Debtors' continued operation of their business during the pendency of these chapter 11 cases.

48.     Accordingly, pursuant to section 363(c)(3) of the Bankruptcy Code and Bankruptcy Rule 4001(b), the Debtors request that the Court conduct an expedited hearing on this Motion and enter the proposed Interim DIP Order authorizing the Debtors to enter into the DIP Facility and use the Cash Collateral.

## Request for Final Hearing

49.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date for the Final Hearing that is as soon as practicable and fix the time and date prior to the Final Hearing for parties to file objections to this Motion.

## Emergency Consideration

50.     Pursuant to Bankruptcy Rule 6003, which empowers a court to grant relief within the first 21 days of the commencement of a chapter 11 case "to the extent that relief is necessary to avoid immediate and irreparable harm" and Local Rule 9013-1(i), the Debtors respectfully request emergency consideration of this Motion.  The Debtors believe an immediate and orderly transition into chapter 11 is critical to the viability of their operations and that any delay in granting the relief requested could hinder the Debtors' operations and cause irreparable harm.  Furthermore, the failure to receive the requested relief during the first 21 days of these chapter 11 cases could severely disrupt the Debtors' operations at this critical juncture and jeopardize the Debtors' restructuring.  Accordingly, the Debtors submit that they have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 and, therefore, respectfully request that the Court approve the relief requested in this Motion on an emergency basis.

## **Waiver of Bankruptcy Rule 6004(a) and 6004(h)**

51.     To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

## **Reservation of Rights**

52.     Nothing contained herein or any actions taken pursuant to such relief requested is intended or shall be construed as: (a) an admission as to the amount of, basis for, or validity of any claim against a Debtor entity under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors' or any other party in interest's right to dispute any claim on any grounds; (c) a promise or requirement to pay any claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Motion or any order granting the relief requested by this Motion or a finding that any particular claim is an administrative expense claim or other priority claim; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; (g) a waiver or limitation of the Debtors', or any other party in interest's, rights under the Bankruptcy Code or any other applicable law; or (h) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) that may be satisfied pursuant to the relief requested in this Motion are valid, and the rights of all parties in interest are expressly reserved to contest the extent, validity, or perfection or seek avoidance of all such liens. If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity of any

particular claim or a waiver of the Debtors' or any other party in interest's rights to subsequently dispute such claim.

## <u>Notice</u>

53.     The Debtors will provide notice of this Motion to:  (a) the United States Trustee for the Southern District of Texas; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) the administrative agent under the Debtors' prepetition revolving credit facility and counsel thereto; (d) the indenture trustee for the Debtors' 8.00% secured second priority notes and counsel thereto; (e) the indenture trustee for the Debtors' 9.125% unsecured notes and counsel thereto; (f) the United States Attorney's Office for the Southern District of Texas; (g) the Internal Revenue Service; (h) the United States Securities and Exchange Commission; (i) the state attorneys general for states in which the Debtors conduct business; and (j) any party that has requested notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

*[Remainder of page intentionally left blank]*

WHEREFORE, the Debtors request entry of the Interim DIP Order and Final DIP Order, granting the relief requested herein and such other relief the Court deems appropriate under the circumstances.

Dated: April 12, 2022
Houston, Texas

**WINSTON & STRAWN LLP**

/s/ *Katherine A. Preston*
Katherine A. Preston (TX Bar No. 24088255)
800 Capitol St., Suite 2400
Houston, Texas 77002
Telephone: (713) 651-2600
Facsimile: (713) 651-2700
Email: kpreston@winston.com

and

Timothy W. Walsh (*pro hac vice* pending)
200 Park Avenue
New York, New York 10166
Telephone: (212) 294-6700
Facsimile: (212) 294-4700
E-mail: twwalsh@winston.com

and

Daniel J. McGuire (*pro hac vice* pending)
35 W. Wacker Drive
Chicago, Illinois 60601-9703
Telephone: (312) 558-3733
Facsimile: (312) 558-5700
Email: dmcguire@winston.com

*Proposed Counsel to the Debtors and Debtors in Possession*

**Certificate of Accuracy**

I certify that the foregoing statements are true and accurate to the best of my knowledge. This statement is being made pursuant to Local Rule 9013-1(i).

*/s/ Katherine A. Preston*
Katherine A. Preston

**Certificate of Service**

I certify that on April 12, 2022, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Katherine A. Preston*
Katherine A. Preston

## Exhibit A

**Interim DIP Order**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| ION GEOPHYSICAL CORPORATION, *et al.*,[1] | ) | Case No. 22-30987 (MI) |
|  | ) |  |
| Debtors. | ) | (Joint Administration Requested) |
|  | ) |  |

## INTERIM ORDER (A) AUTHORIZING THE DEBTORS TO
## (I) OBTAIN POSTPETITION FINANCING, (II) USE CASH
## COLLATERAL, (III) GRANT SENIOR SECURED LIENS
## AND PROVIDE CLAIMS WITH SUPERPRIORITY ADMINISTRATIVE
## EXPENSE STATUS, AND (IV) GRANT ADEQUATE PROTECTION TO THE
## PREPETITION SECURED PARTIES, (B) MODIFYING THE AUTOMATIC STAY,
## (C) SCHEDULING A FINAL HEARING, AND (D) GRANTING RELATED RELIEF

Upon the Motion (the "Motion")[2] of ION Geophysical Corporation ("Geophysical") and certain of its affiliates, each as a debtor and debtor in possession (collectively, the "Debtors") in the above-captioned cases (the "Chapter 11 Cases"), pursuant to sections 105, 361, 362, 363, 364, 503, 506, 507, and 552 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Rules 1075-1, 2002-1, 4001-1, 4002-1, and 9013-1 of the Bankruptcy Local Rules for the Southern District of Texas (the "Local Rules"), and the Procedures for Complex Cases in the Southern District of Texas (the "Complex Case Procedures"), seeking entry of an interim order (together with all exhibits hereto, this "Interim Order"):

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: ION Geophysical Corporation (6646), ION Exploration Products (U.S.A.), Inc. (1394), I/O Marine Systems, Inc. (3230), and GX Technology Corporation (0115). The location of the Debtors' service address is 4203 Yoakum Blvd., Suite 100, Houston, Texas 77006.

[2]   Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion or the DIP Term Sheet, each as defined herein, as applicable.

(i)    authorizing (a) Geophysical, ION Exploration Products (U.S.A.), Inc. ("Exploration"), I/O Marine Systems, Inc. ("Marine"), and GX Technology Corporation ("GXT") and, together with Geophysical, Exploration, and Marine, collectively, the "Borrowers" and each a "Borrower") to obtain and (b) each Debtor other than the Borrowers (collectively, the "Guarantors") to guarantee on a joint and several basis, in each case, senior secured superpriority postpetition financing in an aggregate principal amount of $2,500,000 (the "DIP Facility") on the terms and conditions set forth in that certain Term Sheet (as the same may be amended, restated, supplemented, waived, or otherwise modified from time to time, the "DIP Term Sheet"), a copy of which is attached hereto as **Exhibit A**, to be provided by the DIP Lenders (as defined below), which DIP Facility shall be available as term loans (the "DIP Loans") to the Debtors upon entry of this Interim Order and the satisfaction of the other conditions set forth in the DIP Documents (as defined below);

(ii)    authorizing the Debtors to execute, deliver, and enter into (a) the DIP Term Sheet by and among the Debtors, the lenders party thereto (consisting of 100% of the Prepetition 1L Lenders (as defined below)) (collectively, the "DIP Lenders"), and Ankura Trust Company, LLC, as administrative agent and collateral agent under the DIP Facility (in such capacity, the "DIP Agent" and, together with the DIP Lenders, the "DIP Secured Parties") and (b) any other agreements, instruments, pledge agreements, mortgages, guarantees, security agreements, intellectual property security agreements, control agreements, financing statements, notes, and documents related thereto (as each document may be amended, supplemented, or otherwise modified from time to time in accordance with the terms hereof and thereof, collectively with the DIP Term Sheet, the "DIP Documents");

(iii)    authorizing the Debtors to incur loans, advances, extensions of credit, financial accommodations, reimbursement obligations, fees, costs, expenses, other liabilities, and all other obligations (including indemnities and similar obligations, whether contingent or absolute) due or payable under the DIP Documents, (collectively, the "DIP Obligations") and to perform such other and further acts as may be necessary, desirable, or appropriate in connection therewith;

(iv)    authorizing the Debtors to use the proceeds of the DIP Facility in accordance with this Interim Order, the DIP Documents, and the Approved Budget (as defined below), including (a) to pay certain costs, fees, and expenses related to the Chapter 11 Cases and (b) to fund the working capital needs and expenditures of the Debtors during the Chapter 11 Cases;

(v)    authorizing the Debtors to (a) pay the principal, interest, fees, expenses, and other amounts payable under the DIP Documents as such become earned, due, and payable, including, without limitation, any agency fee and other fees payable pursuant to the DIP Documents, and (b) accrue the reasonable and documented fees and out-of-pocket expenses of the DIP Agent's and DIP Lenders' attorneys, advisors, accountants, appraisers, bankers, and other consultants, all to the extent provided in, and in accordance with, the DIP Documents;

2

(vi)    authorizing the Debtors to use Prepetition Collateral (as defined below), including Cash Collateral (as defined below), as well as the proceeds of the DIP Facility, subject to the restrictions set forth in the DIP Documents and this Interim Order;

(vii)    providing adequate protection to the Prepetition Secured Parties (as defined below) solely to the extent of any Diminution in Value (as defined below) of their interests in the Prepetition Collateral (including Cash Collateral);

(viii)    granting to the DIP Agent, for the benefit of the DIP Secured Parties, and authorizing the Debtors to incur, valid, enforceable, non-avoidable, and automatically and fully perfected DIP Liens (as defined below) in all DIP Collateral (as defined below), including, without limitation, all property constituting Prepetition Collateral, to secure the DIP Obligations, which DIP Liens shall be subject to the Carve-Out (as defined below) and the relative rankings and priorities set forth in this Interim Order, and as further set forth on **Exhibit B**;

(ix)    granting to the DIP Agent, for the benefit of the DIP Secured Parties, and authorizing the Debtors to incur, allowed superpriority administrative expense claims against each of the Debtors, on a joint and several basis, in respect of all DIP Obligations;

(x)    subject to entry of the Final Order, waiving (a) the Debtors' right to surcharge the DIP Collateral pursuant to section 506(c) of the Bankruptcy Code and (b) the "equities of the case" exception under section 552(b) of the Bankruptcy Code;

(xi)    subject to entry of the Final Order, waiving the equitable doctrine of "marshalling" and other similar doctrines with respect to (a) the DIP Collateral and (b) the Prepetition Collateral;

(xii)    modifying or vacating the automatic stay imposed by section 362 of the Bankruptcy Code or otherwise to the extent necessary to implement and effectuate the terms and provisions set forth in this Interim Order and in the DIP Documents, and waiving any applicable stay (including under Bankruptcy Rule 6004) with respect to the effectiveness and enforceability of this Interim Order, and providing for the immediate effectiveness of this Interim Order;

(xiii)    scheduling a final hearing (the "Final Hearing") to consider entry of a final order (the "Final Order") authorizing and approving, among other things, the relief requested in the Motion on a final basis, which order shall be in form substantially similar to this Interim Order and otherwise reasonably acceptable in form and substance to the Debtors, the DIP Lenders, the DIP Agent, and the Prepetition Secured Parties, and approving the form of notice with respect to the Final Hearing; and

(xiv)    granting related relief.

The Court having considered the interim relief requested in the DIP Motion, the exhibits attached thereto, the *Declaration of Mike Morrison*, *Executive Vice President and Chief Financial Officer of ION Geophysical Corporation, in Support of Chapter 11 Petitions and First Day*

*Motions* (the "<u>First Day Declaration</u>"), the *Declaration of Jakub Mleczko in Support of (I) Motion for Entry of Order Authorizing Debtors to Obtain Senior Secured Superpriority Postpetition Financing and Use of Cash Collateral and (II) Motion for Entry of Order Approving Bid Procedures* (the "<u>Mleczko Declaration</u>"), the DIP Documents, and the evidence submitted and arguments made at the interim hearing held on April 13, 2022 (the "<u>Interim Hearing</u>"); and due and sufficient notice of the Interim Hearing having been given in accordance with Bankruptcy Rules 2002 and 4001(b), (c), and (d) and all applicable Local Rules; and the Interim Hearing having been held and concluded; and all objections, if any, to the interim relief requested in the Motion having been withdrawn, resolved, or overruled by the Court; and it appearing that the interim relief requested in the Motion is fair and reasonable and in the best interests of the Debtors and their estates, necessary to avoid immediate and irreparable harm to the Debtors and their estates, and essential for the continued operation of the Debtors' businesses and the preservation of the value of the Debtors' assets; and it appearing that the Debtors' entry into the DIP Documents is a sound and prudent exercise of the Debtors' business judgment; and after due deliberation and consideration, and good and sufficient cause appearing therefor.

**BASED UPON THE RECORD ESTABLISHED AT THE INTERIM HEARING, THE COURT MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:[3]**

---

[3]  The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

A.     **Petition Date**.   On April 12, 2022 (the "Petition Date"), each Debtor filed a voluntary petition (each, a "Petition") under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the Southern District of Texas (this "Court").

B.     **Debtors in Possession**. The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in any of the Chapter 11 Cases.

C.     **Jurisdiction and Venue**.  This Court has jurisdiction over the Chapter 11 Cases, the Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157 and 1334. Venue of the Chapter 11 Cases and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409, and this matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  The predicates for the relief sought herein are sections 105, 361, 362, 363, 364, 503, 506, 507, and 552 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6003, 6004, and 9014, and Local Rules 1075-1, 2002-1, 4001-1, 4002-1, and 9013-1.

D.     **Committee Formation**.  As of the date hereof, the United States Trustee for the Southern District of Texas (the "U.S. Trustee") has not appointed an official committee of unsecured creditors in these Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code (a "Creditors' Committee").

E.     **Notice**.  The Interim Hearing was held pursuant to Bankruptcy Rule 4001(b)(2) and (c)(2).  Proper, timely, appropriate, and sufficient notice of the Motion has been provided in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules, and no other or further notice of the Motion or the entry of this Interim Order shall be required.  The interim relief granted herein is necessary to avoid immediate and irreparable harm to the Debtors and their estates pending the Final Hearing.

5

F.   **Debtors' Stipulations**.  Without prejudice to the rights of any party in interest, as set forth in paragraph 33 of this Interim Order, and subject to the limitations therein, the Debtors acknowledge, admit, stipulate, and agree that:

(i)   **Prepetition RCF Credit Facility**.

(a)   **Prepetition RCF Credit Agreement**.  As of the Petition Date, pursuant to and in accordance with that certain Revolving Credit and Security Agreement, dated as of August 22, 2014 (as amended, restated, amended and restated, or otherwise modified from time to time prior to the date hereof, the "Prepetition RCF Credit Agreement," and all instruments and documents executed at any time in connection therewith, including the "Other Documents" as defined in the Prepetition RCF Credit Agreement, the "Prepetition 1L Documents"), by and among the Borrowers, the lenders party thereto from time to time (the "Prepetition 1L Lenders"), and Ankura Trust Company, LLC, as successor administrative agent and collateral agent ("Prepetition 1L Agent" and together with the Prepetition 1L Lenders, the "Prepetition 1L Secured Parties"), the Prepetition 1L Lenders provided a revolving credit facility to the Borrowers (the "Prepetition RCF Facility").

(b)   **Prepetition RCF Obligations**.  As of the Petition Date, the Borrowers were justly and lawfully liable and indebted to the Prepetition 1L Secured Parties, without defense, challenge, objection, claim, counterclaim, or offset of any kind, in the aggregate principal amount of not less than $15,600,000, plus any other amounts due and payable under the Prepetition RCF Credit Agreement, including, without limitation, accrued and unpaid interest thereon, premiums, reimbursement obligations (contingent or otherwise), fees, costs, expenses (including any attorneys', accountants', appraisers', and financial advisors' fees and expenses), charges, indemnities, and any other amounts, liabilities, or obligations of whatever nature, whenever arising or accruing (whether before or after the Petition Date), that may be due, owing, or chargeable in connection therewith, in each case, as and to the extent provided in the Prepetition RCF Credit Agreement, including all "Obligations" as defined in the Prepetition RCF Credit Agreement (collectively, the "Prepetition RCF Obligations").

(c)   **Prepetition RCF Liens**.  As more fully set forth in the Prepetition 1L Documents, prior to the Petition Date, to secure the Prepetition RCF Obligations, the Debtors granted to the Prepetition 1L Agent, for the benefit of the Prepetition 1L Secured Parties, valid, binding, properly perfected, and enforceable first priority continuing liens on and security interests in (collectively, the "Prepetition RCF Liens") substantially all of their assets and property (with certain exceptions set out in the Prepetition 1L Documents), including a first-priority security interest in all of their right, title, and interest in, to, and under all of the "Collateral" as defined in the Prepetition RCF Credit Agreement, and all proceeds, products thereof, and accessions thereto, in each case whether then owned or owing to or thereafter acquired or arising (the "Prepetition RCF Collateral").

(ii)     **Prepetition Second Lien Facility**.

(a)     **Prepetition Second Lien Indenture**.  As of the Petition Date, pursuant to and in accordance with that certain Indenture, dated as of April 20, 2021 (as amended, restated, amended and restated, or otherwise modified from time to time prior to the date hereof, the "Prepetition Second Lien Indenture," and all instruments and documents executed at any time in connection therewith, the "Prepetition 2L Documents," and together with the Prepetition 1L Documents, the "Prepetition Credit Documents"), by and among Geophysical, as issuer, the guarantors party thereto (the "Prepetition Guarantors"), UMB Bank, National Association, as trustee and as collateral agent ("Prepetition 2L Agent," and together with the Prepetition 1L Agent, the "Prepetition Agents"), and the noteholders party to the Prepetition Second Lien Indenture from time to time (the "Prepetition 2L Noteholders," and together with the Prepetition 2L Agent, the "Prepetition 2L Secured Parties"), the Prepetition 2L Noteholders provided for the issuance of notes to the Borrowers, and the Prepetition Guarantors guaranteed the obligations of the Borrowers on a joint and several basis (the "Prepetition Second Lien Facility" and together with the Prepetition RCF Facility, the "Prepetition Facilities").

(b)     **Prepetition 2L Obligations**.  As of the Petition Date, the Borrowers and Prepetition Guarantors were justly and lawfully liable and indebted to the Prepetition 2L Secured Parties, without defense, challenge, objection, claim, counterclaim, or offset of any kind, in the aggregate principal amount of not less than $116,193,000, plus any other amounts due and payable under the Prepetition Second Lien Indenture, including, without limitation, accrued and unpaid interest thereon, premiums, reimbursement obligations (contingent or otherwise), fees, costs, expenses (including any attorneys', accountants', appraisers', and financial advisors' fees and expenses), charges, indemnities, and any other amounts, liabilities, or obligations of whatever nature, whenever arising or accruing (whether before or after the Petition Date), that may be due, owing, or chargeable in connection therewith, in each case, as and to the extent provided in the Prepetition Second Lien Indenture, including all "Obligations" as defined in the Prepetition Second Lien Indenture (collectively, the "Prepetition 2L Obligations," and together with the Prepetition RCF Obligations, the "Prepetition Secured Obligations").

(c)     **Prepetition 2L Liens**.  As more fully set forth in the Prepetition 2L Documents, prior to the Petition Date, to secure the Prepetition 2L Obligations, the Debtors granted to the Prepetition 2L Agent, for the benefit of the Prepetition 2L Secured Parties, valid, binding, properly perfected, and enforceable second priority continuing liens on and security interests in (collectively, the "Prepetition 2L Liens" and together with the Prepetition RCF Liens, the "Prepetition Liens") substantially all of their assets and property (with certain exceptions set out in the Prepetition 2L Documents), including a security interest in all of their right, title, and interest in, to, and under all of the "Collateral" as defined in the Prepetition Second Lien Indenture, and all proceeds, products thereof, and accessions thereto, in each case whether then owned or owing to or thereafter acquired or arising (the "Prepetition 2L Collateral" and together with the Prepetition RCF Collateral, the "Prepetition Collateral").

(iii)   **Validity, Perfection, and Priority of Prepetition RCF Liens**.  As of the Petition Date, the Prepetition RCF Liens granted to the Prepetition 1L Secured Parties pursuant to and in connection with the Prepetition 1L Documents were: (a) valid, binding, properly perfected, and enforceable first priority liens on and security interests in the Prepetition RCF Collateral securing the Prepetition RCF Obligations, (b) not subject to avoidance, recharacterization, subordination (whether equitable, contractual, or otherwise), recovery, attack, disgorgement, rejection, reduction, disallowance, impairment, counterclaim, crossclaim, defense, or other claim under the Bankruptcy Code (as such term is used in the Bankruptcy Code, a "Claim") or applicable non-bankruptcy law, and (c) senior in priority over any and all other liens on the Prepetition RCF Collateral, subject and subordinate only to certain liens otherwise permitted by the Prepetition 1L Documents (solely to the extent any such permitted liens were valid, properly perfected, non-avoidable, and senior in priority to the Prepetition RCF Liens as of the Petition Date or were valid non-avoidable senior liens that are perfected subsequent to the Petition Date as permitted by Section 546(b) of the Bankruptcy Code), and subject and subordinate only to Permitted Encumbrances (as defined in the DIP Term Sheet).  The Prepetition RCF Liens were granted to or for the benefit of the Prepetition RCF Secured Parties for fair consideration and reasonably equivalent value, and were granted contemporaneously with, or covenanted to be provided as inducement for, the making of the loans and/or the commitments and other financial accommodations secured thereby, or for other accommodations provided by the Prepetition 1L Secured Parties.  The Debtors and their estates have no claims, objections, challenges, causes of action, and/or choses in action, including, without limitation, "lender liability" causes of action or avoidance claims under Chapter 5 of the Bankruptcy Code or applicable state law equivalents or actions for recovery or disgorgement, against any of the Prepetition RCF Secured Parties or any

8

of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors, and employees arising out of, based upon, or related to the Prepetition RCF Facility.

