IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| ION GEOPHYSICAL CORPORATION, *et al.*,[1] | Case No. 22-30987 (MI) |
| Debtors. | (Joint Administration Requested) |
| | (Emergency Hearing Requested) |

**DECLARATION OF JAKUB MLECZKO IN SUPPORT OF (I) MOTION FOR ENTRY OF ORDER AUTHORIZING DEBTORS TO OBTAIN SENIOR SECURED SUPERPRIORITY POSTPETITION FINANCING AND USE CASH COLLATERAL, AND (II) MOTION FOR ENTRY OF ORDER APPROVING BID PROCEDURES**

Pursuant to 28 U.S.C. § 1746, I, JAKUB MLECZKO, hereby declare as follows:

1.  I am an Executive Director at Perella Weinberg Partners LP (together with its corporate advisory affiliates, "PWP"), the proposed investment banker to ION Geophysical Corporation ("ION Geophysical") and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors").

2.  I make this declaration (the "Declaration") in support of (i) the *Debtors' Emergency Motion of Debtors for Entry of Interim and Final Orders (A) Authorizing the Debtors to (I) Obtain Postpetition Financing, (II) Use Cash Collateral, (III) Grant Senior Secured Liens and Provide Claims with Superpriority Administrative Expense Status, and (IV) Grant Adequate Protection to the Prepetition Secured Parties, (B) Modifying the Automatic Stay, (C) Scheduling a Final Hearing, and (D) Granting Related Relief* (the "DIP Motion"), and (ii) the *Debtors' Emergency Motion for Entry of an Order Approving (I)(A) Bidding Procedures and (B) Assumption and*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are: ION Geophysical Corporation (6646); I/O Marine Systems, Inc. (3230); ION Exploration Products (U.S.A.), Inc. (1394); and GX Technology Corporation (0115). The location of the Debtors' service address is 4203 Yoakum Blvd., Suite 100, Houston, Texas 77006.

*Assignment Procedures; (II) Sale of Certain of the Debtors' Assets Free and Clear of Liens, Claims, Interests, and Encumbrances, and (III) Granting Related Relief* (the "Sale Motion").[2]

3.    Except as otherwise indicated, all statements in this Declaration are based on my personal knowledge of the Debtors' operations and finances gleaned during the course of my engagement with the Debtors, my discussions with the Debtors' senior management, other members of the PWP team, and the Debtors' other advisors, as well as my review of relevant documents and/or my opinion based upon my experience. If called to testify, I could and would testify to each of the facts set forth herein based on such personal knowledge, discussions, review of documents, and/or opinion.

## Background and Qualifications

4.    I am an Executive Director with PWP, a financial advisory and investment banking firm, which has its principal office at 767 Fifth Avenue, New York, New York 10153 and is an independent, privately held global financial services firm headquartered in New York, New York. PWP provides strategic and financial advisory services, as well as capital markets knowledge, financing expertise, and restructuring capabilities that are employed in large-scale corporate restructuring transactions. PWP's professionals have extensive experience providing investment banking services to financially distressed companies and to creditors, equity holders, and other constituencies in reorganization proceedings and complex financial restructuring, both in-court and out-of-court.

5.    I graduated from Emory University with a B.A. and earned an M.B.A. from the University of Chicago Booth School of Business. I have over fifteen years of corporate finance and investment banking experience, the past ten of which have been spent advising on and

---

[2] Capitalized terms used but not defined herein shall have the meaning ascribed to them in the DIP Motion, the proposed interim order attached as Exhibit A thereto (the "Interim DIP Order") or the Sale Motion, as applicable.

2

executing financing and restructuring transactions as well as distressed and regular-way mergers and acquisitions, including procuring debtor-in-possession financing facilities. Prior to joining PWP in 2011, I was a Senior Analyst at GE Capital, and prior to that I was an Analyst at Financial Security Assurance (nka Assured Guaranty).

6. I have extensive experience negotiating and managing chapter 11 restructuring transactions, and negotiating, structuring, and marketing debtor-in-possession financings. Consequently, in my current role, I am responsible for tracking and staying current on market trends for debtor-in-possession financings. Since joining PWP, my restructuring and financial advisory engagements have included representing debtors and creditors in the following chapter 11 cases: In re CARBO Ceramics Inc., No. 20-31975 (Bankr. S.D.T.X.); In re LATAM, No. 20-11254 (Bankr. S.D.N.Y); In re Sears Holdings Corporation, No. 18-23538 (Bankr. S.D.N.Y.); In re Orexigen Therapeutics, Inc., No. 18-10518 (Bankr. D. Del.); In re Pacific Sunwear of California, Inc., No. 16-10882 (Bankr. D. Del.); and In re Energy Future Holdings Corp., No. 14-10979 (Bankr. D. Del.).

