## Supplemental Agreement No. 6
### To
## Master Geophysical Services Agreement No. 11195

This Supplemental Agreement No. 6 ("Supplement 6") is entered into as of the __ day of August, 2014, between GX Technology Corporation located at 2105 City West Boulevard, Houston, Texas 77042 (the **"COMPANY"**) and Cobra Energy Services, S.A. a Panamanian corporation whose registered office is at the World Trade Center, 1° Piso Area Commercial, Calle 53, . Marbella, Panama City, Republica de Panama (the **"CONTRACTOR"**) subject to the following:

1. **Master Agreement.** This Supplement 6 is entered into pursuant to the Master Geophysical Service Agreement between the COMPANY and CONTRACTOR dated 22nd July, 2011 (the "Master Agreement"), the terms of which are incorporated herein by reference and attached hereto.

#### Content: PeruSPAN 2D

**This Supplement 6 consists of the following documents;**
- Scope of Work
- General Description of the Services
- Rates and Compensation
- Terms of Payment and invoicing
- Commercial Rates
- HSE
- APPENDIX 1- Insurance Requirements
- APPENDIX 2- Project Map
- APPENDIX 3- Recording Parameters, Source, Navigation System and Vessel Specification

**The following documents will be made available to CONTRACTOR:**
- Schedule 2: Marine Seismic Acquisition Order
   - Seismic Specifications
   - Gravity & Magnetic Requirements
   - Onboard – QC Processing .
   - Airgun Array
- Schedule 3: Project QHSE Policies & Reporting Requirements

#### Master Geophysical Service Agreement
In the event of any conflict between the provisions of the above documents, they shall be given priority in the order listed above.

| COMPANY | CONTRACTOR |
|---|---|
| GX Technology Corporation , | Cobra Energy Services, S.A. |
| BY: | BY: |
| NAME: _SHAWN L RICE_ | NAME: _Li Yumin_ |
| TITLE: _VP, OPERATIONS_ | TITLE: _Country Manager, CHINA_ |
| DATE: _9/30/2014_ | DATE: _2014-09-30_ |

State of Texas
County of Harris

Page 1 of 22

This instrument was acknowledged before me
on 30 day of Sept , 2014  by Shawn L Rice

Karolyn Ratajczak
Notary Public's Signature
My Commission Expires

KAROLYN RATAJCZAK
Notary Public, State of Texas
My Commission Expires
September 30, 2017



EXHIBIT
**Cobra 2**

**Scope of Work:**

**GENERAL:**

This Supplement 6 is entered into between COMPANY and CONTRACTOR (as defined above), through which the CONTRACTOR agrees to deliver and make available the vessel M/V Discoverer (the "Vessel") and equipment listed in Appendix 2 below and the attached schedules 2 and 3. The equipment and services needed to acquire a 2D seismic program ("PeruSPAN") consisting of approximately 7,538 kilometers (Phase 1), as illustrated in Appendix (2). Project duration is not to exceed 365 days.

This Supplemental Agreement is based on the terms and conditions below:

The actual line locations and line kilometers may vary from those shown in the project specific schedules (Schedule 2) as a result of environmental or permit restrictions, acquisition obstacles, and map inaccuracies, any changes in governmental agencies or lease holder restrictions or requirements.

Both Parties agree that if Phase 2 (approx. 4482 km) is approved during the course of the acquisition of Phase 1, then Phase 2 will be completed under the terms and conditions described in this Supplement No. 6.

The "Charter Period" commences immediately upon departure from Durban, South Africa to transit to the project area. CONTRACTOR will need to provide all requisite Vessel specific permits and, evidenced by receipt of a Maritime and Coast Guard clearance letters, customs clearance for temporary importation of crew and Vessel, visas for the crew, and all project specific security requirements including security plans, vessels, equipment and personnel required to maintain a safe passage and efficient operations.

The Charter Period continues until demobilization of the Vessel is completed, including demobilization of COMPANY provided equipment, Company Representative and Survey Data at an agreed safe port or at such port as shall be mutually agreed.

The program will be acquired based on the terms and conditions below:

CONTRACTOR is directly responsible for the proper Vessel certification, insurance and inspections that are required to operate in the proposed project area/ waters. Specifically, the CONTRACTOR will:

- The CONTRACTOR will manage the daily security requirements and direct and instruct the security guards and vessels with daily instructions necessary to maintain safe operations during this Charter Period. CONTRACTOR has the authority to cease all operations immediately if security conditions are deemed unsafe to continue operations in the proposed project areas.

- CONTRACTOR shall, at its cost deliver the M/V Discoverer with approved regulatory certification required to operate safely in the proposed waters. The crew will have received the required training – if required as per the regulatory requirements.

- CONTRACTOR'S Vessel shall arrive at the first site of acquisition for the performance of work with sufficient supplies and experienced personnel to perform the services as set out in the Scope of Work. Once acquisition begins, CONTRACTOR shall remain

Page 2 of 23

- on the project, except for crew change, refueling and re-supplying until the survey is completed.

- CONTRACTOR will provide information to COMPANY as outlined in the "Project Schedules" for the proposed survey.

- CONTRACTOR agrees to a Vessel Inspection and Technical audit of the seismic equipment by COMPANY or 3rd party auditors.

## General Description of the Services:

Except for the Company Provided Equipment and the reimbursable services/items, the CONTRACTOR shall, at its cost, provide experienced operators of the seismic equipment as well as the materials necessary to perform the Services as specified in detail in Schedules 2 and 3. CONTRACTOR shall undertake the acquisition of seismic and its navigation/positioning data, gravity and magnetic data, as well as onboard QC seismic processing in accordance with the technical specification requirements contained in the applicable attachments hereto and in a manner consistent with generally accepted standards of the industry, including operation of equipment within the limits of its generally accepted capability. Survey acquisition parameters and operating specifications are listed in Schedule 2. Accurate offshore positioning is the responsibility and duty of the CONTRACTOR. The primary and secondary navigation systems shall be two independent DGPS systems.

