Supplemental Agreement No. 13
To
Master Geophysical Services Agreement

This Supplemental Agreement No. 13 ("**Supplement 13**") is entered into as of the 17th day of January 2019, between GX Technology Corporation located at 2105 City West Boulevard, Houston, Texas 77042 ("**COMPANY**") and Cobra Energy Services, S.A. a Panamanian corporation whose registered office is at the World Trade Center, 1° Piso Area Commercial, Calle 53, Marbella, Panama City, Republica de Panama ("**CONTRACTOR**") subject to the following:

1. **Master Agreement.** This Supplement 13 is entered into pursuant to the Master Geophysical Service Agreement between COMPANY and CONTRACTOR dated July 8, 2015 (the "Master Agreement"), the terms of which are incorporated herein by reference and attached hereto.

**Content: GrandSPAN 2 Seismic Acquisition**

**This Supplement 13 consists of the following documents:**
- Scope of Work
- General Description of the Services
- Rates and Compensation
- Terms of Payment and invoicing
- Commercial Rates
- HSE
- APPENDIX 1 – Insurance Requirements
- APPENDIX 2 – Project Map
- APPENDIX 3 – Vessel Specifications
- APPENDIX 4 – Seismic Parameters
- APPENDIX 5 – GAP Analysis to be completed
- APPENDIX 6 – Local labor supplement

**The following documents will be made available to CONTRACTOR:**
- Schedule 1 – Operations Plan and Permitting Requirements
- Schedule 2 – Marine Seismic Acquisition Order
    - Seismic Specifications
    - Gravity & Magnetic Requirements
    - Onboard – QC Processing
    - Seismic Source Array

**Master Geophysical Service Agreement**
In the event of any conflict between the provisions of the above documents, they shall be given priority in the order listed above.

| COMPANY | CONTRACTOR |
|---|---|
| GX Technology Corporation | Cobra Energy Services, S.A. |
| BY: _[signature]_ | BY: _[signature]_ |
| NAME: KEN WILLIAMSON | NAME: Yumin Li |
| TITLE: EVP + COO | TITLE: Country Manager, CHINA |
| DATE: JANUARY 17 2019 | DATE: January 17, 2019 |

EXHIBIT
Cobra 3

**GENERAL.:**

This Supplement 13 is entered into between COMPANY and CONTRACTOR (as defined above), through which CONTRACTOR agrees to deliver and make available the vessel M/V Hai Yang Shi You 760 (the "Vessel") along with the personnel and equipment necessary to acquire COMPANY's GrandSPAN 2 seismic survey offshore Canada/Newfoundland (the "Services"). The equipment and personnel needed to perform the Services are illustrated in the Appendices and Schedules attached hereto.

The GrandSPAN 2 program commencement is subject to COMPANY obtaining the proper permits required in the territory and the Vessel receiving regulatory approval from CNLOPB to operate in the proposed area.

This Supplemental Agreement is based on the terms and conditions below:

Services are related to the acquisition of approximately 10,800 FF km of 2D seismic data offshore Canada and Newfoundland. The actual line locations and line kilometers may vary from those shown in the project specific schedules (Schedule 2) as a result of environmental or permit restrictions, acquisition obstacles, and map inaccuracies, any changes in governmental agencies or lease holder restrictions or requirements.

The "Charter Period" commences immediately after the arrival of COMPANY personnel onboard the Vessel and the acceptance of Vessel, equipment and calibrations by COMPANY Representative. CONTRACTOR will need to provide all requisite Vessel specific permits, evidenced by receipt of a Maritime and Coast Guard clearance letters, customs clearance for temporary importation of crew and Vessel, visas for the crew, as well as approve all project specific security requirements including security plans, vessels, equipment and personnel required to maintain safe passage and operations.

The Charter Period continues until demobilization of the Vessel is completed, including demobilization of COMPANY provided equipment, COMPANY Representative and all copies of Survey Data at an agreed safe location.

The program will be acquired based on the terms and conditions below:

CONTRACTOR is directly responsible for the proper Vessel certification, insurance and inspections that are required to operate in the proposed project area/ waters. Specifically, CONTRACTOR will:

- Manage the daily security and ice mitigation measures in place and direct and instruct any security/guard vessels with daily instructions necessary to maintain safe operations during this Charter Period. CONTRACTOR has the authority to cease all operations immediately if security conditions are deemed unsafe to continue operations in the proposed project areas.

- At its cost, deliver the Vessel with the approved regulatory certification required to operate safely in the proposed waters. The crew shall have received any required training as per the regulatory and security requirements of the country of operation and program as set out by COMPANY, the CNLOPB, and any other governing authority regulating this program.

- Arrive with the Vessel at the first site of acquisition for the performance of work with sufficient supplies and experienced personnel to perform the Services as set out in the Scope of Work. Once acquisition begins, CONTRACTOR shall remain on the project, except for crew change, refueling and re-supplying until the survey is completed.

