IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| In re: <br><br> ION GEOPHYSICAL <br> CORPORATION et al.,[1] <br><br> Debtors. | Chapter 11 <br><br> Case No. 22-30987 (MI) <br><br> (Jointly Administered) |

**COBRA'S OBJECTION TO DEBTORS' MOTION FOR ORDER
AUTHORIZING REJECTION OF EXECUTORY CONTRACT**

Cobra Acquisition Services, S.A., as successor in interest to Cobra Energy Services, S.A. ("Cobra") objects to and opposes certain of the relief requested in the above-captioned debtors' (collectively, the "Debtors") First Omnibus Motion for Entry of an Order Authorizing (I) the Rejection of Certain Unexpired Leases and (II) the Rejection of Certain Executory Contracts, Each Effective as of April 12, 2022, and (III) Granting Related Relief [Dkt. 25] (the "Motion") and respectfully states as follows:

**INTRODUCTION**

1. The Debtors seek to reject various agreements with Cobra. Only one set of those agreements is the subject of this objection. They are the Master Geophysical Service Agreement, dated as of July 22, 2011 (the "Master Services Agreement"), and two related supplemental agreements, Supplemental Agreement No. 6 to Master Geophysical Services Agreement No. 1195 ("Supplemental Agreement No. 6") and Supplemental Agreement No. 13 to Master Geophysical

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: ION Geophysical Corporation (6646); I/O Marine Systems, Inc. (3230); ION Exploration Products (U.S.A.), Inc. (1394); and GX Technology Corporation (0115). The location of the Debtors' service address is 4203 Yoakum Blvd., Suite 100, Houston, Texas 77006.

**EXHIBIT B**

Services Agreement ("Supplemental Agreement No. 13" and, together with Supplemental Agreement No. 6, the "Supplemental Agreements").

2. With respect to the Supplemental Agreements, the Debtors' proposed rejection appears at odds with their stated goal in these cases, which is to effectuate a going concern transaction via potential asset sales or a debt-for-equity swap or some combination thereof. As set forth below, however, the Debtors lack the legal right to use the Work Product (as defined in the Master Services Agreement) under either of the Supplemental Agreements. Absent curing existing defaults under the Supplemental Agreements in connection with the Debtors' assumption or assumption and subsequent assignment of the Supplemental Agreements, any reorganized debtor or asset purchaser will also have no ability to use the Work Product generated under the Supplemental Agreements. Thus, to the extent the Debtors intend to utilize the Work Product in connection with any reorganization or sale, they must cure existing defaults in connection with the assumption or assumption and assignment of the Supplemental Agreements.

## BACKGROUND

### A. Master Services Agreement and Supplemental Agreements

3. Under the Master Services Agreement, Cobra may provide certain seismic data services ("Services") to GX Technology. Cobra provided the services on a project-by-project basis and certain of the terms governing the Services were divided into projects and memorialized in separate agreements entered into under the umbrella of the Master Services Agreement. To date, Cobra and GX Technology have executed numerous supplemental agreements. Each supplemental agreement corresponds to an individual energy project in which GX Technology received from Cobra a specific set of Work Product, which the Master Services Agreement defines as including "[a]ll information, drawings, plans, specifications, designs, reports, computations, calculations and other documents prepared by or on behalf of the Contractor or its Representatives

in furtherance of or in connection with the Services."[2] The Supplemental Agreements specifically incorporate the Master Services Agreement by stating "the terms of [the Master Service Agreement] are incorporated herein by reference."[3]

4.  In consideration for the Services, the Supplemental Agreements require that GX Technology compensate Cobra. While the Master Services Agreement gives GX Technology general intellectual property rights over the Work Product, Cobra has the right to retain such Work Product in the event GX Technology has not paid Cobra in accordance with the payment terms of the Supplements—that is fifty days from invoice receipt.[4] Specifically, Section 7(b) of the Master Services Agreement states:

> Notwithstanding the foregoing, **in the event the Company has not paid Contractor in accordance with the payment terms** of the relevant Supplement for fifty (50) days from invoice receipt ("Payment Default"), the Parties agree that Contractor may serve notice on the Company that **Contractor shall retain the Work Product until the Payment Default has been paid in full**, and the Company shall not challenge such notice or retention of its Work Product.[5]

This "notwithstanding" clause gives Cobra the right to retain ownership of the Work Product in the event of non-payment, and GX Technology "shall not challenge such . . . retention of its Work Product."