(iv)    **Validity, Perfection, and Priority of Prepetition 2L Liens**.  As of the Petition Date, the Prepetition 2L Liens granted to the Prepetition 2L Secured Parties pursuant to and in connection with the Prepetition 2L Documents were: (a) valid, binding, properly perfected, and enforceable liens on and security interests in the Prepetition 2L Collateral securing the Prepetition 2L Obligations, (b) not subject to avoidance, recharacterization, subordination (whether equitable, contractual, or otherwise), recovery, attack, disgorgement, rejection, reduction, disallowance, impairment, counterclaim, crossclaim, defense, or Claim under the Bankruptcy Code or applicable non-bankruptcy law, and (c) senior in priority over any and all other liens on the Prepetition 2L Collateral, subject only to certain liens otherwise permitted by the Prepetition 2L Documents (solely to the extent any such permitted liens were valid, properly perfected, non-avoidable, and senior in priority to the Prepetition 2L Liens as of the Petition Date or were valid non-avoidable senior liens that are perfected subsequent to the Petition Date as permitted by Section 546(b) of the Bankruptcy Code), and subject and subordinate only to Permitted Encumbrances.  The Prepetition 2L Liens were granted to or for the benefit of the Prepetition 2L Secured Parties for fair consideration and reasonably equivalent value, and were granted contemporaneously with, or covenanted to be provided as inducement for, the making of the loans and/or the commitments and other financial accommodations secured thereby, or for other accommodations provided by the Prepetition 2L Secured Parties.  The Debtors and their estates have no claims, objections, challenges, causes of action, and/or choses in action, including, without limitation, "lender liability" causes of action or avoidance claims under Chapter 5 of the Bankruptcy Code or applicable state law equivalents or actions for recovery or disgorgement,

against any of the Prepetition 2L Secured Parties or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors, and employees arising out of, based upon, or related to the Prepetition 2L Facility.

(v)    **Validity, Perfection, and Priority of Prepetition Secured Obligations**. Each of the Prepetition RCF Obligations and the Prepetition 2L Obligations, respectively, constitutes the legal, valid, binding, and non-avoidable obligations of the Debtors and the Prepetition Guarantors, enforceable in accordance with their terms (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code), and no portion of any Prepetition Secured Obligations or any payment made to the Prepetition 1L Secured Parties or the Prepetition 2L Secured Parties (collectively, the "Prepetition Secured Parties") (or applied to or paid on account of the Prepetition Secured Obligations) at any time is subject to any contest, attack, disgorgement, rejection, recovery, reduction, defense, counterclaim, subordination, recharacterization, avoidance, or Claim, cause of action, or other challenge of any nature under the Bankruptcy Code or applicable non-bankruptcy law.  The Debtors have waived, discharged, and released any right to challenge any of the Prepetition Secured Obligations, the priority of the Debtors' obligations thereunder, and the validity, extent, priority, and perfection of the liens securing the Prepetition Secured Obligations.  The Prepetition Secured Obligations constitute allowed, secured claims within the meaning of sections 502 and 506 of the Bankruptcy Code.

(vi)    **No Control**.  None of the Prepetition Secured Parties control the Debtors or their properties or operations, have authority to determine the manner in which any Debtors' operations are conducted, or are control persons or insiders of the Debtors or any of their affiliates.

(vii)    **Cash Collateral**. All of the Debtors' cash, whether existing as of the Petition Date or thereafter, wherever located (including, without limitation, all cash on deposit or

maintained by the Debtors in any account or accounts), constitutes or will constitute "cash collateral" of the Prepetition Secured Parties and DIP Secured Parties within the meaning of section 363(a) of the Bankruptcy Code (the "<u>Cash Collateral</u>").

   (viii) **Indemnification**.  The DIP Secured Parties and the Prepetition Secured Parties have acted in good faith, and without negligence or violation of public policy or law, in respect of all actions taken by them in connection with or related in any way to negotiating, implementing, documenting, or obtaining the approval of the DIP Facility and the use of Cash Collateral, including in respect of the granting of the DIP Liens and the Adequate Protection Liens (as defined below), any challenges or objections to the DIP Facility or the use of Cash Collateral, and all documents related to any and all transactions contemplated by the foregoing, including the DIP Documents.  Accordingly, to the extent provided in the DIP Documents and the Prepetition Credit Documents, the DIP Secured Parties and the Prepetition Secured Parties and each of their respective officers, directors, affiliates, attorneys, employees, and agents (each, an "<u>Indemnified Party</u>") shall be and hereby are indemnified and held harmless by the Debtors in respect of any claim or liability incurred in respect thereof or in any way related thereto; *provided*, that no such Indemnified Parties will be indemnified for any cost, expense, or liability to the extent determined in a final, non-appealable judgment of a court of competent jurisdiction to have resulted primarily from such parties' gross negligence, actual fraud, or willful misconduct.  No exception or defense exists in contract, law, or equity as to the Debtors' obligation set forth, as the case may be, in this paragraph F(viii), in the DIP Documents, or the Prepetition Credit Documents, to indemnify and/or hold harmless the Indemnified Parties, as applicable.

   (ix) **Release**.  Subject to entry of the Final Order, the Debtors, on behalf of themselves and their respective estates,   hereby absolutely, irrevocably, and unconditionally

release and forever discharge and acquit the DIP Secured Parties, the Prepetition Secured Parties, and their respective former, current, or future officers, partners, directors, managers, members, principals, employees, agents, related funds, affiliates, investors, financing sources, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals and the respective successors and assigns thereof, in each case solely in their capacities as such (collectively, the "Released Parties"), from any and all claims, offsets, defenses, counterclaims, set off rights, objections, challenges, causes of action, liabilities, losses, damages, responsibilities, disputes, remedies, actions, suits, controversies, reimbursement obligations (including, attorneys' fees), costs, expenses, or judgments of every type, whether known or unknown, asserted or unasserted, fixed or contingent, or pending or threatened, of any kind or nature whatsoever, whether arising at law or in equity (including, without limitation, any so-called "lender liability" or equitable subordination claims or defenses, recharacterization, subordination, avoidance, any claim arising under or pursuant to section 105 or chapter 5 of the Bankruptcy Code or under any other similar provisions of applicable state or federal law, or any other claim or cause of action arising under the Bankruptcy Code or applicable non-bankruptcy law), in each case, arising under, in connection with, or related to the Debtors or their estates, the extent, amount, validity, enforceability, priority, security, and perfection of the DIP Facility, the DIP Obligations, the DIP Liens, the DIP Documents, the Restructuring Support Agreement dated as of April 12, 2022 (the "RSA"), the Prepetition Facilities, the Prepetition Secured Obligations, the Prepetition Liens, and the Prepetition Credit Documents, and the obligations owing and the financial obligations made thereunder, the negotiation thereof and of the deal reflected thereby, in each case that the Debtors at any time had, now have or may have, or that their successors or assigns hereafter can or may have against any of the Released Parties for or by reason of any act, omission, matter,

12

cause, or thing whatsoever arising at any time on or prior to the date of this Interim Order, except to the extent such claim, damage, loss, liability, or expense is found in a final non-appealable judgment by a court of competent jurisdiction to have resulted primarily from such Released Party's gross negligence, actual fraud, or willful misconduct.

G.     **Findings Regarding Postpetition Financing and Use of Cash Collateral**.

(i)     **Good Cause**.  Good and sufficient cause has been shown for the entry of this Interim Order and for authorization of the Debtors to obtain financing under the DIP Facility.  The execution and delivery of the DIP Documents and the implementation of the DIP Facility are in the best interests of the Debtors and their estates.

(ii)     **Request for Postpetition Financing and Use of Cash Collateral**.  The Debtors seek authority to (a) enter into the DIP Facility and incur the DIP Obligations on the terms described herein and in the DIP Documents and (b) use Cash Collateral on the terms described herein, in each case, to administer their Chapter 11 Cases and fund their operations.  At the Final Hearing, the Debtors will seek final approval of the DIP Facility and use of Cash Collateral pursuant to the proposed Final Order, which shall be in form and substance reasonably acceptable to the DIP Agent, the Required DIP Lenders (as such term is defined in the DIP Term Sheet), and the Prepetition Secured Parties.  Notice of the Final Hearing and the proposed Final Order will be provided in accordance with this Interim Order.

(iii)     **Priming of the Prepetition Liens**.  The priming of the Prepetition Liens under section 364(d) of the Bankruptcy Code, as contemplated by the DIP Documents and as provided herein and on **Exhibit B** hereto, will enable the Debtors to obtain the DIP Facility and to continue to operate their business during the pendency of the Chapter 11 Cases, to the benefit of their estates and creditors.  The Prepetition Secured Parties are entitled to receive adequate

13

protection as set forth in this Interim Order pursuant to sections 361, 363, and 364 of the Bankruptcy Code, solely to the extent of any Diminution in Value (as defined below) of their respective interests in the Prepetition Collateral (including Cash Collateral).

(iv)     **Immediate Need for Postpetition Financing and Use of Cash Collateral**. The Debtors have an immediate and a critical need for the DIP Facility and to continue to use the Collateral (including Cash Collateral) in order to, among other things, (a) avoid the liquidation of these estates, (b) permit the orderly continuation of the operation of their businesses, (c) maintain business relationships with customers, vendors, and suppliers, (d) make payroll, (e) satisfy other working capital and operational needs, (f) pay professional fees, expenses, and obligations benefitting from the Carve-Out, and (g) pay costs, fees, and expenses associated with or payable under the DIP Documents and this Interim Order.  The access by the Debtors to sufficient working capital and liquidity through the use of Cash Collateral and other Prepetition Collateral, incurrence of new indebtedness under the DIP Documents, and other financial accommodations provided under the DIP Documents are necessary and vital to the preservation and maintenance of the going concern values of the Debtors and to a successful restructuring of the Debtors.  The Debtors' use of Cash Collateral alone would be insufficient to meet the Debtors' cash disbursement needs during the period of effectiveness of this Interim Order.  The terms of the proposed DIP Facility pursuant to the DIP Documents and this Interim Order are fair and reasonable, reflect each Debtors' exercise of prudent business judgment, and are supported by reasonably equivalent value and fair consideration.

(v)     **No Credit Available on More Favorable Terms**.  The DIP Facility is the best source of debtor-in-possession financing available to the Debtors.  Given their current financial condition, the Debtors have been and continue to be unable to obtain financing and other

14

financial accommodations from sources other than the DIP Lenders on terms more favorable than those provided under the DIP Facility and the DIP Documents.  The Debtors are unable to obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense.  The Debtors have also been unable to obtain (a) unsecured credit having priority over that of administrative expenses of the kind specified in sections 503(b), 507(a), and 507(b) of the Bankruptcy Code; (b) credit secured solely by a lien on property of the Debtors and their estates that is not otherwise subject to a lien; or (c) credit secured solely by a junior lien on property of the Debtors and their estates that is subject to a lien.  Financing on a postpetition basis on better terms is not available without granting the DIP Agent, for the benefit of itself and the other DIP Secured Parties, (1) perfected priming security interests in and liens on (each as provided herein) the DIP Collateral, with the priorities set forth herein; (2) superpriority claims; and (3) the other protections set forth in this Interim Order.

(vi)    **Use of Proceeds of the DIP Facility and Cash Collateral**.  The DIP Secured Parties require, and the Debtors have agreed, that the extension of credit and other financial accommodations made under the DIP Documents, the Cash Collateral (including, without limitation, the proceeds of the DIP Facility), the proceeds of the DIP Facility, and all other cash or funds of the Debtors shall be used solely in accordance with the Approved Budget (as defined below) (subject to permitted variances and the Carve-Out) and otherwise in accordance with the terms and conditions of this Interim Order and the DIP Documents, and for no other purpose.

(vii)    **Adequate Protection**.  The Prepetition Secured Parties are entitled, pursuant to sections 361, 362, 363, 364, and 507 of the Bankruptcy Code, to adequate protection, as and to the extent set forth in this Interim Order, of their interest in all Prepetition Collateral, including Cash Collateral, in an amount equal to the diminution in the value of the Prepetition Secured

Parties' interest in the Prepetition Collateral (including Cash Collateral) from and after the Petition Date, if any, for any reason provided for under the Bankruptcy Code (the "Diminution in Value"). Based on the Motion, the First Day Declaration, the Mleczko Declaration, and the record presented to the Court at the Interim Hearing, the terms of the proposed adequate protection arrangements and of the use of the Prepetition Collateral (including Cash Collateral) are fair and reasonable, reflect the Debtors' prudent exercise of business judgment, and constitute reasonably equivalent value and fair consideration for the use of the Prepetition Collateral (including Cash Collateral); *provided*, that nothing in this Interim Order or the DIP Documents shall (a) be construed as the affirmative consent by any of the Prepetition Secured Parties for the use of Cash Collateral other than on the terms set forth in this Interim Order and in the context of the DIP Facility authorized by this Interim Order or the DIP Term Sheet, (b) be construed as a consent by any Prepetition Secured Party to the terms of any other financing or any other lien encumbering the Prepetition Collateral (whether senior or junior) except to the extent permitted by the DIP Documents, or (c) prejudice, limit, or otherwise impair the rights of any of the Prepetition Secured Parties to seek modification of the grant of Adequate Protection provided hereby so as to provide new, different, or additional adequate protection or assert the interests of any of the Prepetition Secured Parties, without prejudice to the right of the Debtors and any other party in interest's rights to contest such modification.

(viii)   **Consent**.  To the extent such consent is required, the Required DIP Lenders and the requisite amount of Prepetition 1L Lenders and Prepetition 2L Noteholders have consented to the Debtors' use of Prepetition Collateral (including Cash Collateral), and the Debtors' entry into the DIP Documents and the priming liens granted to the DIP Secured Parties, in each case, in

accordance with and subject to the terms and conditions in this Interim Order and the DIP Documents.

(ix)     **Business Judgment and Good Faith Pursuant to Section 364(e).**  Based on the Motion, the First Day Declaration, the Mleczko Declaration, and the record presented to the Court at the Interim Hearing, (a) the extension of credit and other financial accommodations made under, and all of the Debtors' obligations and indebtedness arising under, in respect of, or in connection with the DIP Facility and the DIP Loan Documents, (b) the fees and other amounts paid and to be paid thereunder, (c) the terms of adequate protection granted to the Prepetition Secured Parties, (d) the terms on which the Debtors may continue to use Prepetition Collateral (including Cash Collateral), and (e) the Cash Collateral arrangements described therein and herein, in each case, pursuant to this Interim Order and the DIP Loan Documents, (I) are fair, reasonable, and the best available to the Debtors under the circumstances; (II) reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties; (III) are supported by reasonably equivalent value and fair consideration; and (IV) represent the best financing available.  The DIP Facility and the use of Prepetition Collateral (including Cash Collateral) were negotiated in good faith and at arm's length among the Debtors, the DIP Secured Parties, the Prepetition Secured Parties, and their respective advisors.  The Debtors' continued use of Prepetition Collateral (including Cash Collateral) to fund the administration of the Debtors' estates and continued operation of their businesses (including the incurrence and payment of any adequate protection obligations and the granting of adequate protection liens), in accordance with the terms hereof, and the credit to have been extended by the DIP Secured Parties under the DIP Facility shall be deemed to have been so allowed, advanced, made, used and/or extended in good faith, and for valid business purposes and uses, within the meaning of section 364(e) of the Bankruptcy Code,

17

and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code. The DIP Secured Parties and the Prepetition Secured Parties (and their successors and assigns) shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed, or modified on appeal or otherwise.

(x)   **Initial DIP Budget**.  The Debtors have prepared and delivered to the DIP Lenders and the DIP Agent an initial thirteen (13) week-budget (the "Initial DIP Budget"), a copy of which is attached hereto as **Exhibit C**.  The Initial DIP Budget reflects the Debtors' anticipated cash receipts, operating disbursements, operating cash flow, non-operating disbursements (including restructuring fees and debt servicing), and net cash flow for such thirteen (13) week period.  The Initial DIP Budget may be modified, amended, and updated from time to time in accordance with the DIP Term Sheet and once approved in accordance therewith shall supplement and replace the Initial DIP Budget (the Initial DIP Budget and each subsequent approved budget, shall constitute without duplication, an "Approved Budget").  The Debtors believe that the Initial DIP Budget is reasonable under the facts and circumstances known to them, taken as a whole, as of the Petition Date.  The DIP Secured Parties and the Prepetition Secured Parties are relying, in part, upon the Debtors' agreement to comply with the Approved Budget (subject to permitted variances), the other DIP Documents, and this Interim Order in determining to enter into the DIP Facility provided for in this Interim Order.

(xi)   **Relief Essential; Necessity of Immediate Entry**.  The Debtors have requested immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2) and the Local Rules and good cause has been shown for the immediate entry of this Interim Order.  For the reasons set forth in the Motion, the First Day Declaration, the Mleczko Declaration, and the record presented to the Court at the Interim Hearing, absent granting the relief

18

set forth in this Interim Order, the Debtors' estates would face significant business disruption resulting in immediate and irreparable harm.  Consummation of the DIP Facility and the use of Prepetition Collateral (including Cash Collateral) in accordance with this Interim Order and the DIP Documents are therefore in the best interests of the Debtors, their estates, and their creditors.

(xii)   **Interim Hearing**.  Notice of the Interim Hearing and the relief requested in the Motion has been provided by the Debtors, whether by facsimile, electronic mail, overnight courier, or hand delivery to certain parties in interest, including the Notice Parties (as defined below).  The Debtors have made reasonable efforts to afford the best notice possible under the circumstances, and no other notice is required in connection with the relief set forth in this Interim Order.  Based upon the foregoing findings and conclusions, the Motion, and the record before the Court with respect to the Motion, and after due consideration and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

1.      **DIP Facility Approved on an Interim Basis**.  The relief requested in the Motion is authorized and approved, in each case, subject to the terms and conditions set forth in the DIP Documents and this Interim Order.  Any and all objections to the Motion with respect to the entry of this Interim Order that have not been withdrawn, waived, settled, or resolved and all reservations of rights included therein, are hereby denied and overruled on the merits.  This Interim Order shall become effective immediately upon its entry.

2.      **Authorization of the DIP Facility and the DIP Documents**.

(a)      The Debtors are hereby authorized to execute, enter into, and perform all obligations under the DIP Documents and to take any other and further acts related to the performance of the DIP Documents.  The DIP Documents and this Interim Order shall govern the

financial and credit accommodations to be provided to the Debtors by the DIP Lenders in connection with the DIP Facility. The Borrowers are hereby authorized to borrow money pursuant to the DIP Documents, and the Guarantors are hereby authorized to guarantee the Debtors' obligations with respect to such borrowings, together with applicable interest, expenses, fees, and other charges payable in connection with the DIP Facility, subject to any limitations on borrowing under the DIP Documents, which shall be used for all purposes permitted under the DIP Documents and this Interim Order, including, without limitation to (i) provide working capital and pay for other general corporate purposes of the Debtors, (ii) pay administration costs of the Chapter 11 Cases and claims or amounts approved by the Bankruptcy Court, and (iii) pay interest and make adequate protection and other payments in accordance with the Approved Budget (subject to permitted variances), this Interim Order, and the DIP Documents.

(b)     In furtherance of the foregoing and without further approval of this Court, each Debtor is hereby authorized to perform all acts to make, execute, and deliver all instruments and documents (including, without limitation, the execution or recordation of security agreements, control agreements, mortgages, deeds of trust, and financing statements), and to pay all fees and expenses required or necessary for the Debtors to implement the terms of, perform their obligations under, or effectuate the purposes of and transactions contemplated by this Interim Order or the DIP Documents, including, without limitation:

(i)     the execution and delivery of, and performance under, one or more non-material authorizations, amendments, waivers, consents, or other modifications to and under the DIP Documents, in each case, in such form as the Debtors and the DIP Agent, acting at the express written direction of the Required DIP Lenders, may agree; *provided*, that updates and supplements to the Approved Budget required to be delivered by the Debtors under the DIP Documents shall not be considered amendments or modifications to the Approved Budget or the DIP Documents. The foregoing shall be without prejudice to the Debtors' right to seek approval from the Court of any material modification or amendment on an expedited basis;

20

(ii)     upon entry of this Interim Order, the payment to the DIP Agent and the DIP Lenders, as the case may be, of all fees, including any agency fee (which fees, in each case, shall be, and shall be deemed to have been, approved upon entry of this Interim Order, and which fees shall not be subject to any challenge, contest, disgorgement, rejection, recoupment, reduction, defense, counterclaim, offset, subordination, recharacterization, avoidance, or other claim, cause of action, or other challenge of any nature under the Bankruptcy Code, applicable law, or otherwise), and any amounts due (or that may become due) in respect of the reimbursement and indemnification obligations, in each case referred to in the DIP Term Sheet (and in any separate letter agreements between any or all Debtors, on the one hand, and any of the DIP Agent or DIP Lenders, on the other, in connection with the DIP Facility) and the costs and expenses as may be due from time to time, including, without limitation, fees and expenses of Ropes & Gray LLP ("Ropes & Gray"), counsel to the DIP Agent and the DIP Lenders, in each case, as provided for in the DIP Documents (the "DIP Fees and Expenses"), without the need to file retention motions or fee applications or to provide notice to any party but subject to the procedures set forth in paragraph 31; and

(iii)    the performance of all other acts required under or in connection with the DIP Documents, including the granting of the DIP Liens and DIP Superpriority Claims (as defined below) and perfection of the DIP Liens and DIP Superpriority Claims as permitted herein and therein.