7. I am also generally familiar with the cash flow forecasts prepared by the Debtors' management and their financial advisor, FTI Consulting, Inc. ("FTI"). I understand that these forecasts take into account cash receipts and disbursements anticipated by the Debtors' management during the projected period and consider a number of factors, including, but not limited to, management's anticipated impact of the chapter 11 filing on business operations, fees and interest expenses associated with postpetition financing, professional fees, payroll costs, customer and vendor relationships, and other required operational payments.

**PWP's Retention**

8. Prior to the Petition Date, the Debtors engaged PWP to act as the Debtors' exclusive investment banker in connection with the Debtors' review of strategic alternatives to address their

3

capital structure. Under my supervision, the PWP team has worked closely with the Debtors' management and other professionals retained by the Debtors and has become knowledgeable and familiar with the Debtors' capital structure, liquidity needs, and business operations.

**Prepetition Efforts and Marketing Process**

9. Recognizing the need to address ongoing liquidity challenges, ION Geophysical Corporation (together with its subsidiaries, collectively, "ION") initiated a process to evaluate a range of strategic alternatives to strengthen its financial position and maximize stakeholder value.

10. As part of this strategic alternatives process, PWP conducted a comprehensive prepetition marketing process, targeting a broad range of potential counterparties, with a focus on strategic bidders interested in either bidding on ION as a whole or pursuing a transaction for an individual operating segment. Potential counterparties were asked to submit proposals on an in-court or out-of-court basis, as well as their willingness to serve as "stalking horse" bidders in a chapter 11 case. External outreach commenced the week of September 20, 2021, with an initial deadline of October 20, 2021 for non-binding indications of interest. Of the 67 potential bidders canvassed, 19 parties executed non-disclosure agreements and were granted access to the electronic data room, which contains significant diligence and other confidential information regarding ION's businesses and assets.

11. This process initially yielded one formal non-binding bid for ION's seismic data assets, two formal non-binding bids for ION's software business, one formal non-binding bid for ION's devices business line, and one formal non-binding bid for a combination of the software and devices business lines. In evaluating the bids received, the Debtors analyzed, among other considerations: (a) the structure of the proposed transaction; (b) the form and amount of consideration offered; (c) the assets to be acquired and liabilities to be assumed; and (d) execution or other risks.

4

12. The Debtors met regularly with their advisors and consulted with their key stakeholders before and after bids were submitted. PWP also continued to work with all interested parties to maintain competitive tension and interest. In that regard, the Debtors and their advisors held numerous calls and discussions with potential purchasers for the businesses and assets and engaged in extensive negotiations with those parties over the terms of potential agreements to purchase the applicable businesses and assets. Certain prospective bidders have continued to express interest and stay engaged and PWP has continued to solicit additional indications of interest and engage with interested parties up until the bankruptcy filing.

13. In parallel, ION and its advisors began preparing for a potential bankruptcy filing and commenced discussions with key stakeholders, including an ad hoc group of prepetition second lien lenders (the "Ad Hoc Group"). Based on the outcomes of the prepetition marketing process, discussions with key stakeholders, real-time business results, and available liquidity, the Debtors, with guidance from the board of directors, ultimately concluded that none of the non-binding bids summarized above were actionable or value-maximizing, and that filing these chapter 11 cases was the optimal course to strengthen ION's financial position and maximize stakeholder value.

14. In early February 2022, the Ad Hoc Group and the Debtors began discussing potential alternative restructuring proposals. As part of this process, the Debtors provided the creditors' advisors substantial diligence and the parties held numerous telephone conferences among both advisors and principals. Concurrently with the diligence process, the Debtors and the Ad Hoc Group began to engage in high-level discussions about potential restructuring transaction structures.