CONTRACTOR agrees to provide a proper workboat with certified operators to maintain in-water seismic equipment at all times. The Party Chief and Captain will supervise and give instruction to its maritime crew and seismic personnel and all Sub-Contractors concerning security issues, regulatory compliance and proper performance of the services: including; HSE objectives & Emergency Response Planning, project planning, vessel tracking, quality control, work locations and Security of personnel & vessels or any other matters required to perform the Services properly and cost effectively. The assigned Party Chief shall personally inspect all facets of the operation at least once every 24 hours.

CONTRACTOR agrees to provide significant spare equipment for the Vessel as per the "critical spare list "required by the Vessel's classification. There shall be 20% of spare seismic equipment to maintain the agreed upon in-water equipment. The spare equipment list should be made available to COMPANY's on-board Rep. CONTRACTOR agrees to notify on-board Rep with any problems or delays associated the operation of the Vessel.

CONTRACTOR is responsible for ensuring the Vessel and her complement are in all regards adequate and in full compliance with the regulatory requirements that are applicable to the Vessel and her operation in the intended waters. This includes Vessel and Port and operational security requirements, Vessel documentation, logistical support and similar expenses unless otherwise specifically provided for in this supplement.

CONTRACTOR is responsible for ensuring the crew and CONTRACTOR's subcontractors are fully trained, properly certificated, suitably experienced and medically fit for the intended voyage and program. Copies of resumes and fitness certifications for proposed crew shall be furnished to COMPANY for review prior to program commencement or crew change. The CONTRACTOR is responsible for any delay, downtime, and/or costs directly attributable to the engagement of medically unfit or improperly certificated individuals.

COMPANY may request replacement of any of CONTRACTOR's crew where in the opinion of COMPANY such are considered to be unsuitable for the intended voyage or program. CONTRACTOR will then promptly arrange a suitable alternate.

CONTRACTOR shall continuously inform COMPANY concerning the serviceability of the Vessel and all CONTRACTOR equipment used or likely to be used in the survey. More specifically, the Party Chief, Master, and Chief Engineer shall immediately inform the COMPANY Representatives of any and all ship or equipment deficiencies affecting or potentially affecting the delivery of the program.

CONTRACTOR will ensure Vessel's ability to operate in designated project area under Peruvian standards- if required. This will include but is not limited to passing audits onboard the Vessel from Local Regulatory agencies, or any other requirement deemed necessary by governing agencies for operations in the project area. Cost associated with preparing the vessel to meet these standards will be at CONTRACTOR's expense.

### Rates and Compensation:

### General:

All rates, sums and prices obtained herein shall be in United States Dollars and are exclusive of local Taxes, including Withholding Taxes (WHT) and exclusive of Value Added Taxes (VAT) tied to CONTRACTOR Revenue or COMPANY expense for acquisition, if applicable. All other taxes are as defined in the Master Service Agreement. Rates are fixed and firm for the performance of the services and the duration of the term of this Supplemental 6.

Unless otherwise specified in this Supplement 6, the Acquisition Kilometer Rate includes all costs associated with the operation of the Vessel and the agreed equipment and crew including all supplies, accommodations and food stores.

CONTRACTOR will submit a summary of accumulated Chargeable items to COMPANY on the last day of each month or within five (5) businesses days of the following month.

CONTRACTOR is responsible for ensuring full compliance with Maritime crewing requirements in accordance with the Vessel and crewing Specification. If there are applicable Maritime crewing requirements beyond the Vessel and Crewing Specification, CONTRACTOR is responsible for and in control of the negotiating and contracting process to ensure full compliance with Maritime crewing requirements.

Accommodations and office space for on-board COMPANY Representative(s) must be provided for a 24 hour on-call duty, the location will be agreed upon prior to Vessel departure.

*   Bunk space required will include one GXT Rep, one Grav/Mag operator, one HSE, two MMO's, up to two PAM operators, and one to three security personnel.

CONTRACTOR is responsible for planning, coordinating, and implementing the requisite security operation and is in control of all aspects of said operation with regards for the safe and efficient acquisition of the Scope of Work.

All costs, if any, related to Security and Chase boats shall be approved in advance by COMPANY prior to incurring such expenses and shall be paid by COMPANY as reimbursable

charges. The Chase boat shall safeguard the operations performed by the Vessel in accordance with instructions from the Party Chief of the Vessel.

The Chase boat may be used to provide fuel bunkering offshore to the Vessel and to deliver supplies during the survey. However, Chase boat will only be used for such purposes and only when the Party Chief and Master have given their approval. This will only be granted in an emergency as it is essential that the chase boat stays with the seismic Vessel.

CONTRACTOR operations are based on resupply in port, at a 6 week schedule.

## Terms of Invoicing and Payment:

For the performance of the work, the COMPANY shall pay to the CONTRACTOR the amounts as specified herein.

CONTRACTOR will submit all Invoices to COMPANY monthly on the last day of each month or within five (5) businesses days of the following month. Any claims put forward after the fifth business day of the following month will however still be valid and payable to CONTRACTOR. CONTRACTOR shall present all claims for compensation under this Supplement 6 within 90 days after the expiry of Charter Period.

### Option 1:

All invoices will be payable to CONTRACTOR within forty-five days (45) of receipt by COMPANY. In case of disputed amounts COMPANY can only withhold disputed amounts, the undisputed invoice amount shall be paid by due date. A deferred payment finance fee of 1% per month will be charged for each undisputed and unpaid invoice after the due date.

If COMPANY has not exercised this option by C.O.B., 40 days following receipt of the first acquisition invoice for PeruSPAN from CONTRACTOR, then Option 2 will automatically apply, unless otherwise mutually agreed.