- Provide all information to COMPANY as outlined in the "Project Schedules" and Insurance Requirements for the proposed survey. Failure to do so could result in delay to the start of the program. Any delays caused by the failure of CONTRACTOR to produce requested documentation as stated in this Supplement 13 will not be considered chargeable to COMPANY

- Agrees to a Vessel inspection and technical audit of the seismic equipment by COMPANY, Canadian regulators, or 3rd party auditors should COMPANY request. A list of outstanding



Action items from the GAP Analysis evaluation process will be included and inserted into Appendix 5 once completed. CONTRACTOR agrees that these items will be completed and/or approved in writing to COMPANY's satisfaction prior to the acceptance of the Vessel for this survey. Time spent completing these items is not considered chargeable to COMPANY. CONTRACTOR shall be given prompt notice of any additional outstanding action items and shall have forty-five (45) days from the date of receipt of such notice to remedy and cure such items. If, after forty-five (45) day period, the items have not been remedied or cured or it is shown that CONTRACTOR has not made a commercially reasonable effort to remedy or cure the action items, then COMPANY has the right to terminate this Supplement 13. Any Vessel requested modifications or pending items listed in Appendix 5 will be to CONTRACTOR'S expense unless agreed upon in writing in advance and signed by the COMPANYS VP of operations.

- CONTRACTOR will manage fuel requirements and logistics with local distributor and make the necessary arrangements for bunkering the Vessel, including confirmation of fuel availability, Vessel consumptions and Vessel specific fuel specifications and any pre-testing of fuel samples required by the Vessel Master.

**General Description of the Services:**

Except for COMPANY provided equipment and the reimbursable services/items described herein, CONTRACTOR shall, at its cost, provide experienced operators of the seismic equipment as well as the materials necessary to perform the Services as specified in detail in Schedules 1 and 2 of the Job Book. CONTRACTOR shall undertake the acquisition of seismic and its navigation/positioning data, gravity and magnetic data, as well as onboard QC seismic processing in accordance with the technical specification requirements contained in the applicable attachments hereto and in a manner consistent with generally accepted standards of the industry, including operation of equipment within the limits of its generally accepted capability. Mitigations and Regulatory reporting requirements are listed in Schedule 1 while survey acquisition parameters and operating specifications are listed in Schedule 2. Accurate offshore positioning is the responsibility and duty of CONTRACTOR. The primary and secondary navigation systems shall be two independent DGPS systems.

CONTRACTOR agrees to provide a proper fast rescue craft with certified operators able to pass Canadian standards. The Party Chief and Captain will supervise and give instruction to its maritime crew and seismic personnel and all subcontractors concerning security issues, ice conditions, regulatory compliance and proper performance of the services: including; HSE objectives & Emergency Response Planning, project planning, Vessel tracking, quality control, work locations and security of personnel & vessels or any other matters required to perform the Services properly and cost effectively. The assigned Party Chief shall personally inspect all facets of the operation at least once every 24 hours.

CONTRACTOR agrees to provide significant spare equipment for the Vessel as per the "critical spare list" required by the Vessel's classification. There shall be a minimum of 20% of spare seismic equipment to maintain the agreed upon in-water equipment. The spare equipment list should be made available to COMPANY's on-board Rep. CONTRACTOR agrees to notify on-board Rep with any problems or delays associated the operation of the Vessel.

CONTRACTOR is responsible for ensuring the crew and CONTRACTOR's subcontractors are fully trained, properly certificated, suitably experienced and medically fit for the intended voyage and program. Copies of resumes and fitness certifications for proposed crew shall be furnished to COMPANY for review prior to program commencement or crew change. CONTRACTOR is responsible for any delay, downtime, and/or costs directly attributable to the engagement of medically unfit or improperly certificated individuals. COMPANY agrees that the class requirement language is Chinese but CONTRACTOR will ensure that the Chiefs and crew onboard the Vessel will be capable of speaking and writing in English at a conversational level. CONTRACTOR will make available a suitable translator should the level of English onboard the vessel be deemed inadequate for safe and efficient operations.



COMPANY may request replacement of any of CONTRACTOR's crew where in the opinion of COMPANY such are considered to be unsuitable for the intended voyage or program. CONTRACTOR will then promptly arrange a suitable alternate at their own cost. CONTRACTOR shall continuously inform COMPANY concerning the serviceability of the Vessel and all CONTRACTOR equipment used or likely to be used in the survey. More specifically, the Party Chief, Master, and Chief Engineer shall immediately inform COMPANY Representatives of any and all ship or equipment deficiencies affecting or potentially affecting the delivery of the program or safety of the operation.

CONTRACTOR will ensure Vessel's ability to operate in designated project area. This may include but is not limited to passing audits onboard the Vessel from local regulatory agencies, or any other requirement deemed necessary by governing agencies or operating conditions for the project area including the conditions and mitigations outlined in the GOA (Geophysical Operating Authorization). CONTRACTOR also agrees to complete to the satisfaction of the governing agencies, any non-compliance items found during the GAP Analysis prior to the start of GrandSPAN 2. All costs associated with correcting the non-compliance items found during the GAP Analysis (Appendix 5) and preparing the vessel to meet and maintain Canadian standards will be at CONTRACTOR's reasonable expense unless otherwise specified herein. This includes but is not limited to safety equipment and PPE for all crew members, general upgrades required by Canadian Authorities, installation and maintenance of working FRC, training of the crew, and any other upgrades required to bring the Vessel into and maintain compliance with Canadian regulatory standards. Any downtime of the Vessel attributable to the Vessel's inability to comply with or maintain Canadian standards shall not be chargeable to COMPANY.