5.  The Supplemental Agreements, which incorporate the terms of the Master Services Agreement, set forth specific terms and conditions agreed by the Parties for the performance of the Services. Between July 2011 and October 2020, the Parties entered into 14 different

---

[2] **Exhibit 1**, Master Services Agreement § 7(b), ¶ 1, at 8.

[3] **Exhibit 2**, Suppl. Agreement No. 6, at 1; **Exhibit 3**, Suppl. Agreement No. 13, at 1.

[4] **Exhibit 1**, Master Services Agreement § 7(b), ¶ 2, at 10.

[5] *Id.* (emphasis added).

3

supplemental agreements, with the objective of providing specific data for select energy projects. The supplemental agreements relevant to this dispute are Supplemental Agreement No. 6 and Supplemental Agreement No. 13.[6]

6. Under Supplemental Agreement No. 6, Cobra made available the vessel M/V Discoverer and necessary equipment to provide GX Technology with a 2D seismic program of offshore Peru.[7] GX Technology still owes Cobra approximately $2,909,363 for the Services it provided.

7. Under Supplemental Agreement No. 13, Cobra made available the vessel M/V Hai Yang Shi You 760 and necessary equipment to allow GX Technology to acquire its GrandSPAN 2 seismic survey of offshore Newfoundland, Canada.[8] GX Technology owes Cobra approximately $5,024,581.18 for the Services it provided. The full amount is and remains due, with interest accruing from October 24, 2021.

### B. Notices of Default/Retainment of Work Product

8. In light of GX Technology's failure to pay the outstanding balance due under Supplemental Agreement No. 13, on October 25, 2021, Cobra submitted a Notice of Default and Reservation of Rights to GX Technology.[9] In the notice, Cobra stated that GX Technology failed to make payment for 50 days from invoice receipt for the amounts owed under Supplement 13 (plus the applicable interest, finance fees, and late payment penalties), and, as a result, Cobra

---

[6] Supplemental Agreement No. 13 contains a scrivener's error reciting the date of the Master Services Agreement as July 8, 2015, instead of the correct date of July 22, 2011. *See* **Exhibit 3**. The parties entered into an Acknowledgement Agreement Re: Scriveners Error on July 8, 2019. *See* **Exhibit 4**.

[7] **Exhibit 2**, Suppl. Agreement No. 6, at 2.

[8] **Exhibit 3**, Suppl. Agreement No. 13, at 2.

[9] **Exhibit 5**, Cobra's First Notice of Default and Reservation of Rights, Oct. 25, 2021.

4

notified GX Technology that it had no right to use the Work Product. In this regard, the notice stated: "[A]nd therefore [GX Technology] is prohibited from commercially exploiting the Work Product, including but not limited to licensing or selling the Work Product or continuing to license or sell the Work Product to third parties."[10] Cobra further advised GX Technology that it had a right to enforce this through injunctive relief granted in the Master Services Agreement and it strongly advised GX Technology "to inform all of the Companies' customers of these limitations on the customers' ability to use the Work Product."[11]

9. Given GX Technology's continuing default under the Supplemental Agreements, Cobra submitted a second Notice of Default and Retainment of Work Product on January 14, 2022.[12] This second notice informed GX Technology had failed to pay compensation to Cobra as required under the Supplemental Agreement and, as a result, Cobra was exercising its right to retain its Work Product. Moreover, Cobra emphasized that under Clause 7(b), GX Technology was "prohibited from challenging Cobra's retention of such Work Product" and that until GX Technology met its payment obligations in full, that it had no right to use the Work Product.[13]

## ARGUMENT

10. Under 11 U.S.C. § 365(a), a debtor-in-possession may reject an executory contract "subject to the court's approval." Although courts generally apply a "business judgment" standard to a debtor's request, deference to the debtor is not absolute: "In applying the business judgment rule in deciding whether to grant a debtor's motion to reject a contract a court is not adjured to blindly accept, but rather only to show proper deference to the business judgment of the debtor's

---

[10] *Id.*

[11] *Id.*

[12] **Exhibit 6**, Cobra's Second Notice of Default and Retainment of Work Product, Jan. 14, 2022.