(c)     Subject to the terms and conditions of this Interim Order, the DIP Agent is hereby authorized to execute, enter into, and perform all rights and duties of the DIP Agent under the DIP Documents.

(d)     Upon execution and delivery of the DIP Documents, each of the DIP Documents shall constitute valid, binding, and non-avoidable obligations of the Debtors, fully enforceable against the Debtors and the DIP Secured Parties in accordance with the terms of the DIP Documents and this Interim Order.  No obligation, payment, transfer, or grant of security under the DIP Documents or this Interim Order to the DIP Agent, the DIP Lenders, or any of their respective representatives shall be stayed, restrained, voidable, or recoverable under the Bankruptcy Code or under any applicable law (including, without limitation, under sections 502(d), 544, 547, and 548 through 550 of the Bankruptcy Code, any applicable Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, Uniform Voidable Transactions

21

Act, or other similar state statute or common law), or subject to any defense, reduction, recoupment, recharacterization, subordination, disallowance, impairment, cross-claim, claim, or counterclaim.

(e)     No DIP Lender or DIP Agent shall have any obligation or responsibility to monitor the Debtors' use of the DIP Loans, and each DIP Lender and DIP Agent may rely upon the Debtors' representations that the amount of DIP Loans requested at any time and the use thereof are in accordance with the requirements of this Interim Order, the DIP Documents and Bankruptcy Rule 4001(c)(2).

3.     **Carve-Out**.

(a)     Notwithstanding anything to the contrary herein, the Debtors' obligations to the DIP Secured Parties and Prepetition Secured Parties and the liens, security interests, and superpriority claims granted by this Interim Order or under the Prepetition Credit Documents and the DIP Documents, including the DIP Liens, DIP Priming Liens, the DIP Superpriority Claims, the Adequate Protection Liens, and the 507(b) Claims (in each case, as defined herein), and the payment of all such obligations, shall be subject and subordinate in all respects to payment of the following fees and expenses (the "Carve-Out"):

(i)     allowed administrative expenses pursuant to 28 U.S.C. § 1930(a)(6) for fees payable to the U.S. Trustee, as determined by agreement of the U.S. Trustee or by final order of this Court, and 28 U.S.C. § 156(c) for fees required to be paid to the Clerk of this Court;

(ii)     all reasonable fees and expenses incurred by a chapter 7 trustee appointed under section 726(b) of the Bankruptcy Code in an amount not to exceed $75,000;

(iii)     at any time prior to delivery of a Carve Out Trigger Notice (as defined below), to the extent allowed at any time or from time to time, whether by interim or final compensation order or any other order of the Court, whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice, all unpaid fees, costs, and expenses (the "Accrued Professional Compensation") incurred or accrued by persons or firms

22

retained by the Debtors pursuant to sections 327, 328, or 363 of the Bankruptcy Code (collectively, the "<u>Debtor Professionals</u>") and the Creditors' Committee (if appointed) (the "<u>Committee Professionals</u>" and, together with the Debtor Professionals, the "<u>Professional Persons</u>"); *provided, however*, that the obligations of the DIP Lenders and the Prepetition Secured Parties with respect to the Carve-Out for fees, costs, and expenses for all Professional Persons prior to the delivery of the Carve-Out Trigger Notice (as defined below) shall be limited in all respects to the aggregate amount of fees, costs, and expenses for Professional Persons set forth in the Approval Budget through the date of the Carve-Out Trigger Notice subject to calculation provided in Paragraph 3(b) hereof (such amount shall be referred to as the "<u>Pre Notice Carve-Out Amount</u>"); and

(iv)    after the delivery of a Carve-Out Trigger Notice, to the extent allowed at any time, whether by interim or final order, procedural order, or any other order of this Court, whether allowed by the Court prior to or after delivery of a Carve-Out Trigger Notice, allowed professional fees of Professional Persons in accordance with the Approved Budget, in an aggregate amount not to exceed $450,000, incurred after the delivery of a Carve-Out Trigger Notice (the amount set forth in this clause (iv) being the "<u>Post Notice Carve-Out Amount,</u>" and together with the Pre Notice Carve-Out Amount, the "<u>Professional Fee Carve-Out Amount</u>").

(b)    The term "<u>Carve-Out Trigger Notice</u>" shall mean a written notice delivered by e-mail transmission (or other electronic means) by the DIP Agent to the Debtors, their counsel, the U.S. Trustee, and any counsel to the Creditors' Committee (if any), which notice may be delivered following the occurrence and during the continuation of an Event of Default (as defined in the DIP Term Sheet), stating that the Pre Notice Carve-Out Amount and Post Notice Carve-Out Amount have been invoked.

(c)    On the day on which a Carve-Out Trigger Notice is given by the DIP Agent to the Debtors, the Debtors and the Required DIP Lenders shall determine the Pre Notice Carve-Out Amount by taking the amount of fees, costs, and expenses for each Professional Person (on a Professional Person by Professional Person basis) set forth in the Approved Budget and pro-rating such amount for each Professional Person through the date one business day after deliver of the Carve-Out Trigger Notice (the "<u>Pro-Rated Budget Amount</u>").  The Pro-Rated Budget Amount shall be reduced by the fees, costs, and expenses already paid to each Professional Person (on a

Professional Person by Professional Person basis), with the resulting calculation being the Pre Notice Carve-Out Amount.  For the avoidance of doubt, the Pre Notice Carve-Out Amount shall be allocated to Professional Persons on a Professional Person by Professional Person basis.  The Carve-Out Trigger Notice shall (i) be deemed a draw request and notice of borrowing by the Debtors for the DIP Loans under the DIP Commitments (on a pro rata basis based on the then outstanding DIP Commitments), in an amount equal to the Pre Notice Carve-Out Amount and also (ii) constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor to fund a reserve in an amount equal to the Pre Notice Carve-Out Amount.  The Debtors shall deposit and hold the funded Pre Notice Carve-Out Amount (collectively, the "Pre Notice Carve-Out Amount Reserve") in a segregated account in trust to pay all unpaid Accrued Professional Compensation prior to any and all other claims.  For the avoidance of doubt, (i) the amount funded in the Pre Notice Carve-Out Amount Reserve shall be capped at the Pre Notice Carve-Out Amount whether funded by DIP Loans or cash on hand, and (ii) the funding requirements set forth in this paragraph 3(c) shall not cause the DIP Commitments to increase.

(d)     The Carve-Out Trigger Notice shall also (i) be deemed a request by the Debtors for DIP Loans under the DIP Commitments (on a pro rata basis based on the then outstanding DIP Commitments), in an amount equal to the Post Notice Carve-Out Amount (any such amounts actually advanced shall constitute DIP Loans) and (ii) constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor, after funding the Pre Notice Carve-Out Amount Reserve, to fund a reserve in an amount equal to the Post Notice Carve-Out Amount.  The Debtors shall deposit and hold the funded Post Notice Carve-Out Amount (the "Post Notice Carve-Out Amount Reserve," and together with the

Pre Notice Carve-Out Amount Reserve, the "Carve-Out Reserves") in a segregated account in trust to pay such Accrued Professional Compensation benefiting from the Post Notice Carve-Out Amount prior to any and all other claims.  For the avoidance of doubt, (i) the amount funded in the Post Notice Carve-Out Amount Reserve shall be capped at the Post Notice Carve-Out Amount whether funded by DIP Loans or cash on hand, and (ii) the funding requirements set forth in this paragraph 3(d) shall not cause the DIP Commitments to increase.

(e)     On the first business day after the DIP Agent gives the Carve-Out Trigger Notice, notwithstanding anything in the DIP Documents to the contrary, including with respect to the existence of a Default or an Event of Default (each as defined in the DIP Term Sheet), the failure of the Debtors to satisfy any or all of the conditions precedent for DIP Loans under the DIP Facility, any termination of the DIP Commitments following an Event of Default, or the occurrence of the Maturity Date (as defined in the DIP Term Sheet), each DIP Lender with an outstanding DIP Commitment (on a pro rata basis based on the then outstanding DIP Commitments) shall make available such DIP Lender's pro rata share with respect to such borrowing in accordance with the DIP Facility.

(f)     All funds in the Pre Notice Carve-Out Amount Reserve shall be used first to pay the obligations set forth in clauses (i) through (iii) of the definition of Carve-Out set forth above but not, for the avoidance of doubt, the Post Notice Carve-Out Trigger Amount, until paid in full, and then, to the extent the Pre Notice Carve-Out Reserve has not been reduced to zero, to pay the DIP Agent for the benefit of the DIP Lenders.

(g)     All funds in the Post Notice Carve-Out Trigger Reserve shall be used first to pay the obligations set forth in clause (iv) of the definition of Carve-Out set forth above and then,

to the extent the Post Notice Carve-Out Reserve has not been reduced to zero, to pay the DIP Agent for the benefit of the DIP Lenders.

(h)     Notwithstanding anything to the contrary in the DIP Documents or this Interim Order, if either of the Carve-Out Reserves is not funded in full in the amounts set forth in this paragraph 3, then, any excess funds in one of the Carve-Out Reserves following the payment of the Pre Notice Carve-Out Amounts and Post Notice Carve-Out Amounts, respectively, shall be used to fund the other Carve-Out Reserve, up to the applicable amount set forth in this paragraph 3, prior to making any payments to the DIP Agent on behalf of the DIP Lenders.  Notwithstanding anything to the contrary in the DIP Documents or this Interim Order, following delivery of a Carve-Out Trigger Notice, the DIP Lenders shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve-Out Reserves have been fully funded, but shall have a valid and perfected security interest in any residual interest in the Carve-Out Reserves, with any excess paid to the DIP Agent on behalf of the DIP Lenders for application in accordance with the DIP Documents and this Interim Order. Further, notwithstanding anything to the contrary in this Interim Order, (i) disbursements by the Debtors from the Carve-Out Reserves shall not constitute DIP Loans or increase or reduce the DIP Obligations (unless, for the avoidance of doubt, additional DIP Loans are used to fund the Carve-Out Reserves), (ii) the failure of the Carve-Out Reserves to satisfy in full the Allowed Professional Compensation shall not affect the priority of the Carve-Out, and (iii) in no way shall the Initial Budget, Approved Budget, the amount of the funded Carve-Out Reserves, or any of the foregoing be construed as a cap or limitation on the amount of the Accrued Professional Compensation due and payable by the Debtors.  For the avoidance of doubt and notwithstanding anything to the contrary in this Interim Order, the DIP Facility, or the DIP Documents, the

26

Carve-Out shall be senior to all liens and claims securing the DIP Facility, the Adequate Protection Liens (as defined below), the 507(b) Claims (as defined below), and any and all other forms of adequate protection, liens, or claims securing the DIP Obligations.

(i)     For the avoidance of doubt, none of the (a) Prepetition Secured Parties shall be responsible for funding the Carve-Out Reserves and (b) DIP Agent, DIP Lenders, or the Prepetition Secured Parties shall be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person incurred in connection with these Chapter 11 Cases or any successor cases under any chapter of the Bankruptcy Code.

(j)     Nothing in this Interim Order or otherwise shall be construed to obligate the DIP Agent, the DIP Lenders, or the Prepetition Secured Parties, in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

(k)     Any payment or reimbursement made on or after the delivery of a Carve-Out Trigger Notice for services rendered after the first business day after delivery of a Carve-Out Trigger Notice in respect of any Accrued Professional Compensation shall permanently reduce the aggregate Professional Fee Carve-Out Amount on a dollar-for-dollar basis.

(l)     Nothing herein shall be construed to (i) impair the ability of any party to object to any of the fees, expenses, reimbursement, or compensation of any professionals or (ii) alter any requirement that a Professional Person file and serve fee applications or otherwise comply with the Bankruptcy Code, Bankruptcy Rules, or Local Rules relating to payment of fees and reimbursement of expenses of Professional Persons, or with any interim compensation order or retention order entered by this Court.

4.      **No Obligation to Extend Credit**.  The DIP Secured Parties shall have no obligation to make any loan or advance under the DIP Documents, unless all of the conditions precedent to the making of such extension of credit by the applicable DIP Secured Parties under the applicable DIP Documents and this Interim Order have been satisfied in full or waived by the DIP Secured Parties in accordance with their terms.

5.      **Amendment of the DIP Documents**.  The DIP Documents may from time to time be amended, modified, or supplemented by the parties thereto without further order of the Court if the amendment, modification, or supplement is non-material and in accordance with the DIP Documents.  In the case of a material amendment, modification, or supplement to the DIP Documents that is adverse to the Debtors' estates, the Debtors shall provide notice (which shall be provided through electronic mail) to counsel to the Creditors' Committee (if any), the U.S. Trustee, the DIP Agent, and the DIP Secured Parties and the Prepetition Secured Parties (collectively, the "Notice Parties"), each of whom shall have five (5) days from the date of such notice to object in writing to such amendment, modification, or supplement.  If all Notice Parties indicate that they have no objection to the amendment, modification, or supplement (or if no objections are timely received), the Debtors may proceed to execute the amendment, modification, or supplement, which shall become effective immediately upon execution.  If a Notice Party timely objects to such amendment, modification, or supplement, approval of the Court (which may be sought on an expedited basis) will be necessary to effectuate the amendment, modification, or supplement.  Any material amendment, modification, or supplement that becomes effective in accordance with this paragraph 5 shall be filed with the Court.

6.      **DIP Obligations**.  Upon entry of this Interim Order and execution and delivery of the DIP Documents, the DIP Documents shall constitute valid, binding, enforceable, and

non-avoidable obligations of each of the DIP Secured Parties, and shall be fully enforceable against each of the Debtors, their estates, and any successors thereto, including, without limitation, any estate representative or trustee appointed in any of these Chapter 11 Cases, or any case under Chapter 7 of the Bankruptcy Code upon the conversion of any of these Chapter 11 Cases, or in any other proceedings superseding or relating to any of the foregoing and/or upon the dismissal of any of these Chapter 11 Cases or any such successor cases (collectively, the "Successor Cases"), and their creditors and other parties in interest, in each case, in accordance with the terms thereof and this Interim Order.  The DIP Obligations will include all loans and any other indebtedness or obligations, contingent or absolute, now existing or hereafter arising, which may from time to time be or become owing by the Debtors to any of the DIP Agent or DIP Lenders, in each case, under, or secured by, the DIP Documents or this Interim Order, including all principal, interest, costs, fees, expenses, indemnities, and other amounts under the DIP Documents (including this Interim Order).  The Debtors shall be jointly and severally liable for the DIP Obligations.  No obligation, payment, transfer, or grant of security under the DIP Documents or this Interim Order to the DIP Secured Parties shall be stayed, restrained, voidable, or recoverable under the Bankruptcy Code or under any applicable law (including, without limitation, under sections 502(d), 544, 548, or 549 of the Bankruptcy Code, any applicable Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, or other similar state statute or common law), or subject to any defense, reduction, recoupment, recharacterization, subordination, disallowance, impairment, cross-claim, claim, counterclaim, offset, or any other challenge under the Bankruptcy Code or any applicable law.

7.      **DIP Superpriority Claims**.  Pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP Obligations shall constitute allowed superpriority administrative expense claims of

the DIP Agent for the benefit of itself and the DIP Lenders against the Debtors on a joint and several basis (without the need to file any proof of claim) with priority over any and all claims against each of the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code and any and all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 365, 503(b), 506(c), 507(a), 507(b), 726, 1113, or 1114 of the Bankruptcy Code (including the Adequate Protection Obligations), whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment, which allowed claims (the "<u>DIP Superpriority Claims</u>") shall for purposes of section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code, and which DIP Superpriority Claims shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof in accordance with the DIP Documents and this Interim Order, in each case, subject and subordinate in all respects to the Carve-Out.  The DIP Superpriority Claims shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed, or modified on appeal or otherwise.

8.    **<u>DIP Liens</u>**.

(m)   As security for the DIP Obligations, effective and automatically perfected as of the date of this Interim Order, and subject and subordinate to the Carve-Out, as set forth more fully in this Interim Order, the DIP Agent, for the benefit of the DIP Secured Parties, is hereby granted (without the necessity of the execution, recordation, or filing by the Debtors or the DIP Agent of mortgages, security agreements (including intellectual property security agreements), lockbox or control agreements, pledge agreements, financing statements, or any other instruments

30

and without the necessity of possession or control by the DIP Agent or the DIP Lenders), valid, binding, enforceable, non-avoidable, and automatically and properly perfected liens and security interests (the "DIP Liens") in all property identified in clause (i) below (collectively, the "DIP Collateral"), as collateral security for the prompt and complete performance and payment when due (whether at the stated maturity, by acceleration or otherwise) of all DIP Obligations, subject to the rankings and priorities set forth below and on **Exhibit B** hereto:

(i)    **Liens on Unencumbered Property**.  Pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority senior security interest in and lien on all tangible and intangible prepetition and postpetition property of the Debtors, whether existing on the Petition Date or thereafter acquired, and the proceeds, products, rents, and profits thereof, that, on or as of the Petition Date, is not subject to a valid, perfected, and non-avoidable lien or is not subject to a valid and non-avoidable lien in existence as of the Petition Date that is perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code, including, without limitation, any and all unencumbered cash of the Debtors and any investment of such cash, inventory, accounts receivable, other rights to payment whether arising before or after the Petition Date, contracts, properties, plants, fixtures, machinery, equipment, general intangibles, payment intangibles, documents, instruments, securities, investment property, chattel paper, electronic chattel paper, interests in leaseholds, real properties, deposit accounts, patents, copyrights, trademarks, trade names, rights under license agreements and other intellectual property, capital stock of subsidiaries, and all other interests in capital stock, wherever located, and the proceeds, products, rents, and profits of the foregoing, whether arising under section 552(b) of the Bankruptcy Code or otherwise, of all the foregoing, but in each case subject and subordinate in all respects to the Carve-Out and Permitted Encumbrances as of the Petition Date;

(ii)   **Liens Priming Prepetition Liens**.  Pursuant to section 364(d)(1) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first-priority priming security interest in and lien upon the DIP Collateral, regardless of where located and whether or not any liens on the DIP Collateral are voided, avoided, invalidated, lapsed, or unperfected, which security interest and lien shall prime the Prepetition Liens (the "DIP Priming Liens").  Notwithstanding anything herein to the contrary, the DIP Priming Liens shall be (A) subject and subordinate to the Carve-Out in all respects, (B) subject to Permitted Encumbrances as of the Petition Date, and (C) senior in all respects to the Prepetition Liens, the Adequate Protection Liens, and any lien, security interest, or mortgage that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code.  The Prepetition Liens shall be primed by and made subject and subordinate to the Carve-Out and the DIP Priming Liens only;

31

(iii)   **Liens Junior to Certain Other Liens**.  Pursuant to section 364(c)(3) of the Bankruptcy Code, and subject and subordinate in all respects to the Carve-Out and the Permitted Encumbrances as of the Petition Date, a valid, binding, continuing, enforceable, fully-perfected junior security interest in and lien on the DIP Collateral that, on or as of the Petition Date, is subject to (a) valid, binding, perfected, and non-avoidable senior liens in existence immediately prior to the Petition Date and (b) valid and unavoidable liens in existence immediately prior to the Petition Date that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code, in each case other than the Prepetition Liens; *provided*, that nothing in the foregoing shall limit the rights of the DIP Secured Parties under the DIP Documents to the extent such liens are not permitted thereunder;

(iv)   **Liens Senior to Certain Other Liens**.  The DIP Liens shall not be (a) subject or subordinate to or made *pari passu* with (I) any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code, unless otherwise provided for in the DIP Documents or this Interim Order, (II) any liens or security interests arising after the Petition Date, or (III) any intercompany or affiliate liens of the Debtors or security interests of the Debtors, or (b) subordinated to or made *pari passu* with any other lien or security interest under sections 363 or 364 of the Bankruptcy Code.

9.     **Modification of Automatic Stay**.  The automatic stay imposed under section 362(a) of the Bankruptcy Code is hereby modified as necessary to effectuate all of the terms and provisions of this Interim Order, including, without limitation, to: (a) permit the Debtors to grant the DIP Liens, Adequate Protection Liens, and DIP Superpriority Claims; (b) permit the Debtors to perform such acts as the DIP Secured Parties or the Prepetition Secured Parties, as applicable, may reasonably request to assure the perfection and priority of the liens granted herein; (c) permit the Debtors to incur all liabilities and obligations to the DIP Secured Parties and the Prepetition Secured Parties under the DIP Documents, the DIP Facility, and this Interim Order, as applicable; and (d) authorize the Debtors to pay, and the DIP Secured Parties and Prepetition Secured Parties to retain and apply, payments made in accordance with this Interim Order.

10.    **Protection of DIP Lenders' Rights**.

(a)     So long as the DIP Obligations are outstanding or the DIP Lenders have any outstanding commitments (the "DIP Commitments") under the DIP Documents, the Prepetition

Secured Parties shall: (i) have no right to and shall take no action to foreclose upon, or recover in connection with, the liens granted thereto pursuant to the Prepetition Credit Documents or this Interim Order, or otherwise seek to exercise or enforce any rights or remedies against such DIP Collateral, including in connection with the Prepetition Liens or the Adequate Protection Liens; (ii) be deemed to have consented to any transfer, disposition, or sale of, or release of liens on, such DIP Collateral) (but not any proceeds of such transfer, disposition, or sale to the extent remaining after payment in cash in full of the DIP Obligations and termination of the DIP Commitments), to the extent such transfer, disposition, sale, or release is authorized under the DIP Documents; (iii) not file any further financing statements, trademark filings, copyright filings, mortgages, notices of lien, or similar instruments, or otherwise take any action to perfect their security interests in such DIP Collateral unless, solely as to this clause (iii), the DIP Agent or the DIP Lenders file financing statements or other documents to perfect the liens granted pursuant to this Interim Order, or as may be required by applicable law to continue the perfection of valid and non-avoidable liens or security interests as of the Petition Date or to reflect the succession of the Prepetition 1L Agent, and (iv) at the request of the DIP Agent, deliver or cause to be delivered, at the Debtors' reasonable cost and expense, any termination statements, releases, or assignments in favor of the DIP Agent or the DIP Lenders or other documents reasonably necessary to effectuate or evidence the release, termination, or assignment of liens on any portion of such DIP Collateral subject to any transfer, sale, or disposition permitted by the DIP Documents and this Interim Order.