15. After months of extensive negotiations, the Debtors ultimately negotiated a restructuring transaction with the Ad Hoc Group, pursuant to which such lenders have agreed to (a) provide the Debtors with a $2.5 million debtor-in-possession financing facility (the "DIP Facility") and continued access to cash collateral and (b) to the extent the prepetition claims under the prepetition revolving credit facility are not paid in full in cash, convert their remaining claims into an exit facility, and (c) convert the claims under the second lien notes into 99.75% of the equity of the reorganized company, in each case as set forth in that certain Restructuring Support Agreement, dated as of April 12, 2022 (the "Restructuring Support Agreement") and the chapter 11 plan of reorganization filed contemporaneously herewith (the "Plan").

16. The Plan includes a sale "toggle" feature allowing for potential sales to third parties supported by the Ad Hoc Group. Accordingly, one or more of the business lines could be sold pursuant to the sale process with any remaining assets reorganized pursuant to the Plan. This process will allow the Debtors to run a comprehensive marketing process to market test the transaction contemplated by the Restructuring Support Agreement and the Plan to ensure the Debtors obtain the highest or otherwise best offer, or combination of offers, for the Debtors' assets.

17. Although the Debtors already have conducted a comprehensive outreach to prospective bidders, the Debtors will use the postpetition marketing process to allow additional and/or existing interested bidders to submit final, binding bids. The Debtors intend to continue their discussions with bidders who expressed interest in ION's businesses or assets. At the same time, the Debtors and their creditors have the benefit of the transaction embodied in the Restructuring Support Agreement and Plan, which provides for an alternative reorganization transaction in the event certain assets are not sold pursuant to the sale process.

18. Accordingly, the Debtors have determined that it is in their best interest to (a) continue ongoing diligence with all interested parties, and (b) continue the marketing process in chapter 11, to maximize value of the Debtors' estates.

### **Bidding Procedures and Need for a Timely Sale Process**

19. In support of the marketing process, the Debtors and their advisors have developed bidding and auction procedures for the orderly marketing and sale of ION's businesses and assets (the "Bidding Procedures").

20. The Bidding Procedures provide—with agreement of the non-debtor parties—that interested parties will have the opportunity to bid for the assets of the direct and indirect subsidiaries of the Debtors in addition to the assets of the Debtors.

21. The Bidding Procedures are intended to provide ION with the flexibility to solicit proposals, negotiate transactions, hold an auction, and consummate sale transactions for the highest or otherwise best bid. Given the exigencies of the Debtors' business operations and financial condition, it is vital that the Debtors consummate the sale transaction(s) in an expedient and efficient manner.

22. The time periods set forth in the Bidding Procedures are reasonable under the circumstances and will provide parties with sufficient time and information to submit a bid for ION's businesses or assets, particularly given the significant prepetition marketing efforts. In formulating the procedures and time periods set forth therein, ION balanced the need to provide adequate time to parties in interest and potential bidders with the need to quickly and efficiently close a sale to reduce the ongoing costs associated with maintaining the Debtors as a going concern and comply with the milestones set forth in the Restructuring Support Agreement.

23. Furthermore, potential bidders have had, and will, in accordance with the Bidding Procedures, continue to have access to information prepared by the Debtors and their advisors that is compiled in an electronic data room.

24. ION's businesses and assets have been marketed since September 2021, and ION and their advisors have engaged in discussions with certain interested parties, coordinated discussions with the management team, and provided additional due diligence materials in response to various diligence requests during such process. Therefore, many parties that may have an interest in bidding at the auction already have conducted diligence and evaluated ION's businesses or assets. In addition, potential bidders who have not previously conducted diligence on ION's businesses and assets will have immediate access to a substantial body of information regarding ION's businesses and assets, including information gathered based upon specific due diligence requests of various prepetition bidders who participated in the marketing process.

25. In light of the foregoing, the Debtors have determined that under these circumstances, pursuing the proposed sale transactions and the Bidding Procedures is in the best interests of the Debtors' estates.

## Debtors' Need for Postpetition Financing

26. The Debtors require immediate access to the DIP Facility to continue to operate their business, fund the administrative cost of these chapter 11 cases, and provide sufficient runway to complete the marketing and/or Plan process. The Debtors are entering chapter 11 with limited cash on hand. Without access to the DIP Facility, and the associated use of the lenders' cash collateral, the Debtors would not be able to fund costs associated with the chapter 11 cases and effectuate the transactions contemplated by the Restructuring Support Agreement and Plan, including one or more sale transactions.