### Option 2:

COMPANY and CONTRACTOR have agreed to a finance/shared revenue arrangement under which all invoices will be payable to CONTRACTOR. Payments will be based on the following terms:

- CONTRACTOR will carry all costs associated with the Vessel, Crew, and Vessel Operations, and approved reimbursables, which shall be invoiced monthly as described above.
- COMPANY will carry other 3rd party costs, including Chase Vessel, Gravity & Magnetic acquisition and processing, 3rd Party Security, MMO's, PAM, QC, and HSE personnel ("COMPANY'S Cost").
- COMPANY shall license the PeruSPAN project to third parties and CONTRACTOR's invoices shall be paid from Net Revenue. Net Revenue is defined as the income received from licensing the PeruSPAN project.
- The Parties shall share all Net Revenue received from the sale of licenses to the PeruSPAN as follows:
  - o CONTRACTOR receives 80% of Net Revenue until CONTRACTOR's Cost Recovery is achieved. ("CONTRACTOR's Cost Recovery shall be defined as

Page 5 of 23

when the sum of the approved invoices received from CONTRACTOR for this project plus a 5% premium equals the share of revenue due to CONTRACTOR).

o COMPANY receives 20% of Net Revenue until CONTRACTOR's Cost Recovery is achieved.

o Following CONTRACTOR's Cost Recovery, COMPANY shall receive 100% of Net Revenues until COMPANY's Cost Recovery is achieved. COMPANY's Cost Recovery shall be deemed to occur when all PeruSPAN revenue due to COMPANY is equal to COMPANY's Cost.

o Following COMPANY's Cost Recovery, CONTRACTOR will receive a 20% trailing royalty on all additional net revenues received for PeruSPAN.

- Option. COMPANY has the Option to buy the trailing royalty from CONTRACTOR under the following terms:
  o COMPANY pays CONTRACTOR for all approved invoices as described above, plus a 10% premium.
  o Option period will terminate on COB, April15, 2015.
  o If COMPANY has not exercised the Option by COB, April 15, 2015, then the terms of the trailing royalty as described above will remain in full effect.

- Any and all revenues generated from the licenses of the PeruSPAN data acquired under this agreement, will be recognized for their proper value (a minimum sale price is defined as ▓▓▓▓▓▓▓▓) with respect to CONTRACTOR cost recovery and/or trailing royalty obligations, including but not limited to reduced pricing deals, packaged or other licenses, or give-away arrangements.

- The COMPANY will try to sell user licenses for the Seismic Data at the minimum sale price of ▓▓▓▓▓▓▓, but reserves the right to sell them at lower price depending on the specific and general conditions of the market with notification to the CONTRACTOR.

CONTRACTOR will be paid within thirty days (30) of receipt by COMPANY of license fees associated with this project.

COMPANY will provide CONTRACTOR with a monthly sales statement for all data licensed for the PeruSPAN project.

In case of disputed amounts COMPANY can only withhold disputed amounts, the undisputed invoice amount shall be paid by due date. A deferred payment finance fee of 1% per month will be charged for each undisputed and unpaid invoice after the due date.

### Evidence of Insurance:

Before performing any of the Services, CONTRACTOR shall provide COMPANY or its designee with certificate or other documentary evidence satisfactory to COMPANY of the insurance and endorsements required under Section 13 of Master Agreement and Appendix 1. COMPANY's acceptance of this certificate does not constitute a waiver, release or modification of any of the insurance coverage's and endorsements required under this Section 13. CONTRACTOR acknowledges that failure to provide a certificate or copy of a policy or other evidence as required by this Appendix 1 and Master Agreement shall lead to non-payment of CONTRACTOR's invoices.

- COMPANY AND CONTRACTOR hereby agree that the insurance as described in Appendix 1 hereto is the insurance that CONTRACTOR will require Vessel Owners to provide for the purposes of this Supplemental 6.

**Commercial Rates:**

CONTRACTOR shall be paid the applicable Full-Fold per Kilometer rate, for full fold kilometers approved and accepted by COMPANY during the entire Charter Period for the performance of the work/ services.

All Full Fold Kilometers must be approved & signed by COMPANY'S on-board client QC rep daily.

Any decision to retrieve equipment or discontinue shooting due to CONTRACTOR'S inability to meet TECHNICAL SPECIFICATIONS must be approved in-advance by the COMPANY'S onboard QC representative.

Unless otherwise specified in this Supplement 6, the Mobilization and De-mobilization fees are inclusive of all costs associated with the Transit of the Vessel and Personnel expenses including the following:

- Port call related cost for crew changes, vessels and personnel.
- Fuel consumption during mobilization and demobilization.
- All temporary Vessel importation costs including all agent fees required to operate in the proposed country.
- All personnel visa and training requirements necessary to operate in the proposed country.

**Mobilization & Demobilization Rate:**

The Mobilization/Demobilization is a lump sum and should cover all costs incurred by CONTRACTOR, including but not limited to mobilization of all personnel, seismic equipment, consumables necessary to perform the Services, from point of origin to the survey area, calibration of all instrumentation necessary for the performance of the Services, navigation system offshore calibration in the survey area, deployment of the guns and streamers in the survey area, streamer balancing and source testing.

Demobilization shall commence immediately on completion of seismic data acquisition in the survey area and will be completed upon disembarking of the COMPANY Representative and all survey data. Any time spent carrying out post-survey navigation checks shall be included in demobilization.

CONTRACTOR further agrees that the above Demobilization Fee of [          ] will be paid only if the Vessel does not proceed directly, or within a mutually agreed timeframe, to another GX Technology project. If the vessel does proceed to another GX Technology project, then the demobilization fee described above will be waived in favor of the Mobilization fee for the next project.

Page 7 of 23

**Acquisition Rate:**

For the performance of the Acquisition Services, CONTRACTOR shall be compensated at a Full Fold Kilometer rate for all COMPANY accepted full fold kilometers acquired.

The Per Kilometer Full Fold Rate will commence immediately when the first five (5) kilometers of acquisition is accepted by COMPANY'S Representative. The acquisition shall anyway be deemed accepted when performed in conformity with the technical requirements set out in this Supplement 6.