**Rates and Compensation:**

**General:**

All rates, sums and prices obtained herein shall be in United States Dollars and are exclusive of local Taxes, including Withholding Taxes (WHT) and Value Added Taxes (VAT), if applicable. All other taxes are as defined in the Master Service Agreement. Rates are fixed and firm for the performance of the Services and the duration of the term of this Supplement 13.

Unless otherwise specified in this Supplement 13, the Acquisition Kilometer Rate includes all costs associated with the operation of the Vessel and the agreed equipment and crew including but not limited to all supplies, accommodations and food stores.

CONTRACTOR will submit a summary of accumulated chargeable items to COMPANY upon the completion of demobilization which will be defined as the time at which COMPANY personnel and equipment have been cleared off of the Vessel.

CONTRACTOR is responsible for ensuring full compliance with Maritime crewing requirements in accordance with the Vessel and crewing specification. If there are applicable Maritime crewing requirements beyond the Vessel and crewing specification, CONTRACTOR is responsible for and in control of the negotiating and contracting process to ensure full compliance with Maritime and seismic crewing requirements.

All additional costs, if any, including those related to security and additional chase/security boats on top of what is to be provided by COMPANY, shall be approved in advance by COMPANY prior to incurring such expenses and shall be paid by COMPANY as reimbursable charges if not otherwise specified herein.

The chase/security boat may be used to provide fuel bunkering offshore to the Vessel and to deliver supplies during the survey. However, chase boats will only be used for such purposes in an emergency and only when the Party Chief and Master have given their approval. This will only be granted in an emergency as it is essential that the chase boats stay with the seismic Vessel for security purposes.

CONTRACTOR operations are based on resupply in port, at a 6 week schedule unless otherwise dictated by local requirements.

**Terms of Invoicing and Payment:**

For the performance of the work, COMPANY shall pay to CONTRACTOR the amounts as specified herein.

CONTRACTOR will submit all invoices to COMPANY monthly on the last day of each month or within five (5) businesses days of the following month. Any claims put forward after the fifth (5th) business day of the following month will however still be valid and payable to CONTRACTOR. CONTRACTOR shall present all claims for compensation under this Supplement 13 within 180 days after the expiry of Charter Period.

COMPANY and CONTRACTOR have agreed to a finance/shared revenue arrangement under which all invoices will be payable to CONTRACTOR. Payments will be based on the following terms:

- CONTRACTOR's invoices shall be paid from Net Revenue received from license sales of the GrandSPAN 2 project as follows:

- "Net Revenue" is defined as cash received by COMPANY from license sales of GrandSPAN 2 less any government royalties.

Cost Recovery:

- Revenue sharing from the project revenue: sixty percent (60%) of the revenue to COMPANY and forty percent (40%) of the revenue to CONTRACTOR.

- [COMPANY shall backstop fifty percent (50%) of CONTRACTOR's costs related to the project no later than twelve (12) months after completion of the project.

- COMPANY shall backstop one hundred percent (100%) of CONTRACTOR's costs related to the project no later than twenty-four (24) months after the completion of the project

- CONTRACTOR's "costs" shall be defined as the sum of approved invoices received by COMPANY from CONTRACTOR for the GrandSPAN 2 project.

- CONTRACTOR's costs outstanding after 12 months will incur 7.5% interest per annum

- CONTRACTOR will be provided within 10 business days following quarter end a statement outlining all sales of GrandSPAN 2 data in a format mutually agreed by the parties.

- CONTRACTOR will be provided all executed copies of sales orders, or proof otherwise, within 10 days of execution, for any sales of the GrandSPAN 2 data.

- In the case of the GrandSPAN 2 data being packaged with any other data sold by the COMPANY a minimum sales price of ▮▮▮▮▮▮ will be used to value the GrandSPAN 2 data unless mutually agreed upon by both parties.

All funds received from data sales shall be sent to CONTRACTOR within 30 days from the end of the month in which the funds were received.

Before project commencement the Terms of Invoicing and Payments will be reviewed and if economic conditions warrant the terms may be converted to a fee for service or financing arrangement as agreed mutually by both parties.

In case of disputed amounts COMPANY can only withhold disputed amounts, the undisputed invoice amount shall be paid by due date. A deferred payment finance fee of 1.5% per month will be charged for each undisputed and unpaid invoice after the due date.

**Reporting:**

Prior to commencing Work COMPANY will provide to CONTRACTOR an estimated delivery schedule for the following, based on the estimated date of demobilization by the Vessel:

- Navigation Merged Shot Records
- PSTM
- PSDM

After the demobilization the COMPANY will provide monthly updates as to any changes to the estimated delivery schedules for the data deliveries listed above.

The COMPANY will send to CONTRACTOR monthly the following reports.
- Sales report showing any new sales of data, by sale and cumulatively
- Revenue for the current month per customer on a line by line basis
- Revenue distribution for the current month for COMPANY, CONTRCTOR, and Host Government

**Evidence of Insurance:**

Before performing any of the Services, CONTRACTOR shall provide COMPANY or its designee with certificate or other documentary evidence satisfactory to COMPANY of the insurance and endorsements required under Section 13 of Master Geophysical Services Agreement. COMPANY's acceptance of this certificate does not constitute a waiver, release or modification of any of the insurance coverage's and endorsements required under this Section 13. CONTRACTOR acknowledges that failure to provide a certificate or copy of a policy or other evidence as required by this Appendix 1 will lead to non-payment of CONTRACTOR's invoices.