[13] *Id.*

5

management." *In re Pilgrim's Pride Corp.*, 403 B.R. 413, 426 (Bankr. N.D. Tex. 2009) (citing *Richmond Leasing Co. v. Cap. Bank, N.A.*, 762 F.2d 1303, 1309 (5th Cir. 1985)). "In reviewing a trustee's or debtor-in-possession's decision to assume [or reject] an executory contract . . . , a bankruptcy court sits as an overseer of the wisdom with which the bankruptcy estate's property is being managed by the trustee or debtor-in-possession." *Id.* at 427 (alteration and omission in original) (quoting *Control Data Corp. v. Zelman* (*In re Minges*), 602 F.2d 38 (2d Cir. 1979), *cited with approval in Richmond Leasing*, 762 F.2d at 1309). To that end, the Fifth Circuit has instructed that, in considering a rejection motion, the court should consider "the risks of the proposed transaction, the available alternatives, and the danger of prejudice to the objecting parties." *Richmond Leasing*, 762 F.2d at 1312 n.11.

11. Allowing the Debtors to reject the Master Services Agreement would be detrimental to the estate—and thus necessarily an improper exercise of the Debtors' business judgment—because it appears the Debtors intend to use the Work Product in connection with the consummation of a going concern transaction that will allow the debtors to either reorganize or sell their assets in one or more sales. But, as detailed below, the Debtors are currently prohibited from using the Work Product—and any use constitutes an ongoing infringement of Cobra's intellectual property rights—a situation that can be remedied only if the Debtors *assume* the Master Services Agreement and cure the current default. Moreover, because the Debtors exercised their rights to retain the Work Product prior to the filing of these cases, the Debtors are prohibited from using it under *Mission Product Holdings, Inc. v. Tempnology, LLC*, 139 S. Ct. 1652 (2019).

**A. Any continued use of the Work Product constitutes infringement of Cobra's intellectual property.**

12. To avoid infringement of Cobra's intellectual property rights in the Work Product, the Debtors must either cease use or pay for ownership of the Work Product as provided under the

6

Master Services Agreement. Cobra maintains valid copyright claims in and to the Work Product, which is protected from unauthorized reproduction, among other unauthorized uses, under U.S. copyright law. And, therefore, the Debtors' continued use without payment constitutes copyright infringement.

13. U.S. copyright law steeply penalizes infringers. A copyright infringer may be liable for "the copyright owner's actual damages and any additional profits of the infringer." 17 U.S.C. § 504. And willful copyright infringement, such as any knowing infringement or reckless disregard for the possibility of infringement, may constitute a criminal offense under 17 U.S.C. § 506. *Hamil Am., Inc. v. GFI, Inc.*, 193 F.3d 92, 97 (2d Cir. 1999).

14. To establish copyright infringement, a plaintiff must prove (1) ownership of a valid copyright, and (2) actionable copying by the defendant of constituent elements of the work that are original. *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991). The Work Product under the Agreement is a copyrightable work under 17 U.S.C. § 102(a), which provides that "original works of authorship fixed in any tangible medium of expression," are eligible for copyright protection. The Work Product contains and embodies certain "information, drawings, plans, specifications, designs, reports, computations, calculations and other documents *prepared by or on behalf of the Contractor*" (Master Services Agreement § 7(b) (emphasis added)), which undoubtably represent "some minimal degree of creativity" that is required under U.S. copyright law to give rise to copyright protection. *See, e.g.*, *BUC Int'l Corp. v. Int'l Yacht Council Ltd.*, 489 F.3d 1129, 1140-41 (11th Cir. 2007) (citing *Feist*, 499 U.S. at 345). Additionally, it is well established that compilations of facts are copyrightable. *E.g.*, *id.* (citing 17 U.S.C. § 103; *Feist*, 499 U.S. at 344).