(b)     To the extent any Prepetition Secured Party has possession of any DIP Collateral or has control with respect to any DIP Collateral (including deposit accounts), or has been noted as a secured party on any certificate of title for a titled good constituting DIP Collateral, then such Prepetition Secured Party shall be deemed to maintain such possession or notation or

exercise such control as a gratuitous bailee or gratuitous agent for perfection for the benefit of the DIP Agent and the DIP Lenders, and it shall comply with the instructions of the DIP Agent with respect to the exercise of such control.  The Prepetition Agents are not and shall not be deemed to be a fiduciary of any kind for the DIP Agent or the DIP Lenders, and the DIP Secured Parties hereby waive and release the Prepetition Agents from all claims and liabilities arising pursuant to any Prepetition Agent's role under this paragraph 10(b) as gratuitous bailee and agent with respect to the DIP Collateral.

(c)     Any proceeds of DIP Collateral received by any Prepetition Secured Party in connection with the exercise of any right or remedy relating to the DIP Collateral or otherwise received by any Prepetition Secured Party shall be segregated and held in trust for the benefit of and forthwith paid over to the DIP Agent for the benefit of the DIP Secured Parties in the same form as received, with any necessary endorsements, or as a court of competent jurisdiction may otherwise direct.  The DIP Agent is hereby authorized to make any such endorsements as agent for any such Prepetition Secured Party.  This authorization is coupled with an interest and is irrevocable.

(d)     Notwithstanding anything to the contrary in the DIP Documents and except for payment of the Carve Out as provided in this Interim Order, the automatic stay provisions of section 362 of the Bankruptcy Code are hereby vacated and modified solely to the extent necessary to permit the DIP Secured Parties to enforce all of their rights under the applicable DIP Documents (subject to this paragraph 10(d)) and take any or all of the following actions, at the same or different time, in each case without further order of, or application to, the Court upon the occurrence of an Event of Default on which written notice of the occurrence of such an Event of Default is given by the DIP Agent to counsel to the Debtors, the U.S. Trustee, and counsel to any Committee

34

appointed in the Chapter 11 Cases unless such occurrence and continuation of an Event of Default is cured prior to the expiration of the Remedies Notice Period (as defined below): (i) declare the termination, reduction, or restriction of any further DIP Commitment to the extent any such DIP Commitment remains, (ii) declare all DIP Obligations to be immediately due, owing, and payable, without presentment, demand, protest, or other notice of any kind, all of which are expressly waived by the Debtors, notwithstanding anything herein or in any DIP Document to the contrary, (iii) declare the termination of the applicable DIP Documents as to any future liability or obligation of the DIP Agent and the applicable DIP Lenders (but, for the avoidance of doubt, without affecting any of the DIP Liens or the DIP Obligations), and (iv) declare the termination, reduction, or restriction on the ability of the Debtors to use Cash Collateral (any such declaration of the foregoing (i) through (iv), a "Termination Declaration" and the date of such Termination Declaration, the "Termination Declaration Date").  On and after the Termination Declaration Date and other than as required by paragraph 3 with respect to the Carve-Out: (A) the Debtors shall be prohibited from requesting any further draws under the DIP Facility; (B) all DIP Obligations shall be immediately due and payable, all commitments to extend credit under the DIP Facility will terminate , and all treasury and cash management, hedging obligations, and bank product obligations shall be cash collateralized; (C) all authority to use Cash Collateral shall cease, *provided, however*, that during the Remedies Notice Period (as defined below), the Debtors may use Cash Collateral to pay payroll obligations (other than severance), sales tax, and other necessary expenses that are deemed critical to keeping the Debtors' business operating subject to the Required DIP Lenders' reasonable consent and in accordance with the Approved Budget; and (D) upon the expiration of the Remedies Notice Period and satisfaction of the Carve-Out funding obligations set forth in paragraph 3, the DIP Secured Parties shall be entitled to exercise rights and

remedies under the DIP Documents in accordance with this Interim Order.  The automatic stay in the Chapter 11 Cases otherwise applicable to the DIP Secured Parties is hereby modified so that five (5) days after the date a Termination Declaration is delivered (the "Remedies Notice Period"), the DIP Secured Parties shall be entitled to exercise their rights and remedies in accordance with the DIP Documents and this Interim Order to satisfy the DIP Obligations, DIP Superpriority Claims, and DIP Liens, subject to the Carve-Out and unless such occurrence and continuation of such Event of Default is cured prior to the expiration of the Remedies Notice Period.  During the Remedies Notice Period, the Debtors, the Creditors' Committee (if appointed), and/or any party in interest shall be entitled to seek an emergency hearing with the Court.  Unless the occurrence and continuation of such Event of Default is cured prior to the expiration of the Remedies Notice Period or the Court orders otherwise, the automatic stay, as to the DIP Secured Parties, shall automatically be terminated at the end of the Remedies Notice Period without further notice or order.  Upon expiration of the Remedies Notice Period, the DIP Secured Parties shall be permitted to exercise all remedies set forth herein, in the DIP Documents, and as otherwise available at law without further order of or application or motion to the Court.

(e)     No rights, protections, or remedies of the DIP Secured Parties or the Prepetition Secured Parties granted by this Interim Order or the DIP Documents shall be limited, modified, or impaired in any way by (i) any withdrawal of the consent of any party to the Debtors' authority to continue to use Cash Collateral or (ii) any termination of the Debtors' authority to continue to use Cash Collateral.

(f)     Notwithstanding anything to the contrary in the DIP Documents or this Interim Order, nothing therein or herein shall prohibit the Debtors from taking any action consistent with their fiduciary duties.

36

11.     **Protection of Rights of Prepetition Secured Parties and DIP Secured Parties**.

(a)     Unless (i) the DIP Agent and the Required DIP Lenders or (ii) the Prepetition Agents and the requisite amount of Prepetition Secured Parties, as applicable, provide their prior written consent, or all DIP Obligations and all Prepetition Secured Obligations have been, or contemporaneously will be, indefeasibly paid in full in cash and the DIP Commitments have terminated, in any of these Chapter 11 Cases or any Successor Cases, the Debtors shall neither seek entry of, nor support any motion or application seeking entry of, and otherwise shall object to any motion or application seeking entry of, any order (including any order confirming any plan of reorganization or liquidation) that authorizes any of the following: (i) the use of Cash Collateral for any purpose other than as permitted in the DIP Documents and this Interim Order; or (ii) any modification of any of the DIP Secured Parties' or the Prepetition Secured Parties' rights under this Interim Order, the DIP Documents, or the Prepetition Credit Documents, as applicable, with respect to any DIP Obligations or Prepetition Secured Obligations.  It shall be an Event of Default under the DIP Documents and this Interim Order, and terminate the Debtors' use of Cash Collateral, if, in any of these Chapter 11 Cases or any Successor Cases, any order is entered granting any of the relief enumerated in provisions (i) through (ii) of the previous sentence.

(b)     No Debtor shall object to the DIP Secured Parties' credit bidding up to the full amount of the applicable outstanding DIP Obligations, including any accrued interest and expenses, in any sale of any DIP Collateral, whether such sale is effectuated through section 363 or section 1129 of the Bankruptcy Code, by a Chapter 7 trustee under section 725 of the Bankruptcy Code, or otherwise.

12.     **Proceeds of Subsequent Financing**.  If the Debtors', their estates, any trustee, any examiner with enlarged powers, or any responsible officer subsequently appointed in any of the

Chapter 11 Cases or any Successor Cases shall obtain credit or incur debt pursuant to sections 364(b), (c), or (d) of the Bankruptcy Code in violation of this Interim Order or the DIP Documents at any time prior to the repayment in full in cash of all of the DIP Obligations, the satisfaction of the Superpriority DIP Claims and the Adequate Protection Claims, and the termination of the DIP Lenders' obligations to extend credit under the DIP Facility and this Interim Order, including subsequent to the confirmation of any plan with respect to any or all of the Debtor and the Debtors' estates, then unless otherwise agreed by the Required DIP Lenders, all cash proceeds derived from such credit or debt shall immediately be turned over to the DIP Agent to be applied to the DIP Obligations pursuant to the DIP Documents.  For the avoidance of doubt, none of the Prepetition Secured Parties consent to the priming of the Prepetition Liens or shall be deemed to have consenting to the priming of the Prepetition Liens in connection with the incurrence of credit or debt referenced in this paragraph 12.

13.    **Credit Bidding**.  In connection with any sale process authorized by the Court, (i) the DIP Secured Parties (or any such party's designee), and (ii) the Prepetition Secured Parties (or any such party's designee), subject to the rights preserved in paragraph 25, shall be authorized to credit bid, consistent with the applicable DIP Documents and/or Prepetition Credit Documents, some or all of their claims for their respective priority collateral (each, a "Credit Bid") pursuant to section 363(k) of the Bankruptcy Code, subject to the provision of cash consideration sufficient to satisfy the Carve-Out and any senior liens on the collateral that is subject to the Credit Bid except to the extent otherwise agreed by the holder of such senior lien in their sole and absolute discretion.  Each of the DIP Lenders, and the Prepetition 1L Lenders and the Prepetition 2L Noteholders (collectively, the "Prepetition Lenders"), shall be deemed a "Qualified Bidder" with respect to their rights to acquire all or any of the assets by Credit Bid.

14.     **Limitation on Charging Expenses Against Collateral**.  Subject to and effective only upon entry of the Final Order, and without limiting the scope of the Carve-Out, no costs or expenses of administration of these Chapter 11 Cases or any Successor Cases or future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the DIP Collateral or the Prepetition Collateral (including Cash Collateral) pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the Required DIP Lenders and the requisite number of Prepetition Secured Parties, as applicable, and no consent shall be implied from any other action, inaction, or acquiescence by the DIP Secured Parties or the Prepetition Secured Parties, as applicable, and nothing contained in this Interim Order shall be deemed to be a consent by the DIP Secured Parties or the Prepetition Secured Parties to any charge, lien, assessment, or claims against the DIP Collateral or the Prepetition Collateral under section 506(c) of the Bankruptcy Code or otherwise.

15.     **Section 552(b) of the Bankruptcy Code**.  Subject to and effective only upon entry of the Final Order, the DIP Secured Parties shall each be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code.  Subject to and effective only upon entry of the Final Order, in no event shall the "equities of the case" exception in section 552(b) of the Bankruptcy Code apply to the Prepetition Agents or the Prepetition Secured Parties with respect to proceeds, products, offspring, or profits of any Prepetition Collateral.

16.     **No Marshaling**.  Subject to and effective only upon entry of the Final Order, in no event shall the DIP Secured Parties or the Prepetition Secured Parties be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral, the DIP Obligations, the Prepetition Collateral, or the Prepetition Secured Obligations.

17.     **Payments Free and Clear**.  In light of, among other things, the agreement of the DIP Secured Parties and the Prepetition Secured Parties to allow the Debtors to use Cash Collateral on the terms set forth herein, (i) the DIP Agent and the Prepetition Agents shall be entitled to apply the payments or proceeds of the DIP Collateral in accordance with the provisions of this Interim Order or the Final Order, as applicable, the DIP Documents, and the Prepetition Credit Documents, as applicable, and (ii) any and all payments or proceeds remitted to the DIP Agent, the DIP Lenders, the Prepetition Agents, or the Prepetition Secured Parties pursuant to the provisions of this Interim Order or the DIP Documents or any subsequent order of the Court shall be irrevocable and non-refundable, received free and clear of any claim, charge, assessment, or other liability, including without limitation, any such claim or charge arising out of or based on, directly or indirectly, sections 506(c) or 552(b) of the Bankruptcy Code (only to the extent granted in the Final Order) (in all cases, in accordance with Local Rule 4001-2(g)(9)), whether asserted or assessed by through or on behalf of the Debtors.

18.     **Use of DIP Facility Proceeds**.  From and after the Closing Date, the Debtors shall be permitted to use the proceeds of the DIP Facility and Cash Collateral solely in accordance with and subject to this Interim Order, the DIP Documents, and the Approved Budget (subject to the Carve-Out and permitted variances as provided in the DIP Term Sheet).

19.     **Maintenance of DIP Collateral**.  The Debtors shall take all steps necessary to preserve, maintain, and maximize the value of the DIP Collateral, including but not limited to: (a) insure the DIP Collateral as required under the DIP Facility or the Prepetition Credit Documents, as applicable; and (b) maintain the cash management system which has been agreed to by the Required DIP Lenders.  To the fullest extent provided by applicable law, the DIP Agent (on behalf of the DIP Secured Parties) shall be, and shall be deemed to be, without any further

40

action or notice, named as additional insureds and lender's loss payees on each insurance policy maintained by the Debtors that in any way relates to the DIP Collateral.

20.     **Disposition of DIP Collateral**.  The Debtors shall not sell, transfer, lease, encumber, or otherwise dispose of any portion of the DIP Collateral other than in the ordinary course of business without the prior written consent of the Required DIP Lenders (and no such consent shall be implied, from any other action, inaction, or acquiescence by the Required DIP Lenders or from any order of this Court) and after prior consultation with the Prepetition Agents (which consultation shall not constitute approval rights), except as otherwise permitted by the DIP Documents or otherwise ordered by the Court.

21.     **Authorization to Use Cash Collateral**.  The Debtors are authorized to use Cash Collateral in accordance with the Approved Budget subject to (a) permitted variances (as provided in the DIP Term Sheet), (b) the Carve-Out, and (c) the terms and conditions of the DIP Document sand this Interim Order, provided that the Prepetition Secured Parties are granted the Adequate Protection as hereinafter set forth.  Nothing in this Interim Order shall authorize the Debtors' use of any Cash Collateral or other proceeds resulting therefrom, except as permitted under this Interim Order and the DIP Documents and in accordance with the Approved Budget (subject to the Carve-Out and permitted variances as provided in the DIP Term Sheet).  The Prepetition Liens on the Prepetition Collateral shall continue to attach to the Cash Collateral irrespective of the commingling of the Cash Collateral with other cash of the Debtors (if any).  Any failure by the Debtors on or after the Petition Date to comply with the segregation requirements of section 363(c)(4) of the Bankruptcy Code in respect of any Cash Collateral shall not be used as a basis to challenge the Prepetition Secured Obligations, or the extent, validity, enforceability, or perfected status of the Prepetition Liens.

22.    **Weekly Meetings**.  The Debtors shall arrange for weekly (unless waived by the Required DIP Lenders in their sole and absolute discretion) status calls with the DIP Lenders and their advisors, and shall cause the Debtors' advisers and CAO to participate to discuss (A) the Approved Budget and any other reports or information delivered by the Debtors, (B) the financial operations and performance of the Debtors' business, (C) progress in achieving the Milestones (as defined in the RSA) and any winddown, liquidation, or going concern sale or marketing process or efforts, (D) the status of the Chapter 11 Cases generally, and (E) such other matters relating to the Debtors as the DIP Lenders (or their respective agents or advisors) shall reasonably request ("Weekly Meetings").  The DIP Agent and its counsel may attend the Weekly Meetings at their discretion.

23.    **Financial Reporting**.  The Debtors shall provide to the DIP Agent, the DIP Lenders, and the Prepetition Agents (and, in each case, their respective consultants, advisors, and professionals) reasonable access to the Debtors' books and records, assets, and properties, for purposes of monitoring the Debtors' businesses, evaluating compliance with the budget, and monitoring the value of the DIP Collateral during normal business hours.  The DIP Lenders and the Prepetition Lenders (and, in each case, their respective consultants, advisors, and professionals) shall also be permitted, during normal business hours, to conduct, at their discretion and at their respective cost and expense, field audits, collateral examinations, and inventory appraisals in respect of the DIP Collateral.

24.    **Adequate Protection of Prepetition Secured Parties**.  Subject and subordinate in all respects to the Carve-Out, the Prepetition Secured Parties are entitled, pursuant to sections 361, 362, 363(e), 364(d)(1), and 507 of the Bankruptcy Code, to adequate protection of their interests in all DIP Collateral, including Cash Collateral, for and equal in amount to the aggregate

42

Diminution in Value of the Prepetition Secured Parties' interests in the DIP Collateral (including Cash Collateral) from and after the Petition Date for any reason, including, without limitation, any such Diminution in Value resulting from the depreciation, sale, lease, or use by the Debtors (or other decline in value) of the DIP Collateral, the priming of the Prepetition Liens by the DIP Liens pursuant to the DIP Documents and this Interim Order, the payment of any amounts under the Carve-Out, and the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code. Solely to the extent of any Diminution in Value, the Prepetition Secured Parties are hereby granted the following, in each case subject and subordinate in all respects to the Carve-Out (collectively, the "Adequate Protection Obligations"):

(a) **Adequate Protection Liens**. The Prepetition Agents, for the benefit of their respective Prepetition Secured Parties, are hereby granted (effective and perfected upon the date of this Interim Order and without the necessity of the execution of any mortgages, security agreements, control agreements, pledge agreements, financing statements, or other agreements) a valid, perfected security interest in and lien on all of the DIP Collateral, in each case subject and subordinate only to (i) the Carve-Out and (ii) the DIP Liens and the Permitted Encumbrances (the "Adequate Protection Liens"). Notwithstanding anything to the contrary in this Interim Order or in the Prepetition Credit Documents, the relative priority of the Adequate Protection Liens shall be as set forth in **Exhibit B** attached hereto.

(b) **507(b) Claims**. The Prepetition Agents, for the benefit of their respective Prepetition Secured Parties, are hereby granted an allowed superpriority administrative expense claim under section 507(b) of the Bankruptcy Code with priority in payment over any and all administrative expenses of the kind specified or ordered pursuant to any provision of the Bankruptcy Code (the "507(b) Claims"), which 507(b) Claims shall be payable from and have

recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof.  The 507(b) Claims shall be subject and subordinate only to the DIP Superpriority Claims granted in respect of the DIP Obligations and the Carve-Out.  Except to the extent expressly set forth in this Interim Order or the DIP Documents, as applicable, the Prepetition Secured Parties shall not receive or retain any payments, property, or other amounts in respect of the 507(b) Claims unless and until the DIP Obligations (other than contingent indemnification obligations as to which no claim has been asserted) and any claims having a priority senior to or *pari passu* with the DIP Superpriority Claims have indefeasibly been paid in cash in full, and all DIP Commitments have been terminated.

(c)    **Adequate Protection Fees and Expenses**.  The Debtors shall accrue, as adequate protection, (i) for the benefit of the Prepetition 1L Lenders, interest (at the default rate) due under the Prepetition Credit Documents and (ii) for the benefit of the Prepetition Secured Parties, the reasonable and documented prepetition and postpetition fees and out-of-pocket expenses of the Prepetition Agents and the Prepetition Secured Parties, including, but not limited to, the reasonable and documented fees and out-of-pocket expenses of (A) Ropes & Gray and (B) any other advisors (including local and foreign local legal counsel) retained by the requisite Prepetition Lenders (the "Adequate Protection Fees and Expenses"), which Adequate Protection Fees and Expenses shall be allowed under section 507(b) of the Bankruptcy Code.

(d)    **Information Rights**.  The Debtors shall promptly provide the Prepetition Agents and the Prepetition Secured Parties all required written financial reporting and other periodic reporting that is required to be provided to the DIP Agent or the DIP Lenders under the DIP Term Sheet.

25.    **Adequate Protection Liens and Prepetition Credit Documents**.  All distributions on account of any of the claims granted herein shall be in accordance with the Prepetition Credit Documents, the terms of this Interim Order, and the priority of liens set forth on **Exhibit B** attached hereto.  Each of the Prepetition Secured Parties are deemed to consent to the priming of their Prepetition Liens by the DIP Liens.

26.    **Reservation of Rights of Prepetition Secured Parties**.  Under the circumstances and given that the above-described adequate protection is consistent with the Bankruptcy Code, the Court finds that the adequate protection provided herein is reasonable and sufficient to protect the interests of the Prepetition Secured Parties; *provided* that the Prepetition Agents, acting at the express written direction of the requisite Prepetition Secured Parties, may request further or different adequate protection and the Debtors or any other party in interest may contest any such request.

27.    **Perfection of DIP Liens and Adequate Protection Liens**.

(a)    The DIP Agent, the DIP Lenders, and the Prepetition Secured Parties are hereby authorized, but not required, to file or record (and to execute in the name of the Debtors, as their true and lawful attorneys, with full power of substitution, to the maximum extent permitted by law) financing statements, intellectual property filings, mortgages, notices of lien, or similar instruments in any jurisdiction, or take possession of or control over cash or securities or other property, or take any other action in order to validate and perfect the liens and security interests granted to them hereunder.  All such financing statements, trademark filings, copyright filings, mortgages, notices of lien, or similar instruments shall be deemed to have been filed or recorded at the time of and on the Petition Date.  Whether or not the DIP Agent (on behalf of the DIP Secured Parties) or the Prepetition Agents (on behalf of the Prepetition Secured Parties) shall, in their

45

respective sole discretion, choose to file such financing statements, intellectual property filings, mortgages, notices of lien, or similar instruments, or take possession of or control over any cash or securities or other property, or otherwise confirm perfection of the liens and security interests granted to them hereunder, such liens and security interests shall be deemed valid, automatically perfected, allowed, enforceable, non-avoidable, and not subject to challenge, dispute, or subordination (subject to the priorities set forth in this Interim Order).  Upon the request of the DIP Agent or the Prepetition Agents, as applicable, each of the Prepetition Secured Parties and the Debtors, without any further consent of any party, is authorized, but not directed, to take, execute, deliver, and file such instruments (in each case, without representation or warranty of any kind) to enable the DIP Agent or the Prepetition Agents to further validate, perfect, preserve, and enforce the DIP Liens and the applicable Adequate Protection Liens, respectively.  All such documents will be deemed to have been recorded and filed as of the Petition Date.