27. The Debtors, with the assistance of their advisors, evaluated cash flow and liquidity needs in a chapter 11 scenario to determine how much postpetition financing the Debtors would need to operate their businesses and pay the expenses of a chapter 11 process. Under the Debtors' current cash flow forecasts, the proposed DIP and use of cash collateral provides the Debtors with sufficient liquidity to operate their business, maintain ordinary course operations, meet their financial commitments through the chapter 11 case and fund the administrative costs to complete the marketing and/or Plan process and effectuate one or more sale transactions.

28. The proposed DIP Facility is necessary (a) to continue operations during the marketing and Plan process and to complete any sale transactions, and (b) to avoid immediate and potentially irreparable harm to the Debtors' estates. Absent the Court's entry of the Interim DIP Order, I believe that the continued operation of the Debtors' business will not be possible.

### **Efforts to Obtain DIP Financing**

29. Beginning in November 2021 and leading up to the Petition Date, the Debtors, with the assistance of PWP and FTI, engaged in numerous marketing processes to obtain financing. The Debtors and their advisors worked diligently to evaluate options for financing from the Debtors' existing secured lenders and potential third-party lenders.

30. In parallel with the discussions with the Ad Hoc Group, the PWP initially solicited proposals for DIP financing from 51 potential third-party lenders, including large asset managers and other sophisticated, alternative investment institutions. Of the 51 potential third-party lenders, 11 executed a non-disclosure agreement. Each was given access to the Debtors' diligence materials, and two made a DIP financing proposal.

31. The Debtors, with the assistance of their advisors, analyzed each proposal and ultimately determined that third party proposals received were not actionable. The contacted parties were simply unwilling to provide liquidity to the Debtors on a junior basis or on terms

9

comparable to or better than those proposed by the Ad Hoc Group. In light of the pricing and terms received from the DIP marketing process, the Debtors concluded, in consultation with PWP, that the best and least costly approach was to continue negotiating the terms of the DIP Facility with the Debtors' prepetition lenders.

32. As such, the proposal from the Ad Hoc Group became the basis for the DIP Facility. On April 12, the Debtors and their advisors finalized a term sheet (the "DIP Term Sheet") attached as Exhibit A to the Interim DIP Order.

33. The DIP Facility consists of $2,500,000 in postpetition secured financing. The Debtors will use the proceeds of the DIP Facility and cash collateral for working capital and other general corporate purposes of the Debtors, each in accordance with the DIP Term Sheet, Interim DIP Order, and Approved Budget.

34. The DIP Term Sheet contains milestones that the Debtors must meet throughout the chapter 11 cases, including milestones related to the Plan and marketing process. The milestones were negotiated with the Ad Hoc Group as a condition to providing the DIP Facility. The Debtors believe that such milestones will be achievable under the circumstances if the DIP Facility is approved.

### DIP Financing Has Been Negotiated at Arm's-Length and in Good Faith

35. The Debtors and the Ad Hoc Group exchanged multiple iterations of the DIP Term Sheet outlining the terms of the proposed DIP Facility. In addition, the Debtors exchanged multiple drafts of the Interim DIP Order. These negotiations were extensive and, based upon my observations and involvement in negotiations, conducted at arm's-length and in good faith.

36. Based on my experience and knowledge of the market, as well as my understanding of the Debtors' capital structure and need for postpetition financing, I believe the DIP Facility is reasonable under the circumstances and in the best interests of the Debtors' estates.

**Need for Interim Relief**

37. Based on discussions with the Debtors and their other advisors, the Debtors' access to the DIP Facility is necessary to continue the operation of the Debtors' business, supplements the Debtors' liquidity needs, helps the Debtors preserve the value of their estates, and increases the prospect of executing successful sales and/or completing the transaction contemplated by the Restructuring Support Agreement and Plan. It is my professional opinion that, absent the Court's entry of the Interim DIP Order, the Debtors' business will be immediately and irreparably harmed.

38. Based on my experience in negotiating debtor-in-possession financings and involvement in this DIP financing as well as my discussions with the Debtors and their other advisors, I believe that the DIP Facility is reasonable and necessary under the circumstances and that without it the Debtors would not have sufficient liquidity and would risk liquidation.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated: April 12, 2022
      New York, New York

                                        /s/ *Jakub Mleczko*
                                        JAKUB MLECZKO
                                        Executive Director
                                        Perella Weinberg Partners LP