The Per Kilometer Full Fold Rate is inclusive of all supplies, stores, fuel & lube and tape copying, CONTRACTOR's integrated navigation system with experienced operators, (including dual independent DGPS), agent fees, all personnel costs and expenses, and all related communications charges from the Vessel and all equipment and materials necessary to perform the Services.

The Per Kilometer Full Fold Rate shall also apply for:

- Time associated with seismic recording and line changes
  - o Line change time is considered chargeable for time in excess of an average of 9 hours per line change accumulated over the total acquisition of the project, and based on a minimum vessel speed of 4.2 knots. (e.g. 9 hours/line change x the total number of line changes made for the project = the accumulated non-chargeable line change time. Any time in excess of this accumulated total time will be considered chargeable; in so far as it not a result of downtime within the contractors control). CONTRACTOR will maintain as high a speed as equipment will allow, based on the above description and in so far as industry standard tension levels are maintained.
- Time spent configuring or re-balancing the streamers after mobilization
- Onboard navigation data processing and Seismic data QC processing
- All time associated with scheduled crew changes, including Pilot, harbor dues, agent fees and shore rep cost.
- Onboard processing QC equipment and personnel for the provision of onboard seismic QC Data Processing thru brute stack.
- All associated crew cost, food, supplies and shipping expenses
- All costs for agents, including Vessel, equipment, personnel, supplies and appropriate permits and clearances.

CONTRACTOR shall insure all tapes shipped, and shall fully insure against the total costs of re-shooting the data recorded thereon, if both original and copy tape set are lost or unusable. All such cost of insurance is reimbursable to CONTRACTOR. If COMPANY declines to pay for such insurance CONTRACTOR is not obligated to obtain such insurance cover.

**Standby Rate:**

The Standby Rate shall apply during time periods data cannot be recorded in accordance with TECHNICAL SPECIFICATIONS in (Schedule 2) due to reasons or conditions considered to be outside

the reasonable control of CONTRACTOR and with COMPANY Representatives prior approval, including but not limited to the following reasons:

- Inclement weather, currents or atmospheric conditions preventing the safe recording of data.
- Time spent recording data which are subsequently rejected in accordance with TECHNICAL SPECIFICATIONS in (Schedule 2) ) due to reasons or conditions considered to be outside the reasonable control of CONTRACTOR and with COMPANY Representatives prior approval, including but not limited to the following reasons:
  - Interference from other seismic vessels or oilfield activity.
  - Interference caused by fishing activities, including fishing vessels, fishing equipment, or marine traffic.
- Time lost due to restrictions imposed by governmental or military agencies (including neighboring countries) and third party pressure groups, provided Contractor has not caused the restrictions to be imposed;
- Delays caused by proximity of wildlife (marine mammals and other protected species) as a result of stipulations provided in project specific permits or regulatory requirements. local regulations
- Time lost due to Vessel and Crew having to maneuver away from a specific security threat. COMPANY's onboard QC will be advised immediately on any potential threat.
- Time spent during scouting  (to include time spent scouting the survey area prior to Vessel acquiring data as part of mobilization agreement)
- Navigation stand-by occasioned by inappropriate satellite geometry or by the inherent operating constraints of positioning system, including sky wave, weather interference or other atmospheric effects.
- Delays caused by collision of in-water seismic equipment with flotsam, jetsam and other debris and time spent repairing damages caused by same.
- Third party interference including but not limited to vessel activity, static hazards and extraneous sources of acoustic noise, notwithstanding efforts of chase/escort vessel to minimize the same.
- Time spent awaiting environmental restrictions.
- Time lost as a result of damages to in-sea equipment caused by uncharted obstructions.
- Time lost due to default or damage to COMPANY provided Equipment.
- Equipment recovery before any of the above occurrences and also re-streaming, returning and re-calibration after such periods.
- Time spent on port call requested by Company, for any reason other than to remedy a Contractor downtime situation.
- Excess time spent on extended line changes, as described above.

During periods of standby at Standby Rate and subject to acceptance from COMPANY, CONTRACTOR may perform necessary maintenance and repair of equipment.

The Standby Rate shall not apply if data cannot be recorded due to reasons regarded as Technical Downtime Periods, and the Standby Rate shall in such situations commence (if no other day rate is applicable) after the Technical Downtime Period ceases and COMPANY has been returned to an equally favorable position.

Notwithstanding the above, the Standby Rate shall apply during time periods CONTRACTOR is prevented from making repairs by virtue of one or more of the standby conditions listed above (and then the Standby Rate shall apply in lieu of the Technical Downtime Period from the point in time CONTRACTOR is prevented from making such repairs. Once the standby condition has cleared, the Standby rate shall cease and the Technical Downtime period shall commence again, until and COMPANY has been returned to an equally favorable position from the time the initial Technical Downtime Period began.)

### Technical Downtime Periods:

Except as otherwise set out in this Supplement 6, the Mobilization Fee, Standby Rate, and/ or Per Kilometer Full Fold Rate shall not apply during time periods of "Technical Downtime" within CONTRACTOR'S control, and no compensation will be paid to CONTRACTOR during such periods.

"Technical Downtime" is time lost due to CONTRACTOR'S Vessel, Vessel equipment, recording electronics, seismic cables, airgun source, cabling handling equipment, system software or navigation equipment or any other equipment, systems, or software that are inoperable or fail to meet survey specifications, unless approved by COMPANY'S onboard QC Representative.

Any delays or time lost, within reasonable control of CONTRACTOR, prior to the Vessel's arrival to or during its departure from the survey area as a result of failure to reasonably complete acceptance tests, place qualified operators on board the Vessel, or as a result of CONTRACTOR failing to provide requisite information necessary for timely acquisition of any visa's, permits or clearances, will be recognized as "Technical Downtime".