- COMPANY AND CONTRACTOR hereby agree that the insurance as described in Annex 1 hereto is the insurance that CONTRACTOR will require Vessel Owners to provide for the purposes of this Supplemental Agreement.

**Commercial Rates:**

CONTRACTOR shall be paid the applicable Full-Fold per Kilometer rate, for full fold kilometers approved and accepted by COMPANY during the entire Charter Period for the performance of the work/ services.

All Full Fold Kilometers must be approved & signed by COMPANY'S on-board client QC representative daily.

Any decision to retrieve equipment or discontinue shooting due to CONTRACTOR'S inability to meet TECHNICAL SPECIFICATIONS must be approved in-advance by COMPANY'S onboard QC representative.

Unless otherwise specified in this Supplement 13, the mobilization and demobilization fees are inclusive of all costs associated with the Transit of the Vessel and Personnel expenses including but not limited to the following:

- Port call related cost for crew changes, vessels and personnel.
- Fuel consumption during mobilization and demobilization.
- All temporary Vessel importation costs including all agent fees required to operate in the proposed country.
- All personnel visa and training requirements necessary to operate in the proposed country.

**Mobilization, Transit & Demobilization Rate:**

GrandSpan 2   Page 6 of 20   January 17, 2019



**Mobilization Fee:** ███████████████

**Demobilization Fee:** ███████████████

The Mobilization Fee is a lump sum and covers all costs incurred by CONTRACTOR, including but not limited to mobilization of all personnel, seismic equipment, consumables necessary to perform the Services, from the time CONTRACTOR is given written approval to commence Mobilization by COMPANY and until the first five (5) kilometers of acquisition is accepted by COMPANY'S Representative of the GrandSPAN 2 survey as described in this Supplement 13.

CONTRACTOR further agrees that the above Demobilization Fee of ███████████ will be paid only if the Vessel does not proceed directly, or within a mutually agreed timeframe, to another GX Technology project. If the Vessel does proceed to another GX Technology project, then the Demobilization Fee described above will be waived in favor of the Mobilization Fee for the next project. The Mobilization Fee for the next program will be outlined in the next Supplement.

Any delays or time lost, within reasonable control of CONTRACTOR, prior to the Vessel's arrival to or during its departure from the survey area as a result of failure to reasonably complete acceptance tests, place qualified operators on board the Vessel, or as a result of CONTRACTOR failing to provide requisite information requested in this Supplement 13 or necessary for timely acquisition of any visa's, permits or clearances, will not be payable by COMPANY.

Demobilization shall commence immediately on completion of seismic data acquisition to be defined as the last accepted shot point, and will be completed upon disembarking of COMPANY Representative and all survey data. Any time spent carrying out post-survey navigation checks shall be included in demobilization.

**Acquisition Kilometer Rate:**

**Per Kilometer Full Fold Rate:** ███████████████

For the performance of the Services, CONTRACTOR shall be compensated at a Full Fold Kilometer rate for all COMPANY accepted full fold kilometers acquired.

The Per Kilometer Full Fold Rate will commence immediately when the first five (5) kilometers of acquisition is accepted by COMPANY'S Representative. The acquisition shall anyway be deemed accepted when performed in conformity with the technical requirements set out in this Supplement 13.

The Per Kilometer Full Fold Rate is inclusive of all design and operation of the proposed equipment, agency fees, local port charges, import and export of the Vessel, fuel & lubricants and associated logistics thereof, supplies, food supplies, QC processing, tapes, integrated navigation system of CONTRACTOR with operators (including two independent systems (DGPS), all personnel costs and expenses, and all related communications charges from the Vessel and all equipment and materials necessary to perform the Services.

The Per Kilometer Full Fold Rate shall also apply for:

- Time associated with seismic recording and line changes
    - Line change time is considered chargeable for time in excess of an average of 9 hours per line change accumulated over the total acquisition of the project, and based on a minimum Vessel speed of 4.0 knots. (e.g. 9 hours/line change x the total number of line changes made for the project = the accumulated non-chargeable line change time. Any time in excess of this accumulated total time will be considered chargeable, in so far as it not a result of downtime within CONTRACTOR'S control). CONTRACTOR will maintain as high

a speed as equipment will allow, based on the above description and in so far as industry standard tension levels are maintained.
- Time spent configuring or re-balancing the streamers after mobilization
- Onboard navigation data processing and seismic QC data processing
- All time associated with scheduled crew changes, including Pilot, harbor dues, agent fees and shore rep cost.
- Onboard processing QC equipment and personnel for the provision of onboard seismic QC data processing through brute stack.
- All associated crew cost, food, supplies and shipping expenses unless otherwise stated in this Supplement 13
- All costs for agents, including Vessel, equipment, personnel, supplies and appropriate permits and clearances.

CONTRACTOR shall ensure all tapes are shipped, and shall fully insured against the total costs of re-shooting the data recorded thereon, if both original and copy tape set are lost or unusable. All such cost of insurance is reimbursable to CONTRACTOR. If COMPANY declines to pay for such insurance CONTRACTOR is not obligated to obtain such insurance cover.

The above rates are based on a fuel cost of less than $1,000 USD per metric ton of MGO. Any cost of fuel consumed by the vessels engaged in the survey in excess of this capped value will be reimbursed to CONTRACTOR by COMPANY at cost. This will apply to the fuel consumed by all the vessels engaged in the project, the seismic survey vessel but also the chase vessel(s), from the port of mobilization and back to the port of demobilization.