7

15. Any unauthorized act of reproducing, preparing derivative works, distributing copies, or engaging in other prohibited acts with the Work Product constitutes copyright infringement. *See, e.g.*, 17 U.S.C. § 106. Copyright infringement is shown by demonstrating substantial similarity between the accused work and the copyrighted work. *E.g.*, *Abdin v. CBS Broad., Inc.*, 971 F.3d 57, 69 (2d Cir. 2020) (citing *Eden Toys, Inc. v. Florelee Undergarment Co.*, 697 F.2d 27, 34 (2d Cir. 1982)). The substantial similarity standard "occupies a non-quantifiable value on the legal spectrum between no similarity and identicalness." *BUC Int'l*, 489 F.3d at 1147-48. Here, any use of the Work Product without a license or payment for the assignment and ownership of the Work Product pursuant to the Agreement constitutes a direct and exact copy of the copyrighted work, and therefore is a clear-cut case of infringement.

16. Cobra notified Debtors on January 14, 2022 of its payment default under the Master Services Agreement ("<u>Notice of Default</u>"). As provided in the Notice of Default at page 1 (emphasis added):

> The Company has failed to make payments for fifty (50) days from invoice receipt. According to Clause 7(b) para. 2 of the Master Services Agreement, *Cobra has the right to retain its Work Product in such event,* **"notwithstanding the foregoing"** *started obligations under the Master Services Agreement that would otherwise give the Company the right to exclusive ownership and use to that Work Product*. Thus, Cobra can retain ownership of the Work Product as long as the total amount due under the Master Services Agreement is not paid in full. Cobra hereby notifies the Company of the Default and that *Cobra may and can now proceed to exercise its* **right to retain** *the Work Product concerning all Supplements* 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14 under the Master Services Agreement.

Upon Cobra's exercise of its right to retain the Work Product, Debtors possess no right to continue using the Work Product. Continued use of the Work Product by the Debtors constitutes copyright infringement.

8

17. Cobra owns a valid copyright in the Work Product. The Master Services Agreement, when construed as a whole, establishes that Cobra owns all right, title, and interest to the Work Product until the Debtors have satisfied all payment terms and can no longer default. While Cobra is obligated to assign the Work Product to Debtors under Section 7(b), this assignment is qualified by a "notwithstanding" provision—namely, that Cobra "shall retain the Work Product until the Payment Default has been paid in full." As recognized by numerous courts, provisions of a "notwithstanding" section override conflicting provisions of any other section of the agreement. *See, e.g.*, *Cisneros v. Alpine Ridge Grp.*, 508 U.S. 10, 17-18 (1993) ("[T]he use of such a 'notwithstanding' clause clearly signals the drafter's intention that the provisions of the 'notwithstanding' section override conflicting provisions of any other section."); *Helmerich & Payne Int'l Drilling Co. v. Swift Energy Co.*, 180 S.W.3d 635, 643 (Tex. App. 2005) (collecting cases) ("When parties use the clause 'notwithstanding anything to the contrary contained herein' in a paragraph of their contract, they contemplate the possibility that other parts of their contract may conflict with that paragraph, and they agree that this paragraph must be given effect regardless of any contrary provisions of the contract.").

18. Cobra would not be able to immediately assign the Work Product to GX Technology under Section 7(b) of the Agreement because this would preclude or limit Cobra's ability to "retain the Work Product until the Payment Default has been paid in full." Reading the "notwithstanding" provision as overriding the assignment language in the previous paragraph resolves this conflict. That is, Cobra retains (i.e., "owns") the Work Product until Payment Default is no longer possible. At that time, the "notwithstanding provisions" are no longer applicable, and therefore the assignment of the Work Product becomes effective immediately because it is no longer in conflict.

19. The Debtors' use of the Work Product prior to the Default Notice to date is under a revocable, implied license granted by Cobra. An implied license is created when a licensee requests creation of a work; the licensor makes that work and delivers it to licensee; and the licensor intends that the licensee copy and distribute the work. *E.g.*, *Karlson v. Red Door Homes, LLC*, 18 F. Supp. 3d 1301, 1307 (N.D. Ala. 2014); *Photographic Illustrators Corp. v. Orgill, Inc.*, 953 F.3d 56, 61 (1st Cir. 2020). Here, Debtors requested the Work Product, and Cobra made and delivered the Work Product with the intention that Debtors would copy and distribute to its customers. The touchstone for an implied license is intent, as evidenced by the objective actions of the Parties. *Photographic Illustrators*, 953 F.3d at 61 (citing *John G. Danielson, Inc. v. Winchester-Conant Props., Inc.*, 322 F.3d 26, 40 (1st Cir. 2003)). Here, the intent to grant an implied license is evidenced by the objective language of the Master Services Agreement and the actions of the parties.