(b)     A certified copy of this Interim Order may, in the discretion of the DIP Agent or the Prepetition Agents, as applicable, be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, intellectual property filings, mortgages, notices of lien, or similar instruments, and all filing offices are hereby instructed to accept such certified copy of this Interim Order for filing or recording, as applicable.  The automatic stay of section 362(a) of the Bankruptcy Code shall be modified to the extent necessary to permit the DIP Agent or the Prepetition Agents, as applicable, to take all actions referenced in this subparagraph (b) and the immediately preceding subparagraph (a).

(c)     To the extent that any Prepetition Secured Party is the secured party under any account control agreements, listed as loss payee or additional insured under any of the Debtors' insurance policies or is the secured party under any other agreement, the DIP Agent, on behalf of

46

the DIP Secured Parties, is also deemed to be the secured party under such account control agreements or loss payee or additional insured under the Debtors' insurance policies and the secured party under each such agreement (in any such case with the same priority of liens and claims thereunder relative to the priority of (i) the Prepetition Liens and Adequate Protection Liens and (ii) the DIP Liens, as set forth herein), and shall (A) have all rights and powers in each case attendant to that position (including, without limitation, rights of enforcement, but subject in all respects to the terms of this Interim Order), and (B) subject to the terms of this Interim Order, act in that capacity and distribute any proceeds recovered or received in respect of any of the foregoing to the payment in full of the DIP Obligations.

28.    **Preservation of Rights Granted Under This Interim Order**.

(a)    Upon the occurrence and continuance of any Event of Default, interest, including, where applicable, default interest, shall accrue and be paid as set forth in the DIP Documents.  Notwithstanding any order that may be entered dismissing any of the Chapter 11 Cases under section 1112 of the Bankruptcy Code: (i) the DIP Superpriority Claims, the 507(b) Claims, the DIP Liens, and the Adequate Protection Liens, and any claims related to the foregoing, shall continue in full force and effect and shall maintain their priorities as provided in this Interim Order until all DIP Obligations and Adequate Protection Obligations shall have been paid in full in cash (and such DIP Superpriority Claims, 507(b) Claims, DIP Liens, and Adequate Protection Liens shall, notwithstanding such dismissal, remain binding on all parties in interest), (ii) the other rights granted by this Interim Order shall not be affected, and (iii) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens, and security interests referred to in this paragraph and otherwise in this Interim Order.

(b)     If any or all of the provisions of this Interim Order are hereafter reversed, modified, vacated, or stayed, such reversal, modification, vacation, or stay shall not affect: (i) the validity, priority, or enforceability of the DIP Obligations or Adequate Protection Obligations incurred prior to the actual receipt of written notice by the DIP Agent or the Prepetition Agents, as applicable, of the effective date of such reversal, modification, vacation, or stay or (ii) the validity, priority or enforceability of the DIP Superpriority Claims, the 507(b) Claims, the DIP Liens, the DIP Obligations, the Adequate Protection Liens, the Adequate Protection Obligations, the Prepetition Liens, or the Prepetition Secured Obligations. Notwithstanding any such reversal, modification, vacation, or stay of any use of DIP Collateral (including any Cash Collateral), any DIP Superpriority Claims, 507(b) Claims, DIP Obligations, DIP Liens, Adequate Protection Obligations, or Adequate Protection Liens incurred by the Debtors to the DIP Agent, the DIP Lenders or the Prepetition Secured Parties, as the case may be, prior to the actual receipt of written notice by the DIP Agent or the Prepetition Agents, as applicable, of the effective date of such reversal, modification, vacation, or stay shall be governed in all respects by the original provisions of this Interim Order, and the DIP Agent, the DIP Lenders, and the Prepetition Secured Parties shall be entitled to all rights, remedies, privileges, and benefits granted to parties acting in "good faith" under section 364(e) of the Bankruptcy Code, this Interim Order, and the DIP Documents with respect to all uses of Cash Collateral, the DIP Obligations, and Adequate Protection Obligations.

(c)     Except as expressly provided in this Interim Order or in the DIP Documents, the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, and the 507(b) Claims, and all other rights and remedies of the DIP Agent, the DIP Lenders, and the Prepetition Secured Parties granted by the provisions of this Interim Order and the DIP Documents shall

survive, and shall not be modified, impaired or discharged by: (i) the entry of an order converting any of the Chapter 11 Cases to a case under chapter 7, dismissing any of the Chapter 11 Cases, substantively consolidating any of the Chapter 11 Cases with another case (except as provided in an Acceptable Plan of Reorganization (as defined in the DIP Term Sheet)), terminating the joint administration of these Chapter 11 Cases or by any other act or omission; (ii) the entry of an order approving the sale of any DIP Collateral pursuant to section 363(b) of the Bankruptcy Code (except to the extent permitted by the DIP Documents); or (iii) the entry of an order confirming a chapter 11 plan in any of the Chapter 11 Cases and, pursuant to section 1141(d)(4) of the Bankruptcy Code, the Debtors have waived any discharge as to any remaining DIP Obligations or Adequate Protection Obligations.  The terms and provisions of this Interim Order and the DIP Documents shall continue in these Chapter 11 Cases, in any Successor Cases if these Chapter 11 Cases cease to be jointly administered and in any superseding chapter 7 cases under the Bankruptcy Code, and the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, and the 507(b) Claims, and all other rights and remedies of the DIP Agent, the DIP Lenders and the Prepetition Secured Parties granted by the provisions of this Interim Order and the DIP Documents shall continue in full force and effect until the DIP Obligations are paid in full in cash, as set forth herein and in the DIP Documents, and the DIP Commitments have been terminated.

29.     **Limitation on Use of DIP Facility Proceeds and Collateral**.  No DIP Loans, DIP Collateral, or any portion of the Carve-Out, may be used directly or indirectly by any Debtor, any statutory, or non-statutory committee (including any Creditors' Committee, if appointed), or any trustee appointed in the Chapter 11 Cases or any Successor Case, including any chapter 7 case, or any other person, party, or entity (a) in connection with the investigation, initiation, or prosecution of any claims, causes of action, adversary proceedings, or other litigation (i) against any of the DIP

49

Agent, the DIP Lenders, or the Prepetition Secured Parties, or their respective predecessors in interest, officers, directors, employees, agents, affiliates, representatives, attorneys, or advisors, or any action purporting to do the foregoing in respect of the Prepetition Secured Obligations, the Prepetition Liens, the DIP Obligations, the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, the Adequate Protection Obligations, or the 507(b) Claims granted to the Prepetition Secured Parties under this Interim Order, or (ii) challenging the amount, validity, perfection, priority or enforceability of or asserting any defense, counterclaim or offset with respect to, the Prepetition Secured Obligations, the DIP Obligations, the DIP Superpriority Claims, the Adequate Protection Obligations, or the 507(b) Claims or the liens, claims, rights, or security interests granted under this Interim Order, the DIP Documents, or the Prepetition Credit Documents including, in each case, without limitation, for lender liability or pursuant to section 105, 510, 544, 547, 548, 549, 550, or 552 of the Bankruptcy Code, applicable non-bankruptcy law, or otherwise; (b) to prevent, hinder, or otherwise delay the Prepetition Secured Parties', the DIP Agent's, or the DIP Lenders', as applicable, enforcement or realization on the Prepetition Secured Obligations, DIP Obligations, DIP Superpriority Claims, Adequate Protection Obligations, 507(b) Claims, DIP Collateral, and the liens, claims, and rights granted to such parties under this Interim Order, each in accordance with the DIP Documents, the Prepetition Credit Documents, or this Interim Order; (c) to seek to modify any of the rights and remedies granted to the Prepetition Secured Parties, the DIP Agent, or the DIP Lenders under this Interim Order, the Prepetition Credit Documents, or the DIP Documents, as applicable; (d) to apply to the Court for authority to approve superpriority claims or grant liens (other than the liens permitted pursuant to the DIP Documents) or security interests in the DIP Collateral or any portion thereof that are senior to, or *pari passu* with, the DIP Liens, DIP Obligations, DIP Superpriority Claims, Adequate Protection Liens, the

Adequate Protection Obligations, and 507(b) Claims, unless all DIP Obligations, Prepetition

Secured Obligations, Adequate Protection Obligations, and claims granted to the DIP Agent, DIP

Lenders, or Prepetition Secured Parties under this Interim Order, have been paid in full in cash or

as otherwise agreed to in writing by the Required DIP Lenders and the requisite Prepetition

Secured Parties, (e) to seek to pay any amount on account of any claims arising prior to the Petition

Date unless such payments are agreed to in writing by the Required DIP Lenders and the requisite

Prepetition Secured Parties or are otherwise included in the Approved Budget (as initially attached

to the Motion, and as updated in accordance with the terms of the DIP Documents and this Interim

Order), or (f) for any purpose specified in the "DIP Facility; Use of Proceeds" section of the DIP

Term Sheet; *provided*, that notwithstanding anything to the contrary herein, the Creditors'

Committee (if appointed) may use the proceeds of the DIP Loans, DIP Collateral (including Cash

Collateral), and the Carve-Out in an amount not to exceed $50,000 (the "Investigation Budget

Cap") only to investigate, but not prosecute, (y) the claims and liens of the Prepetition Secured

Parties, and (z) potential claims, counterclaims, causes of action or defenses against the Prepetition

Secured Parties.

30.  **Approved Budget**.  The Approved Budget is approved on an interim basis.

Proceeds of the DIP Facility and Cash Collateral under this Interim Order shall be used by the

Debtors in accordance with the DIP Documents and this Interim Order and consistent with the

Approved Budget (subject to the Carve-Out and permitted variances as provided in the DIP Term

Sheet) or as otherwise agreed by the Required DIP Lenders and Borrower.  None of the DIP

Secured Parties' consent (if any) to, or acknowledgment of, the Approved Budget shall be

construed as consent to use of the proceeds of the DIP Facility or Cash Collateral beyond the

maturity date set forth in the DIP Term Sheet, regardless of whether the aggregate funds shown on the Approved Budget have been expended.

31.     **Payment of DIP Agent's Annual Agency Fee**.  The Debtors shall pay indefeasibly in full, in cash within one (1) Business Day of entry of this Interim Order, all amounts owed to the DIP Agent under the DIP Documents.  The remainder of the DIP Fees and Expenses and the Adequate Protection Fees and Expenses shall accrue and shall be paid when agreed to by the Debtors and the Required Support Creditors (as defined in the RSA) (such consent not to be unreasonably withheld).  The payment of DIP Fees and Expenses and the Adequate Protection Fees and Expenses shall be subject to the review procedures set forth in this paragraph 31 and shall not be subject to allowance or review by the Court.  Professionals for the DIP Secured Parties and the Prepetition Secured Parties shall not be required to comply with the U.S. Trustee fee guidelines, *provided*, *however*, any time such professionals seek payment of post-petition fees and expenses from the Debtors prior to confirmation of a chapter 11 plan, each professional shall provide a copy of its invoices (which shall not be required to contain time entries and which may be redacted or modified to the extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product, or any other confidential information, and the provision of such invoices shall not constitute any waiver of the attorney-client privilege or of any benefits of the attorney work product doctrine) to the Debtors, the U.S. Trustee, and counsel for the Creditors' Committee (if appointed) (collectively, the "Notice Parties").  The invoices for such fees and expenses may be in summary form only, but shall include a general, brief description of the nature of the matters for which services were performed, a list of the professionals who worked on such matters and the number of hours each professional billed.  The Debtors, the U.S. Trustee and the Creditors' Committee (if appointed) may object to such fees and expenses and any such

objection must be in writing and state with particularity the grounds therefor and must be submitted

to the applicable professional within ten (10) days of receipt of such invoice (the "Review Period").

If no written objection is received by 12:00 p.m., Central Time on the last date of the Review

Period, the Debtors shall pay such invoices within five (5) days.  If an objection to a professional's

invoice is received within the Review Period, the Debtors shall promptly pay the undisputed

amount of the invoice, and this Court shall have jurisdiction to determine the disputed portion of

such invoice if the parties are unable to resolve the dispute consensually.  No attorney or advisor

to the DIP Secured Parties or any Prepetition Secured Party shall be required to file an application

seeking compensation for services or reimbursement of expenses with the Court.  Any and all fees,

costs, and expenses paid prior to or following the Petition Date in accordance with the terms of

this Interim Order by any of the Debtors to the (a) DIP Secured Parties in connection with or with

respect to the DIP Facility and (b) Prepetition Secured Parties in connection with or with respect

to the Chapter 11 Cases or the Prepetition RCF Facility, are hereby approved in full and shall not

be subject to recharacterization, avoidance, subordination, disgorgement, or any similar form of

recovery by the Debtors or any other person.

34. **Limits to Lender Liability**.  Nothing in this Interim Order, the DIP Documents, the

Prepetition Credit Documents, or any other documents related to these transactions shall in any

way be construed or interpreted to impose upon the DIP Agent, any DIP Lender, or any Prepetition

Secured Party any liability for any claims arising from the prepetition or postpetition activities of

the Debtors in the operation of their business or in connection with their restructuring efforts.  So

long as the DIP Agent and the DIP Lenders comply with their obligations under the DIP Documents

and their obligations, if any, under applicable law (including the Bankruptcy Code), (a) the DIP

Agent and the DIP Lenders shall not in any way or manner be liable or responsible for (i) the

safekeeping of the DIP Collateral, (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (iii) any diminution in the value thereof, or (iv) any act or default of any carrier, servicer, bailee, custodian, forwarding agency or other person, and (b) all risk of loss, damage, or destruction of the DIP Collateral shall be borne by the Debtors.

33.    **Effect of Stipulations on Third Parties**.  The Stipulations contained in paragraph F(i)–(viii) of this Interim Order (the "Debtors' Stipulations") shall be binding on the Debtors for all purposes, and the Debtors' Stipulations and Releases contained in paragraph F(i)–(ix) of this Interim Order shall be binding on the Debtors, any successor thereto (including, without limitation, any chapter 7 or chapter 11 trustee or examiner appointed or elected for any of the Debtors) and all other parties in interest, including, without limitation, any statutory or non-statutory committees appointed or formed in the Chapter 11 Cases, and any other person, in all circumstances and for all purposes unless: (a) such committee or any other person or entity with requisite standing (subject in all respects to any agreement or applicable law that may limit or affect such entity's right or ability to do so), has timely filed an adversary proceeding or contested matter (subject to the limitations contained herein, including, *inter alia*, in this paragraph) by the earlier of: (i) (y) if a Creditors' Committee has been appointed, by the Creditors' Committee within sixty (60) calendar days after appointment of the Creditors' Committee and (z) if no Creditors' Committee has been appointed, by any party in interest with requisite standing (other than the Debtors) within seventy-five (75) calendar days after entry of the Interim Order and (ii) the date that is established as the deadline for filing objections to confirmation of a chapter 11 plan in any of the Chapter 11 Cases (the time period established by the foregoing clauses (i) and (ii), as may be extended in the sole discretion of the Required DIP Lenders, the "Challenge Period"), provided, however, that if, prior to the end of the Challenge period, (x) the cases convert to a chapter 7, or (y) a chapter 11 trustee is appointed, then,

in each such case, the Challenge Period shall be extended for a period of sixty (60) days solely with respect to any such trustee, (A) objecting to or challenging the amount, validity, perfection, enforceability, priority or extent of the Prepetition Secured Obligations or the Prepetition Liens or (B) otherwise asserting or prosecuting any action for preferences, fraudulent transfers or conveyances, other avoidance claims or any other claims, counterclaims or causes of action, objections, contests or defenses (collectively, the "Challenges") against any of the Prepetition Secured Parties or their respective affiliates and subsidiaries and each of their respective former, current, or future officers, partners, directors, managers, members, principals, employees, agents, related funds, affiliates, investors, financing sources, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals and the respective successors and assigns thereof, in each case solely in their respective capacity as such (each a "Representative" and collectively, the "Representatives") in connection with the Prepetition Credit Documents, the Prepetition Secured Obligations, the Prepetition Liens, and the Prepetition Collateral and (b) there is a final non-appealable order in favor of the plaintiff sustaining any such Challenge in any such timely filed adversary proceeding or contested matter; *provided*, *however*, that any pleadings filed in connection with any Challenge shall set forth with specificity the basis for such challenge or claim and any challenges or claims not so specified prior to the expiration of the Challenge Period shall be deemed forever, waived, released and barred.  If no such Challenge is timely and properly filed during the Challenge Period or the Court does not rule in favor of the plaintiff in any such proceeding then: (a) the Debtors' Stipulations and Releases contained in paragraph F shall be binding on all parties in interest; (b) the obligations of the Debtors under the Prepetition Credit Agreements, including the Prepetition Secured Obligations, shall constitute allowed claims not subject to defense, claim, counterclaim, recharacterization, subordination, offset

or avoidance, for all purposes in the Chapter 11 Cases, and any subsequent chapter 7 case(s); (c) the Prepetition Liens on the Prepetition Collateral shall be deemed to have been, as of the Petition Date, legal, valid, binding, perfected, security interests and liens, not subject to recharacterization, subordination, avoidance or other defense and (d) the Prepetition Secured Obligations and the Prepetition Liens on the Prepetition Collateral shall not be subject to any other or further claim or challenge by any statutory or non-statutory committee, or any other party in interest, including, without limitation, any successor thereto (including, without limitation, any chapter 7 trustee or chapter 11 trustee or examiner appointed or elected for any of the Debtors) and any defenses, claims, causes of action, counterclaims and offsets by any statutory or non-statutory committee, if any, or any other party in interest, including, without limitation, any successor thereto (including, without limitation, any chapter 7 trustee or chapter 11 trustee or examiner appointed or elected for any of the Debtors), whether arising under the Bankruptcy Code or otherwise, against any of the Prepetition Secured Parties and their Representatives arising out of or relating to any of the Prepetition Credit Documents shall be deemed forever waived, released and barred.  If any such Challenge is timely filed during the Challenge Period, the Debtors' Stipulations and Releases contained in paragraph F shall nonetheless remain binding and preclusive on any statutory or non-statutory committee, and on any other person or entity, except to the extent that such stipulations, admissions, agreements and releases were expressly and successfully challenged in such Challenge as set forth in a final, non-appealable order of a court of competent jurisdiction.  Nothing in this Interim Order vests or confers on any Person (as defined in the Bankruptcy Code), including any statutory or non-statutory committee, standing or authority to pursue any claim or cause of action belonging to the Debtors or their estates, including, without limitation, Challenges with respect to the Prepetition Credit Documents, the Prepetition Secured Obligations or the Prepetition Liens.  Any motion seeking

standing (which ruling on standing, if appealed, shall not stay or delay the Chapter 11 Cases or confirmation of any chapter 11 plan) shall attach a draft complaint or other pleading that sets forth such Challenge, and any Challenge not included therein shall be deemed forever waived, released, and barred.  For the avoidance of doubt, none of the foregoing challenge provisions set forth in this paragraph shall apply to any DIP Secured Party, in their capacities as such, and in no event shall the DIP Facility, DIP Obligations, DIP Superpriority Claims, or DIP Liens be subject to challenge pursuant to this paragraph on avoidance or any other grounds by any party.

34.    **Cash Collateral Termination Event**.  Upon repayment of the DIP Facility (pursuant to a Voluntary Prepayment or Mandatory Prepayment under the DIP Term Sheet), the Debtors consensual use of Cash Collateral shall immediately terminate and cease and no continued use of Cash Collateral by the Debtors shall be permitted; provided, that, as long as no Default or Event of Default was continuing as of the date of the repayment of the DIP Facility, (A) the Prepetition Secured Parties shall agree to the continued use of Cash Collateral on the same terms and conditions as the DIP Loans were advanced under the DIP Term Sheet and Adequate Protection was provided under this Interim Order including, among other terms, budget compliance, events of default, financial reporting, and adequate protection, with such changes to be agreed upon taking into account the then current circumstances of these Chapter 11 Cases, including payment of accrued Adequate Protection Fees and Expenses and (B) prior to the repayment of the DIP Facility, the Debtors and the Prepetition Secured Parties shall negotiate in good faith on the terms of an order for the consensual use of cash collateral taking into account the terms outlined in subpart (A) of this paragraph.

35.    **Joint and Several Liability**.  Nothing in this Interim Order shall be construed to constitute a substantive consolidation of any of the Debtors' estates, it being understood, however,

that the Debtors shall be jointly and severally liable for the obligations hereunder and all DIP Obligations in accordance with the terms hereof and of the DIP Facility and the DIP Documents.

36. **Interim Order Governs**.  In the event of any inconsistency between the provisions of this Interim Order, the DIP Documents, or any other order entered by this Court, the provisions of this Interim Order shall govern.  Notwithstanding anything to the contrary in any other order entered by this Court, any payment made pursuant to, or authorization contained in, any other order entered by this Court shall be consistent with and subject to the requirements set forth in this Interim Order and the DIP Documents, including, without limitation, the Approved Budget.