### The Acquisition and Standby Rates shall NOT include:

- Technical Downtime periods as described above
- Fuel charges in excess of ▮▮▮ per metric ton.
- Delays caused by collision of Vessel with any obstructions, catastrophic failures, or any time spent repairing resultant damages. (including engines, compressor, or hull failures etc.) Catastrophic failures are defined as interruptions or significant slowdowns in crew performance due to breakdown of Vessel or machinery including but not limited to compressors; Vessel propulsion, steering or ship's power.
- Re-shoots due to CONTRACTOR error or negligence
- CONTRACTOR engaging in time-sharing or standby time without the expressed consent of the COMPANY QC representative.
- CONTRACTOR not receiving prior approvals from COMPANYS on-board rep for extended periods of downtime
- CONTRACTOR port call periods and time spent conducting crew changes.

### Reimbursable Charges:

Where the following additional services are provided by the Contractor, the reimbursable charges will be paid by Company monthly and will be billed at cost plus five per cent (5%), unless otherwise stated, in accordance with the terms set out above.

All Reimbursable items provided at the request of COMPANY must be approved in writing (e-mail acceptable) by COMPANY prior to incurring such expense, and CONTRACTOR shall not be obliged to provide such reimbursable services/ items before approved by COMPANY in writing.

CONTRACTOR agrees to draft 3rd Party contracts to reflect extended periods of downtime. Extended periods of downtime due to CONTRACTORS Vessel, equipment or catastrophic failures will not be reimbursable cost to Contractor.

### Reimbursable Items to CONTRACTOR:

Unless, otherwise described above:

- All items provided at the request of the COMPANY
- Additional personnel at the request of the COMPANY or due to regulatory requirements
- Fuel charges in excess of ▮▮▮▮▮▮ for acquisition and standby periods.
- Tape Shipment:
  - o CONTRACTOR shall insure all tapes shipped, and shall fully insure against the total costs of re-shooting the data recorded thereon, if both original and copy tape set are lost or unusable. All such cost of insurance is reimbursable to CONTRACTOR.
  - o All navigation and streamer/source positioning data tapes shall be shipped to COMPANY at cost plus five percent (5%).
- Tape copies charged at ▮▮▮▮▮▮
- Communications;
  - o VSAT communications charges up to ▮▮▮▮▮ per day

### Notifications:

Any notifications regards this Supplement shall be made to the following:

**Cobra Energy Services**
**10550 Bissonnet, Suite 100**
**Houston, Texas 77099**
**Attn: Mr. Ted Cooper**
**(713) 728-6266**

**GX Technology**
**2015 CityWest Blvd., Suite 900**
**Houston, Texas 77042**
**Attn: Mr. Shawn L. Rice**
**(713) 789-7250**

### HSE:

CONTRACTOR agrees to perform a Comprehensive Project Risk and Hazard Assessment that takes in account the hazards of operating in the project specific areas the hazards and control measures should be agreed upon by sub-contractors and Security Companies providing chase or security vessels and guards to protect personnel and Vessels. (When drawing up such an assessment, it is appropriate to make use of professional advisers (such as project management companies, private security companies, risk management consultants and the local police or Navy).

CONTRACTOR is obliged to comply with COMPANY's HSE (Health, Safety and Environment) policies as outlined in Schedule 3

COMPANY may undertake an independent HSE audit whilst the Vessel is in port and/or when in an operational condition on location. COMPANY may refuse to accept the Vessel if the HSE audit reveals major deficiencies.

As a minimum requirement, the CONTRACTOR shall comply with the standards set by the OGP (formerly E&P Forum) Health and Safety Schedules and training guidelines, the IAGC Safety Manual for Marine Geophysical Operations and the IAGC Environmental Manual. Additional HSE requirements are provided in Schedule 3 of the signed contract document.

CONTRACTOR shall be solely responsible for the Security of the Vessel and personnel in addition to the health and safety of its agents, employees and subcontractors' employees engaged in the work. CONTRACTOR and its subcontractors shall comply with all applicable health, environment and safety standards, codes and regulations; whether defined by the Government/Federal regulatory bodies, ION or ION's clients (whichever are the most stringent). If such standards, codes or regulations do not adequately protect against hazards arising from the work, CONTRACTOR shall adopt appropriate practices.

CONTRACTOR shall take all reasonable precautions to protect the environment during the performance of work as outlined in the contract. The responsibilities of the CONTRACTOR shall include, but not be limited to the prevention of pollution caused by Contractor's equipment and materials, as well as protection of marine mammals and other wildlife.

CONTRACTOR shall exercise due care, skill and diligence and take all necessary measures and precautions to ensure that in the execution of the work, safe working practices are observed and that human life and property is not destroyed, injured, or put in any danger. Consequently, the CONTRACTOR's responsibilities include but shall not be limited to:

- Implementation of a management strategy directed at providing a safe operations at the worksite;
- Safety of its Vessel and Personnel;
- Training of its personnel to ensure safe operations;
- Maintenance of its equipment and materials in safe running order and regular inspection of the same to ensure safe and uninterrupted operations;
- Compliance with all applicable laws & regulations

CONTRACTOR shall promptly furnish Company full reports of any incidents involving Contractor's agents, employees or property connected with the work and shall update such reports as reasonable necessary. Such reports and updates shall contain a description of the circumstance of any personal injury, treatment provided, number of restricted or lost work days, and the date of return to work and description of any lasting impairment. Contractor shall endeavor to provide similar reports to Company for all its subcontractors.

## APPENDIX 1: Insurance Requirements

Without limiting the indemnity obligations or liabilities of Cobra or its insurers, Cobra or its Vessel Owner, Shanghai Offshore Petroleum Geophysical Corporation, at their sole expense, shall maintain the following insurances as long as this Agreement is in force:

(1)  Hull and Machinery insurance shall be provided for the vessel by the Owner, including the equipment to be supplied in the performance of Services with navigation limits adequate for the vessel's trade. In an amount equal to the full market value of the vessel on a form at least equivalent to the American Institute Hull Clauses 6-2-77 Form (including 4/4 Collision Liability and damage to fixed or floating objects unless otherwise provided under Protection and Indemnity Insurance).