**Local Content**

Local marine crew labor content requirements are estimated as follows and will be billed back at cost plus 3.5%. COMPANY will approve local content provider and costs prior to CONTRACTOR incurring costs per local regulations.

CONTRACTOR will also ensure a Canadian Technical Representative will ride the Vessel during the duration of the project. The initial Representative will be Gaston Sheehy at this time.

**Standby Rate:**

**Standby Rate:**                    ███████████████

The Standby Rate shall apply during time periods data cannot be recorded in accordance with TECHNICAL SPECIFICATIONS in (Schedule 2) due to reasons or conditions considered to be outside the reasonable control of CONTRACTOR and with COMPANY Representatives prior approval, including but not limited to the following reasons:
- Inclement weather, currents or atmospheric conditions preventing the safe recording of data.
- Time spent recording data which are subsequently rejected in accordance with TECHNICAL SPECIFICATIONS in (Schedule 2) ) due to reasons or conditions considered to be outside the reasonable control of CONTRACTOR and with COMPANY Representatives prior approval, including but not limited to the following reasons:
    - Interference from other seismic vessels or oilfield activity.
    - Interference caused by fishing activities, including fishing vessels, fishing equipment, or marine traffic.
    - Interference from any security threat deemed necessary by mutually agreed upon security plan
- Time lost due to restrictions imposed by governmental or military agencies (including neighboring countries) and third party pressure groups, provided CONTRACTOR has not caused the restrictions



to be imposed; any downtime associated with non-compliance with the GOA or CNLOPB requirements will not be chargeable.
- Delays caused by proximity of wildlife (marine mammals and other protected species) as a result of stipulations provided in project specific permits, regulatory requirements, or local regulations
- Time lost due to Vessel and Crew having to maneuver away from a specific security threat. COMPANY's onboard QC representative will be advised immediately on any potential threat.
- Time spent during scouting (to include time spent scouting the survey area prior to Vessel acquiring data as part of mobilization agreement).
- Navigation stand-by occasioned by inappropriate satellite geometry or by the inherent operating constraints of positioning system, including sky wave, weather interference or other atmospheric effects.
- Delays caused by collision of in-water seismic equipment with flotsam, jetsam and other debris and time spent repairing damages caused by same provided damages were not the result of CONTRACTOR or CONTRACTOR's subcontractor's negligence.
- Third party interference including but not limited to vessel activity, static hazards and extraneous sources of acoustic noise, notwithstanding efforts of chase/escort vessel to minimize the same.
- Time spent awaiting environmental restrictions.
- Time lost as a result of damages to in-sea equipment caused by uncharted obstructions.
- Time lost due to default or damage to COMPANY provided equipment.
- Equipment recovery before any of the above occurrences and also re-streaming, returning and re-calibration after such periods.
- Time spent on port call requested by COMPANY, for any reason other than to remedy a CONTRACTOR downtime situation.
- Excess time spent on extended line changes, as described above
- The first 72 hours for alternating crew change port calls based on the Canadian regulated 28 day crew rotation mandate. On all other crew changes the 1st 24 hours will be chargeable standby. This clause will not apply if the six – week exemption is granted by Canadian authorities.
- If the clause above does not apply due to the exemption given by Canadian authorities the 1st 24 hours during regular port calls due approximately every six weeks will be chargeable

During periods of standby at Standby Rate and subject to acceptance from COMPANY, CONTRACTOR may perform necessary maintenance and repair of equipment so long as it does not extend the standby time past that required by the original event.

The Standby Rate shall not apply if Data cannot be recorded due to reasons regarded as Technical Downtime Periods, and the Standby Rate shall in such situations commence (if no other day rate is applicable) after the Technical Downtime Period ceases and COMPANY has been returned to an equally favorable position.

Notwithstanding the above, the Standby Rate shall apply during time periods CONTRACTOR is prevented from making repairs by virtue of one or more of the standby conditions listed above (and then the Standby Rate shall apply in lieu of the Technical Downtime Period from the point in time CONTRACTOR is prevented from making such repairs. Once the standby condition has cleared, the Standby rate shall cease and the Technical Downtime Period shall commence again, until and COMPANY has been returned to an equally favorable position from the time the initial Technical Downtime Period began.)

**Technical Downtime Periods:**

Except as otherwise set out in this Supplement 13, the Mobilization/Demobilization Fee, Standby Rate, and/ or Per Kilometer Full Fold Rate shall not apply during time periods of "Technical Downtime" within CONTRACTOR'S control, and no compensation will be paid to CONTRACTOR during such periods.

"Technical Downtime Period" is time lost due to CONTRACTOR'S Vessel, Vessel equipment, recording electronics, seismic cables, airgun source, cable handling equipment, system software or navigation

equipment or any other equipment, systems, or software that are inoperable or fail to meet survey specifications, unless approved by COMPANY'S onboard QC representative.

Any delays or time lost, within reasonable control of CONTRACTOR, prior to the Vessel's arrival to or during its departure from the survey area as a result of failure to reasonably complete acceptance tests, place qualified operators on board the Vessel, or as a result of CONTRACTOR failing to provide requisite information necessary for timely acquisition of any visa's, permits or clearances, will be recognized as "Technical Downtime Period".