20. The Termination section of the Master Services Agreement provides further objective evidence of the intent of the parties to establish an implied license until Payment Default is no longer possible. Under the Termination of the Agreement, Section 15(d), if the Company terminates the agreement, Cobra is obligated to take actions for "the protection and preservation of the Work Product" and "transfer title and deliver to the Company all Work Product . . . ." As another well-worn principle of contract interpretation, a provision shall not be construed so as to be meaningless. *E.g.*, *Dynamic CRM Recruiting Sols., LLC v. UMA Educ., Inc.*, 31 F.4th 914, --- (5th Cir. 2022) ("To properly understand the objective meaning conveyed by contractual text, '[w]e must read all parts of the contract together, striving to give meaning to every . . . word" and 'to avoid rendering any portion inoperative.'" (omission in original) (quoting *Balandran v. Safeco Ins. Co. of Am.*, 972 S.W.2d 738, 741 (Tex. 1998))).

21. The language of Section 7(b) cannot be read as a pure present-day assignment that immediately triggers upon creation of the Work Product. Such reading would render the transfer of title to the Debtors under the Termination Section meaningless. Understanding the Debtors' use of the Work Product prior to Default Notice as under an implied license resolves all such conflicts and harmonizes the plain meaning of the Agreement and the conduct of the parties.

22. Cobra is entitled to revoke the Debtors' license to the Work Product. An implied license is revocable absent consideration. *See, e.g.*, *Teter v. Glass Onion, Inc.*, 723 F. Supp. 2d 1138, 1150 (W.D. Mo. 2010); *Karlson*, 18 F. Supp. 3d at 1316; *Avtec Sys. v. Peiffer*, 21 F.3d 568, 574 n.12 (4th Cir. 1994). Here, Cobra has received no consideration for the implied license; there is a Payment Default. Accordingly, Cobra may revoke the implied license at any time in order to exercise its right to "retain" the Work Product under the "notwithstanding" provision. Once payment is made, then the ownership of the Work Product provisions would be triggered, and Company would have all rights to the IP and the Work Product. Thus, the "notwithstanding" language means that the Cobra shall retain ownership rights to the Work Product until the Payment Default has been remedied.

23. Once Cobra sent the Notice of Default, the implied license was revoked, and the Debtors no longer have the rights to use the Work Product until payment is received by Cobra. The Debtors' continued use of the Work Product constitutes infringement of Cobra's copyright to the Work Product. Debtors have no right to reproduce, prepare derivative works, distribute copies, and/or engage in other prohibited acts with the Work Product. Any such action by the Debtors would constitute a direct and exact copy of the copyright-protected Work Product that is owned and retained by Cobra. The Debtors may be liable for Cobra's actual damages, as well as any additional profits of the Debtors arising from use of the Work Product. Further, the Debtors are

on notice of their infringement of the copyright(s) protecting the Work Product. Thus, any further continued unauthorized use of the Work Product is a knowing infringement, which may subject the Debtors to criminal liability under 17 U.S.C. § 506.

24. In light of the foregoing, the Debtors must assume the Master Services Agreement and provide requisite cure to use the Work Product. The Debtors' use of the Work Product during Payment Default constitutes infringement. The Debtors may remedy the Payment Default by complying with all payment terms of the Master Services Agreement and relevant supplements. The Debtors' complete satisfaction of all payment terms shall render the notwithstanding provisions non-applicable and will thus automatically trigger an assignment by Cobra to the Debtors of all intellectual property rights in and to the Work Product, including all copyrights discussed herein.

      **B.    Rejection of the Master Services Agreement cannot entitle the Debtors to use the Work Product or otherwise expand the Debtors' rights.**

25. Rejecting the Master Services Agreement cannot terminate the Master Services Agreement or eliminate Cobra's existing rights under the Master Services Agreement, including Cobra's right to enforce its IP rights and prevent authorized use of the Work Product. *See Mission Prod. Holdings, Inc. v. Tempnology, LLC*, 139 S. Ct. 1652, 1663 (2019); *Occidental Petroleum Corp. v. Sanchez Energy Corp.* (*In re Sanchez Energy Corp.*), 631 B.R. 847, 859-60 (Bankr. S.D. Tex. 2021) (Isgur, J.).