37. **Proof of Claim**.  None of the Prepetition Secured Parties shall be required to file proofs of claim in any of the Chapter 11 Cases or Successor Cases in order to assert claims for payment of the Prepetition Secured Obligations arising under the Prepetition Credit Documents. The statements of claim in respect of the Prepetition Secured Obligations set forth in this Interim Order (including the DIP Documents and the Debtors' Stipulations), together with any evidence accompanying the Motion and presented at the Interim Hearing, are deemed sufficient and do constitute timely filed proofs of claim in respect of such debt and such secured status against each of the applicable Debtors.  Any order entered by the Court in relation to the establishment of a bar date for any claim (including administrative claims) in any of the Chapter 11 Cases shall not apply to any of the DIP Secured Parties or Prepetition Secured Parties with respect to any claims and interests, including claims arising under or related to the DIP Documents or the Prepetition Credit Documents.  Notwithstanding the foregoing, or any order entered by the Court in relation to the establishment of a bar date in any of the Chapter 11 Cases, the DIP Agent and the Prepetition Agents are hereby authorized and entitled, in each case in its respective sole discretion, but not required, to file a master proof of claim in the Debtors' lead chapter 11 case, Case No. 22-30987

58

(MI) (a "Master Proof of Claim"), which shall be deemed asserted against each of the Debtors in their respective Chapter 11 Cases.  Upon the filing of a Master Proof of Claim, the Prepetition Agents and the DIP Agent, and each of their respective successors and assigns, as applicable, shall be deemed to have filed a proof of claim in the aggregate amount set forth in such Master Proof of Claim against each of the Debtors.  The Master Proofs of Claim shall not be required to identify any Prepetition Secured Party (other than the Prepetition Agents) or whether such Prepetition Secured Party acquired its claim from another party and the identity of any such party or to be amended to reflect a change in the holders of the claims set forth therein or a reallocation among such holders of the claims asserted therein resulting from the transfer of all or any portion of such claims.  A Master Proof of Claim shall not be required to attach any instruments, agreements, or other documents evidencing the obligations owing by each of the Debtors to the applicable Prepetition Secured Parties, which instruments, agreements, or other documents will be provided upon written request to the Prepetition Agents.  Any proof of claim filed by the Prepetition Agents shall be deemed to be in addition to and not in lieu of any other proof of claim that may be filed by any of the applicable Prepetition Secured Parties.  The provisions set forth in this paragraph 37 are intended solely for the purpose of administrative convenience and shall not affect the substantive rights of any party in interest or their respective successors in interest.

38.     **Binding Effect; Successors and Assigns**.  Subject only to paragraph 33, the DIP Documents and the provisions of this Interim Order, including all findings herein, shall be binding upon all parties in interest in these Chapter 11 Cases, including the DIP Agent, the DIP Lenders, the Prepetition Secured Parties, any statutory or non-statutory committee (including any Creditors' Committee, if appointed), and the Debtors and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of any of the

59

Debtors, an examiner appointed pursuant to section 1104 of the Bankruptcy Code, or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors) and shall inure to the benefit of the DIP Agent, the DIP Lenders, the Prepetition Secured Parties, and the Debtors and their respective successors and assigns; *provided*, that the DIP Agent, the DIP Lenders and the Prepetition Secured Parties shall have no obligation to permit the use of the DIP Collateral (including Cash Collateral) by, or to extend any financing to, any chapter 7 trustee, chapter 11 trustee or similar responsible person appointed for the estates of the Debtors.

39.     **Limitation of Liability**.  In determining to make any loan or other extension of credit under the DIP Documents to permit the use of Cash Collateral or in exercising any rights or remedies as and when permitted pursuant to this Interim Order or the DIP Documents, none of the DIP Agent, the DIP Lenders or the Prepetition Secured Parties, each in their capacity as such, by reason of entering into the DIP Facility or the Prepetition Credit Documents and taking any actions permitted under the DIP Documents, the Prepetition Credit Documents or this Interim Order, shall (a) be deemed to be in "control" of the operations or participating in the management of the Debtors, (b) owe any fiduciary duty to the Debtors, their respective creditors, shareholders or estates, or (c) be deemed to be acting as a "Responsible Person" or "Owner" or "Operator" with respect to the operation or management of the Debtors (as such terms or similar terms are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. §§ 9601, et seq., as amended, or any similar federal or state statute).  Nothing in this paragraph shall impact or limit the rights of any governmental authority.  Furthermore, nothing in this Interim Order, the DIP Documents or the Prepetition Credit Documents shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Agent, the DIP Lenders

or the Prepetition Secured Parties of any liability for any claims arising from the prepetition or postpetition activities of any of the Debtors and their direct or indirect subsidiaries.

40.     **Effectiveness**.  This Interim Order shall constitute findings of fact and conclusions of law and shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon entry hereof.  Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062, or 9014, or any Local Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Interim Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Interim Order.

41.     **Headings**.  Section headings used herein are for convenience only and are not to affect the construction of or to be taken into consideration in interpreting this Interim Order.

42.     **Payments Held in Trust**.  Except as expressly permitted in this Interim Order or the DIP Documents, in the event that any person or entity receives any payment on account of a security interest in DIP Collateral, receives any DIP Collateral or any proceeds of DIP Collateral or receives any other payment with respect thereto from any other source prior to payment in full in cash of all DIP Obligations under the DIP Documents and termination of the DIP Commitments in accordance with the DIP Documents, such person or entity shall be deemed to have received, and shall hold, any such payment or proceeds of DIP Collateral in trust for the benefit of the DIP Secured Parties and shall immediately turn over such proceeds to the DIP Agent, or as otherwise instructed by this Court, for application in accordance with the DIP Documents and this Interim Order.

43.     **Good Faith**.  Each of the DIP Secured Parties and Prepetition Secured Parties have acted in good faith (including for the purposes of sections 363(m) and 364(e) of the Bankruptcy

Code) in connection with this Interim Order and their reliance on this Interim Order has been and is in good faith.

44.    **No Third-Party Rights**.  Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder, or any direct, indirect, or incidental beneficiary.

45.    **Retention of Jurisdiction**.   The Court shall retain exclusive jurisdiction to implement, interpret, and enforce the provisions of this Interim Order, and this retention of jurisdiction shall survive the confirmation and consummation of any chapter 11 plan for any one or more of the Debtors notwithstanding the terms or provisions of any such chapter 11 plan or any order confirming any such chapter 11 plan.

46.    **Bankruptcy Rules**.  The requirements of Bankruptcy Rules 4001, 6003, and 6004 and Local Rule 4001-2, in each case to the extent applicable, are satisfied by the contents of the Motion.

47.    **Necessary Action**.  The Debtors are authorized to take any and all such necessary actions as are necessary or appropriate to implement the terms of this Interim Order.

48.    **Final Hearing**.  The Final Hearing is scheduled for [_____], 2022 at [  ]:00 [ ].m. (Central Standard Time) before this Court.  Any party in interest objecting to the relief sought at the Final Hearing shall serve and file a written objection thereto, which shall be served upon the Notice Parties, the DIP Secured Parties, and the Prepetition Secured Parties, and shall also be filed with the Clerk of the United States Bankruptcy Court for the Southern District of Texas, in each case to allow actual receipt by the foregoing no later than[_____], 2022 at [  ]:00 [ ].m. (Central Standard Time).

Signed:  _____, 2022

62

_____

United States Bankruptcy Judge

## **EXHIBIT A**

**DIP Term Sheet**

**DIP TERM SHEET**

Set forth below is a summary of the principal terms and conditions for the proposed debtor-in-possession financing facility (the "DIP Facility").  Capitalized terms used but not defined in this term sheet (the "DIP Term Sheet") shall have the meanings set forth in either the Restructuring Support Agreement, dated as of April 12, 2022 (the "Restructuring Support Agreement") or the Prepetition RCF Credit Agreement (as defined below), as applicable.

The terms and conditions for the extension of credit described herein are dependent upon, among other things, authorization and approval by the Bankruptcy Court (as defined below). The terms and conditions with respect to such commitments are mutually dependent on each other and the DIP Lenders shall not be obligated to extend credit unless agreement with the Obligors (as defined below) and approval by the Bankruptcy Court is obtained with respect to such terms and conditions as a whole.

| | |
|---|---|
| **Parties** | **Debtors**: The Borrowers (as defined below) and their subsidiaries, each as debtors in possession (collectively, the "Debtors") in the chapter 11 cases (the "Chapter 11 Cases") to be commenced in the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court").<br><br>**Borrowers**: ION GEOPHYSICAL CORPORATION, a Delaware corporation ("Geophysical"), ION EXPLORATION PRODUCTS (U.S.A.), INC., a Delaware corporation ("Exploration"), I/O MARINE SYSTEMS, INC., a Louisiana corporation ("Marine") and GX TECHNOLOGY CORPORATION, a Texas corporation ("GXT" and, together with Geophysical, Exploration and Marine, or any other affiliated entity as determined by the Required DIP Lenders, collectively, the "Borrowers", and each a "Borrower").<br><br>**Guarantors**: All obligations under the DIP Facility will be unconditionally guaranteed, jointly and severally, on a first priority secured basis by each Debtor, if any, other than the Borrowers (collectively, the "Guarantors").<br><br>Borrowers and the Guarantors are collectively referred to herein as the "Loan Parties".  Each Loan Party is identified in Annex II hereto.<br><br>**DIP Lenders**: The lenders under this DIP Facility as set forth on Annex I and such lenders' successors and permitted assigns (collectively, the "DIP Lenders").<br><br>**DIP Agent**:  Ankura Trust Company, LLC will serve as the administrative agent and collateral agent under the DIP Facility (in such capacity, the "DIP Agent") and will perform duties customarily associated with such capacities. |
| **Prepetition Facilities** | **Prepetition Facilities**:  Each Borrower is party to each of that certain Revolving Credit and Security Agreement, dated as of August 22, 2014 (as amended, restated, amended and restated or otherwise modified from time to time prior to the date hereof), by and among the Borrowers, the lenders party thereto from time to time and Ankura Trust Company, LLC, as successor administrative and collateral agent (the "Prepetition RCF Credit Agreement") and that certain Indenture, dated as of April 20, 2021(as amended, restated, amended and restated or otherwise modified from time to time prior to the date hereof), by and among Geophysical, as issuer, the guarantors party thereto and UMB Bank, National Association, as trustee and as collateral agent (the "Prepetition Second Lien Indenture") (each, a "Prepetition Facility", and collectively, the "Prepetition Facilities") and the lenders party to the Prepetition RCF Credit Agreement from time |

|  | to time, the "<u>Prepetition 1L Lenders</u>", and the noteholders party to the Prepetition Second Lien Indenture from time to time, the "<u>Prepetition 2L Noteholders</u>", and together with the Prepetition 1L Lenders, the "<u>Prepetition Lenders</u>"), with Ankura Trust Company, LLC, as administrative agent and as collateral agent (the "<u>Prepetition 1L Agent</u>") under the Prepetition RCF Credit Agreement, and UMB Bank, National Association, as trustee and as collateral agent (the "<u>Prepetition 2L Agent</u>", and together with the Prepetition 1L Agent, the "<u>Prepetition Agents</u>").<br><br>The Prepetition Lenders and the Prepetition Agents are collectively referred herein as the "<u>Prepetition Secured Parties</u>."<br><br>All instruments and documents executed at any time in connection with the Prepetition RCF Credit Agreement (including the Other Documents, as defined in the Prepetition RCF Credit Agreement) shall be referred to collectively as the "<u>Prepetition 1L Documents</u>", and all instruments and documents executed at any time in connection with the Prepetition Second Lien Indenture shall be referred to collectively as the "<u>Prepetition 2L Documents</u>." |
|---|---|
| **DIP Facility; Use of Proceeds** | **<u>DIP Facility</u>**: The DIP Facility shall be comprised of superpriority priming term loans (the "<u>DIP Loans</u>" and each DIP Lender's portion thereof, a "<u>Commitment</u>") in an aggregate principal amount of $2,500,000.<br><br>Amounts paid or prepaid under the DIP Facility may not be reborrowed. As used herein, "<u>DIP Obligations</u>" shall mean the DIP Loans, including all principal and accrued interest on the DIP Loans, and all reimbursement, indemnity, and other obligations under the DIP Facility.<br><br>**<u>DIP Loans</u>**: Subject to the terms and conditions herein, including the restrictions on Use of Proceeds set forth below, the proceeds of the DIP Facility (including the Interim Facility (as defined below)) will be used in accordance with the terms of the Budget (subject to Permitted Variances (as defined below)), including: (i) to pay (a) professional fees and other restructuring charges arising on account of the Chapter 11 Cases, including statutory fees of the United States Trustee and allowed professional fees and expenses of a Committee (as defined herein) (if any), and (b) all professional fees and expenses (including legal, financial advisor, appraisal, and valuation-related fees and expenses) incurred by the DIP Agent and/or the DIP Lenders as provided under the DIP Facility, including those incurred in connection with the preparation, negotiation, documentation, and court approval of the DIP Facility (which fees, in the case of clauses (i)(a) and (b), shall be subject to the Carve-Out (as defined in the DIP Orders)), (ii) to provide working capital, and for other general corporate purposes of the Debtors, and (iii) to pay administration costs of the Chapter 11 Cases and claims or amounts approved by the Bankruptcy Court.<br><br>**<u>Use of Proceeds</u>**: No portion of the Borrowers' "cash collateral" (as such term is defined in section 363(a) of the Bankruptcy Code) (the "<u>Cash Collateral</u>"), the proceeds of the DIP Facility, the Collateral (as defined below), or the Carve-Out (as defined in the DIP Orders) may be used:<br><br>(a)      for any purpose that is prohibited under the Bankruptcy Code or the DIP Orders;<br><br>(b)      to finance in any way: (i) any adversary action, suit, arbitration, proceeding, application, motion or other litigation of any type adverse to the interests of any or all of the DIP Agent, the DIP Lenders, the Prepetition Secured Parties or their respective rights and remedies under this DIP Term Sheet, the Interim Order (as defined below), the Final Order (as defined below), or the Prepetition 1L |

| | |
|---|---|
| | Documents or (ii) any other action, which with the giving of notice or passing of time, would result in an Event of Default under this DIP Term Sheet; |
| | (c)    for the payment of fees, expenses, interest, or principal under the Prepetition 1L Documents or Prepetition 2L Documents (in each case, other than adequate protection payments permitted under the DIP Orders (as defined below)); |
| | (d)    to make any distribution under a plan of reorganization in the Chapter 11 Cases (a "<u>Plan of Reorganization</u>") unless such Plan of Reorganization provides for the indefeasible payment of DIP Obligations in full and in cash or is otherwise agreed by the DIP Agent and DIP Lenders; and |
| | (e)    except as permitted by the Budget (including Permitted Variances (as defined below)) to make any payment in settlement of any claim, action or proceeding in excess of $50,000 in the aggregate without the prior written consent of the Required DIP Lenders (as defined below); |
| | <u>provided</u> that, advisors to the Committee (as defined below), if one is appointed, may investigate the liens granted pursuant to, or any claims under or causes of action with respect to, the Prepetition Facilities at an aggregate expense for such investigation not to exceed $50,000 (the "<u>Investigation Budget Cap</u>"), provided that no portion of such amount may be used to prosecute any claims. |
| **Availability** | <u>**Interim Facility**</u>: During the period commencing on the date (the "<u>Interim Order Entry Date</u>") of the Bankruptcy Court's entry of an interim order approving the DIP Facility ("<u>Interim Order</u>") but prior to the entry of a final order approving the DIP Facility ("<u>Final Order</u>", and together with the Interim Order, the "<u>DIP Orders</u>", as applicable), or if earlier, the occurrence of a maturity event, the full Commitment ($2,500,000) shall be available in no more than three (3) draws under the DIP Facility, subject to compliance with the terms, conditions, and covenants set forth in this DIP Term Sheet (the "<u>Interim Facility</u>"). |
| | <u>**Full Availability**</u>:  Upon the Bankruptcy Court's entry of the Final Order (the "<u>Final Order Entry Date</u>"), all amounts of the DIP Loan unfunded as of the Final Order Entry Date shall be available in a single draw to the Debtors (excluding any draws under the Interim Facility), subject to compliance with the terms, conditions, and covenants set forth in this DIP Term Sheet. |
| **Budget** | <u>**Initial Budget; Budget**</u>:  The 13-week statement of the Loan Parties' anticipated cash receipts and disbursements for the first 13 weeks of the Chapter 11 Cases, set forth on a weekly basis, including the anticipated uses of the DIP Facility for such period (the "<u>Initial Budget</u>").  On the first Thursday that is two (2) full weeks after the date on which the Chapter 11 Cases are commenced (the "<u>Petition Date</u>"), and on the Thursday of each second week thereafter, the Loan Parties shall provide to the DIP Agent and the legal advisors of the DIP Lenders with an updated 13-week statement for the subsequent 13-week period (a "<u>Proposed Budget</u>"), which Proposed Budget shall modify and supersede any prior Budget unless the Required DIP Lenders notify the Loan Parties of their objection (which objection may be made via e-mail) to the Proposed Budget within three (3) business days of receipt (such objection not to be made unreasonably).  If the Required DIP Lenders object to the Proposed Budget as set forth above (such objection not to be made unreasonably) the then-current Budget shall remain the Budget. |
| | <u>**Budget Variance**</u>: Commencing on the first Thursday that is two (2) full weeks after the Petition Date, and continuing weekly thereafter, the Loan Parties shall deliver to the DIP Agent a report |

(each, a "Variance Report") describing in reasonable detail the Debtors' aggregate cash receipts and aggregate cash disbursements during the preceding two-week period as compared to the projected, aggregate cash receipts and disbursements provided by the then-current Budget for such two-week period (such difference, a "Variance").

"Permitted Variance" means a Variance from the then-current Budget on a two-week trailing basis (the "Testing Period") that does not exceed the total aggregate amount in such Budget of disbursements (exclusive of (x) professional fees of the DIP Agent and/or DIP Lenders) and (y) disbursements made on account of prepetition claims pursuant to any order of the Bankruptcy Court for the Testing Period) by more than 10%.

The Loan Parties hereby agree that during any Testing Period, the Variance from the then-current Budget shall not exceed the Permitted Variance.

| | |
|---|---|
| **Collateral; Priority** | **Collateral**:  All property of the Loan Parties (now or hereafter acquired and all proceeds thereof), including property or assets, if any, that do not secure the Existing Primed Secured Facilities (as defined below), and including, subject to entry of the Final Order, the proceeds of all claims and causes of action arising under sections 502(d), 542, 544, 545, 547, 548, 549, 550, 551, 553(b), or 724(a) of the Bankruptcy Code or any other avoidance actions under the Bankruptcy Code or applicable state-law equivalents (the "Avoidance Actions") (the "Collateral").<br><br>**Priority**:  All obligations of the Loan Parties to the DIP Lenders and the DIP Agent under this DIP Term Sheet, including all loans made under the DIP Facility, shall, subject in all respects to the Carve-Out, at all times:<br><br>    (a)  pursuant to section 364(c)(1) of the Bankruptcy Code, be entitled to joint and several superpriority administrative expense claim status against each Debtor in the Chapter 11 Cases, which claims in respect of the DIP Facility shall be superior to all other claims;<br><br>    (b)  pursuant to section 364(c)(2) of the Bankruptcy Code, have first priority liens on all unencumbered assets of the Loan Parties (now or hereafter acquired and all proceeds thereof);<br><br>    (c)  pursuant to section 364(c)(3) of the Bankruptcy Code, have junior liens on all encumbered assets of the Loan Parties (now or hereafter acquired and all proceeds thereof), other than as set forth in clause (d) immediately below; and<br><br>    (d)  pursuant to section 364(d) of the Bankruptcy Code, have first priority priming liens on all assets of the Loan Parties (now or hereafter acquired and all proceeds thereof) that serve as collateral under the Existing Primed Secured Facilities (as defined below), which liens shall be senior to the liens on the Collateral securing the Existing Primed Secured Facilities and the adequate protection liens on the Collateral granted under the DIP Orders.<br><br>It is understood and agreed that the priming liens described herein shall prime the liens securing each Prepetition Facility and other secured obligations thereunder (collectively, the "Existing Primed Secured Facilities"), but that the liens so created as described in clauses (b), (c), and (d) above shall be subject to "Permitted Encumbrances" (as such term is defined below) as of the Petition Date, except those securing the Existing Primed Secured Facilities.<br><br>All of the liens described herein with respect to the assets of the Loan Parties shall be effective and perfected as of the Interim Order Entry Date and without the necessity of the execution or |

filing of control agreements, mortgages, security agreements, pledge agreements, financing statements, or other agreements.

Except to the extent expressly set forth in this DIP Term Sheet, each DIP Order shall contain provisions prohibiting each Loan Party from incurring any indebtedness which (x) ranks *pari passu* with or senior to the DIP Obligations or (y) benefits from a first priority lien under section 364 of the Bankruptcy Code.