(2)  Full Form Protection and Indemnity Liability or Marine Liability insurance including coverage for injuries to or death of masters, mates, and crew, collision liabilities, damage to fixed and floating objects not covered under Hull and Machinery and pollution liabilities in an amount equivalent to the cover provided by members of the International Group of Protection and Indemnity Associations.  The obligation to insure for loss of life or bodily injury to crew of vessel may be covered by extension of Workers' Compensation and Employer's Liability insurance.

(3)  Civil Liability – Insurance pursuant to Article 7 of the International Convention on Civil Liability for Bunker Oil Pollution Damage (2001).

(4)  Worker's Compensation and Employer's Liability Insurance in compliance with the laws of all jurisdictions in which the Services under this Agreement are performed covering all persons employed in the performance of such Services by each party.

Owner is required to provide COMPANY with a certificate of insurance evidencing each of the coverage's above. Certificates are required to indicate that should the described policy be cancelled before the expiration date thereof, notice will be delivered to COMPANY in accordance with the policy provisions.

**APPENDIX 2:   Project Map**
*(Approx. 7,538 2D kms)*



**APPENDIX 3: Seismic Acquisition Parameters**

Page 15 of 23

# SECTION 1.    SURVEY DESCRIPTION

## 1.1.    Program Overview

| | General Information | |
|---|---|---|
| 1. | Survey Name: | Tanzania 2D |
| 2. | Operating Company: | GX Technology |
| 3. | Operating Contractor: | SOPGC |
| 4. | Vessel(s): | M/V Discoverer |
| 5. | Location: | Offshore Tanzania |
| 6. | Type of Survey: | 2D Streamer |
| 7. | Desired acquisition time period | July – Aug 2014 |
| 8. | Estimated survey duration | 45 days |

| | Survey Size | |
|---|---|---|
| 9. | Full-fold line length (km) | 4,054 |
| 10. | Number of Lines | 57 |

## 1.2.    Service Requirements

The primary services will consist of the following:

| | Service Description | Required? |
|---|---|---|
| 1. | Seismic Acquisition | Yes |
| 2. | Field QC Processing | Yes |
| 3. | Field Extended Processing | No |
| 4. | Gravity Acquisition | Yes |
| 5. | Magnetometer Acquisition | No |
| 6. | Gradiometry Acquisition | No |
| 7. | Multibeam Bathymetry Acquisition | No |
| 8. | Raw GPS Observations (Rinex format) | No |
| 9. | GXT Declinometer | No |
| 10. | Other | No |

## 2.1.    Seismic Acquisition Parameters

| | Acquisition Geometry | |
|---|---|---|
| 1. | Acquisition method | Streamer |
| 2. | Configuration (2D,3D,4D / 1C,2C,3C,4C) | 2D / 1C |

| | Recording Geometry | |
|---|---|---|
| 3. | Number of cables | 1 |
| 4. | Cable Length | 10,050 m |
| 5. | Group Interval | 12.5 m |
| 6. | Number of Channels | 804 |
| 7. | Cable Depth | 10 m |
| 8. | Nominal Near Trace Offset | 150 m or less |
| 9. | Shot Interval | 25 m |
| 10. | Source depth | 6 m |

| | Recording Parameters | |
|---|---|---|
| 11. | Instrument type | Sercel SEAL ALS |
| 12. | Tape format | SEG-D 8058 |
| 13. | Record length | 10 seconds |
| 14. | Sample rate | 2 milliseconds |
| 15. | Recording filter: Lo-cut | Out (3 Hz, 6 dB/octave) |
| 16. | Recording filter: Hi-cut | 200 Hz, 370 dB/octave |
| 17. | Filter Phase | Linear |
| 18. | Recording media | IBM 3590E |
| 19. | Dual recording / tapes copies required? | Yes |
| 20. | Auxiliary channel recording requirements | time break, near field hydrophones |

| | Source Parameters | |
|---|---|---|
| 21. | Airgun type | Bolt 1500 LL, Sleeve 1 & 2 |
| 22. | Number of source arrays | 1 |
| 23. | Number of sub-arrays per source | 4 |
| 24. | Sub-array spacing | 10/12/10 m |
| 25. | Total volume per source | 6420 cu. in. |
| 26. | Bar meter output (out-128/72 filter) p-p | 150.4 bar-m |
| 27. | Peak/Bubble ratio (out-128/72 filter) | 18.5 : 1 |
| 28. | Source operating pressure | 2000 psi |
| 29. | Number of pressure indicators per sub-array | 1 |
| 30. | Number of depth indicators per sub-array | Minimum of two, three preferred |
| 31. | Near fields to be recorded? | Yes if available, but not required |

| | Binning Parameters | |
|---|---|---|
| 32. | CMP Bin Size | 6.25 m |
| 33. | Nominal Fold | 201 |
| 34. | Calculate fold coverage? | Yes |
| 35. | Require infill? | No, follow technical specs |
| 36. | Offset Ranges to be evaluated for coverage | 4 equal ranges non-overlapping |
| 37. | Unique Offset Increment | 100 meters |
| 38. | No. of Azimuth Segments | 1 |
| 39. | Group 1 range / minimum fold | 0-2500 m / 50 |
| 40. | Group 2 range / minimum fold | 2500-5000 m / 50 |
| 41. | Group 3 range / minimum fold | 5000-7500 m / 50 |
| 42. | Group 4 range / minimum fold | 7500-10050 m / 50 |
| 43. | All offsets / minimum fold | 0-10050 m / 201 |