**The Acquisition Kilometer Rate and Standby Rate shall NOT include:**
- Technical Downtime Periods as described above
- Delays caused by collision of Vessel with any obstructions, catastrophic failures, or any time spent repairing resultant damages. (including engines, compressor, or hull failures etc.) Catastrophic failures are defined as interruptions or significant slowdowns in crew performance due to breakdown of Vessel or machinery including but not limited to compressors; Vessel propulsion, steering or ship's power.
- Re-shoots due to CONTRACTOR error or negligence
- CONTRACTOR engaging in time-sharing or standby time without the expressed consent of COMPANY QC representative.
- CONTRACTOR not receiving prior approvals from COMPANY's on-board rep for extended periods of downtime

CONTRACTOR agrees to draft third party contracts to reflect extended periods of downtime. Extended periods of downtime due to CONTRACTOR's Vessel, equipment or catastrophic failures will not be reimbursable cost to CONTRACTOR.

**Reimbursable Charges:**

Where the following additional services are provided by CONTRACTOR, the reimbursable charges will be paid by COMPANY monthly and will be billed at cost +5% to COMPANY, unless otherwise stated, in accordance with the terms set out above. Items requested by COMPANY in writing for logistics purposes such as specifically requested agency services, shipping of third party equipment, or other pass through charges will be invoiced separately from other charges monthly and is payable within 30 days.

All reimbursable items provided at the request of COMPANY must be approved in writing (e-mail acceptable) by COMPANY prior to incurring such expense, and CONTRACTOR shall not be obliged to provide such reimbursable services/ items before approved by COMPANY in writing.

Unless, otherwise described above, reimbursable charges will consist of:

- All items provided at the request of COMPANY.
- Additional personnel at the request of COMPANY or due to regulatory requirements.
- Fuel charges in excess of ███████, for acquisition and standby periods (at cost, without markup).
- Tape Shipment:
  o CONTRACTOR shall insure all tapes shipped, and shall fully insure against the total costs of re-shooting the data recorded thereon, if both original and copy tape set are lost or unusable. All such cost of insurance is reimbursable to CONTRACTOR.
  o All navigation and streamer/source positioning data tapes shall be shipped to COMPANY.
- Tape copies charged at ███████████████
- Communications:
  o VSAT communications charges up to ███████████████



**Notifications:**

Any notifications in regards to this this Supplement shall be made to the following:

| | |
|---|---|
| **Cobra Energy Services** | **GX Technology Corporation** |
| 10550 Bissonnet, Suite 100 | 2105 CityWest Blvd #400 |
| Houston, Texas 77099 | Houston, TX. 77042 |
| Attn: Mr. Marcus Pullicino | Attn: Shawn M Rice |
| 713-728-6266 | 1-281-781-1080 |

**HSE:**

CONTRACTOR agrees to perform a Comprehensive Project Risk and Hazard Assessment that takes in account the hazards of operating in the project specific areas the hazards and control measures should be agreed upon by subcontractors and any third party service providers.

COMPANY may undertake an independent HSE and technical audit whilst the Vessel is in port and/or when in an operational condition on location. COMPANY may refuse to accept the Vessel if the HSE audit reveals major deficiencies.

As a minimum requirement, CONTRACTOR shall comply with the standards set by the OGP (formerly E&P Forum) Health and Safety Schedules and training guidelines, the IAGC Safety Manual for Marine Geophysical Operations, the Canada-Newfoundland and Labrador Offshore Petroleum Board standards, and Geophysical Operations Authorization requirements.

CONTRACTOR shall be solely responsible for the security of the Vessel and personnel in addition to the health and safety of its agents, employees and subcontractors' employees engaged in the work. CONTRACTOR and its subcontractors shall comply with all applicable health, environment and safety standards, codes and regulations; whether defined by the Government/Federal regulatory bodies, COMPANY or COMPAMNY's clients (whichever are the most stringent). If such standards, codes or regulations do not adequately protect against hazards arising from the work, CONTRACTOR shall adopt appropriate practices.

CONTRACTOR shall take all reasonable precautions to protect the environment during the performance of work as outlined in the contract. The responsibilities of CONTRACTOR shall include, but not be limited to the prevention of pollution caused by CONTRACTOR'S equipment and materials, as well as protection of marine mammals and other wildlife.

CONTRACTOR shall exercise due care, skill and diligence and take all necessary measures and precautions to ensure that in the execution of the work, safe working practices are observed and that human life and property is not destroyed, injured, or put in any danger. Consequently, CONTRACTOR's responsibilities include but shall not be limited to:

- Implementation of a management strategy directed at providing a safe operations at the worksite;
- Safety of its Vessel and Personnel;
- Training of its personnel to ensure safe operations;
- Maintenance of its equipment and materials in safe running order and regular inspection of the same to ensure safe and uninterrupted operations; and
- Compliance with all applicable laws & regulations.

CONTRACTOR shall promptly furnish COMPANY full reports of any incidents involving CONTRACTOR'S agents, employees or property connected with the work and shall update such reports as reasonable necessary. Such reports and updates shall contain a description of the circumstance of any personal



injury, treatment provided, number of restricted or lost work days, and the date of return to work and description of any lasting impairment. CONTRACTOR shall endeavor to provide similar reports to COMPANY for all its subcontractors.