26. The Supreme Court's recent decision in *Mission* makes this clear:

> Section 365 reflects a general bankruptcy rule: The estate cannot possess anything more than the debtor itself did outside bankruptcy. As one bankruptcy scholar has put the point: Whatever limitations on the debtor's property apply outside of bankruptcy apply inside of bankruptcy as well. A debtor's property does not shrink by happenstance of bankruptcy, but it does not expand, either. So if the not-yet debtor was subject to a counterparty's contractual right (say, to retain a copier or use a trademark), so too is the trustee or debtor

12

> once the bankruptcy petition has been filed. The rejection-as-breach rule (but *not* the rejection-as-rescission rule) ensures that result. By insisting that the same counterparty rights survive rejection as survive breach, the rule prevents a debtor in bankruptcy from recapturing interests it had given up.

139 S. Ct. at 1663 (cleaned up).

27. In that case, the debtor had licensed the use of a trademark to a contractor. *Id.* at 1658. After filing for bankruptcy and rejecting the license agreement under section 365 of the Bankruptcy Code, the debtor argued that, by virtue of the rejection, the license was terminated and the contractor no longer could use the trademark. *Id.* at 1659. The Supreme Court disagreed, holding that rejection under section 365 constitutes only a breach by the debtor and does not act as a recission or termination of the rejected contract. *Id.* at 1663. The contractor thus retained its right to the trademark license. *Id.*

28. Similarly, in *Sanchez*, this Court, following *Mission*, held that the rejection of contracts that included certain real property rights for the non-debtor party could not deprive that party of its property rights. 631 B.R. at 859-60. Rejection, the Court explained, "breaches a contract, but does not rescind it. And that means all the rights that would ordinarily survive a contract breach . . . remain in place." *Id.* at 859 (omission in original) (quoting *Mission*, 139 S. Ct. at 1658). In reaching its holding, the Court noted that, while "[r]eal property covenants are clear examples of rights that are not terminated by a breach of contract," any "given contract could convey countless other rights that might survive rejection consistent with *Mission*." *Id.* at 860.

29. In this case, the Debtors' rejection of the Master Services Agreement could have only the same effect—a breach by Debtors but not a recission or termination of Cobra's rights. Cobra's continuing ability to enforce its IP rights and prevent the Debtors' use of the Work Product would remain unaffected.

13

30. Such a rejection would be detrimental to the estate because rejection would essentially lock in the status quo—that is, the Debtor's inability to use the Work Product and/or ongoing liability for continuing infringement—and render the estate's assets valueless. By contrast, if the Debtors assumed the Master Services Agreement and cured their default, their rights to the Work Product—and the value of those rights to the estate's assets—would be restored.

## CONCLUSION

31. For the reasons stated above, the Debtors' motion to reject the Master Services Agreement should be denied.

May 4, 2022

Respectfully,

*/s/ Tom Kirkendall*
Tom Kirkendall
**LAW OFFICE OF TOM KIRKENDALL**
State Bar No. 11517300 / SDTX No. 02287
2 Violetta Ct.
The Woodlands, TX 77381
+1 713.703.3536
bigtkirk@gmail.com

*/s/ Timothy Hoffmann*
Timothy Hoffmann
**KING & SPALDING LLP**
Illinois Bar No. 6289756
*Pro hac vice* motion pending
110 N Wacker Drive Suite 3800
Chicago, IL 60606
+1 312.764.6939
thoffmann@kslaw.com

**CO-COUNSEL FOR COBRA ACQUISITION SERVICES, S.A.**

## CERTIFICATE OF SERVICE

  I hereby certify that a true and correct copy of the foregoing instrument, was served via electronic transmission to counsel for the debtor, U.S. Trustee, creditors and parties-in-interest via the Court's ECF system on the 4th day of May, 2022.

                /s/ Tom Kirkendall_____
                Tom Kirkendall