"Permitted Encumbrances" shall mean: (a) Liens in favor of the Prepetition Agents for the benefit of the Prepetition Secured Parties, subject to the New Second Priority Intercreditor Agreement and the priority set forth herein; (b) Liens for taxes, assessments or other governmental charges that are either not delinquent or are being Properly Contested; (c) deposits or pledges to secure obligations under worker's compensation, social security or similar laws, or under unemployment insurance; (d) deposits or pledges to secure bids, tenders, contracts (other than contracts for the payment of money), leases, statutory obligations, surety and appeal bonds, performance bonds, bid bonds, return-of-money bonds and other obligations of like nature arising in the Ordinary Course of Business; (e) Liens arising by virtue of the rendition, entry or issuance against any Borrower or any Subsidiary, or any property of any Borrower or any Subsidiary, of any judgment, writ, order, or decree to the extent the rendition, entry, issuance or continued existence of such judgment, writ, order or decree (or any event or circumstance relating thereto) has not resulted in the occurrence of an "Event of Default" under Section 10.6 of the Prepetition RCF Credit Agreement; (f) carriers', repairmens', mechanics', workers', materialmen's, or other like Liens arising in the Ordinary Course of Business with respect to obligations which are either not due or which are being Properly Contested; (g) Liens in respect of Purchase Money Indebtedness or Capital Lease Obligations, solely to the extent in existence prior to the date of commencement of the Chapter 11 Cases; (h) [reserved]; (i) [reserved]; (j) [reserved]; (k) [reserved]; (l) Liens that secure Indebtedness permitted by clause (c) of the definition of "Permitted Loans", solely to the extent in existence prior to the date of commencement of the Chapter 11 Cases; (m) easements, zoning restrictions, rights-of-way, licenses, restrictions on the use of property or other minor imperfections in title and similar encumbrances on real property that do not materially detract from the value of the affected property or interfere with the Ordinary Course of Business of the Loan Parties; (n) leases or subleases granted to third parties in accordance with any applicable terms of the Prepetition RCF Credit Agreement and not interfering in any material respect with the Ordinary Course of Business of the Loan Parties; (o) Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods; (p) any zoning or similar law or right reserved to or vested in any Governmental Body to control or regulate the use of any real property; (q) licenses of patents, trademarks and other intellectual property rights granted by any Loan Party in the Ordinary Course of Business and not interfering in any material respect with the Ordinary Course of Business of the Loan Parties; (r) the prior rights of consignees and their lenders under consignment arrangements entered into in the Ordinary Course of Business; (s) any obligations or duties affecting any of the property of any Person to any municipality or public authority with respect to any franchise, grant, license or permit which do not materially impair the use of such property for the purposes for which it is held; (t) Liens on cash deposits in the nature of a right of setoff, banker's lien, counterclaim or netting of cash amounts owed arising in the Ordinary Course of Business on deposit accounts; (u) [reserved]; (v) Liens reserved in leases for rent and for compliance with the terms of the lease in the case of leasehold estates; (w) [reserved]; and (x) [reserved].

| **Carve-Out** | "Carve-Out" shall have the meaning set forth in the DIP Orders. |

| | |
|---|---|
| **Adequate Protection** | "Adequate Protection" shall have the meaning set forth in the DIP Orders. |
| **DIP Orders** | The DIP Orders shall (i) provide that in no event shall the DIP Agent, the DIP Lenders, the Prepetition Agents or the Prepetition Lenders be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the Collateral; (ii) approve the Debtors' waiver of all section 506(c) claims and any "equities of the case" exception under section 552(b) of the Bankruptcy Code, (iii) contain stipulations by the Debtors ratifying the extent, validity, priority, perfection, enforceability and non-avoidance of the obligations under the Prepetition Facilities and (iv) otherwise be in form and substance satisfactory to the Required DIP Lenders (as defined below). |
| **Closing Date** | The closing date of the DIP Facility (the "Closing Date") shall occur within three (3) business days of the Interim DIP Order Entry Date and shall be the first business day on which the conditions precedent set forth in this DIP Term Sheet have been satisfied or waived by the DIP Agent and the Required DIP Lenders (as defined below). |
| **Maturity** | All DIP Obligations shall be due and payable in full and in cash, and the commitments shall terminate, on the earlier to occur (the "Maturity Date") of (i) October 11, 2022 (the "Initial Maturity Date"), (ii) the effective date and the date of the substantial consummation (as defined in section 1102(2) of the Bankruptcy Code) of a Plan of Reorganization that has been confirmed by an order of the Bankruptcy Court (the "Plan Effective Date") and (iii) the closing of a sale of all or substantially all of the assets of the Debtors; <br><br> Any confirmation order entered in the Chapter 11 Cases ("Confirmation Order") shall not discharge or otherwise affect in any way the joint and several obligations of the Loan Parties to the DIP Agent and the DIP Lenders under the DIP Facility and this DIP Term Sheet, other than after either (i) the payment in full and in cash to the DIP Agent and the DIP Lenders of all obligations under the DIP Facility and this DIP Term Sheet on or before the Plan Effective Date and the termination of the Commitments or (ii) upon terms otherwise agreed by the DIP Agent and the DIP Lenders. |
| **Interest; Discount; Premiums; Fees** | The interest rate, default rate, discount, premiums, and fees under the DIP Facility are set forth in Annex III hereto. <br><br> Interest shall accrue on the principal balance of the DIP Loans, from time to time, based on a 360 day year and charged for the actual number of days outstanding.  Borrowers shall pay interest and default interest monthly in cash in arrears on the fifth (5th) business day of each calendar month and the Maturity Date; provided, that, Borrowers may pay such interest in kind on any interest payment date (other than the Maturity Date) by capitalizing such interest and adding it to principal, if Borrowers provide a written request to the DIP Agent to pay such interest in kind at least five (5) business days prior to the applicable interest payment date and the Required DIP Lenders consent to such request in their sole discretion. |
| **Conditions Precedent** | **Conditions to the Closing Date:** <br><br> 1.  Interim Order/Bankruptcy Matters. <br><br>    (a)  The Chapter 11 Cases shall have been commenced in the Bankruptcy Court and all of the "first day orders" (including a cash management order (the "Cash Management Order")) and all related pleadings to be filed at the time of commencement of the Chapter 11 Cases shall have been provided to counsel to the Required DIP Lenders (as defined |

below) and shall be in form and substance reasonably acceptable to the Required DIP Lenders.

(b) The Bankruptcy Court shall have entered an Interim Order that shall be in form and substance consistent with this DIP Term Sheet and otherwise in form and substance acceptable to the Required DIP Lenders and the Debtors, shall be in full force and effect, and shall not (in whole or in part) have been reversed, modified, amended, stayed, vacated, appealed, or subject to a stay pending appeal. The Loan Parties shall be in compliance in all material respects with the Interim Order.

2. Budgets and Financial Information. The DIP Lenders shall have received the Initial Budget as of the Closing Date, which Initial Budget shall be in form and substance satisfactory to the Required DIP Lenders; it being acknowledged and agreed that the budget set forth on Schedule 1 is in form and substance acceptable to the Required DIP Lenders as a "Budget" (as the same may be modified or superseded by a Proposed Budget).

3. Customary Closing Documents.

(a) All costs, fees, expenses (including reasonable and documented legal fees and expenses and agency fees) and other compensation contemplated by this DIP Term Sheet shall have been paid or reimbursed to the extent invoiced prior to the Closing Date.

(b) The Loan Parties shall have complied with the following closing conditions: (i) the delivery of corporate records and documents from public officials, secretary's certificates, and officer's certificates; (ii) evidence of authority; and (iii) obtaining of any material third-party and governmental consents necessary in connection with the DIP Facility, the financing thereunder, and related transactions. The Loan Parties and the transactions contemplated by this DIP Term Sheet shall be in compliance with all applicable laws and regulations.

(c) The DIP Agent and the DIP Lenders shall have received prior to the Closing Date all documentation and other information required by bank regulatory authorities under applicable "know-your-customer" and anti-money laundering rules and regulations, including the Patriot Act, in each case satisfactory to each DIP Lender.

(d) Execution and delivery by the Loan Parties of promissory notes (if requested by any DIP Lender) evidencing the DIP Loans made and to be made under the DIP Facility.

(e) The Interim Order and the security documents shall be effective to create in favor of the DIP Agent a legal, valid and enforceable first priority (subject to Permitted Encumbrances and the Carve-Out) security interest in and lien upon the Collateral and the DIP Agent, for its benefit and the benefit of each DIP Lender, shall have been granted a perfected lien on the Collateral by the Interim Order on the terms and conditions set forth herein.

(f) The DIP Agent shall have received appropriate UCC-1 financing statements for filing under the UCC of each jurisdiction of organization of each Loan Party.

(g) The DIP Agent shall have received an agency fee letter consistent with the agency fee letter for the Prepetition RCF Credit Agreement, duly executed and delivered on behalf of the Borrowers.

**<u>Conditions to All Loans</u>**:

(a) The Interim Order or the Final Order, as applicable, shall be in full force and effect and shall not (in whole or in part) have been reversed, modified, amended, stayed, vacated, appealed, or subject to a stay pending appeal.

(b) The Loan Parties shall be in material compliance with each order entered in the Chapter 11 Cases, including the DIP Orders and the Cash Management Order.

(c) The Loan Parties shall be in compliance with their obligations in connection with the delivery of an Initial Budget, Proposed Budgets, and Variance Reports (as set forth herein and in the DIP Order), and the Loan Parties shall be in compliance with the Budget (subject to Permitted Variances).

(d) Except as disclosed to the DIP Lenders in writing prior to the date hereof, since December 31, 2021, no material adverse change in the operations, assets, revenues, financial condition, profits or prospects of the Loan Parties (other than by virtue of the Chapter 11 Cases) shall have occurred.

(e) The following statements shall be true and correct: (i) the representations and warranties contained in the Prepetition RCF Credit Agreement are true and correct in all material respects (unless otherwise qualified by materiality, in which case such representations and warranties shall be true and correct in all respects) on and as of each date the Loan Parties request to borrow DIP Loans, as though made on and as of such date, except to the extent that any such representation or warranty expressly relates to an earlier date (in which case such representation or warranty shall be true and correct in all material respects (unless otherwise qualified by materiality, in which case such representations and warranties shall be true and correct in all respects) on and as of such earlier date) and (ii) no Default or Event of Default shall have occurred and be continuing on such date.

(f) The DIP Agent shall have received a written borrowing notice in form and substance satisfactory to the DIP Agent, which notice shall (i) specify the principal amount of the DIP Loan to be borrowed, which amount will be in increments of not less than $100,000, (ii) the date of such anticipated borrowing (which shall be no less than three (3) business days from the delivery of such notice) and (iii) confirm the satisfaction of the conditions precedent in this DIP Term Sheet.

(g) The Loan Parties shall not hold domestic unrestricted cash or cash equivalents (including the proceeds of any such borrowing) (i) at the time of the request for borrowing, in an aggregate amount in excess of $5,000,000 and (ii) immediately after giving effect to such borrowing, in an aggregate amount in excess of $7,000,000.

| | |
|---|---|
| **Covenants** | The provisions of Articles VI (other than Section 6.5) and VII of the Prepetition RCF Credit Agreement, together with all related definitions and ancillary provisions, all as in effect from time to time, are hereby incorporated herein by reference *mutatis mutandis* and shall be deemed to continue in effect (with any amendments, modifications or waivers thereof) for the benefit of the DIP Agent and the DIP Lenders and each Debtor covenants and agrees that it shall perform |

and observe each of the covenants set forth in Articles VI and VII of the Prepetition RCF Credit Agreement as if (i) each reference therein to "Agent" and "Lender" and similar expressions were references to the DIP Agent and each DIP Lender under this DIP Facility, (ii) each reference therein to "Default" or "Event of Default" and similar expressions were references to "Default" or "Event of Default", respectively, under this DIP Facility and (iii) each reference to "Agreement" were references to this DIP Facility.

**<u>Additional Covenants</u>**:

(a) <u>Chapter 11 Cases Filings</u>. The Debtors shall use commercially reasonable efforts to provide to the DIP Agent and the legal advisors to the DIP Lenders promptly after the same is available, copies of all pleadings, motions, applications and other documents filed by or on behalf of any other Loan Party with the Bankruptcy Court in the Chapter 11 Cases, including all motions for "first day" and "second day" relief.

(b) <u>Orders</u>. The Debtors shall comply with each order entered by the Bankruptcy Court in the Chapter 11 Cases.

(c) <u>Information Rights.</u> The Debtors shall provide the DIP Agent, the DIP Lenders, and their respective advisors and representatives with reasonable access to information (including historical information) and management and executive personnel regarding strategic planning, cash and liquidity management, and operational and restructuring activities, except to the extent access to such information would compromise the Debtors' attorney-client privilege.

(d) <u>Exclusivity</u>. Absent the consent of the Required DIP Lenders (as defined below), the Debtors shall not consent to termination or reduction of the "Exclusivity Period" or fail to object to any motion seeking to terminate or reduce the "Exclusivity Period".

(e) <u>Business Operations</u>. The Debtors shall not modify or alter (i) in any material manner the nature and type of its business or the manner in which such business is conducted or (ii) in any manner materially adverse to the DIP Agent or the DIP Lenders, the Loan Parties' organizational documents, except as required by the Bankruptcy Code.

(f) <u>Subrogation</u>. The Debtors shall not assert any right of subrogation or contribution against any other Loan Party until all borrowings under the DIP Facility are paid in full as provided herein and the commitments are terminated.

(g) <u>No Payments</u>. The Debtors shall not make any payment of principal or interest or otherwise on account of any prepetition indebtedness or payables, other than as contemplated as adequate protection herein or in the DIP Orders or payments (i) agreed in writing by the Required DIP Lenders and authorized by the Bankruptcy Court or (ii) authorized by the Bankruptcy Court pursuant to "first day" or "second day" relief.

(h) <u>Milestones</u>. The Debtors shall comply with each of the "Milestones" set forth in Section 7 of the Restructuring Support Agreement.

(i) <u>Chief Administrative Officer</u>. The Debtors shall retain (unless he resigns voluntarily), at the Debtors' expense, Steve Bate as chief administrative officer for the Debtors

<table>
<tr>
<td></td>
<td>(the "<u>CAO</u>").  The CAO shall perform the following duties in accordance with the DIP Term Sheet and the Restructuring Support Agreement:

(i)    consult with other management on the day-to-day operations of the Debtors' businesses, with any disagreements between the CAO and other management on such issues to be resolved by the Debtors' board of directors;

(ii)    analyze and verify all budgets and other financial reports prepared for, and/or provided to, the DIP Lenders;

(iii)    determine which claims are "critical vendor claims";

(iv)    analyze all royalty agreements and (i) report to the Debtors and the DIP Lenders an analysis of which royalty agreements should be assumed under section 365 of the Bankruptcy Code and (ii) direct negotiations with royalty agreement counterparties regarding payments thereunder;

(v)    review and approve in advance all asset dispositions outside of the ordinary course made by the Debtors prior to approval by the Debtors' board of directors;

(vi)    review and negotiate all material documents related to the Debtors' restructuring;

(vii)    participate in all status calls with the DIP Lenders; and

(viii)    provide reports or other information to the DIP Lenders as they reasonably request.</td>
</tr>
<tr>
<td><strong>Representations and Warranties</strong></td>
<td>Each Debtor represents and warrants to the DIP Lenders and the DIP Agent that (i) the execution of this DIP Facility has been duly authorized and this DIP Facility has been duly and validly executed and delivered by the Debtors and constitutes each Debtor's legal, valid and binding obligation, enforceable against it in accordance with its terms; and (ii) the provisions of Article V (other than Section 5.8 with respect to the solvency of the Debtors) of the Prepetition RCF Credit Agreement, together with all related definitions and ancillary provisions, all as in effect from time to time, are hereby incorporated herein by reference *mutatis mutandis* for the benefit of the DIP Agent and the DIP Lenders, and the Borrowers hereby make each of the representations and warranties in Article V of the Prepetition RCF Credit Agreement as if (A) each reference therein to "this Agreement" included reference to this DIP Facility, (B) each reference therein to "Closing Date" were references to the date hereof and (C) each reference therein to "Obligations" includes all DIP Obligations.</td>
</tr>
<tr>
<td><strong>Prepayments</strong></td>
<td><u>**Voluntary Prepayment**</u>: The Loan Parties may, at any time, (i) repay the loans under the DIP Facility and/or (ii) reduce the DIP Facility commitments.

<u>**Mandatory Prepayment**</u>:

(a)  <u>Asset Dispositions</u>.  Immediately upon receipt by any Loan Party of net cash proceeds from any asset disposition of Collateral (other than Inventory in the Ordinary Course of Business, each as defined in the Prepetition RCF Credit Agreement), the Borrowers shall</td>
</tr>
</table>

prepay the DIP Obligations in an amount equal to 100% of the proceeds so received in excess of the Carve-Out; provided that the Debtors shall not be required to apply all or any portion of such net cash proceeds to prepay the DIP Obligations if the Required Lenders consent in their sole discretion, upon the request of the Debtors.

(b) <u>Insurance Proceeds</u>.  The Debtors immediately shall prepay the DIP Obligations in an amount equal to 100% of any proceeds received by any Loan Party (i) under any insurance policy on account of damage or destruction of any assets or property of any Loan Party, or (ii) as a result of any taking or condemnation of any assets or property, with any excess above the DIP Obligations to be used to repay obligations and amounts under the Prepetition RCF Credit Agreement.

(c) <u>Incurrence of Indebtedness</u>.  Within three (3) business days after the incurrence or issuance by any Loan Party of any indebtedness, the Borrowers shall prepay the DIP Obligations in an amount equal to 100% of such net cash proceeds so received; provided that the Debtors shall not incur or issue additional postpetition indebtedness or grant or request authority to grant any lien or security interest to secure postpetition indebtedness unless the amount of such debt shall be sufficient to pay (and shall be used to pay) the DIP Obligations in full in cash and to the extent the net cash proceeds so received do not pay in full in cash all obligations under the Prepetition RCF Credit Agreement, such indebtedness shall be junior, subject and subordinate, in all respects to all rights, title, interests, liens, claims, liabilities and obligations under the Prepetition RCF Credit Agreement.

The Borrowers shall deliver to the DIP Agent written notice of the Borrowers' intent to make any prepayment under this Section, no less than three (3) business days prior to the date of such prepayment, specifying the principal amount of such prepayment and the date on which such prepayment is to be made.  All such prepayments shall be accompanied by accrued interest on the principal amount so prepaid.

| | |
|---|---|
| **Events of Default** | The events of default ("<u>Events of Default</u>") are as follows:<br><br>(a) **Nonpayment**. Failure by any Borrower to pay (a) any principal on the DIP Loans when due or (b) any interest, other fee, charge, amount or liability provided for herein, within three (3) business days following the due date thereof, in each case whether at maturity, by reason of acceleration pursuant to the terms of this DIP Term Sheet, by notice of intention to prepay or by required prepayment;<br><br>(b) **Breach of Representation**. Any representation or warranty made or deemed made by any Borrower or any Guarantor in this DIP Term Sheet or any related agreement or in any certificate, document or financial or other statement furnished at any time in connection herewith or therewith shall prove to have been incorrect or misleading in any material respect on the date when made or deemed to have been made;<br><br>(c) **Noncompliance**. Except as otherwise provided for herein, (i) failure or neglect of any Borrower, any Guarantor or any person to perform, keep or observe any term, provision, condition, covenant contained in Section 6.2 or Articles VII or IX of the Prepetition RCF Credit Agreement, or (ii) failure or neglect of any Borrower or any Guarantor to perform, keep or observe any other term, provision, condition or covenant, contained herein or in the Prepetition RCF Credit Agreement or in any other agreement or arrangement, now or hereafter entered into between any Borrower, any Guarantor or such person, and the |

DIP Agent or any DIP Lender which is not cured within thirty (30) days from any Borrower having become aware of the occurrence of such failure or neglect;

(d) **Budget**. The proceeds of any DIP Loan shall have been expended in a manner which is not in accordance with the Budget (subject to Permitted Variances).

(e) **Collateral Documents**. The DIP Orders and the Security Agreement shall cease to create valid and perfected liens on the Collateral with such priority required by this DIP Term Sheet, subject to Permitted Encumbrances.

(f) **Entry of Order**. The entry of the Final Order shall not have occurred within thirty-five (35) calendar days after the Interim Order Entry Date.

(g) **Conversion to Chapter 7**. An order with respect to any of the Chapter 11 Cases shall be entered by the Bankruptcy Court converting such Chapter 11 Case to a Chapter 7 case.

(h) **Prepetition Claims**. Any Loan Party shall file a motion seeking, or the Bankruptcy Court shall enter, an order (i) approving payment of any prepetition claim in excess of $100,000 in the aggregate other than (x) as provided for in the "first day" and "second day" orders and included in the Budget or (y) otherwise consented to by the Required DIP Lenders in writing; (ii) granting relief from the automatic stay applicable under section 362 of the Bankruptcy Code to any holder of any security interest to permit foreclosure on any assets having a book value in excess of $50,000 in the aggregate; or (iii) except with respect to each Prepetition Facility as provided in the DIP Orders, approving any settlement or other stipulation in excess of $50,000 in the aggregate not approved by the Required DIP Lenders and not included in the Budget with any secured creditor of any Loan Party providing for payments as adequate protection or otherwise to such secured creditor.

(i) **Appointment of Trustee or Examiner**. An order with respect to any of the Chapter 11 Cases shall be entered by the Bankruptcy Court appointing, or any Loan Party, any subsidiary of a Loan Party, or any affiliate of a Loan Party shall file an application for an order with respect to any Chapter 11 Case seeking the appointment of, (i) a trustee under section 1104 or (ii) an examiner with enlarged powers (powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code) under section 1106(b) of the Bankruptcy Code.

(j) **Dismissal of Chapter 11**. An order shall be entered by the Bankruptcy Court dismissing any of the Chapter 11 Cases which does not contain a provision for termination of the Commitments and payment in full of all DIP Obligations.

(k) **Order With Respect to Chapter 11 Cases**. An order with respect to any of the Chapter 11 Cases shall be entered by the Bankruptcy Court without the express prior written consent of the Required DIP Lenders (and, with respect to any provisions that materially affect the rights or duties of the DIP Agent, the DIP Agent), (i) to revoke, reverse, stay, modify, supplement, or amend any of the DIP Orders in a manner inconsistent with this DIP Term Sheet that is not otherwise consented to by the Required DIP Lenders (and with respect to amendments, modifications, or supplements that affect the rights or duties of the DIP Agent, the DIP Agent); (ii) to permit any administrative expense or any claim (now existing or hereafter arising, of any kind or nature whatsoever) to have

administrative priority as to the Loan Parties equal or superior to the priority of the DIP Loans (other than the Carve-Out) or the Adequate Protection Claims (as defined the DIP Orders) (other than the Carve-Out or the administrative expense claims on account of the DIP Facility) or (iii) to grant or permit the grant of a lien on the Collateral (other than a Permitted Encumbrance) that is senior to the liens of the DIP Lenders.