## 2.2.   Navigation Acquisition Parameters

| | Navigation System | |
|---|---|---|
| 1. | INS software | Orca |
| 2. | Post Processing software | NRT / Sprint |

| | Primary GPS Navigation | |
|---|---|---|
| 3. | System type | C-Nav1 |
| 4. | Receiver Mfg/Model | FS2050G |
| 5. | Reference station | N/A - PPP |
| 6. | Corrections via | L1 band |
| 7. | Providing company | C&C Technologies |
| 8. | Position QC | Orca |

| | Secondary GPS Navigation | |
|---|---|---|
| 9. | System type | C-Nav2 |
| 10. | Receiver Mfg/Model | FS2050G |
| 11. | Reference station | N/A - PPP |
| 12. | Corrections via | L1 - band |
| 13. | Providing company | C&C Technologies |
| 14. | Position QC | Orca |

| | Tertiary GPS Navigation | |
|---|---|---|
| 15. | System type | PosNet |
| 16. | Receiver Mfg/Model | Novatel |
| 17. | Reference station | N/A |

| 18. | Corrections via | N/A |
|---|---|---|
| 19. | Providing company | PBX Systems |
| 20. | Position QC | Orca |

| | In-water Equipment Requirements | |
|---|---|---|
| 21. | Compass / leveller spacing | One every 300m with redundancy at head and tail |
| 22. | Cable diverters | N/A |
| 23. | Tailbuoy | Yes, rGPS |
| 24. | Gun pods | Yes, minimum of 2 active rGPS |
| 25. | Head acoustic network | No, but desired if no water break avail. |
| 26. | Velocimeter | No, but desired if routine TS-Dip measurements unavailable |
| 27. | Fathometer | Max depth range 3000m (if water depths exceed fathometer capabilities, water depths will be picked from the seismic data and P1-90 files updated with this depth) |

| | Navigation Settings | |
|---|---|---|
| 28. | Navigation mode | Great circle |
| 29. | Navigation Reference to Preplot Position | First CMP |
| 30. | Nominal echo-sounder water velocity | 1500 m/sec |
| 31. | Tidal Correction Vertical Datum | N/A |
| 32. | Magnetic declination usage | One value per line at mid-line location |

## SECTION 3.   REPORTS AND DELIVERABLES SUMMARY

### 3.1.   Pre-Survey Deliverables

| | Pre-Survey Products | Supplied by |
|---|---|---|
| 1. | Survey Project Plan (including mobilization schedule) | GXT/Contractor |
| 2. | Cables and spares listing and history | Contractor |
| 3. | Gun drop-out specifications | GXT |
| 4. | Representative sample of all onboard QC products | Contractor |
| 5. | System timing, data flow, and control diagrams | Contractor |
| 6. | Test communication link to GXT office with seismic and navigation test files | GXT Rep |
| 7. | Pre-plot listing, map and UKOOA files | GXT |
| 8. | Positioning Quality Plan | Contractor |
| 9. | Onboard Processing Project Plan | Contractor |
| 10. | Detailed Project Safety Plan | Contractor |
| 11. | Drug and Alcohol Testing Program | Contractor |
| 12. | Local Medical Services information | Contractor |
| 13. | Crew Training Matrix Summary | Contractor |
| 14. | Preliminary Project Risk Assessment | GXT and Contractor |
| 15. | Incident Report Format | GXT |
| 16. | Emergency Response Plan | Contractor . |
| 17. | Interface Management Plan (Bridging Document) | GXT and Contractor |
| 18. | Third Party QHSE Audit Report | GXT |
| 19. | Other QHSE details | Contractor |

### 3.2.   Deliverables at Start-Up

| | Start-Up Products | Delivery To |
|---|---|---|
| 1. | Source calibration and verification results | GXT Rep |
| 2. | Instrumentation test results to include recording system timing verification and instrument acceptance tests | GXT Rep |
| 3. | Multi-vessel timing tests | GXT Rep |
| 4. | Cable/sensor test results | GXT Rep |
| 5. | Calibration reports to include gyrocompass and streamer compass calibration reports, GPS position check and acoustic network reports, gundepth accuracy, GPS procedures and base station descriptions | GXT Rep |
| 6. | Bin center pre-plot & P6/98 grid definition (3D) | GXT Rep |
| 7. | First line instrument tests (SEG-D) | S&R Services |
| 8. | First line navigation tests (P2-94) | CSL |

### 3.3. Deliverables during Survey

| | Survey Products | Deliver To | Upload To |
|---|---|---|---|
| 1. | Observer logs | GXT Rep | GXT FTP |
| 2. | Monthly instrument tests results | GXT Rep | GXT FTP |
| 3. | Daily instrument test results | GXT Rep | |
| 4. | Navigation logs | GXT Rep | GXT FTP |
| 5. | STS and SBS logs from navigation system | GXT Rep | GXT FTP |
| 5. | End of line reporting (Spectra logs, QC products, noise analyses, etc.) | GXT Rep | GXT FTP |
| 6. | Orca/Spectra SBS and STS logs | GXT Rep | GXT FTP |
| 7. | Vessel position log – positions recorded at 1 minute intervals throughout the duration of the project (including non-production time, line changes etc..) | GXT Rep | GXT FTP |
| 8. | ION Declinometer data - continuously recording throughout survey | N/A | N/A |
| 9. | Gun logs | GXT Rep | GXT FTP |
| 10. | Configuration diagrams | GXT Rep | GXT FTP |
| 11. | Weekly onboard processing status report | GXT Rep | GXT FTP |
| 12. | Final P1-90 data for each sequence | GXT Rep | GXT FTP |
| 13. | Final P1-90 source records for each sequence (S cards only) | GXT Rep | GXT FTP |
| 14. | Raw P2/94 data for each sequence | GXT Rep | GXT FTP |
| 15. | Onboard processing QC plots for each sequence | GXT Rep | GXT FTP |
| 16. | Decimated SEG-Y stack (100m trace spacing) | GXT Rep | GXT FTP |
| 17. | Tape Logs and Data Transmittals | GXT Rep | GXT FTP |