## APPENDIX 1: Insurance Requirements

Without limiting the indemnity obligations or liabilities of CONTRACTOR or its insurers, CONTRACTOR at their sole expense, shall maintain the following insurances as long as this Agreement is in force:

(1) Hull and Machinery insurance shall be provided for the Vessel by the Owner, including the equipment to be supplied in the performance of Services with navigation limits adequate for the Vessel's, in an amount equal to the full market value of the Vessel on a form at least equivalent to the American Institute Hull Clauses 6-2-77 Form (including 4/4 Collision Liability and damage to fixed or floating objects unless otherwise provided under Protection and Indemnity Insurance).

(2) Full Form Protection and Indemnity Liability or Marine Liability insurance including coverage for injuries to or death of masters, mates, and crew, collision liabilities, damage to fixed and floating objects not covered under Hull and Machinery and pollution liabilities in an amount equivalent to the cover provided by members of the International Group of Protection and Indemnity Associations. The obligation to insure for loss of life or bodily injury to crew of Vessel may be covered by extension of Workers' Compensation and Employer's Liability insurance.

(3) Civil Liability – Insurance pursuant to Article 7 of the International Convention on Civil Liability for Bunker Oil Pollution Damage (2001) evidenced in the form of a certificate issued in favor of Canada-Newfoundland & Labrador Offshore Petroleum Board to be provided by Vessel Owner.

(4) Worker's Compensation and Employer's Liability Insurance in compliance with the laws of all jurisdictions in which the Services under this Agreement are performed covering all persons employed in the performance of such Services by each party.

Owner is required to provide Canada-Newfoundland & Labrador Offshore Petroleum Board with a certificate of insurance evidencing each of the coverage's above. Each certificate shall provide that a Waiver of Subrogation is granted in favor of Canada-Newfoundland & Labrador Offshore Petroleum Board and is subject to the policy terms, conditions and exclusions. Certificates are required to indicate that should the described policy be cancelled before the expiration date thereof, notice will be delivered to the Board in accordance with the policy provisions.

**APPENDIX 2:   Project Map**



## APPENDIX 3: Vessel Specifications



Hai Yang Shi You 760 is built with the typically high standard at Shanghai shipyards in 2015. It has an overall length of 84.8 meters and width 18.4 meters. It is equipped with the latest proven equipment.

HYSY760 is equipped for 1×15000 meters or 4×8000 meters streamers and has maximum capacity of 8 strings with high-pressure air guns. Propulsion and compressors are all diesel
-driven, with all rotating machinery resiliently mounted to ensure hydro-acoustic noise is kept to a minimum. The hull and propulsion system is designed specifically for extremely low noise level.

The specification gives extra importance on the seismic equipment and the related seismic systems onboard.

### 1.1. GENERAL SPECIFICATION

#### 1.1.1. Flag & Port of Registry
The Vessel is flying under the flag state and Port or Registry of China-Tianjin.

#### 1.1.2. Classification
The Vessel is registered and shall be maintained to meet the minimum requirements of CCS, CSA research ship Ice Class B3 Helicopter Facilities Clean.

#### 1.1.3. Regulations
The Vessel shall be maintained in full compliance with all International Conventions, Resolutions and their latest amendments, in addition to applicable flag state requirements. These includes, but not limited to:

(A). National Authorities rules and regulations for unlimited trades.
(b). Safety requirements regarding general arrangement, mechanism and safety equipment for seagoing Vessels.
(c). SOLAS 1997 with later amendments including ISPS code. (d). Load Line Convention 1966,
with amendments.
(e). MAPROL 1973/1978 Regulations, with amendments. (f). International Safety
Management Code.
(g). International Convention on Tonnage Measurements 1969.
(h). International Convention for Preventing Collision at Sea 1972, with amendments.



(i). STCW 1995, with amendment.
(j). Rules and regulations governing navigation through the Panama Canal and Suez Canal, including its Tonnage Regulations.
(k) The Vessel shall be equipped for area A3 acc. to GMDSS rules, and according to International registration 1973 and Radio regulations 1982.
(l). All necessary certificates in original forms will be kept on board. Copies to be made available in shore based office.

## Project Overview

| | General Information | |
|---|---|---|
| 1. | Project name | GrandSPAN 2 |
| 2. | Client name | GX Technology |
| 3. | Contractor name | China Oilfield Services (COSL) |
| 4. | Vessel(s) | M/V HAI YANG SHI YOU 760 |
| 5. | Location | Atlantic Ocean Canada (Offshore Labrador) |
| 6. | Water depths | 200 – 4000 meters |
| 7. | Desired acquisition time period | June-2019 to October-2019 |
| 8. | Estimated project duration | 4 months |

## APPENDIX 4: Seismic Parameters

### Project Summary

| | Parameter | Specification |
|---|---|---|
| 1. | Acquisition method | Streamer |
| 2. | Number of vessels | 1 |
| 3. | Vessel configuration | 2D / 1C |
| 4. | Survey type | 2D (Basin reconnaissance) |
| 5. | Nominal fold coverage | 120 |
| 6. | Acquisition speed (planned) | Not to exceed 4.8 knots (BSP) |
| 7. | Time zone for reporting | UTC |
| 8. | Comments: Vessel speed (BSP) limited to minimize noise from source wrap-around. Vessel speed limitations maybe modified at discretion of COMPANY SUPERVISOR. | |