(l) **Application for Order by Third Party**.  An application for any of the orders described in clauses (d), (f), (g) (h), (i)  and (k) of this section shall be made by a person other than the Loan Parties and such application is not contested by the Loan Parties in good faith or any person obtains a non-appealable final order charging any of the Collateral under section 506(c) of the Bankruptcy Code against the DIP Agent or the DIP Lenders or obtains a final order adverse to the DIP Agent or the DIP Lenders.

(m) **Right to File Chapter 11 Plan**.  The entry of an order by the Bankruptcy Court terminating or modifying the exclusive right of any Loan Party to file a Plan of Reorganization pursuant to section 1121 of the Bankruptcy Code, without the prior written consent of the Required DIP Lenders.

(n) **Liens**.  (i) Any Loan Party shall attempt to invalidate, reduce, or otherwise impair the liens or security interests of the DIP Agent and/or the DIP Lenders or to subject any Collateral to assessment pursuant to section 506(c) of the Bankruptcy Code; (ii) any lien or security interest created by this DIP Term Sheet or the DIP Orders with respect to Collateral shall, for any reason, cease to be valid; or (iii) any action is commenced by the Loan Parties that contests the validity, perfection, or enforceability of any of the liens and security interests of the DIP Agent and/or the DIP Lenders created by any of the Interim Order, the Final Order, or this DIP Term Sheet.

(o) **Invalidation of Claims**.  Any Loan Party shall seek to, or shall support (in any such case by way of any motion or other pleading filed with the Bankruptcy Court or any other writing to another party-in-interest executed by or on behalf of the Loan Parties) any other person's motion to disallow in whole or in part the DIP Lenders' claims in respect of the obligations under the DIP Facility or contest any provision of this DIP Term Sheet.

(p) **Modifications**. A joint Plan of Reorganization, pursuant to Chapter 11 of the Bankruptcy Code in form and substance reasonably satisfactory to the Required DIP Lenders and the DIP Agent (the "Approved Plan"), or the Confirmation Order, is amended, supplemented, or otherwise modified in a manner that materially affects the rights or duties of the DIP Lenders and/or the DIP Agent without the prior written consent of the Required DIP Lenders (and with respect to amendments, modifications, or supplements that affect the rights or duties of the DIP Agent, the DIP Agent).

(q) **Withdrawal or Termination of Approved Plan**.  The withdrawal or termination of the Approved Plan.

(r) **Payments**. Any Loan Party or any of their affiliates shall have filed a motion seeking the entry of, or the Bankruptcy Court shall have entered, an order approving a payment to any person that would be materially inconsistent with the treatment of any such person under the Approved Plan, without the prior written consent of the Required DIP Lenders.

| | |
|---|---|
| | (s) **Termination of the Restructuring Support Agreement**. The termination of the Restructuring Support Agreement in accordance with its terms.<br><br>(t) **Chief Administrative Officer**. The termination or any change to the role or responsibilities of the CAO (not including any voluntary resignation by the CAO) on or after the date hereof. |
| **Remedies** | Immediately upon the occurrence and during the continuation of an Event of Default, the DIP Agent may, and at the direction of the Required DIP Lenders, shall (without further notice or grace period, unless required by applicable law) take any or all of the following actions: (a)(i) declare all DIP Obligations to be immediately due and payable and (ii) terminate the DIP Facility as to any future liability or obligation of the DIP Agent and the DIP Lenders, but without affecting any of the DIP Obligations, the liens under the DIP Facility, or postpetition administrative superpriority claim status; (b) declare a termination, reduction or restriction on the ability of the Debtors to use any cash collateral derived solely from the proceeds of Collateral; (c) exercise the rights of a secured party upon default under the UCC; and/or (d) exercise any and all rights and remedies available under the Prepetition RCF Credit Agreement, including judicial or non-judicial foreclosure or public or private sale of any of the Collateral.<br><br>Following three (3) business days' notice of such Event of Default to the Debtors, any official committee of unsecured creditors, and the U.S. Trustee, unless such Event of Default is cured within such time or an order of the Bankruptcy Court is entered to the contrary, the DIP Agent and the DIP Lenders shall have relief from the automatic stay to exercise remedies under the DIP Facility. |
| **Indemnity** | Each Borrower shall defend, protect, indemnify, pay and save harmless DIP Agent and each DIP Lender and each of their respective officers, directors, affiliates, attorneys, employees and agents (each an "<u>Indemnified Party</u>") for and from and against any and all claims, demands, liabilities, obligations, losses, damages, penalties, fines, actions, judgments, suits, fees, costs, charges, expenses and disbursements of any kind or nature whatsoever (including fees and disbursements of counsel (including allocated costs of internal counsel)) arising out of or in any way relating to or as a consequence, direct or indirect, of: (i) this DIP Term Sheet, the DIP Facility, any documents or instruments relating thereto, and/or the transactions contemplated hereby or thereby, (ii) any action or failure to act or action taken only after delay or the satisfaction of any conditions by any Indemnified Party in connection with and/or relating to the negotiation, execution, delivery or administration of the DIP Term Sheet, the DIP Facility established hereunder, any documents or instruments relating thereto, and/or the transactions contemplated hereby, (iii) any Loan Party's failure to observe, perform or discharge any of its covenants, obligations, agreements or duties under or breach of any of the representations or warranties made in this DIP Term Sheet, (iv) the enforcement of any of the rights and remedies of DIP Agent or any DIP Lender under this DIP Term Sheet and any documents or instruments relating thereto,, (v) any threatened or actual imposition of fines or penalties, or disgorgement of benefits, for violation of any anti-terrorism law by any Loan Party or subsidiary of any Loan Party, and (vi) any claim, litigation, proceeding or investigation instituted or conducted by any governmental body or instrumentality or any other person with respect to any aspect of, or any transaction contemplated by, or referred to in, or any matter related to, this DIP Term Sheet, the DIP Facility, any documents or instruments relating thereto, whether or not the DIP Agent or any DIP Lender is a party thereto. |
| **Required DIP Lenders** | The vote of DIP Lenders holding more than 50% of the principal amount of the aggregate undrawn Commitments and outstanding DIP Loans (the "<u>Required DIP Lenders</u>") shall be |

| | |
|---|---|
| | required to amend, waive, or modify the DIP Facility. No amendment, supplement, other modification or waiver to this DIP Term Sheet or the DIP Facility or any documents or instruments relating thereto shall adversely affect the rights or duties of, or any fees or other amounts payable to, the DIP Agent without the prior written consent of the DIP Agent. |
| **Credit Bidding** | The DIP Agent, upon the instruction of the Required DIP Lenders, shall have the right to credit bid up to the full amount of the outstanding DIP Obligations. |
| **Assignments and Participations** | The DIP Lenders shall have the right to assign the DIP Loans, (a) subject to (i) the Borrowers' consent (such consent not to be unreasonably withheld or delayed), unless (A) an Event of Default has occurred and is continuing or (B) such assignment is to a "Permitted Assignee" and (ii) the DIP Agent's consent other than any assignment to a DIP Lender or any of its affiliates; and (b) so long as any such assignee of the DIP Loans has signed a joinder to the Restructuring Support Agreement (in which case Borrower consent shall not be required). No affiliate of any Loan Party shall become a DIP Lender.<br><br>The parties to each assignment shall execute and deliver to the DIP Agent customary assignment documentation reasonably acceptable to the DIP Agent, together with the processing and recordation fee of $3,500 (which may be waived in the DIP Agent's sole discretion), and the assignee DIP Lender shall deliver to the DIP Agent an administrative questionnaire, and all required tax forms and "know your customer" documentation.<br><br>"Permitted Assignees" shall mean: (a) the DIP Agent, any DIP Lender or any of their affiliates; (b) a federal or state chartered bank, a United States branch of a foreign bank, an insurance company, or any finance company generally engaged in the business of making commercial loans; (c) any fund that is administered or managed by the DIP Agent or any DIP Lender, an affiliate of the DIP Agent or any DIP Lender or a related entity; and (d) any person to whom the DIP Agent or any DIP Lender assigns its rights and obligations under this DIP Term Sheet as part of an assignment and transfer of such DIP Agent's or DIP Lender's rights in and to a material portion of such DIP Agent's or DIP Lender's portfolio of asset-based credit facilities. |
| **Governing Law** | The Loan Parties submit to the non-exclusive jurisdiction and venue of the Bankruptcy Court or, in the event that the Bankruptcy Court does not have or does not exercise jurisdiction, then in any state or federal court of competent jurisdiction in the state, county, and city of New York, borough of Manhattan, and shall waive any right to trial by jury. New York law shall govern this DIP Term Sheet and the DIP Facility (other than security documents to be governed by local law, to be determined by the DIP Agent). |
| **Release** | Each of the Loan Parties, for itself and its successors, assigns, parents, subsidiaries, affiliates, predecessors, employees, agents, heirs and executors, as applicable, hereby fully and unconditionally releases each of the DIP Agent and DIP Lenders, and their respective directors, officers, employees, subsidiaries, affiliates, attorneys, agents, representatives, successors and assigns (collectively, the "Released Parties") from any and all claims, causes of action, costs or demands of whatever kind or nature, whether known or unknown, liquidated or unliquidated, fixed or contingent, asserted or unasserted, foreseen or unforeseen, or matured or unmatured, which any Loan Party may have had against the Released Parties by reason of any act or omission on the part of the Released Parties occurring prior to the date hereof, in each case regarding or relating to this DIP Term Sheet, the DIP Facility, or any document or instrument relating thereto (collectively, the "Released Matters"); *provided*, that Released Matters shall not include any claims, causes of action, costs or demands of whatever kind or nature, whether known or unknown, liquidated or unliquidated, fixed or contingent, asserted or unasserted, foreseen or |

|  | unforeseen, or matured or unmatured, resulting primarily from the gross negligence or willful misconduct of the Released Parties, as determined by a court of competent jurisdiction in a final and non-appealable judgment or order.  Each of the Loan Parties represents and warrants that (i) it has no knowledge of any such claims by it against the Released Parties and (ii) that the foregoing constitutes a full and complete release of all such claims. |
|---|---|
| **Taxes;  Waterfall; Expenses** | The provisions of Section 3.10 and Sections 11.5, 16.3(e), 16.6 and 16.9 of the Prepetition RCF Credit Agreement, together with all related definitions and ancillary provisions, all as in effect from time to time, are hereby incorporated herein by reference *mutatis mutandis* and shall be deemed to continue in effect (with any amendments, modifications or waivers thereof) for the benefit of the DIP Agent and the DIP Lenders, as applicable, as if (i) each reference therein to "Lender" and similar expressions were references to the DIP Lender under this DIP Facility, (ii) each reference therein to "Agent" and similar expressions were references to the DIP Agent under this DIP Facility, and (iii) each reference to "Agreement" were references to this DIP Facility. |
| **Agency** | The provisions of Article XIV of the Prepetition RCF Credit Agreement, together with all related definitions and ancillary provisions, all as in effect from time to time, are hereby incorporated herein by reference *mutatis mutandis* and shall be deemed to continue in effect (with any amendments, modifications or waivers thereof) for the benefit of the DIP Lenders, the DIP Agent, and the Debtors, as applicable, as if (i) each reference therein to "Lender" and similar expressions were references to the DIP Lender under this DIP Facility, (ii) each reference therein to "Agent" and similar expressions were references to the DIP Agent under this DIP Facility, and (iii) each reference to "Agreement" were references to this DIP Facility. |

**<u>Annex II</u>**

**Loan Parties**

| Legal Name |
|---|
| ION GEOPHYSICAL CORPORATION |
| ION EXPLORATION PRODUCTS (U.S.A.), INC. |
| I/O MARINE SYSTEMS, INC. |
| GX TECHNOLOGY CORPORATION |

## Annex III

### Interest, Discount, Premiums, Fees

| | |
|---|---|
| **Interest Rate** | DIP Loans will bear interest at the rate of 6.0% per annum. |
| **Default Interest**: | During the continuance of an Event of Default, all DIP Obligations will bear interest at an additional 2% *per annum* above the interest rate otherwise applicable. |
| **Agency Fees**: | As agreed with the DIP Agent. |

## **EXHIBIT B**

**Priority of Liens**

| **Prepetition Collateral and DIP Collateral (other than Unencumbered Assets)** | |
|---|---|
| 1) | • Carve-Out |
| 2) | • Any liens to which the DIP Liens are junior (the Permitted Encumbrances) |
| 3) | • DIP Liens |
| 4) | • Adequate Protection Liens granted to the Prepetition 1L Agent for the benefit of the Prepetition 1L Secured Parties |
| 5) | • Prepetition RCF Liens |
| 6) | • Adequate Protection Liens granted to the Prepetition 2L Agent for the benefit of the Prepetition 2L Secured Parties |
| 7) | • Prepetition 2L Liens |

| **Unencumbered Assets** | |
|---|---|
| 1) | • Carve-Out |
| 2) | • Any liens to which the DIP Liens are junior after the Petition Date (e.g. the Permitted Encumbrances) |
| 3) | • DIP Liens |
| 4) | • Adequate Protection Liens granted to the Prepetition 1L Agent for the benefit of the Prepetition 1L Secured Parties |
| 5) | • Adequate Protection Liens granted to the Prepetition 2L Agent for the benefit of the Prepetition 2L Secured Parties |

**<u>EXHIBIT C</u>**

**Initial DIP Budget**

Exhibit C

($ in 000s)

| Week of Forecast ==> | Wk-1 | Wk-2 | Wk-3 | Wk-4 | Wk-5 | Wk-6 | Wk-7 | Wk-8 | Wk-9 | Wk-10 | Wk-11 | Wk-12 | Wk-13 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week Ending ==> | 15-Apr | 22-Apr | 29-Apr | 6-May | 13-May | 20-May | 27-May | 3-Jun | 10-Jun | 17-Jun | 24-Jun | 1-Jul | 8-Jul |
| **RECEIPTS** | | | | | | | | | | | | | |
| Customer Receipts | 4,894 | 301 | 315 | 1,280 | 853 | 2,032 | 5,795 | 2,145 | 765 | 773 | 14,895 | 4,968 | 534 |
| Other Receipts | 32 | - | - | 480 | - | - | - | - | - | - | - | - | - |
| **Total Receipts** | **4,926** | **301** | **315** | **1,760** | **853** | **2,032** | **5,795** | **2,145** | **765** | **773** | **14,895** | **4,968** | **534** |
| **OPERATING DISBURSEMENTS** | | | | | | | | | | | | | |
| Payroll & Benefits | (109) | (1,358) | (927) | (1,021) | (117) | (1,349) | (984) | (786) | (117) | (1,117) | (680) | (1,035) | - |
| Rent & Utilities | - | - | - | (563) | - | - | - | (383) | (66) | - | - | (383) | (110) |
| Taxes | - | (106) | (345) | (123) | (500) | (500) | (2,095) | (29) | - | - | (125) | (1,361) | (26) |
| Capex | - | (750) | - | - | - | - | - | - | - | - | - | - | - |
| Royalty Payments | - | - | - | - | - | - | - | - | - | - | (1,000) | - | - |
| Revenue Share Obligations | - | - | - | - | - | - | - | - | - | - | (1,895) | - | - |
| Insurance | - | - | (102) | - | - | - | (102) | - | - | - | (125) | - | - |
| Inventory | (100) | (408) | (122) | (318) | (214) | (326) | (122) | (100) | (496) | (100) | (480) | (100) | (100) |
| Other Operating Expenses | (675) | (567) | (711) | (546) | (538) | (638) | (820) | (445) | (526) | (575) | (793) | (446) | (549) |
| **Total Operating Disbursements** | **(884)** | **(3,189)** | **(2,207)** | **(2,570)** | **(1,369)** | **(2,813)** | **(4,122)** | **(1,742)** | **(1,205)** | **(1,792)** | **(5,098)** | **(3,325)** | **(785)** |
| **OPERATING CASH FLOW** | **4,042** | **(2,888)** | **(1,892)** | **(810)** | **(516)** | **(781)** | **1,673** | **403** | **(440)** | **(1,019)** | **9,797** | **1,643** | **(250)** |
| **RESTRUCTURING COSTS** | | | | | | | | | | | | | |
| Professional Fees | (63) | - | - | (19) | - | - | - | (843) | - | - | - | - | (1,335) |
| Other Restructuring Costs | (25) | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Restructuring Costs** | **(88)** | **-** | **-** | **(19)** | **-** | **-** | **-** | **(843)** | **-** | **-** | **-** | **-** | **(1,335)** |
| **DEBT SERVICE** | | | | | | | | | | | | | |
| Revolver Facility Interest & Fees | - | - | (85) | - | - | - | - | (85) | - | - | - | (85) | - |
| DIP Facility Interest & Fees | (25) | - | - | (3) | - | - | - | (12) | - | - | - | - | (9) |
| **Total Debt Service** | **(25)** | **-** | **(85)** | **(3)** | **-** | **-** | **-** | **(96)** | **-** | **-** | **-** | **(85)** | **(9)** |
| **NET CASH FLOW** | **3,929** | **(2,888)** | **(1,976)** | **(832)** | **(516)** | **(781)** | **1,673** | **(536)** | **(440)** | **(1,019)** | **9,797** | **1,559** | **(1,594)** |
| Beginning Cash Balance | 8,554 | 12,483 | 10,995 | 9,018 | 9,286 | 8,770 | 7,989 | 9,662 | 9,126 | 8,685 | 7,666 | 14,963 | 16,522 |
| Total Net Cash Flow | 3,929 | (2,888) | (1,976) | (832) | (516) | (781) | 1,673 | (536) | (440) | (1,019) | 9,797 | 1,559 | (1,594) |
| **Ending Cash Balance** | **12,483** | **9,595** | **9,018** | **8,186** | **8,770** | **7,989** | **9,662** | **9,126** | **8,685** | **7,666** | **17,463** | **16,522** | **14,928** |
| Less: Restricted LC's | (1,862) | (1,862) | (1,862) | (1,862) | (1,862) | (1,862) | (1,862) | (1,862) | (1,862) | (1,862) | (1,862) | (1,862) | (1,862) |
| Less: Foreign Cash | (5,709) | (4,145) | (3,018) | (3,986) | (3,885) | (3,432) | (3,683) | (3,989) | (3,956) | (3,449) | (2,705) | (3,247) | (3,456) |
| DIP Draw / (Paydown) | - | 1,400 | - | 1,100 | - | - | - | - | - | - | (2,500) | - | - |
| **Ending U.S. Non-Restricted Cash Balance** | **4,911** | **4,988** | **4,138** | **3,438** | **3,022** | **2,695** | **4,116** | **3,275** | **2,867** | **2,355** | **10,395** | **11,413** | **9,609** |
| **Liquidity** | | | | | | | | | | | | | |
| DIP Commitment | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 |
| Beginning DIP Balance | - | - | 1,400 | 1,400 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | - | - |
| Draw / (Paydown) | - | 1,400 | - | 1,100 | - | - | - | - | - | - | (2,500) | - | - |
| **Ending DIP Balance** | **-** | **1,400** | **1,400** | **2,500** | **2,500** | **2,500** | **2,500** | **2,500** | **2,500** | **2,500** | **-** | **-** | **-** |
| DIP Availability | 2,500 | 1,100 | 1,100 | - | - | - | - | - | - | - | 2,500 | 2,500 | 2,500 |
| Ending U.S. Non-Restricted Cash Balance | 4,911 | 4,988 | 4,138 | 3,438 | 3,022 | 2,695 | 4,116 | 3,275 | 2,867 | 2,355 | 10,395 | 11,413 | 9,609 |
| **Total Liquidity** | **7,411** | **6,088** | **5,238** | **3,438** | **3,022** | **2,695** | **4,116** | **3,275** | **2,867** | **2,355** | **12,895** | **13,913** | **12,109** |

| Company Professionals | Firm | Apr-22 | May-22 | Jun-22 | Jul-22 | Post Emergence | Total |
|---|---|---|---|---|---|---|---|
| Counsel | Winston & Strawn | $ 500 | $ 425 | $ 425 | $ 350 | $ - | $ 1,700 |
| Foreign Counsel | [UK, India] | 100 | 100 | 100 | 50 | - | 350 |
| Financial Advisor | FTI Consulting | 400 | 375 | 350 | 200 | - | 1,325 |
| Investment Bank | PWP/TPH | 150 | 169 | 150 | 150 | 1,438 | 2,057 |
| Noticing Agent | EPIQ | 40 | 50 | 50 | 30 | - | 170 |
| Board Counsel | O'Melveny & Myers | 30 | 30 | 30 | 15 | - | 105 |
| **Total Company Professionals** | | **$ 1,220** | **$ 1,149** | **$ 1,105** | **$ 795** | **$ 1,438** | **$ 5,707** |

| Lender Professionals | Firm | Apr-22 | May-22 | Jun-22 | Jul-22 | Post Emergence | Total |
|---|---|---|---|---|---|---|---|
| 1L & DIP Counsel / 2L + Local Counsel | Ropes & Gray | $ 250 | $ 250 | $ 250 | $ 175 | $ 531 | $ 1,456 |
| UCC BK + Local Counsel | TBD | 125 | 300 | 300 | 175 | - | 900 |
| UCC Financial Advisor | TBD | 100 | 200 | 175 | 50 | - | 525 |
| **Total Creditor Professionals** | | **$ 475** | **$ 750** | **$ 725** | **$ 400** | **$ 531** | **$ 2,881** |

| **Total Professional Fees** | | **$ 1,695** | **$ 1,899** | **$ 1,830** | **$ 1,195** | **$ 1,968** | **$ 8,588** |

| Contingency & Expenses | 5% | $ 85 | $ 95 | $ 92 | $ 60 | | $ 180 |
|---|---|---|---|---|---|---|---|

| **U.S. Trustee Fees** | | **$ -** | **$ -** | **$ -** | **$ 250** | **$ 250** | **$ 500** |

| **Total Fees** | | **$ 1,780** | **$ 1,994** | **$ 1,922** | **$ 1,505** | **$ 2,218** | **$ 9,267** |