### 3.4. Post-Survey Deliverables

| | Post-Survey Products | | Deliver To | Qty | Format | Media |
|---|---|---|---|---|---|---|
| 1. | Field (SEGD) tapes | Line archive | GXT | 1 | SEG-D | 3590 |
| | | Sequence archive | Hold on boat | 1 | SEG-D | |
| 2. | Observer logs | | GXT | 1 | XLS | HD-USB |
| 3. | Monthly instrument tests | | GXT | 1 | SEG-D | 3590 |
| 4. | Daily instrument tests results | | GXT | 1 | XLS/DOC | HD-USB |
| 5. | Raw navigation data | | GXT | 1 | P2-94 | HD-USB |
| 6. | Survey-wide Navigation Statistics (including SBS & STS data) | | GXT | 1 | PDF/TEXT | HD-USB |
| 7. | Processed navigation data | | GXT | 2 | P1-90 | 3590 or USB-HD |
| 8. | Backup of QC Node | | GXT | 1 | Archive format | HD-USB |
| 9. | Brute stacks | | GXT | 1 | SEG-Y | HD-USB |
| 10. | Onboard processing QC plots for each sequence | | GXT | 1 | Archive each SEQ | HD-USB |
| 11. | Nav-sels merged SEGY data (no nmo) | | N/A | 0 | SEG-Y | 3590 |
| 12. | Stacking velocities | | GXT | 1 | ASCII | HD-USB |
| 13. | Navigation logs | | GXT | 1 | XLS/DOC | HD-USB |

| | Post-Survey Products | Deliver To | Qty | Format | Media |
|---|---|---|---|---|---|
| 14. | Post-Plot maps in WGS-84 & Local Datum | GXT | 1 | Paper | Paper |
| 15. | Acquisition Bin-Grid Definition (3D) | GXT | 1 | P6/98 | HD-USB |
| 16. | Final Seismic Operations & Navigation Report | GXT | 3 | DOC | HD-USB |
| 17. | Final Onboard Seismic Processing Report | GXT | 3 | DOC | HD-USB |
| 18. | Ancillary digital data (grav. mag. ...) | FGMS | 1 | Misc | HD-USB |

**APPENDIX 3: *continued....***
**(Vessel Specifications)**



**A. Vessel Detail**

| | |
|---|---|
| VESSEL NAME | DISCOVERER |
| Owner | Shanghai Offshore Petroleum Bureau |
| Maritime operator | Shanghai Offshore Petroleum Geophysical Corporation |
| Flag | Bahamas |
| Port Of Registry | Nassau |
| Year of Build | 1980 |
| Year of Rebuilt | 1988 |
| Class | DNV + IAI ICE-C SUPPLY VESSEL SF |
| IMO number | 7623926 |
| Call sign | C6CZ2 |
| **Vessel Dimensions** | |
| Length over all | 72.07m |
| Length between p.p. | 72m |
| Breadth mould | 16.0m |
| Air draught | 30m |
| Draught (mean)/Design draught | 3.61m |
| Scantling draught /Max Draft | 5.25m |
| **Vessel Tonnage** | |
| Gross Tonnage | 2747 |
| Net Reg Tonnage | 824 |
| Deadweight at scantling draught | 1800t |
| **Vessel Capacities** | |
| Ballast water | 800m$^3$ |
| Freshwater | 350m$^3$ plus 8m$^3$ /day water maker |
| Fuel oil, incl. service tanks and overflow | 700t approx |
| Fuel, Useful for 100 % Consumption | 550t |

| Navtex Receiver | JRC NCR333 |
| AIS ( Automatic Identification System) | JRC JHS -182 |
| BNWAS | AMI Marine KW810 |
| **E. Accommodation** | |
| Cabin Type 1 Marine crew | 11 x 1 berth |
| Cabin Type 2 Seismic crew | 15 x 2 berths |
| Cabin Type 3 Treatment room | 2 x 4 berths |
| Total Accommodation | 49+hospital |

**F. Helideck**

Helicopter deck     16m Diameter   No Certified

**G. Vessel Fire Fighting Equipment**

| ENGINEROOM/CONTROL/ SWITCHBOARD | HALON SYSTEM 1301 |
| Tape Store | EXTINGUISHER |
| Cable Store | FOAM SYSTEM |
| Streamer Reels | FOAM SYSTEM |
| Helocopter Deck | APPP $ DRYPOWDER EXTINGUISHER |
| Paint Store | EXTINGUISHER |
| Main Fire Pump | 2 |
| Emergency Fire Pump | 1 |
| Fire Detection Monitoring System | 1 x SYSTEM 3    1 x CERBERUS PYROTRONICS |

**H. Vessel Safety and Survival**

| Lifeboats | 2 x Harding Fully Enclosed Motor Lifeboats (total 120 persons) |
| Engine of lifeboat | 30HP, NORWAY MCM-28 |
| Life rafts | 4 x Life-rafts (total 64 persons) |
| MOB (Fast Rescu Craft) | 5.30 MIDGET RESCUE BOAT |
| Engine, MOB and speed of boat | 57-75HP / 18 knots |
| Life jackets | 73 : |
| Survival suits | 64 |



# The State of Texas

## Secretary of State

Requested for use in PERU

Not for use within the United States of America

This Apostille only certifies the signature, the capacity of the signer and the seal or stamp it bears. It does not certify the content of the document for which it was issued.

Certificate Validation available at www.sos.state.tx.us

---

## APOSTILLE

### (Convention de La Haye du 5 Octobre 1961)

1. Country

United States of America

This public document

2. has been signed by

KAROLYN RATAJCZAK

3. acting in the capacity of

Notary Public, State of Texas

4. and bears the seal/stamp of

KAROLYN RATAJCZAK,
Notary Public, State of Texas,
Commission Expires: 09-30-17

## CERTIFIED

5. at Austin, Texas

6. on October 3, 2014

7. by the Secretary of State of Texas

8. Certificate No. 10150854

9. Seal



10. Signature:

*Nandita Berry*

Nandita Berry
Secretary of State

GF/tl