**Recording System & Streamers**

|     | System / Parameter | Specification |
| --- | --- | --- |
| 1.  | Manufacturer and type | Sercel SEAL Sentinel (SSAS) |
| 2.  | Number of streamers | 1 |
| 3.  | Active Streamer Length | 12,000 m |
| 4.  | Length of active section | 150 m |
| 5.  | Receiver Group Interval | 12.5 m |
| 6.  | Nominal Streamer Depth | 15.0 m |
| 7.  | Number of active sections per streamer | 80 |
| 8.  | Number of receiver groups per section | 12 |
| 9.  | Number of receiver groups per streamer | 960 |
| 10. | Hydrophone type | Sercel flexible hydrophone |
| 11. | Number of Hydrophones per group | 8 |
| 12. | Group Sensitivity | -194.1 dB re 1 V/µPa ±1 dB (19.7 V/bar) |
| 13. | Comments: | |

**Recording Parameters**

|     | System / Parameter | Specification |
| --- | --- | --- |
| 1.  | Acquisition System | Sercel SEAL 408 (software v5.2.17) |
| 2.  | Number of Seismic Channels | 960 |
| 3.  | Number of AUX channels | Maximum= 60 |
| 4.  | Record length | 18,100 milliseconds (including 100ms delay) |
| 5.  | Continuous recording required | N/A |
| 6.  | Start of data delay | 100 milliseconds (in order to capture rise in pulse on NFH) |
| 7.  | Sample rate | 2 milliseconds |
| 8.  | Low-cut filter (Analog) | 3Hz – 6dB/Oct (SEAL active sections) |
| 9.  | Low-cut filter (Digital IIR) | OUT |
| 10. | Low-cut filter (Combined) | 3Hz – 6dB/Oct |
| 11. | DC Offset | On |
| 12. | Anti-alias filter | 0.8 Nyquist (200 Hz, 370 dB/octave) |
| 13. | Anti-alias filter type | Linear |
| 14. | Pre-amplifier gain | 0dB |
| 15. | Polarity | SEG Standard |
| 16. | Seismic data media | IBM 3592 compatible |
| 17. | Seismic data format | SEGD 8058 IEEE Floating Point |
| 18. | External header size | 4096 bytes |
| 19. | Comments: External header to include concatenation of information from INS | |

## Energy Source
**Technical Specifications**

|    | System / Parameter | Specification |
|----|---|---|
| 1. | Source controller manufacturer and type | DigiShot |
| 2. | Airgun manufacturer and type | Sercel GII-Gun |
| 3. | Air compressors | 3 x LMF 51 / 138-207 D (1801cfm ea.) |
| 4. | Number of source arrays | 1 |
| 5. | Number of sub-arrays per source | 4 |
| 6. | Nominal source array volume | 4860 cubic inches |
| 7. | Nominal operating pressure | 2000 psi |
| 8. | Peak-to-Peak Output (DFS-V: Out – 128Hz 72dB/Oct) | 155.4 bar-m (at 20°C water temperature) |
| 9. | Peak-to-Bubble Ratio (DFS-V: Out – 128Hz 72dB/Oct) | 21.4 (at 20°C water temperature) |
| 10. | Shot point interval | 50 m |
| 11. | Nominal inline seismic offset (COS-CNG) | 120 m or less |
| 12. | Centre of source array separation | N/A |
| 13. | Sub-array cross-line separation | 8.0 m |
| 14. | Nominal source array depth | 10.0 m |
| 15. | Number of pressure indicators per sub-array | Minimum 1 per sub-array |
| 16. | Number of depth indicators per sub-array | Minimum 3 per sub-array |
| 17. | Number of near field hydrophones per sub-array | 1 per gun station or cluster preferred (minimum 3 NFH per sub-array) |
| 18. | Number of RGPS units per sub-array | Minimum 1 per sub-array |
| 19. | Number of acoustic devices per sub-array | N/A |
| 20. | Firing sensor type | Solenoid / MP Time Break |
| 21. | Timing resolution | 0.1 ms |
| 22. | Synchronization | Tolerance based on individual gun volume: <200cuin better than ± 1.0ms  >200cuin better than ± 2.0ms |
| 23. | Near Field Hydrophone data | Recorded by Sercel system and appended to seismic data AUX channels |
| 24. | NFH record length | >9 seconds (or as per system limitations) |
| 25. | NFH sample rate | 2 milliseconds |
| 26. | NFH polarity | SEG |
| 27. | NFH data format | SEGD 8058 IEEE Floating Point |
| 28. | Comments: Near field hydrophone data shall be appended to seismic data shot records as AUX channels | |

## Source Drop-Out Criteria

|    | Parameter | Specification |
|----|---|---|
| 1. | Filter settings | SEAL 3/6 - 200/370 |
| 2. | Allowed loss in peak amplitude | ≤ 10% |
| 3. | Allowed change in peak-bubble-ratio | ≤ 15% |

4

| 4. | Normalized cross-correlation coefficient | ≥ 0.998 |
| --- | --- | --- |
| 5. | Average spectral deviation (0-70Hz) | ≤ ± 1.50 dB |
| 6. | Maximum spectral deviation (0-70Hz) | ≤ ± 2.50 dB |
| 7. | Drop-out table | Refer to Appendix 5 |

**Appendix 5: GAP Analysis – Ship Owners outstanding actions to be addressed prior to the acceptance of the Vessel for this survey.**