## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | Case No. 22-30987 (MI) |
| ION GEOPHYSICAL CORPORATION, | § | Chapter 11 |
| Debtors | § | |
| | § | |
| WITNESSES: | § | Judge: Marvin Isgur |
| Marcus Pullicino (fact & expert witness) | § | Courtroom Deputy: Tyler Laws |
| Debtor representative | § | Hearing Date: July 28, 2022; 9:00 a.m. |
| Any witness called by other parties-in-interest | § | Party Name:Cobra Acquisition Servs, SA |
| | § | Attorney Name: Tom Kirkendall, |
| | § | Timothy Hoffman |
| | § | Attorney Phone: 713.703.3536 |
| | § | Nature of Proceeding: Debtors' Motion for |
| | § | Order Approving Sale of Certain of the |
| | § | Debtors Assets Free and Clear of Liens, |
| | § | Claims, Interests and Encumbrances |
| | § | (Dkt ## 21, 374, 379, 478) and |
| | § | Confirmation of Debtors' First Amended |
| | § | Plan of Reorganization, as Supplemented |
| | § | (Dkt ## 455, 463) |

## WITNESS AND EXHIBIT LIST OF
## COBRA ACQUISITION SERVICES, S.A.

Cobra may call the following witnesses:

1. Marcus Pullicino, president of Cobra Acquisition Services, S.A.

2. The Debtors' representative;

3. Any witness called or designated by any other party-in-interest; and

4. Any witness called to rebut the testimony of witnesses called or designated by any other party-in-interest.

| Ex # | Description | Offered | Objection | Admitted/ Not Admitted | Disposition |
|---|---|---|---|---|---|
| 1 | Master Geophysical Service Agreement dated as of July 22, 2011 (the "Master Services Agreement") | | | | |
| 2 | Supplemental Agreement No. 6 to Master Geophysical Services Agreement No. 1195 | | | | |
| 3 | Supplemental Agreement No. 13 to Master Geophysical Services Agreement | | | | |
| 4 | Supplemental Agreement No. 5 to Master Geophysical Services Agreement (Comoros) | | | | |
| 5 | Acknowledgement Letter Re: Scrivener's Error | | | | |
| 6 | Cobra's First Notice of Default and Reservation of Rights, Oct. 25, 2021 | | | | |
| 7 | Cobra's Second Notice of Default and Retainment of Work Product, January 14, 2022 | | | | |

| Ex # | Description | Offered | Objection | Admitted/ Not Admitted | Disposition |
|------|-------------|---------|-----------|------------------------|-------------|
| 8 | Cobra's Amended Demand for Arbitration against GX Technology Corporation dated January 19, 2022 | | | | |
| 9 | Any rebuttal or impeachment exhibits, demonstrative exhibits, exhibits identified or offered by other parties, and pleadings and exhibits previously filed on the Court's dockets. | | | | |

Cobra reserves the right to call or to introduce any of none of the witnesses or exhibits listed above, and further reserves the right to supplement or amend this list at any time prior to the final hearing in this contested matter.

Respectfully submitted:

*/s/ Tom Kirkendall*

Tom Kirkendall
State Bar No. 11517300/SDTX No. 02287
**LAW OFFICE OF TOM KIRKENDALL**
2 Violetta Court
The Woodlands, Texas 77381-4550
713.7033536
bigtkirk@gmail.com

**ATTORNEY FOR COBRA ACQUISITION SERVICES, S.A.**

**OF COUNSEL:**

Timothy Hoffmann
**KING & SPALDING LLP**
Illinois Bar No. 6289756
*Admitted Pro hac vice*
110 N Wacker Drive Suite 3800
Chicago, IL 60606
312.764.6939
thoffmann@kslaw.com

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument, was served via electronic transmission to counsel for the debtor, U.S. Trustee, creditors and parties-in-interest via the Court's ECF system on the 26th day of July, 2022.

/s/ Tom Kirkendall

Tom Kirkendall

No- 11195







## Master Geophysical Service Agreement

This Master Geophysical Service Agreement ("Agreement"), dated this _22_ day of July, 2011, is between:

**GX TECHNOLOGY CORPORATION,**
located at 2105 City West Boulevard, Suite 900, Houston, Texas, 77042
(the "Company")

**- AND –**

Cobra Energy Services, S.A.
located at 14810 Park Almeda Dr., Houston, TX  77047
(the "Contractor")

The Company is in the business of performing data acquisition and processing projects for its customers. The Contractor is in the business of providing seismic data acquisition services. The Company desires for the Contractor to provide seismic data acquisition services to the Company in connection with data acquisition and processing projects undertaken by the Company, and the Contractor is agreeable to providing such services to the Company, in each case on the terms and conditions as set out in this Agreement.

**NOW THEREFORE,** in consideration of the mutual obligations and agreements contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties to this Agreement (individually, a "Party" and collectively, the "Parties") hereby agree as follows:

1. **Engagement.**   The Company hereby agrees to engage the Contractor to provide the Company with seismic data acquisition services and such other services as the Company and the Contractor may agree upon from time to time ("Services"), and the Contractor hereby agrees to provide such Services to the Company. For each Service project to be undertaken by the Contractor under this Agreement, the Parties shall from time to time complete and sign a separate Supplement for such project ("Supplement"). Each Supplement shall contain the principal terms of the Service project, including, but not limited to: scope and description of the Services; project management; pricing, incentives, and similar issues; staffing; project timetable; critical milestones; and acceptance criteria. Neither Party shall be required to sign any Supplement except to the extent approved by each Party in such Party's sole discretion. Each Supplement shall be governed by the General Terms and Conditions of this Agreement

EXHIBIT
Cobra 1

as if this Agreement were set forth in full in each Supplement. The Contractor agrees that it will perform the Services in accordance with the terms of this Agreement and each Supplement.

2. **General Terms and Conditions**. The General Terms and Conditions that are attached to this Agreement are an integral part of this Agreement. Any capitalized term used in this Agreement shall have the meaning ascribed to such term in the particular part of this Agreement where such term is defined. In the event of any conflict between any provision contained in the General Terms and Conditions and any provision contained in the Supplement, the provision contained in the Supplement shall control.

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed as of the day and year first above written.

**GX TECHNOLOGY CORPORATION**

By: _____

Name: _SHAWN LRICE_

Title: _VP OPERATIONS_

**Contractor:**

**COBRA ENERGY SERVICES, S.A.**

By: _____

Name: ~~Ted Cooper~~ _Marcus Pillicus_

Title: ~~President~~ _Treasurer_







# General Terms And Conditions
## to
## Master Geophysical Service Agreement

1. **Additional Terms**. Certain terms regarding the Services are more particularly described in one or more Supplemental Agreements ("Supplement(s)") signed by the Parties from time to time during the term of this Agreement.

2. **Performance of Services**.

   (a) The Contractor shall, at its cost, provide the personnel, equipment, and materials necessary to perform the Services. The Company agrees to provide the Contractor with all relevant and available information provided to the Company by its customer (the "E&P Customer") that may be required for the Contractor's performance of each Supplement and this Agreement unless otherwise agreed between the Parties.

   (b) The Company enters into this Agreement based on the Contractor's demonstrated ability to perform the Services. The Contractor warrants that it has, and will utilize for the Services, the technical competence, financial capacity, management skills, competent and qualified personnel and equipment and all necessary licenses, permits, authorizations and registrations necessary or required to perform the Services and the other duties and responsibilities of the Contractor under this Agreement. The Contractor warrants that the Services, and any labor, equipment, materials, or service related to the Services, shall (a) be free of any defect in title, design, materials, and workmanship; (b) be performed in accordance with all environmental, health and safety requirements applicable to the Services (including under any Master Contract, as defined in Section 3); (c) be performed in a safe, diligent, efficient and workmanlike manner; (d) be performed in accordance with the industry standards for professional care for similar activities, but in no event less that in accordance with prudent industry standards; and (e) be in conformance with all provisions and specifications of this Agreement.

   (c) In performing the Services, the Contractor agrees that it and its Representatives (as defined below) will comply fully with all applicable laws, statutes and

2105 City West Blvd., Suite 900, Houston, Texas 77042-2839 | Tel: 281.933.3339 | Fax: 281.879.3701

3

regulations, including, but not limited to, the United States Foreign Corrupt Practices Act ("FCPA") or anti-bribery laws of other countries, environmental laws, employment laws, safety regulations, securities laws and regulations, antitrust laws, intellectual property laws and any other applicable laws, statutes or regulations, and to conduct itself in keeping with high ethical standards. The Contractor further agrees that it and its Representatives will comply with all applicable safety and security regulations and policies while on the Company's premises and all other applicable policies of the Company and will use their best efforts to preserve the business of the Company and the good will of all employees, customers, suppliers and other persons having business relations with the Company. As used in this Agreement, "Representatives" shall mean a Party's affiliates, officers, directors, employees, subcontractors, agents and representatives, and "affiliates" shall mean persons or entities that directly, or indirectly through one or more intermediaries, control or are controlled by, or are under common control with, the Party.

(d)     The Contractor shall not directly or indirectly make any Prohibited Payments. As used in this Agreement, "Prohibited Payments" means an offer, gift or payment, or authorization or promise of an offer, gift or payment, of any money or thing of value to or for the benefit of any official or employee of any government (or of any department, agency or other instrumentality of any government) of any country or subdivision of any country, or any person acting in an official capacity on behalf of such government or instrumentality, or any political party or official of any political party, or any candidate for political office, for the purposes of influencing any act or decision of such person or party in his or its official capacity (including an act or omission to act in violation of his or its lawful duties), or inducing such person or party to use his or its influence to affect or influence to affect or influence any act or decision of such government or instrumentality, in order to assist the Contractor or the Company in obtaining or retaining business for or with, or directing business to, any person or entity related to the Services. (Solely for purposes of this Agreement and not as an admission under or interpretation of the FCPA or any statute or regulation of any country, the term "government instrumentality" shall be deemed to include any enterprise in which a government owns a substantial equity interest or which any government controls). In accordance with the FCPA, the Contractor shall not make any payment prohibited by the FCPA to any party for the purpose of securing business. The Contractor acknowledges that breach of this paragraph constitutes grounds for the Company to terminate this Agreement immediately. In such event, the Contractor agrees and acknowledges that the Contractor shall lose any right to receive compensation under this Agreement, whether already earned or not.

4

(e) At no cost to the Company or the E&P Customer, the Contractor shall manage and enforce all manufacturers' and vendors' warranties with respect to all goods, equipment, and material utilized in the performance of the Services.

(f) At no cost to the Company or the E&P Customer, and prior to demobilization, the Contractor shall promptly correct or re-perform any Services that are defective or fail to conform to the requirements or specifications of this Agreement. If the Contractor fails to re-perform or correct any defective Services as required by the Company or to fulfill its obligations to perform Services pursuant to the Agreement, then the Company shall have the right, but not the obligation, without prejudice to any other rights or remedies the Company may have, to correct such deficiencies or perform such Services by whatever reasonable method it may deem expedient. In such case, the Company shall have right, but not the obligation, to deduct from any and all payments then or thereafter due the Contractor, all reasonable costs and expenses incurred by the Company in connection with correcting such deficiencies or performing such Services, including costs related to third parties or the Company's own employees up to the cost for similar services if they were performed by the Contractor expressly provided that the Contractor will not be liable for costs in excess of its charges for those Services hereunder. The Company shall have the right at all times to immediately apply any retention against any amounts limited to the cost for provision of similar services by Contractor, incurred by the Company in correcting or re-performing any such defective Services, and the Contractor shall pay any remaining deficiency to the Company within thirty (30) days of the Company's invoice therefor. Regardless of whether the Company elects to correct or re-perform any defective Services, the Contractor shall reimburse the Company for all prior payments made by the Company for Services performed but which do not meet the requirements or specifications of this Agreement that have not been corrected, unless these services have been prior approved by Company onboard representative.

(g) The Company may designate one or more Company field representatives to ensure that the Services are carried out in conformance with this Agreement and the Company's objectives and goals and to represent the Company in all field activity.

(h) The Contractor shall observe any drug, alcohol and search policies applicable to the Services (including those required under any Master Contract).

(i) If, in the Company's reasonable determination, the acts or omissions of any of the Contractor's personnel interfere with the Contractor's operating efficiency or reflect adversely upon the Company's reputation, the Contractor shall, at the

Company's request, at its own expense promptly replace such personnel with another person suitably qualified to fill the position vacated.

(j)    If, in the Company's reasonable determination, any item of equipment furnished by the Contractor, either directly or indirectly through a subcontractor, is defective or inefficient or otherwise inadequate, the Contractor shall, upon the Company's request, promptly replace such item at the Contractor's expense, or provide documented evidence that the equipment is operating to manufacturers specifications. If at any time any equipment furnished by the Contractor shall for any reason become inoperable or fail to function reasonably adequately and efficiently, the Contractor shall promptly take all action necessary to repair or replace such equipment at its expense.

(k)    The Contractor shall, at its own expense, provide all transportation for all personnel and equipment involved in providing the Services, including transportation involved in mobilization, demobilization, travel to, from and within the Services area and any other transportation incidental to the Services hereunder. The Contractor shall, at its own expense, furnish board and quarters for all personnel furnished by the Contractor hereunder.

3.    **Compensation**. In consideration for the Services provided by the Contractor, the Company shall pay the Contractor the compensation set forth in the applicable Supplement. Terms regarding timing, frequency and manner of payment that have not been defined in the Supplement shall be consistent with such terms contained in any applicable master contract between the Company and the E & P Customer ("Master Contract"). The Contractor agrees that the compensation set forth in the applicable Supplement represents the complete and final compensation that will be payable to the Contractor for the Services (including mobilization and demobilization) and that no additional compensation has been implied or represented.

4.    **Term**. Unless terminated sooner pursuant to the provisions set forth in this Agreement, the term of this Agreement shall commence on the date hereof and shall continue until completion of the Services by the Contractor in accordance with this Agreement.

5.    **Expenses; Taxes**.

(a)    The Contractor acknowledges and agrees that its compensation pursuant to Section 3 above shall constitute all of the Contractor's compensation, and that the Contractor will not otherwise be reimbursed for any costs and expenses incurred by the Contractor in connection with providing the Services, including, but not limited to, applicable Taxes (as defined below), fees (including permit fees and costs and the Contractor's business license fees), charges, travel expenses,

expenses for fuel and chandelling the crew and other expenses incurred by the Contractor, unless specifically stipulated in an executed Supplement.

(b)     The Contractor shall promptly pay when due all obligations for labor and material. **The Contractor hereby waives its right to assert any liens and attachments, statutory, constitutional, common law or otherwise, on the facility or site of the Services and shall also discharge at once, or bond or otherwise secure against, all liens and attachments that are filed by its subcontractors and vendors on account of labor performed for the Contractor or materials, equipment and supplies furnished for the owners of the premises on which the Services are performed against all loss, damage, injury, liability and claims thereof resulting directly or indirectly from such liens and attachments.**

(c)     The Contractor acknowledges and agrees that it will be responsible for all sales, use, VAT, the Contractor's federal and state income tax, Social Security tax, unemployment insurance taxes, or other taxes and charges, including interest, additions and penalties (collectively, "Taxes"), arising out of the Contractor's activities under this Agreement or due upon any payments, services, materials or items to be provided by the Contractor as part of the Services. The Contractor shall be responsible for paying all such Taxes imposed, if any, on any services, materials, or items it consumes, acquires, or uses in the performance of its activities under this Agreement. The Company will neither pay unemployment taxes on, nor withhold employment taxes from, any compensation it pays the Contractor. Notwithstanding the foregoing, the Company shall have the right to withhold any and all taxes and other amounts from payments due to the Contractor under this Agreement to the extent that such withholding may be required by any governmental body claiming jurisdiction over any payment made to or earned by the Contractor hereunder, and payment by the Company to the respective governmental office of the amount of money so withheld will relieve the Company from any further obligation to the Contractor with respect to the amount so withheld. Company shall promptly provide Contractor with proof of payment of such withheld amount to governmental body. **The Contractor shall protect, indemnify and hold the Company, its affiliates, officers, directors, agents, employees and partners harmless from any and all claims or liability for all taxes assessed or levied by any governmental body against the Contractor or against the Company for or on account of any payment made to or earned by the Contractor hereunder. The Contractor shall further protect and hold the Company harmless from all taxes assessed or levied against or on account of wages, salaries or other benefits paid to the Contractor's employees and all taxes assessed or levied against or on the account of any property or equipment of the Contractor.**

6.  **Independent Contractor**. The Services performed by the Contractor shall be as an independent contractor and not as an employee of the Company or the E&P Customer. Consequently, other than providing related information as requested from time to time by the Contractor, the Company will not provide the Contractor with any training with respect to the Services. Similarly, except as otherwise agreed by the Parties, the Contractor is responsible for providing any equipment, materials, or supplies that the Contractor determines are necessary to perform the Services. The Contractor is not entitled to the benefits provided by the Company to its employees, including, but not limited to, group insurance and participation in the Company's employee benefit and pension plans. In the event the Contractor or its employees for any reason were to become eligible to participate in a Company-sponsored benefit program, the Contractor, on behalf of itself and its employees, hereby waives any such right to participate in the program. This waiver of any right to participate in Company-sponsored employee benefit programs represents a material component of the terms of payment agreed to by the Parties. Further, the Contractor is not an agent, partner, or joint venturer of the Company or the E&P Customer. The Contractor shall not represent itself to third persons to be other than an independent contractor of the Company or the E&P Customer, nor shall the Contractor permit itself or its Representatives to offer or agree to incur or assume any obligations or commitments in the name of the Company or the E&P Customer or for the Company or the E&P Customer without the prior written consent and authorization of the Company or the E&P Customer, as the case may be.

7.  **Intellectual Property Rights**.

    (a)  All information, data, documents and materials provided by the Company to the Contractor, or acquired or learned by the Contractor from the Company's files, documents, employees or Representatives in connection with the Services, shall remain the sole and exclusive property of the Company. The Contractor shall obtain no rights whatsoever, whether under applicable patent, copyright, trade secret laws or otherwise, in such information, data, documents or materials unless specifically provided in writing by the Company.

    (b)  All information, drawings, plans, specifications, designs, reports, computations, calculations and other documents prepared by or on behalf of the Contractor or its Representatives in furtherance of or in connection with the Services (collectively, the "Work Product") will be and shall remain the sole and exclusive property of the Company and shall be delivered to the Company upon its request. The Company shall have full and unlimited right to use all of the same without any claim or right thereto by the Contractor or its Representatives for any additional compensation for such use. The Contractor further agrees that the Work Product and all other information developed or secured by the Contractor during performance of the Services shall be kept strictly confidential and shall not be sold, traded, published or otherwise disclosed to anyone in any manner

IINTiny would have Sale 90B, Houston, Texas 77042 U.S.A. / Tel: +1 281 933 3339 / Fax: +1 281 933 3339

8

whatsoever, including by means of photocopying or reproduction, without the Company's prior written consent. The Contractor shall obtain no rights whatsoever, whether under applicable patent, copyright, trade secret laws or otherwise, in such Work Product and information unless specifically provided in writing by the Company. The Contractor agrees to assign and hereby assigns to the Company all title, patents, patent rights, copyrights, mask work rights, trade secret rights and all other intellectual and industrial property rights of any sort anywhere in the world in connection with such Work Product. All works of authorship by the Contractor under this Agreement will be "works made for hire" to the extent allowed by law. Any assignment of copyright hereunder (and any ownership of a copyright as a work made for hire) includes all rights of paternity, integrity, disclosure and withdrawal and any other rights that may be known as or referred to as "moral rights" (collectively "Moral Rights"). To the extent such Moral Rights cannot be assigned under applicable law and to the extent the following is allowed by the laws in the various countries where Moral Rights exist, the Contractor hereby ratifies and consents to any action of the Company that would violate such Moral Rights in the absence of such ratification/consent. The Contractor agrees to confirm any such ratifications and consents from time to time as requested by the Company. Similarly, if the Contractor, in connection with the Services, obtains access to third party information, data, documents and materials that are in the possession of the Company, the Contractor shall obtain no rights in such third party information, data, documents and materials. Irrespective of whether the Work Product, information, data, documents and materials is subject to the obligations of confidence imposed by Section 9, the Contractor shall make no copies, summaries or extracts thereof except as necessary in connection with this Agreement or as otherwise specifically authorized in writing by the Company, and the Contractor shall make no use of such Work Product, information, data, documents and materials except as specifically necessary in connection with the Services or as authorized in writing by the Company. Irrespective of whether the Work Product, information, data, documents and materials is subject to the obligations of confidence imposed by Section 9, upon completion of the Services, or the termination of this Agreement, the Contractor shall immediately return to the Company all such Work Product, information, data, documents and materials, as well as any and all copies, summaries or extracts thereof. The Contractor shall also immediately return to the Company all such Work Product, information, data, documents and materials, as well as any and all copies, summaries or extracts thereof, whenever requested by the Company. For purposes of this Agreement, "Work Product" also includes inventions (including, but not limited to, improvements, inventions, designs, formulas, works of authorship, trade secrets, technology, mask works, circuits, layouts, algorithms, computer programs, ideas, processes, techniques, know-how and data, whether or not patentable) that the Contractor makes, conceives, reduces to practice or develops (in whole or in part, either alone or jointly with others)

9

during the term of this Agreement in connection with performing Services or that relate to any other Work Product.

Notwithstanding the foregoing, in the event the Company has not paid Contractor in accordance with the payment terms of the relevant Supplement for fifty (50) days from invoice receipt ("Payment Default"), the Parties agree that Contractor may serve notice on the Company that Contractor shall retain the Work Product until the Payment Default has been paid in full, and the Company shall not challenge such notice or retention of its Work Product.

The Company acknowledges that in the course of its performance under this Agreement, the Contractor may elect to use products, software, materials and methodologies that were owned by or proprietary to the Contractor prior to the date of this Agreement ("Pre-existing Material"). The Company agrees that it shall not acquire any ownership rights in such Pre-existing Material under this Section 7(b). Subject to the terms of this Agreement, the Contractor grants to the Company a royalty-free, nonexclusive, irrevocable, worldwide license to use, duplicate and disclose, in whole or in part, any such Pre-existing Material that is delivered to the Company, unless specifically stipulated in an executed supplement to this agreement.

(c)     The Contractor shall not disclose or provide to the Company any information, ideas, concepts, improvements, discoveries, inventions or forms of expression of ideas that the Contractor does not own or otherwise have the right to disclose or provide to the Company. The Contractor represents and warrants to the Company that all information, ideas, concepts, improvements, discoveries, inventions or forms of expression of ideas disclosed or provided to the Company shall be free from third party claims of ownership and from third party intellectual property rights. **The Contractor shall defend, indemnify and hold the Company, its parent, affiliates, officers, directors, agents, employees and partners harmless from and against all claims, demands and causes of action brought by third parties (and all costs, expenses, damages, liabilities or judgments sustained or incurred by the Company in connection therewith, including the costs of investigation and reasonable attorneys' fees and legal costs) alleging or establishing (i) that the third party owns information, ideas, concepts, improvements, discoveries, inventions or forms of expression of ideas described or provided by the Contractor to the Company; (ii) that the Company's worldwide right to own, use, make, have made, license, sell or otherwise market information, ideas, concepts, improvements, discoveries, inventions or forms of expression of ideas disclosed or provided by the Contractor to the Company infringe the third party's intellectual property rights therein; or (iii) that the processes utilized by the Contractor in providing the Services to the Company infringe third party intellectual**

property rights or that the products provided by the Contractor to the Company infringe third party intellectual property rights (including a violation of the Process Patents Amendment Act of 1988). The above indemnity shall not apply to any process or device that the Company requires the Contractor to use for the Services.

(d) If the Contractor cannot perform the Services as a result of patent infringement litigation, the Company shall not be required to make further payment under this Agreement until the Services recommence. Furthermore, if the Contractor cannot perform the Services as a result of patent infringement litigation or threat of patent infringement litigation, the Company may, at its option:

      (i) terminate the Agreement or the applicable Supplement; or

      (ii) with the Contractor's prior consent and at the sole cost of the Contractor, require the Contractor to obtain the right to continue using the alleged infringing product or to obtain the rights to comparable technology so that the Contractor can continue performing Services; or

      (iii) with the Contractor's prior consent and at the sole cost of the Contractor, obtain the right for the Company or the Contractor to continue using the alleged infringing product or to obtain the rights to comparable technology so that the Contractor can continue performing Services.

## 8. Confidentiality.

(a) The Contractor acknowledges that the business of the Company and its affiliates is highly competitive and that the Company's books, records and documents, information concerning the Company's strategies, plans, business, products, equipment, services and processes, procurement procedures and pricing techniques, the names of and other information (such as credit and financial data) concerning the Company's customers and business affiliates and any other confidential and/or proprietary information and/or trade secrets that have been developed or used by or on behalf of the Company or its affiliates or will be developed and that cannot be obtained readily by third parties from outside sources (collectively, "Confidential Information"), all comprise confidential business information and trade secrets of the Company that are valuable, special and unique proprietary assets of the Company. The Contractor further acknowledges that protection of the Company's Confidential Information against unauthorized disclosure and use is of critical importance to the Company in maintaining its competitive position. Accordingly, the Contractor hereby agrees that during the term of this Agreement and for a period of three (3) years thereafter, it will not (and it will ensure that its Representatives do not), make any

2105 City West Blvd., Suite 900, Houston, Texas 77042-2839 ( Tel: U.S. 713.781.5250 Asia: 1.713.561.5250 )

unauthorized disclosure of any Confidential Information of the Company, or make any use thereof, except solely for the benefit of, and on behalf of, the Company in the performance of the Services pursuant to this Agreement. The Contractor will safeguard the Confidential Information from unauthorized disclosure. The Contractor also agrees to preserve and protect the confidentiality of third party Confidential Information (including Confidential Information of the E&P Customer) to the same extent, and on the same basis, as the Company's Confidential Information. The Contractor's obligations under this Section 8 will not extend to information that (i) is already known by the Contractor prior to receipt from the Company, (ii) is or becomes part of the public domain through no act or omission of the Contractor or its Representatives, (iii) the Contractor can demonstrate through written evidence was independently developed by the Contractor without the use of or reference to any Confidential Information, (iv) becomes available to the Contractor on a non-confidential basis from a source other than the Company if such source was not subject to any restriction or duty of confidentiality or (v) is approved for release in writing by an authorized representative of the Company.

(b) The Contractor will not (and will ensure that its Representatives do not) disclose to any person (other than its tax, legal and financial advisers who have a need to know) the terms of this Agreement or the results or accomplishments of its activities under this Agreement without the prior written consent of the Company.

(c) If the Contractor or its Representatives are requested or required (by oral question, interrogatories, requests for information or documents, subpoena, civil investigative demand or similar process) to disclose any Confidential Information, the Contractor will promptly notify the Company of such request or requirement so that the Company may seek an appropriate protective order or waiver in compliance with the provisions of this Agreement. If, in the absence of a protective order or the receipt of a waiver hereunder, the Contractor or its Representatives are, in the opinion of the Contractor's legal counsel, compelled to disclose the Confidential Information, the Contractor may disclose only such of the Confidential Information to the party compelling disclosure as is required by law. The Contractor shall not be liable for the disclosure of Confidential Information pursuant to the preceding sentence unless such disclosure was caused by the Contractor or its Representatives and not otherwise permitted by this Agreement. The Contractor shall exercise its best efforts to obtain a protective order or other reliable assurance that confidential treatment will be accorded the Confidential Information so disclosed.

(d) Subject to the express terms and conditions hereof, all written Confidential Information (including that portion of the Confidential Information that may be found in analyses, compilations, studies or other documents prepared by or for the

WWW.IONGEO.COM

2105 City West Blvd. Suite 900, Houston, Texas 77042 www / tel 713.789 7790 fax 713.986.5911

12

Contractor) will be returned to the Company immediately upon the Company's request, and no copies shall be retained by the Contractor or its Representatives. Oral Confidential Information and written Confidential Information not so requested or returned will be held by the Contractor and kept subject to the terms of this Agreement or destroyed. The Contractor shall be responsible for any breach of the terms of this Section 8 by its Representatives.

9.    **Protection of Company's Business Interest; Conflicts of Interest**. The Contractor agrees that during the term of this Agreement, the Contractor will not (and shall ensure that its Representatives will not), directly or indirectly, for itself or for others, (i) consult, advise, counsel, provide services for or otherwise assist any competitor of the Company in connection with any project or bid in connection with the Master Contract or (ii) serve any interest or do any act or thing that might conflict with the interests of the Company or any of its subsidiaries or affiliates in connection with the Master Contract. The Contractor shall be responsible for any breach of the terms of this Section 9 by its Representatives.

10.   **Non-Solicitation**. The Contractor acknowledges that any attempt on the part of the Contractor to induce the Company's employees to leave the Company's employ, or any effort by the Contractor to interfere with the Company's relationship with its employees or other contractors, would be harmful and damaging to the Company. The Contractor agrees that during the term of this Agreement and a period of two (2) years thereafter, the Contractor will not, directly or indirectly, solicit for employment or hire or engage as an independent contractor or consultant any officers, directors or employees of the Company or the Company's affiliates.

The Company acknowledges that any attempt on the part of the Company to induce the Contractor's employees to leave the Contractor's employ, or any effort by the Company to interfere with the Contractor's relationship with its employees or other contractors, would be harmful and damaging to the Contractor. The Company agrees that during the term of this Agreement and a period of two (2) years thereafter, the Company will not, directly or indirectly, solicit for employment or hire or engage as an independent contractor or consultant any officers, directors or employees of the Contractor or the Contractor's affiliates.

11.   **Indemnification.** Subject to the terms of this Agreement, Contractor expressly agrees that, save for the Company's and/or E & P Customer's willful misconduct, or gross negligence, it will look solely to its own insurance in the event that Contractor incurs or suffers any damages to its property or that of its agents, employees, representatives, contractors, invitees, affiliates, successors and assigns and Company will not be responsible for any such damages. By execution of any Supplement, Contractor expressly agrees to all of the Mutual Release, Defense and Indemnity Provisions of the Client Agreement contained in such Supplement, if any. To the extent not in conflict

1100 City West Blvd., Suite 900, Houston, Texas 77042-3610 | Tel: 713-486-7795 | Fax: 713-789-3181

with such provisions in an applicable Supplement or to the extent any Supplement shall be silent on such provisions, the Parties agree as follows:

(a)     The Contractor assumes all risk of personal injury or death to the Contractor's Representatives and all risk of damage to or loss of property furnished by the Contractor in connection with the Services to be performed by the Contractor under this Master Agreement or any Supplement, and to the fullest extent permitted by law, the Contractor shall release, defend, indemnify and hold the E & P Customer and Company, their affiliates and its and their officers, directors, agents, employees and partners harmless from and against all liabilities, claims, damages, losses and expenses, including but not limited to the costs of investigation and reasonable attorneys' fees and legal costs (herein collectively called "Claims"), arising out of or connected with or alleged to arise from or be connected with (i) the Services performed by the contractor, its subcontractors or vendors; (ii) contractor's, its subcontractors' or vendors' act of preparing or delivering personnel, materials or equipment to the location of the Services; (iii) any property owned or furnished by the Contractor and its subcontractors or vendors relating to the Services provided by the contractor, its subcontractors or vendors, including removal of wreckage; (iv) injury to or death of employees of the Contractor and its subcontractors and vendors relating to the Services provided by the contractor, its subcontractors or vendors; (v) pollution or contamination that originates from the equipment used by the Contractor or its subcontractors or vendors or from any property in the control of the Contractor or its subcontractors or vendors or arises out of or in connection with the operations of the Contractor or its subcontractors or vendors in providing the Services; (vi) the Contractor's generation, transportation, handling, or disposal of any materials or substances regulated as "hazardous materials" or "hazardous wastes" under any Law, relating to the Services provided by the contractor, its subcontractors or vendors; or (vii) any act or omission of the Contractor or the Contractor's subcontractors or vendors or their Representatives relating to the Services provided by the contractor, its subcontractors or vendors. The Contractor shall assume and control the defense of, or settle, at its own expense, any demand, action or suit in which its indemnification obligation to the Company arises. Notwithstanding the foregoing, the Contractor does not indemnify or hold the E & P Customer and/or the Company harmless from and against any liabilities, claims, damages, losses and expenses, including but not limited to the costs of investigation and reasonable attorneys' fees and legal costs (herein collectively called "Claims"), arising from the E & P Company's and/or the Company's willful misconduct or gross negligence.

(b)     The Company assumes all risk of personal injury or death to the Company's representatives and employees, and all risk of damage to or loss of the Company's property in connection with any Services performed under this Master

2105 CityWest Blvd. Suite 900, Houston, Texas 77042-2839   Tel: 713.789.7250 | Fax: 713.789.7201

Agreement or any Supplement, and to the fullest extent permitted by law, the Company shall release, defend, indemnify and hold the E & P Customer and Contractor and their subcontractors, and their affiliates, and officers, directors, agents, employees and partners harmless from and against all liabilities, claims, damages, losses and expenses, including but not limited to the costs of investigation and reasonable attorneys' fees and legal costs (herein collectively called "Claims"), arising out of or connected with or alleged to arise from or be connected with the Company's and/or its representatives' and employees' activities or conduct, and/or with the Company's property on or in the vicinity of the premises of any Project. Notwithstanding the foregoing, the Company does not indemnify or hold the contractor harmless from and against any liabilities, claims, damages, losses and expenses, including but not limited to the costs of investigation and reasonable attorneys' fees and legal costs (herein collectively called "Claims"), arising from the contractor's willful misconduct or gross negligence.

(c) Each Party shall release, defend, indemnify and hold the other Party and its affiliates and its and their officers, directors, agents, employees and partners harmless from and against all Claims of third parties that arise out of or result from any infringement of any patent, copyright, trademark or trade secret right, or other intellectual property right in connection with the Services (an "Infringement Claim"). The Company or the Contractor (at the other Party's request) shall assume and control the defense of, or settle, at its own expense, any demand, action or suit on any Infringement Claim for which it is the indemnitor under the preceding provisions, and each Party shall timely notify the other Party of any assertion against it of any Infringement Claim and shall cooperate in good faith with the other Party to facilitate the defense of any such claim. No amounts shall be payable by a Party pursuant to this Section in respect of all claims settled or compromised without such Party's prior consent.

(d) Each Party shall release, defend, indemnify and hold the other Party and its affiliates and its and their officers, directors, agents, employees and partners harmless from and against all Claims of third parties resulting from or arising out of any breach of any representation, warranty or covenant contained in this Master Agreement or any Supplement.

(e) The indemnification provisions contained in this Section 11 shall survive the termination or expiration of this Master Agreement or any Supplement.

12. **Consequential Damages. Notwithstanding any other provisions of this Agreement, in no event shall either Party be liable to the other for damages from loss of use, loss of profits or other indirect, consequential or punitive damages.**

7700 Cha West Blvd, Suite 500, Houston, Texas 7700-5007 / tel: 713-789-7500 / fax: 713-789-7800

15

13. **Insurance**.

(a)    At all times during the term of this Agreement, the Contractor shall, at its cost and expense, carry or cause to be carried and maintain in force at least the following insurance coverages with internationally recognized insurers reasonably satisfactory to the Company:

*Workers' Compensation and Employers Liability Insurance*:  The Contractor shall comply with Workers' Compensation laws where the Services are performed, and maintain a Workers' Compensation and Employers Liability policy as required by the applicable laws of the country of operations and the states of residence of the Contractor's employees, including coverage under the Longshoreman's and Harbor Worker's Act, Death on the High Seas Act, and Jones Act. If the work is performed in a non-U.S. location, equivalent coverage must be provided.

*Commercial General Liability Insurance*:  Commercial General Liability insurance, endorsed to provide coverage for explosion, collapse and underground hazards; Contractual Liability (particularly the applicable general indemnity provisions of this Agreement); Contractor's Protective Liability (if subcontracting is authorized); Products and Completed Operations (for a minimum of two years after acceptance of the Services); and Sudden and Accidental Pollution. Watercraft exclusions must be deleted (if the Services necessitate the use of watercraft of any kind.). The policy limits for such insurance shall be the aggregate limits of the Contractor's applicable primary, excess and umbrella policies, but such aggregate policy limits shall not be less than              per occurrence.

*Automobile Bodily Injury and Property Damage Liability Insurance*:  Automobile Liability insurance which shall include coverage for all owned, non-owned and hired vehicles used in the performance of the Services. The policy limits for such insurance shall be the aggregate limits of the Contractor's applicable primary, excess and umbrella policies, but not less than those required by applicable law nor less than              combined single limit per occurrence.

*Marine Insurance*:  If performance of the Services requires the Contractor to furnish watercraft, the Contractor shall maintain or require owners of such watercraft to maintain

(i)     Hull and Machinery Insurance on all vessels and barges, including the equipment to be supplied by the Contractor in the performance of this Agreement, in the amount equal to the full market value of each vessel, with navigation limits adequate for the vessel's trade; and

       (ii)    Protection and Indemnity Liability insurance (including coverage for injuries to or death of masters, mates and crews, collision liabilities not covered under H&H, excess collision liabilities and pollution liabilities for all vessels used in the performance of the Services). The limits of liability of such insurance shall be an amount at least equal to the actual value of each vessel, but not less than ▇▇▇▇▇▇▇▇ per occurrence. The phrase "as owner of the vessel", and all similar phrases purporting to limit the underwriters' liability to the value of the vessel or to that of an owner shall be deleted from the policy. The Contractor may cover its obligation for loss of life or bodily injury to the crew of the vessel by extension of the Workers' Compensation and Employer's Liability insurance under this Section 13(a). This policy shall provide that claims "in rem" shall be treated as claims against the Contractor.

*Aircraft Liability Insurance*:    If performance of the Services requires the Contractor to furnish aircraft (including helicopters), the Contractor shall maintain or require owners of such aircraft to maintain Aircraft Liability (Bodily Injury, including liability to passengers, and Property Damage) Insurance with an overall combined single limit per occurrence equal to the aggregate limits of the applicable primary, excess and umbrella policies, but not less than ▇▇▇▇▇▇▇▇.

(b)    The Contractor shall submit to the Company within thirty (30) calendar days after the Company notifies the Contractor that the Company has entered into the Master Contract with the E&P Customer, a Certificate of Insurance, in form satisfactory to the Company, evidencing that satisfactory coverage of the type and limits set forth above are in effect. Policies providing such coverages shall contain provisions that no cancellation or material changes in the policies shall become effective except on thirty (30) days advance written notice thereof to the Company. Irrespective of the requirements as to insurance to be carried as provided for herein, the insolvency, bankruptcy or failure of any insurance company carrying insurance of the Contractor, or the failure of any insurance company to pay claims accruing, or the inadequacy of the limits of the insurance, shall not affect, negate or waive any of the provisions of the Agreement, including, without exception, the indemnity obligations of the Contractor. The Contractor acknowledges and agrees that neither the minimum insurance requirements as set forth above nor the actual amounts of insurance maintained by the Contractor shall in any way limit or reduce the Contractor's legal or contractual responsibilities to the Company or to others.

(c)    The Contractor agrees to require any policies of insurance (except Workers' Compensation and Professional Liability coverages) which are in any way related to the Services and that are secured and maintained by the Contractor or any

subcontractors, to include the Company, its affiliates, and its and their directors, officers, employees and agents, as additional insureds. Furthermore, (i) the Contractor hereby waives and releases all claims and rights of recovery against the Company or its affiliates or their directors, officers, employees and agents by reason of any peril insured or to be insured against under the policies of insurance required to be maintained by the Contractor pursuant to this Agreement, including any rights of recovery the Contractor may have or acquire because of deductible clauses in or inadequacy of limits of, any policies of insurance maintained by the Contractor, and (ii) the Contractor agrees to require all such policies of insurance that are in any way related to the Services and that are secured and maintained by the Contractor or its subcontractors, to include clauses providing that (A) each underwriter shall waive its rights of recovery, under subrogation or otherwise, against the Company, its affiliates, and their directors, officers, employees and agents and (B) the insurance is primary coverage with respect to all insureds and shall not consider any other insurance policies of the Company, its affiliates, and its and their directors, officers, employees and agents as contributory insurance.

(d) If the Contractor does not satisfy all obligations of this Section 13 within the required time period, the Company shall have the option, but not the obligation, to elect to arrange on the Contractor's behalf all or any part of the insurance required in this Section 13. If the Company elects this alternative, it shall so state in a notice to the Contractor, and the Contractor's compensation under this Agreement shall be reduced by an amount equal to the cost of the insurance incurred by the Company.

(e) If the Contractor subcontracts any part of the Services, the Contractor shall require its subcontractors to maintain insurance at the same level and types of coverage as required of the Contractor by this Agreement. The Contractor shall have its subcontractors furnish the same evidence of insurance required by the Contractor.

(f) The Contractor and its subcontractors shall not begin Services under this Agreement until all of the insurance required of the Contractor and its subcontractors is in force and the necessary documents have been received by the Company.

(g) In all cases where the Contractor's employees (for purposes of this Section, defined to include the Contractor's and its subcontractor's direct, borrowed, special or statutory employees) are covered by the Louisiana Workers' Compensation Act, La. Rev. Stat. Ann. 23:102 *et seq.*, the Parties agree that, pursuant to Section 23:106(A)(1) of such Act, all Services performed by the Contractor and its employees under the terms and conditions of this Agreement are an integral part of the Company's operations and are essential to the

18

Company's ability to generate its goods, products and services. Additionally, the Parties agree that the Company is the principal or statutory employer of the Contractor's employees for purposes of Section 23:1061(A)(3) of the Act. Irrespective of the Company's status as the statutory employer or special employer of the Contractor's employees under Section 23:1061(A)(3) of the Act, the Contractor shall remain primarily responsible for the payment of Louisiana Workers' Compensation benefits to its employees, and shall not be entitled to seek contribution for any such payments from the Company.

14. **Company's Conflict of Interest.** No director, employee or agent of the Contractor or of any subcontractor or vendor of the Contractor shall give to or receive from any director, employee or agent of the Company or any affiliate of the Company any commission, fee, rebate or any gift or entertainment of material cost or value in connection with the Services or enter into any business arrangement with any director, employee or agent of the Company or any affiliate of the Company other than as a representative of the Company or its affiliate, without prior written notification thereof to the Company. The Contractor shall promptly notify the Company of any violation of this Section 14 and any consideration received as a result of such violation shall be paid over or credited to the Company. Additionally, if any violation of this Section 14 occurring prior to the date of this Agreement resulted directly or indirectly in the Company's consent to enter into this Agreement with the Contractor, the Company may, at the Company's sole option, terminate this Agreement at any time and, notwithstanding any other provision of this Agreement, pay no compensation or reimbursement to the Contractor whatsoever for any Services performed after the date of termination. Any representative authorized by the Company may audit any and all records of the Contractor and any such subcontractor or vendor for the sole purpose of determining whether there has been compliance with this Section 14.

15. **Termination of Agreement.**

   (a) The Company may terminate this Agreement and/or any Supplement effective immediately upon written notice to the Contractor in the event:

      (i) The Contractor fails to comply with any representation, warranty, covenant or obligation of this Agreement and such failure has not been cured within fifteen (15) calendar days after receipt of written notice of such failure from the Company;

      (ii) The Contractor becomes insolvent, becomes subject to any form of insolvency administration, makes an assignment for the benefit of creditors, admits in writing its inability to pay its debts as they become due or generally is not paying its debts as such debts become due;

        (iii)    The Contractor willfully refuses without proper legal cause to perform the Services after having received seven (7) calendar days' written notice of such refusal from the Company;

        (iv)    The Contractor willfully engages in conduct that is injurious to the Company;

        (v)    The Contractor or an owner or principal of the Contractor is either charged with or convicted of violating any state, Federal or foreign criminal law with respect to safety, corruption, fraud or involving moral turpitude or any law relating to antitrust;

        (vi)    the Master Contract is terminated for any reason; or

        (vii)    the Company elects to terminates the Agreement or the applicable Supplement pursuant to Section 7(d)(i).

(b)    The Contractor may terminate this Agreement and/or any Supplement effective immediately upon written notice to the Company in the event:

        (i)    the Company fails to comply with any representation, warranty, covenant or obligation of this Agreement and such failure has not been cured within seven (7) calendar days after receipt of written notice of such failure from the Contractor; or

        (ii)    the Company becomes insolvent, becomes subject to any form of insolvency administration, makes an assignment for the benefit of creditors, admits in writing its inability to pay its debts as they become due or generally is not paying its debts as such debts become due.

        (iii)    the Company willfully engages in conduct that is injurious to the Contractor,

        (iv)    the Company or an executive officer of the Company is charged with or convicted of violating any state, federal or foreign criminal law with respect to safety, corruption, fraud or involving moral turpitude or any law relating to antitrust.

(c)    In addition to the termination rights described in Section 16(a), the Company may also terminate this Agreement or any Supplement without cause by giving the Contractor written notice of such termination at least thirty (30) days prior to the effective date of such termination.

2105 City West Blvd., Suite 900, Houston, Texas 77042-2855 • Tel: 281.89.5700 • Fax: 1.713.369.1101

(d) Upon receipt of written notice from the Company of any termination (or upon Contractor notifying the Company of a termination), the Contractor shall (i) immediately discontinue all Services as directed by the Company, (ii) take actions as necessary, or that the Company may direct, for the protection and preservation of the Work Product, (iii) except for Services directed by the Company to be performed prior to the effective date of termination, terminate all existing subcontracts and purchase orders and enter into no further subcontracts or purchase orders regarding the Services, (iv) upon the effective date of termination, subject to the terms and conditions hereof, transfer title and deliver to the Company all Work Product (including work in process, completed work, supplies and other materials produced or acquired for the Services, as well as the completed or partially completed plans, drawings, information, and other property that, if this Agreement had been completed, would be required to be furnished to the Company). Termination of this Agreement or any Supplement shall not relieve any Party from any obligation accruing or accrued to the date of such termination, nor deprive a Party not in default of any remedy otherwise available to it. The foregoing notwithstanding, any use of or reliance on such work in process or uncompleted work products shall be at the Company's sole risk.

(e) If this Agreement or any Supplement is terminated, and such termination occurs after commencement of any Services hereunder, the Company shall pay the Contractor for Services which have been satisfactorily performed in accordance with this Agreement to the date of termination for which the Contractor has not previously been paid by the Company. In the event such termination by the Company occurs prior to commencement of any Services, the Company shall be liable for the reasonable costs of the Contractor, including but not limited to, the Contractor's costs associated with proposal preparation, the purchase of equipment or materials or supplies, and the hiring or reassignment of employees.

(f) In the event of a termination by the Contractor pursuant to Sections 15(b)(i) or (ii) or a termination by the Company pursuant to Section 15(c), the Company shall pay the Contractor for Services which have been satisfactorily performed in accordance with this Agreement to the date of termination for which the Contractor has not previously been paid by the Company (subject to the right of retainage, offset or withholding as set forth in this Agreement) and a demobilization fee as set forth in the applicable Supplement (or, if no demobilization fee is set forth in the Supplement, a demobilization fee to be agreed by the Parties for the purpose of reimbursing the Contractor its direct out-of-pocket costs related to the return of personnel, supplies and equipment, termination of subcontractors, reimbursement for necessary cancellation fees, non-refundable deposits and other amounts necessary to demobilize the project in an efficient manner).

(g)     In the event of a termination by the Company pursuant to Section 15 (a) (i), (ii), (iii), (iv), (v) and (vii)., the Company shall then be entitled, without prejudice to any other right or remedy, to perform the remainder of the Services by whatever reasonable method it may deem expedient. In such case, the Company shall, before it is entitled to seek any other remedy, deduct from any and all payments then or thereafter due the Contractor, all reasonable costs and expenses incurred by the Company associated with losses as a result of the termination. The Company shall have the right at all times to immediately apply any retention against any amounts incurred by the Company in performing any such Services. The Company shall also have the right, without further notice to the Contractor or any third party, to immediately draw down on any retention, performance bond, or guarantee for the purposes of completing the Services.

(h)     The obligations of the Parties set forth in Sections 5, 7, 8, 9, 10, 11, 15, 20 and 27 shall survive the expiration or termination of this Agreement or any Supplement. The indemnification provisions of this Agreement shall survive such termination relative to all claims and other indemnified matters, discovered or undiscovered, arising out of, in connection with, or incident to this Agreement.

(i)     Money damages would not be a sufficient remedy for any breach of Sections 7, 8, 9 or 10 of this Agreement by the Contractor or its Representatives, and the Company shall be entitled to specific performance and injunctive relief as remedies upon proof of any such breach. Such remedies shall not be deemed to be the exclusive remedies for a breach of this Agreement by the Contractor or its Representatives but shall be in addition to all other remedies available at law or in equity to the Company.

16.     **Assignment; Subcontractors.** The Contractor will not voluntarily or by operation of law assign or otherwise transfer the obligations incurred pursuant to the terms of this Agreement or any Supplement without the prior written consent of the Company. The Contractor shall not utilize the services of any individual, company or other entity as a subcontractor or an independent contractor to assist in performing the Services unless the Contractor obtains the prior written consent of the Company to utilize the services of such subcontractor or independent contractor in connection with the Services.

17.     **Currency.** Unless otherwise agreed, all monetary amounts referred to herein will be paid in United States dollars.

18.     **Notices.** All notices or other communications required or permitted under this Agreement or by law shall, unless otherwise provided herein, be in writing, shall be either personally delivered, sent by facsimile, or sent by registered, certified mail, or

22

recognized overnight courier, in each case to the address set forth at the beginning of this Agreement. Notices by fax shall be followed by written notice by hand delivery, recognized overnight courier, or certified or registered mail. Fax notices shall be effective upon receipt of confirmation of transmission; provided, however, that fax notices received after 5:00 p.m. (local time at the recipient's address) shall be effective on the next business day. All other notices shall be effective upon receipt; provided, however, that notices received after 5:00 p.m. (local time at the recipient's address) shall be effective on the next business day.

19. **Waiver**. Failure of the Company at any time to require performance by the Contractor of any provision hereof shall in no way affect the right of the Company hereafter to enforce the same. Nor shall any waiver by the Company of any breach of any provision hereof be taken or held to be a waiver of any succeeding breach of such provision or as a waiver of this provision itself.

20. **Applicable Law; Dispute Resolution**. This Agreement shall be governed by and construed in accordance with the laws of the State of Texas, excluding applicable conflict-of-law rules or principles. Either Party shall have the right to apply to a court to enjoin any breach of this Agreement. Excepting the right of a Party to seek such relief, all claims, disputes and matters in question arising out of this Agreement or the relationship between the Parties created by this Agreement, whether sounding in contract, tort or otherwise, shall be resolved by binding arbitration in Houston, Texas, administered by the American Arbitration Association (the "AAA") using the AAA rules for commercial disputes. If the claim under the dispute is US$1,000,000 or less, then the arbitration shall be conducted by one arbitrator. If the claim under the dispute is more than US$1,000,000, the arbitration shall be conducted by a panel of three arbitrators. Each party shall designate a representative, who need not be neutral, within 30 days of receiving notification of the filing with the AAA of a demand for arbitration. The two representatives so designated shall elect the arbitrator(s) from a panel of independent arbitrators proposed by the AAA. If the Contractor fails to designate a representative within the time specified or the Parties' representatives fail to designate the arbitrator(s) within 30 days of the representatives' appointments, the arbitrator(s) shall be appointed by the AAA. The Parties agree that the terms of this arbitration agreement are enforceable under the United States Federal Arbitration Act. The Parties further agree that any disputes relating to or in connection with the enforceability of this arbitration agreement shall be brought only in a Federal court in Houston, Texas, and each Party consents to the exclusive jurisdiction of the Federal courts in Houston, Texas for that purpose.

21. **Severability**. The terms in this Agreement shall be enforceable to the fullest extent permitted by law. If any such term or covenant or the application thereof to any person or circumstance shall be construed to be invalid or unenforceable, then such term shall be

2105 West Holcombe, Suite 900, Houston, Texas 77042

construed in a manner as to permit its enforceability to the fullest extent permitted by law. The remaining provisions of this Agreement shall remain in full force and effect.

22. **Force Majeure**. For purposes of this Agreement, "Force Majeure" means any act, circumstance or event beyond the control of either of the Parties, including, but not limited to, earthquakes, hurricanes, fires, storms, tidal waves or other acts of nature, riots, strikes, lockouts, picketing, boycotts, insurrections, rebellions, civil disturbances, acts of terrorism, war and dispositions or orders of government authority, whether such authority be actual or assumed. Any failure by a Party to comply with this Agreement (except for the payment of money) shall be excused if and for so long as compliance by either Party is prevented by Force Majeure. In such event, the affected Party shall give written notice to the other Party by the fastest means of communication available, specifying the circumstances which such Party believes constitute Force Majeure and the estimated duration thereof. Such Party shall make all reasonable efforts to relieve such Force Majeure condition.

23. **Successors**. This Agreement automatically shall be binding upon and shall inure to the benefit of each Party's successors and permitted assigns.

24. **Other Agreements/Modifications**. This Agreement supersedes all other preceding agreements between the Parties and constitutes the entire agreement of the Parties regarding the performance of the Services. Neither this Agreement nor any Supplement may be amended, modified, superseded, canceled, renewed, or extended without a written instrument executed by both Parties.

25. **Representations**. The Contractor represents that it is not a party to any restrictive agreement limiting its activities in providing the Services. The Contractor further represents that at the time of the execution of this Agreement, the Contractor knows of no written or oral contract or of any other impediment that would inhibit or prohibit this arrangement with the Company.

26. **Advertising and Publicity**. The Company shall not use the name of the Contractor or of any of its employees in any advertising, publicity, or selling material without prior written approval of the Contractor. The Contractor shall not use the name of the Company, its affiliates or any of its or their employees in any advertising, publicity, or selling material without prior written approval of the Company.

27. **Records and Audit**. The Contractor and its subcontractors and vendors shall maintain true and correct records pertaining to the Services and this Agreement and shall retain all such records for at least 24 months after termination of this Agreement. The Company and any designated representatives of the Company shall have the right to audit all records of the Contractor and its subcontractors and vendors in connection with direct claims to the Company or its affiliates from subcontractors and vendors for non-payment

by the Contractor. The Company may, from time to time during the term of this Agreement and for a 24-month period after termination of this Agreement, perform an audit of all records of the Contractor and its subcontractors and vendors in connection with payments made on a cost reimbursement basis and the Contractor's procedures and controls with respect to such reimbursable costs. Upon completion of the audit, the Company shall pay the Contractor any compensation due hereunder as shown by the audit, and the Contractor shall return to the Company any amount that is shown by the audit to be due to the Company. The Contractor shall assist the Company in making the above audits.

28. **Counterparts**. This Agreement and any Supplement may be executed in multiple counterparts and each counterpart shall be deemed to be an original and all counterparts together shall constitute one and the same document.

WWW.IONGEO.COM

2105 CityWest Blvd. Suite 100, Houston, Texas 77041-1101 | tel +1.281.933.3339 | fax +1.281.933.3339

25

Case 22300987 Document 630512 Filed in TXSB on 00/08/22 Page 30 of 205

## Supplemental Agreement No. 6
## To
## Master Geophysical Services Agreement No. 11195

This Supplemental Agreement No. 6 ("Supplement 6") is entered into as of the ___ day of August, 2014, between GX Technology Corporation located at 2105 City West Boulevard, Houston, Texas 77042 (the **"COMPANY"**) and Cobra Energy Services, S.A. a Panamanian corporation whose registered office is at the World Trade Center, 1° Piso Area Commercial, Calle 53, . Marbella, Panama City, Republica de Panama (the **"CONTRACTOR"**) subject to the following:

1. **Master Agreement.** This Supplement 6 is entered into pursuant to the Master Geophysical Service Agreement between the COMPANY and CONTRACTOR dated 22nd July, 2011 (the "Master Agreement"), the terms of which are incorporated herein by reference and attached hereto.

### Content: PeruSPAN 2D

This Supplement 6 consists of the following documents;
- Scope of Work
- General Description of the Services
- Rates and Compensation
- Terms of Payment and invoicing
- Commercial Rates
- HSE
- APPENDIX 1- Insurance Requirements
- APPENDIX 2- Project Map
- APPENDIX 3- Recording Parameters, Source, Navigation System and Vessel Specification

### The following documents will be made available to CONTRACTOR:
- Schedule 2: Marine Seismic Acquisition Order
  - Seismic Specifications
  - Gravity & Magnetic Requirements
  - Onboard – QC Processing .
  - Airgun Array
- Schedule 3: Project QHSE Policies & Reporting Requirements

### Master Geophysical Service Agreement
In the event of any conflict between the provisions of the above documents, they shall be given priority in the order listed above.

| COMPANY | CONTRACTOR |
|---|---|
| GX Technology Corporation , | Cobra Energy Services, S.A. |
| BY: | BY: |
| NAME: _SHAWN L RICE_ | NAME: _Li Yumin_ |
| TITLE: _VP, OPERATIONS_ | TITLE: _Country Manager, CHINA_ |
| DATE: _9/30/2014_ | DATE: _2014-09-30_ |

State of _Texas_
County of _Harris_

Page 1 of 22

This instrument was acknowledged before me
on _30_ day of _Sept_, 20_14_ by _Shawn L Rice_

_Karen Ditajczak_
**Notary Public's Signature**
**My Commission Expires**



KAROLYN RATAJCZAK
Notary Public, State of Texas
My Commission Expires
September 30, 2017

**EXHIBIT**

**Cobra 2**

Case 22-30987 Document 630-2 Filed in TXSB on 00/28/22 Page 82 of 285

**Scope of Work:**

**GENERAL:**

This Supplement 6 is entered into between COMPANY and CONTRACTOR (as defined above), through which the CONTRACTOR agrees to deliver and make available the vessel M/V Discoverer (the "Vessel") and equipment listed in Appendix 2 below and the attached schedules 2 and 3. The equipment and services needed to acquire a 2D seismic program ("PeruSPAN") consisting of approximately 7,538 kilometers (Phase 1), as illustrated in Appendix (2). Project duration is not to exceed 365 days.

This Supplemental Agreement is based on the terms and conditions below:

The actual line locations and line kilometers may vary from those shown in the project specific schedules (Schedule 2) as a result of environmental or permit restrictions, acquisition obstacles, and map inaccuracies, any changes in governmental agencies or lease holder restrictions or requirements.

Both Parties agree that if Phase 2 (approx. 4482 km) is approved during the course of the acquisition of Phase 1, then Phase 2 will be completed under the terms and conditions described in this Supplement No. 6.

The "Charter Period" commences immediately upon departure from Durban, South Africa to transit to the project area. CONTRACTOR will need to provide all requisite Vessel specific permits and, evidenced by receipt of a Maritime and Coast Guard clearance letters, customs clearance for temporary importation of crew and Vessel, visas for the crew, and all project specific security requirements including security plans, vessels, equipment and personnel required to maintain a safe passage and efficient operations.

The Charter Period continues until demobilization of the Vessel is completed, including demobilization of COMPANY provided equipment, Company Representative and Survey Data at an agreed safe port or at such port as shall be mutually agreed.

The program will be acquired based on the terms and conditions below:

CONTRACTOR is directly responsible for the proper Vessel certification, insurance and inspections that are required to operate in the proposed project area/ waters. Specifically, the CONTRACTOR will:

- The CONTRACTOR will manage the daily security requirements and direct and instruct the security guards and vessels with daily instructions necessary to maintain safe operations during this Charter Period. CONTRACTOR has the authority to cease all operations immediately if security conditions are deemed unsafe to continue operations in the proposed project areas.

- CONTRACTOR shall, at its cost deliver the M/V Discoverer with approved regulatory certification required to operate safely in the proposed waters. The crew will have received the required training – if required as per the regulatory requirements.

- CONTRACTOR'S Vessel shall arrive at the first site of acquisition for the performance of work with sufficient supplies and experienced personnel to perform the services as set out in the Scope of Work. Once acquisition begins, CONTRACTOR shall remain

Page 2 of 23

- on the project, except for crew change, refueling and re-supplying until the survey is completed.

- CONTRACTOR will provide information to COMPANY as outlined in the "Project Schedules" for the proposed survey.

- CONTRACTOR agrees to a Vessel Inspection and Technical audit of the seismic equipment by COMPANY or 3rd party auditors.

## General Description of the Services:

Except for the Company Provided Equipment and the reimbursable services/items, the CONTRACTOR shall, at its cost, provide experienced operators of the seismic equipment as well as the materials necessary to perform the Services as specified in detail in Schedules 2 and 3. CONTRACTOR shall undertake the acquisition of seismic and its navigation/positioning data, gravity and magnetic data, as well as onboard QC seismic processing in accordance with the technical specification requirements contained in the applicable attachments hereto and in a manner consistent with generally accepted standards of the industry, including operation of equipment within the limits of its generally accepted capability. Survey acquisition parameters and operating specifications are listed in Schedule 2. Accurate offshore positioning is the responsibility and duty of the CONTRACTOR. The primary and secondary navigation systems shall be two independent DGPS systems.

CONTRACTOR agrees to provide a proper workboat with certified operators to maintain in-water seismic equipment at all times. The Party Chief and Captain will supervise and give instruction to its maritime crew and seismic personnel and all Sub-Contractors concerning security issues, regulatory compliance and proper performance of the services: including; HSE objectives & Emergency Response Planning, project planning, vessel tracking, quality control, work locations and Security of personnel & vessels or any other matters required to perform the Services properly and cost effectively. The assigned Party Chief shall personally inspect all facets of the operation at least once every 24 hours.

CONTRACTOR agrees to provide significant spare equipment for the Vessel as per the "critical spare list "required by the Vessel's classification. There shall be 20% of spare seismic equipment to maintain the agreed upon in-water equipment. The spare equipment list should be made available to COMPANY's on-board Rep. CONTRACTOR agrees to notify on-board Rep with any problems or delays associated the operation of the Vessel.

CONTRACTOR is responsible for ensuring the Vessel and her complement are in all regards adequate and in full compliance with the regulatory requirements that are applicable to the Vessel and her operation in the intended waters. This includes Vessel and Port and operational security requirements, Vessel documentation, logistical support and similar expenses unless otherwise specifically provided for in this supplement.

CONTRACTOR is responsible for ensuring the crew and CONTRACTOR's subcontractors are fully trained, properly certificated, suitably experienced and medically fit for the intended voyage and program. Copies of resumes and fitness certifications for proposed crew shall be furnished to COMPANY for review prior to program commencement or crew change. The CONTRACTOR is responsible for any delay, downtime, and/or costs directly attributable to the engagement of medically unfit or improperly certificated individuals.

COMPANY may request replacement of any of CONTRACTOR's crew where in the opinion of COMPANY such are considered to be unsuitable for the intended voyage or program. CONTRACTOR will then promptly arrange a suitable alternate.

CONTRACTOR shall continuously inform COMPANY concerning the serviceability of the Vessel and all CONTRACTOR equipment used or likely to be used in the survey. More specifically, the Party Chief, Master, and Chief Engineer shall immediately inform the COMPANY Representatives of any and all ship or equipment deficiencies affecting or potentially affecting the delivery of the program.

CONTRACTOR will ensure Vessel's ability to operate in designated project area under Peruvian standards- if required. This will include but is not limited to passing audits onboard the Vessel from Local Regulatory agencies, or any other requirement deemed necessary by governing agencies for operations in the project area. Cost associated with preparing the vessel to meet these standards will be at CONTRACTOR's expense.

### Rates and Compensation:

#### General:

All rates, sums and prices obtained herein shall be in United States Dollars and are exclusive of local Taxes, including Withholding Taxes (WHT) and exclusive of Value Added Taxes (VAT) tied to CONTRACTOR Revenue or COMPANY expense for acquisition, if applicable. All other taxes are as defined in the Master Service Agreement. Rates are fixed and firm for the performance of the services and the duration of the term of this Supplemental 6.

Unless otherwise specified in this Supplement 6, the Acquisition Kilometer Rate includes all costs associated with the operation of the Vessel and the agreed equipment and crew including all supplies, accommodations and food stores.

CONTRACTOR will submit a summary of accumulated Chargeable items to COMPANY on the last day of each month or within five (5) businesses days of the following month.

CONTRACTOR is responsible for ensuring full compliance with Maritime crewing requirements in accordance with the Vessel and crewing Specification. If there are applicable Maritime crewing requirements beyond the Vessel and Crewing Specification, CONTRACTOR is responsible for and in control of the negotiating and contracting process to ensure full compliance with Maritime crewing requirements.

Accommodations and office space for on-board COMPANY Representative(s) must be provided for a 24 hour on-call duty, the location will be agreed upon prior to Vessel departure.

* Bunk space required will include one GXT Rep, one Grav/Mag operator, one HSE, two MMO's, up to two PAM operators, and one to three security personnel.

CONTRACTOR is responsible for planning, coordinating, and implementing the requisite security operation and is in control of all aspects of said operation with regards for the safe and efficient acquisition of the Scope of Work.

All costs, if any, related to Security and Chase boats shall be approved in advance by COMPANY prior to incurring such expenses and shall be paid by COMPANY as reimbursable

Page 4 of 23

charges. The Chase boat shall safeguard the operations performed by the Vessel in accordance with instructions from the Party Chief of the Vessel.

The Chase boat may be used to provide fuel bunkering offshore to the Vessel and to deliver supplies during the survey. However, Chase boat will only be used for such purposes and only when the Party Chief and Master have given their approval. This will only be granted in an emergency as it is essential that the chase boat stays with the seismic Vessel.

CONTRACTOR operations are based on resupply in port, at a 6 week schedule.

## Terms of Invoicing and Payment:

For the performance of the work, the COMPANY shall pay to the CONTRACTOR the amounts as specified herein.

CONTRACTOR will submit all invoices to COMPANY monthly on the last day of each month or within five (5) businesses days of the following month. Any claims put forward after the fifth business day of the following month will however still be valid and payable to CONTRACTOR. CONTRACTOR shall present all claims for compensation under this Supplement 6 within 90 days after the expiry of Charter Period.

### Option 1:

All invoices will be payable to CONTRACTOR within forty-five days (45) of receipt by COMPANY. In case of disputed amounts COMPANY can only withhold disputed amounts, the undisputed invoice amount shall be paid by due date. A deferred payment finance fee of 1% per month will be charged for each undisputed and unpaid invoice after the due date.

If COMPANY has not exercised this option by C.O.B., 40 days following receipt of the first acquisition invoice for PeruSPAN from CONTRACTOR, then Option 2 will automatically apply, unless otherwise mutually agreed.

### Option 2:

COMPANY and CONTRACTOR have agreed to a finance/shared revenue arrangement under which all invoices will be payable to CONTRACTOR. Payments will be based on the following terms:

- CONTRACTOR will carry all costs associated with the Vessel, Crew, and Vessel Operations, and approved reimbursables, which shall be invoiced monthly as described above.
- COMPANY will carry other 3rd party costs, including Chase Vessel, Gravity & Magnetic acquisition and processing, 3rd Party Security, MMO's, PAM, QC, and HSE personnel ("COMPANY'S Cost").
- COMPANY shall license the PeruSPAN project to third parties and CONTRACTOR's invoices shall be paid from Net Revenue. Net Revenue is defined as the income received from licensing the PeruSPAN project.
- The Parties shall share all Net Revenue received from the sale of licenses to the PeruSPAN as follows:
  - o CONTRACTOR receives 80% of Net Revenue until CONTRACTOR's Cost Recovery is achieved. ("CONTRACTOR's Cost Recovery shall be defined as

Page 5 of 23

when the sum of the approved invoices received from CONTRACTOR for this project plus a 5% premium equals the share of revenue due to CONTRACTOR).
- o COMPANY receives 20% of Net Revenue until CONTRACTOR's Cost Recovery is achieved.
- o Following CONTRACTOR's Cost Recovery, COMPANY shall receive 100% of Net Revenues until COMPANY's Cost Recovery is achieved. COMPANY's Cost Recovery shall be deemed to occur when all PeruSPAN revenue due to COMPANY is equal to COMPANY's Cost.
- o Following COMPANY's Cost Recovery, CONTRACTOR will receive a 20% trailing royalty on all additional net revenues received for PeruSPAN.

- Option. COMPANY has the Option to buy the trailing royalty from CONTRACTOR under the following terms:
  - o COMPANY pays CONTRACTOR for all approved invoices as described above, plus a 10% premium.
  - o Option period will terminate on COB, April15, 2015.
  - o If COMPANY has not exercised the Option by COB, April 15, 2015, then the terms of the trailing royalty as described above will remain in full effect.
- Any and all revenues generated from the licenses of the PeruSPAN data acquired under this agreement, will be recognized for their proper value (a minimum sale price is defined as ██████████) with respect to CONTRACTOR cost recovery and/or trailing royalty obligations, including but not limited to reduced pricing deals, packaged or other licenses, or give-away arrangements.
- The COMPANY will try to sell user licenses for the Seismic Data at the minimum sale price of ██████, but reserves the right to sell them at lower price depending on the specific and general conditions of the market with notification to the CONTRACTOR.

CONTRACTOR will be paid within thirty days (30) of receipt by COMPANY of license fees associated with this project.

COMPANY will provide CONTRACTOR with a monthly sales statement for all data licensed for the PeruSPAN project.

In case of disputed amounts COMPANY can only withhold disputed amounts, the undisputed invoice amount shall be paid by due date. A deferred payment finance fee of 1% per month will be charged for each undisputed and unpaid invoice after the due date.

### Evidence of Insurance:

Before performing any of the Services, CONTRACTOR shall provide COMPANY or its designee with certificate or other documentary evidence satisfactory to COMPANY of the insurance and endorsements required under Section 13 of Master Agreement and Appendix 1. COMPANY's acceptance of this certificate does not constitute a waiver, release or modification of any of the insurance coverage's and endorsements required under this Section 13. CONTRACTOR acknowledges that failure to provide a certificate or copy of a policy or other evidence as required by this Appendix 1 and Master Agreement shall lead to non-payment of CONTRACTOR's invoices.

- COMPANY AND CONTRACTOR hereby agree that the insurance as described in Appendix 1 hereto is the insurance that CONTRACTOR will require Vessel Owners to provide for the purposes of this Supplemental 6.

Page 6 of 23

**Commercial Rates:**

CONTRACTOR shall be paid the applicable Full-Fold per Kilometer rate, for full fold kilometers approved and accepted by COMPANY during the entire Charter Period for the performance of the work/ services.

All Full Fold Kilometers must be approved & signed by COMPANY'S on-board client QC rep daily.

Any decision to retrieve equipment or discontinue shooting due to CONTRACTOR'S inability to meet TECHNICAL SPECIFICATIONS must be approved in-advance by the COMPANY'S onboard QC representative.

Unless otherwise specified in this Supplement 6, the Mobilization and De-mobilization fees are inclusive of all costs associated with the Transit of the Vessel and Personnel expenses including the following:

- Port call related cost for crew changes, vessels and personnel.
- Fuel consumption during mobilization and demobilization.
- All temporary Vessel importation costs including all agent fees required to operate in the proposed country.
- All personnel visa and training requirements necessary to operate in the proposed country.

**Mobilization & Demobilization Rate:**

The Mobilization/Demobilization is a lump sum and should cover all costs incurred by CONTRACTOR, including but not limited to mobilization of all personnel, seismic equipment, consumables necessary to perform the Services, from point of origin to the survey area, calibration of all instrumentation necessary for the performance of the Services, navigation system offshore calibration in the survey area, deployment of the guns and streamers in the survey area, streamer balancing and source testing.

Demobilization shall commence immediately on completion of seismic data acquisition in the survey area and will be completed upon disembarking of the COMPANY Representative and all survey data. Any time spent carrying out post-survey navigation checks shall be included in demobilization.

CONTRACTOR further agrees that the above Demobilization Fee of ▓▓▓▓▓▓▓▓▓ will be paid only if the Vessel does not proceed directly, or within a mutually agreed timeframe, to another GX Technology project. If the vessel does proceed to another GX Technology project, then the demobilization fee described above will be waived in favor of the Mobilization fee for the next project.

Page 7 of 23

## Acquisition Rate:

For the performance of the Acquisition Services, CONTRACTOR shall be compensated at a Full Fold Kilometer rate for all COMPANY accepted full fold kilometers acquired.

The Per Kilometer Full Fold Rate will commence immediately when the first five (5) kilometers of acquisition is accepted by COMPANY'S Representative. The acquisition shall anyway be deemed accepted when performed in conformity with the technical requirements set out in this Supplement 6.

The Per Kilometer Full Fold Rate is inclusive of all supplies, stores, fuel & lube and tape copying, CONTRACTOR's integrated navigation system with experienced operators, (including dual independent DGPS), agent fees, all personnel costs and expenses, and all related communications charges from the Vessel and all equipment and materials necessary to perform the Services.

The Per Kilometer Full Fold Rate shall also apply for:

- Time associated with seismic recording and line changes
  - o Line change time is considered chargeable for time in excess of an average of 9 hours per line change accumulated over the total acquisition of the project, and based on a minimum vessel speed of 4.2 knots. (e.g. 9 hours/line change x the total number of line changes made for the project = the accumulated non-chargeable line change time. Any time in excess of this accumulated total time will be considered chargeable; in so far as it not a result of downtime within the contractors control). CONTRACTOR will maintain as high a speed as equipment will allow, based on the above description and in so far as industry standard tension levels are maintained.
- Time spent configuring or re-balancing the streamers after mobilization
- Onboard navigation data processing and Seismic data QC processing
- All time associated with scheduled crew changes, including Pilot, harbor dues, agent fees and shore rep cost.
- Onboard processing QC equipment and personnel for the provision of onboard seismic QC Data Processing thru brute stack.
- All associated crew cost, food, supplies and shipping expenses
- All costs for agents, including Vessel, equipment, personnel, supplies and appropriate permits and clearances.

CONTRACTOR shall insure all tapes shipped, and shall fully insure against the total costs of re-shooting the data recorded thereon, if both original and copy tape set are lost or unusable. All such cost of insurance is reimbursable to CONTRACTOR. If COMPANY declines to pay for such insurance CONTRACTOR is not obligated to obtain such insurance cover.

## Standby Rate:

The Standby Rate shall apply during time periods data cannot be recorded in accordance with TECHNICAL SPECIFICATIONS in (Schedule 2) due to reasons or conditions considered to be outside

the reasonable control of CONTRACTOR and with COMPANY Representatives prior approval, including but not limited to the following reasons:

- Inclement weather, currents or atmospheric conditions preventing the safe recording of data.
- Time spent recording data which are subsequently rejected in accordance with TECHNICAL SPECIFICATIONS in (Schedule 2) ) due to reasons or conditions considered to be outside the reasonable control of CONTRACTOR and with COMPANY Representatives prior approval, including but not limited to the following reasons:
  - Interference from other seismic vessels or oilfield activity.
  - Interference caused by fishing activities, including fishing vessels, fishing equipment, or marine traffic.
- Time lost due to restrictions imposed by governmental or military agencies (including neighboring countries) and third party pressure groups, provided Contractor has not caused the restrictions to be imposed;
- Delays caused by proximity of wildlife (marine mammals and other protected species) as a result of stipulations provided in project specific permits or regulatory requirements. local regulations
- Time lost due to Vessel and Crew having to maneuver away from a specific security threat. COMPANY's onboard QC will be advised immediately on any potential threat.
- Time spent during scouting (to include time spent scouting the survey area prior to Vessel acquiring data as part of mobilization agreement)
- Navigation stand-by occasioned by inappropriate satellite geometry or by the inherent operating constraints of positioning system, including sky wave, weather interference or other atmospheric effects.
- Delays caused by collision of in-water seismic equipment with flotsam, jetsam and other debris and time spent repairing damages caused by same.
- Third party interference including but not limited to vessel activity, static hazards and extraneous sources of acoustic noise, notwithstanding efforts of chase/escort vessel to minimize the same.
- Time spent awaiting environmental restrictions.
- Time lost as a result of damages to in-sea equipment caused by uncharted obstructions.
- Time lost due to default or damage to COMPANY provided Equipment.
- Equipment recovery before any of the above occurrences and also re-streaming, returning and re-calibration after such periods.
- Time spent on port call requested by Company, for any reason other than to remedy a Contractor downtime situation.
- Excess time spent on extended line changes, as described above.

During periods of standby at Standby Rate and subject to acceptance from COMPANY, CONTRACTOR may perform necessary maintenance and repair of equipment.

The Standby Rate shall not apply if data cannot be recorded due to reasons regarded as Technical Downtime Periods, and the Standby Rate shall in such situations commence (if no other day rate is applicable) after the Technical Downtime Period ceases and COMPANY has been returned to an equally favorable position.

Notwithstanding the above, the Standby Rate shall apply during time periods CONTRACTOR is prevented from making repairs by virtue of one or more of the standby conditions listed above (and then the Standby Rate shall apply in lieu of the Technical Downtime Period from the point in time CONTRACTOR is prevented from making such repairs. Once the standby condition has cleared, the Standby rate shall cease and the Technical Downtime period shall commence again, until and COMPANY has been returned to an equally favorable position from the time the initial Technical Downtime Period began.)

### Technical Downtime Periods:

Except as otherwise set out in this Supplement 6, the Mobilization Fee, Standby Rate, and/ or Per Kilometer Full Fold Rate shall not apply during time periods of "Technical Downtime" within CONTRACTOR'S control, and no compensation will be paid to CONTRACTOR during such periods.

"Technical Downtime" is time lost due to CONTRACTOR'S Vessel, Vessel equipment, recording electronics, seismic cables, airgun source, cabling handling equipment, system software or navigation equipment or any other equipment, systems, or software that are inoperable or fail to meet survey specifications, unless approved by COMPANY'S onboard QC Representative.

Any delays or time lost, within reasonable control of CONTRACTOR, prior to the Vessel's arrival to or during its departure from the survey area as a result of failure to reasonably complete acceptance tests, place qualified operators on board the Vessel, or as a result of CONTRACTOR failing to provide requisite information necessary for timely acquisition of any visa's, permits or clearances, will be recognized as "Technical Downtime". ·

### The Acquisition and Standby Rates shall NOT include:

- − Technical Downtime periods as described above
- − Fuel charges in excess of ▮▮▮▮ per metric ton.
- − Delays caused by collision of Vessel with any obstructions, catastrophic failures, or any time spent repairing resultant damages. (Including engines, compressor, or hull failures etc.) Catastrophic failures are defined as interruptions or significant slowdowns in crew performance due to breakdown of Vessel or machinery including but not limited to compressors; Vessel propulsion, steering or ship's power.
- − Re-shoots due to CONTRACTOR error or negligence
- − CONTRACTOR engaging in time-sharing or standby time without the expressed consent of the COMPANY QC representative.
- − CONTRACTOR not receiving prior approvals from COMPANYS on-board rep for extended periods of downtime
- − CONTRACTOR port call periods and time spent conducting crew changes.

### Reimbursable Charges:

Where the following additional services are provided by the Contractor, the reimbursable charges will be paid by Company monthly and will be billed at cost plus five per cent (5%), unless otherwise stated, in accordance with the terms set out above.

All Reimbursable items provided at the request of COMPANY must be approved in writing (e-mail acceptable) by COMPANY prior to incurring such expense, and CONTRACTOR shall not be obliged to provide such reimbursable services/ items before approved by COMPANY in writing.

CONTRACTOR agrees to draft 3rd Party contracts to reflect extended periods of downtime. Extended periods of downtime due to CONTRACTORS Vessel, equipment or catastrophic failures will not be reimbursable cost to Contractor.

### Reimbursable Items to CONTRACTOR:

Unless, otherwise described above:

- All items provided at the request of the COMPANY
- Additional personnel at the request of the COMPANY or due to regulatory requirements
- Fuel charges in excess of          for acquisition and standby periods.
- Tape Shipment:
    - o CONTRACTOR shall insure all tapes shipped, and shall fully insure against the total costs of re-shooting the data recorded thereon, if both original and copy tape set are lost or unusable. All such cost of insurance is reimbursable to CONTRACTOR.
    - o All navigation and streamer/source positioning data tapes shall be shipped to COMPANY at cost plus five percent (5%).
- Tape copies charged at
- Communications;
    - o VSAT communications charges up to       per day

### Notifications:

Any notifications regards this Supplement shall be made to the following:

| | |
|---|---|
| **Cobra Energy Services** | **GX Technology** |
| **10550 Bissonnet, Suite 100** | **2015 CityWest Blvd., Suite 900** |
| **Houston, Texas 77099** | **Houston, Texas 77042** |
| **Attn: Mr. Ted Cooper** | **Attn: Mr. Shawn L. Rice** |
| **(713) 728-6266** | **(713) 789-7250** |

### HSE:

CONTRACTOR agrees to perform a Comprehensive Project Risk and Hazard Assessment that takes in account the hazards of operating in the project specific areas the hazards and control measures should be agreed upon by sub-contractors and Security Companies providing chase or security vessels and guards to protect personnel and Vessels. (When drawing up such an assessment, it is appropriate to make use of professional advisers (such as project management companies, private security companies, risk management consultants and the local police or Navy).

CONTRACTOR is obliged to comply with COMPANY's HSE (Health, Safety and Environment) policies as outlined in Schedule 3

Case 2:22-cv-30987 Document 52-12 Filed in TXSB on 06/30/22 Page 41 of 105

COMPANY may undertake an independent HSE audit whilst the Vessel is in port and/or when in an operational condition on location. COMPANY may refuse to accept the Vessel if the HSE audit reveals major deficiencies.

As a minimum requirement, the CONTRACTOR shall comply with the standards set by the OGP (formerly E&P Forum) Health and Safety Schedules and training guidelines, the IAGC Safety Manual for Marine Geophysical Operations and the IAGC Environmental Manual. Additional HSE requirements are provided in Schedule 3 of the signed contract document.

CONTRACTOR shall be solely responsible for the Security of the Vessel and personnel in addition to the health and safety of its agents, employees and subcontractors' employees engaged in the work. CONTRACTOR and its subcontractors shall comply with all applicable health, environment and safety standards, codes and regulations; whether defined by the Government/Federal regulatory bodies, ION or ION's clients (whichever are the most stringent). If such standards, codes or regulations do not adequately protect against hazards arising from the work, CONTRACTOR shall adopt appropriate practices.

CONTRACTOR shall take all reasonable precautions to protect the environment during the performance of work as outlined in the contract. The responsibilities of the CONTRACTOR shall include, but not be limited to the prevention of pollution caused by Contractor's equipment and materials, as well as protection of marine mammals and other wildlife.

CONTRACTOR shall exercise due care, skill and diligence and take all necessary measures and precautions to ensure that in the execution of the work, safe working practices are observed and that human life and property is not destroyed, injured, or put in any danger. Consequently, the CONTRACTOR's responsibilities include but shall not be limited to:

- Implementation of a management strategy directed at providing a safe operations at the worksite;
- Safety of its Vessel and Personnel;
- Training of its personnel to ensure safe operations;
- Maintenance of its equipment and materials in safe running order and regular inspection of the same to ensure safe and uninterrupted operations;
- Compliance with all applicable laws & regulations

CONTRACTOR shall promptly furnish Company full reports of any incidents involving Contractor's agents, employees or property connected with the work and shall update such reports as reasonable necessary. Such reports and updates shall contain a description of the circumstance of any personal injury, treatment provided, number of restricted or lost work days, and the date of return to work and description of any lasting impairment. Contractor shall endeavor to provide similar reports to Company for all its subcontractors.

Page 12 of 23

Case 2:22-30997 Document 5205-12 Filed in TXSB on 09/30/22 Page 42 of 105

## APPENDIX 1: Insurance Requirements

Without limiting the indemnity obligations or liabilities of Cobra or its insurers, Cobra or its Vessel Owner, Shanghai Offshore Petroleum Geophysical Corporation, at their sole expense, shall maintain the following insurances as long as this Agreement is in force:

(1) Hull and Machinery insurance shall be provided for the vessel by the Owner, including the equipment to be supplied in the performance of Services with navigation limits adequate for the vessel's trade. In an amount equal to the full market value of the vessel on a form at least equivalent to the American Institute Hull Clauses 6-2-77 Form (including 4/4 Collision Liability and damage to fixed or floating objects unless otherwise provided under Protection and Indemnity Insurance).

(2) Full Form Protection and Indemnity Liability or Marine Liability insurance including coverage for injuries to or death of masters, mates, and crew, collision liabilities, damage to fixed and floating objects not covered under Hull and Machinery and pollution liabilities in an amount equivalent to the cover provided by members of the International Group of Protection and Indemnity Associations. The obligation to insure for loss of life or bodily injury to crew of vessel may be covered by extension of Workers' Compensation and Employer's Liability insurance.

(3) Civil Liability – insurance pursuant to Article 7 of the International Convention on Civil Liability for Bunker Oil Pollution Damage (2001).

(4) Worker's Compensation and Employer's Liability Insurance in compliance with the laws of all jurisdictions in which the Services under this Agreement are performed covering all persons employed in the performance of such Services by each party.

Owner is required to provide COMPANY with a certificate of insurance evidencing each of the coverage's above. Certificates are required to indicate that should the described policy be cancelled before the expiration date thereof, notice will be delivered to COMPANY in accordance with the policy provisions.

Case 22-30977   Document 5205-12   Filed in TXSB on 07/20/22   Page 43 of 105

**APPENDIX 2: Project Map**
*(Approx. 7,538 2D kms)*



PeruSPAN (v13)
12,120 km

**APPENDIX 3: Seismic Acquisition Parameters**

# SECTION 1.     SURVEY DESCRIPTION

## 1.1.    Program Overview

| | General Information | |
|---|---|---|
| 1. | Survey Name: | Tanzania 2D |
| 2. | Operating Company: | GX Technology |
| 3. | Operating Contractor: | SOPGC |
| 4. | Vessel(s): | M/V Discoverer |
| 5. | Location: | Offshore Tanzania |
| 6. | Type of Survey: | 2D Streamer |
| 7. | Desired acquisition time period | July – Aug 2014 |
| 8. | Estimated survey duration | 45 days |

| | Survey Size | |
|---|---|---|
| 9. | Full-fold line length (km) | 4,054 |
| 10. | Number of Lines | 57 |

## 1.2.    Service Requirements

The primary services will consist of the following:

| | Service Description | Required? |
|---|---|---|
| 1. | Seismic Acquisition | Yes |
| 2. | Field QC Processing | Yes |
| 3. | Field Extended Processing | No |
| 4. | Gravity Acquisition | Yes |
| 5. | Magnetometer Acquisition | No |
| 6. | Gradiometry Acquisition | No |
| 7. | Multibeam Bathymetry Acquisition | No |
| 8. | Raw GPS Observations (Rinex format) | No |
| 9. | GXT Declinometer | No |
| 10. | Other | No |

## 2.1.    Seismic Acquisition Parameters

| | Acquisition Geometry | |
|---|---|---|
| 1. | Acquisition method | Streamer |
| 2. | Configuration (2D,3D,4D / 1C,2C,3C,4C) | 2D / 1C |

| | Recording Geometry | |
|---|---|---|
| 3. | Number of cables | 1 |
| 4. | Cable Length | 10,050 m |
| 5. | Group Interval | 12.5 m |
| 6. | Number of Channels | 804 |
| 7. | Cable Depth | 10 m |
| 8. | Nominal Near Trace Offset | 150 m or less |
| 9. | Shot Interval | 25 m |
| 10. | Source depth | 6 m |

| | Recording Parameters | |
|---|---|---|
| 11. | Instrument type | Sercel SEAL ALS |
| 12. | Tape format | SEG-D 8058 |
| 13. | Record length | 10 seconds |
| 14. | Sample rate | 2 milliseconds |
| 15. | Recording filter: Lo-cut | Out (3 Hz, 6 dB/octave) |
| 16. | Recording filter: Hi-cut | 200 Hz, 370 dB/octave |
| 17. | Filter Phase | Linear |
| 18. | Recording media | IBM 3590E |
| 19. | Dual recording / tapes copies required? | Yes |
| 20. | Auxiliary channel recording requirements | time break, near field hydrophones |

| | Source Parameters | |
|---|---|---|
| 21. | Airgun type | Bolt 1500 LL, Sleeve 1 & 2 |
| 22. | Number of source arrays | 1 |
| 23. | Number of sub-arrays per source | 4 |
| 24. | Sub-array spacing | 10/12/10 m |
| 25. | Total volume per source | 6420 cu. in. |
| 26. | Bar meter output (out-128/72 filter) p-p | 150.4 bar-m |
| 27. | Peak/Bubble ratio (out-128/72 filter) | 18.5 : 1 |
| 28. | Source operating pressure | 2000 psi |
| 29. | Number of pressure indicators per sub-array | 1 |
| 30. | Number of depth indicators per sub-array | Minimum of two, three preferred |
| 31. | Near fields to be recorded? | Yes if available, but not required |

| | Binning Parameters | |
|---|---|---|
| 32. | CMP Bin Size | 6.25 m |
| 33. | Nominal Fold | 201 |
| 34. | Calculate fold coverage? | Yes |
| 35. | Require infill? | No, follow technical specs |
| 36. | Offset Ranges to be evaluated for coverage | 4 equal ranges non-overlapping |
| 37. | Unique Offset Increment | 100 meters |
| 38. | No. of Azimuth Segments | 1 |
| 39. | Group 1 range / minimum fold | 0-2500 m / 50 |
| 40. | Group 2 range / minimum fold | 2500-5000 m / 50 |
| 41. | Group 3 range / minimum fold | 5000-7500 m / 50 |
| 42. | Group 4 range / minimum fold | 7500-10050 m / 50 |
| 43. | All offsets / minimum fold | 0-10050 m / 201 |

Page 17 of 23

## 2.2. Navigation Acquisition Parameters

| | Navigation System | |
|---|---|---|
| 1. | INS software | Orca |
| 2. | Post Processing software | NRT / Sprint |

| | Primary GPS Navigation | |
|---|---|---|
| 3. | System type | C-Nav1 |
| 4. | Receiver Mfg/Model | FS2050G |
| 5. | Reference station | N/A - PPP |
| 6. | Corrections via | L1 band |
| 7. | Providing company | C&C Technologies |
| 8. | Position QC | Orca |

| | Secondary GPS Navigation | |
|---|---|---|
| 9. | System type | C-Nav2 |
| 10. | Receiver Mfg/Model | FS2050G |
| 11. | Reference station | N/A - PPP |
| 12. | Corrections via | L1 - band |
| 13. | Providing company | C&C Technologies |
| 14. | Position QC | Orca |

| | Tertiary GPS Navigation | |
|---|---|---|
| 15. | System type | PosNet |
| 16. | Receiver Mfg/Model | Novatel |
| 17. | Reference station | N/A |

| 18. | Corrections via | N/A |
|---|---|---|
| 19. | Providing company | PBX Systems |
| 20. | Position QC | Orca |

| | In-water Equipment Requirements | |
|---|---|---|
| 21. | Compass / leveller spacing | One every 300m with redundancy at head and tail |
| 22. | Cable diverters | N/A |
| 23. | Tailbuoy | Yes, rGPS |
| 24. | Gun pods | Yes, minimum of 2 active rGPS |
| 25. | Head acoustic network | No, but desired if no water break avail. |
| 26. | Velocimeter | No, but desired if routine TS-Dip measurements unavailable |
| 27. | Fathometer | Max depth range 3000m (if water depths exceed fathometer capabilities, water depths will be picked from the seismic data and P1-90 files updated with this depth) |

| | Navigation Settings | |
|---|---|---|
| 28. | Navigation mode | Great circle |
| 29. | Navigation Reference to Preplot Position | First CMP |
| 30. | Nominal echo-sounder water velocity | 1500 m/sec |
| 31. | Tidal Correction Vertical Datum | N/A |
| 32. | Magnetic declination usage | One value per line at mid-line location |

Page 18 of 23

## SECTION 3. REPORTS AND DELIVERABLES SUMMARY

### 3.1. Pre-Survey Deliverables

| | Pre-Survey Products | Supplied by |
|---|---|---|
| 1. | Survey Project Plan (including mobilization schedule) | GXT/Contractor |
| 2. | Cables and spares listing and history | Contractor |
| 3. | Gun drop-out specifications | GXT |
| 4. | Representative sample of all onboard QC products | Contractor |
| 5. | System timing, data flow, and control diagrams | Contractor |
| 6. | Test communication link to GXT office with seismic and navigation test files | GXT Rep |
| 7. | Pre-plot listing, map and UKOOA files | GXT |
| 8. | Positioning Quality Plan | Contractor |
| 9. | Onboard Processing Project Plan | Contractor |
| 10. | Detailed Project Safety Plan | Contractor |
| 11. | Drug and Alcohol Testing Program | Contractor |
| 12. | Local Medical Services Information | Contractor |
| 13. | Crew Training Matrix Summary | Contractor |
| 14. | Preliminary Project Risk Assessment | GXT and Contractor |
| 15. | Incident Report Format | GXT |
| 16. | Emergency Response Plan | Contractor |
| 17. | Interface Management Plan (Bridging Document) | GXT and Contractor |
| 18. | Third Party QHSE Audit Report | GXT |
| 19. | Other QHSE details | Contractor |

### 3.2. Deliverables at Start-Up

| | Start-Up Products | Delivery To |
|---|---|---|
| 1. | Source calibration and verification results | GXT Rep |
| 2. | Instrumentation test results to include recording system timing verification and instrument acceptance tests | GXT Rep |
| 3. | Multi-vessel timing tests | GXT Rep |
| 4. | Cable/sensor test results | GXT Rep |
| 5. | Calibration reports to include gyrocompass and streamer compass calibration reports, GPS position check and acoustic network reports, gundepth accuracy, GPS procedures and base station descriptions | GXT Rep |
| 6. | Bin center pre-plot & P6/98 grid definition (3D) | GXT Rep |
| 7. | First line instrument tests (SEG-D) | S&R Services |
| 8. | First line navigation tests (P2-94) | CSL |

### 3.3. Deliverables during Survey

| | Survey Products | Deliver To | Upload To |
|---|---|---|---|
| 1. | Observer logs | GXT Rep | GXT FTP |
| 2. | Monthly instrument tests results | GXT Rep | GXT FTP |
| 3. | Daily instrument test results | GXT Rep | |
| 4. | Navigation logs | GXT Rep | GXT FTP |
| 5. | STS and SBS logs from navigation system | GXT Rep | GXT FTP |
| 5. | End of line reporting (Spectra logs, QC products, noise analyses, etc.) | GXT Rep | GXT FTP |
| 6. | Orca/Spectra SBS and STS logs | GXT Rep | GXT FTP |
| 7. | Vessel position log – positions recorded at 1 minute intervals throughout the duration of the project (including non-production time, line changes etc..) | GXT Rep | GXT FTP |
| 8. | ION Declinometer data - continuously recording throughout survey | N/A | N/A |
| 9. | Gun logs | GXT Rep | GXT FTP |
| 10. | Configuration diagrams | GXT Rep | GXT FTP |
| 11. | Weekly onboard processing status report | GXT Rep | GXT FTP |
| 12. | Final P1-90 data for each sequence | GXT Rep | GXT FTP |
| 13. | Final P1-90 source records for each sequence (S cards only) | GXT Rep | GXT FTP |
| 14. | Raw P2/94 data for each sequence | GXT Rep | GXT FTP |
| 15. | Onboard processing QC plots for each sequence | GXT Rep | GXT FTP |
| 16. | Decimated SEG-Y stack (100m trace spacing) | GXT Rep | GXT FTP |
| 17. | Tape Logs and Data Transmittals | GXT Rep | GXT FTP |

### 3.4. Post-Survey Deliverables

| | Post-Survey Products | | Deliver To | Qty | Format | Media |
|---|---|---|---|---|---|---|
| 1. | Field (SEGD) tapes | Line archive | GXT | 1 | SEG-D | 3590 |
| | | Sequence archive | Hold on boat | 1 | SEG-D | |
| 2. | Observer logs | | GXT | 1 | XLS | HD-USB |
| 3. | Monthly instrument tests | | GXT | 1 | SEG-D | 3590 |
| 4. | Daily instrument tests results | | GXT | 1 | XLS/DOC | HD-USB |
| 5. | Raw navigation data | | GXT | 1 | P2-94 | HD-USB |
| 6. | Survey-wide Navigation Statistics (including SBS & STS data) | | GXT | 1 | PDF/TEXT | HD-USB |
| 7. | Processed navigation data | | GXT | 2 | P1-90 | 3590 or USB-HD |
| 8. | Backup of QC Node | | GXT | 1 | Archive format | HD-USB |
| 9. | Brute stacks | | GXT | 1 | SEG-Y | HD-USB |
| 10. | Onboard processing QC plots for each sequence | | GXT | 1 | Archive each SEQ | HD-USB |
| 11. | Nav-sels merged SEGY data (no nmo) | | N/A | 0 | SEG-Y | 3590 |
| 12. | Stacking velocities | | GXT | 1 | ASCII | HD-USB |
| 13. | Navigation logs | | GXT | 1 | XLS/DOC | HD-USB |

| | Post-Survey Products | Deliver To | Qty | Format | Media |
|---|---|---|---|---|---|
| 14. | Post-Plot maps in WGS-84 & Local Datum | GXT | 1 | Paper | Paper |
| 15. | Acquisition Bin-Grid Definition (3D) | GXT | 1 | P6/98 | HD-USB |
| 16. | Final Seismic Operations & Navigation Report | GXT | 3 | DOC | HD-USB |
| 17. | Final Onboard Seismic Processing Report | GXT | 3 | DOC | HD-USB |
| 18. | Ancillary digital data (grav. mag. ...) | FGMS | 1 | Misc | HD-USB |

Page 20 of 23

## APPENDIX 3: *continued....*
## (Vessel Specifications)



A. Vessel Detail

| | |
|---|---|
| VESSEL NAME | DISCOVERER |
| Owner | Shanghai Offshore Petroleum Bureau |
| Maritime operator | Shanghai Offshore Petroleum Geophysical Corporation |
| Flag | Bahamas |
| Port Of Registry | Nassau |
| Year of Build | 1980 |
| Year of Rebuilt | 1988 |
| Class | DNV + IAI ICE-C SUPPLY VESSEL SF |
| IMO number | 7623928 |
| Call sign | C8CZ2 |
| **Vessel Dimensions** | |
| Length over all | 72.07m |
| Length between p.p. | 72m |
| Breadth mould | 16.0m |
| Air draught | 30m |
| Draught (mean)/Design draught | 3.61m |
| Scantling draught /Max Draft | 5.25m |
| **Vessel Tonnage** | |
| Gross Tonnage | 2747 |
| Net Reg Tonnage | 824 |
| Deadweight at scantling draught | 1800t |
| **Vessel Capacities** | |
| Ballast water | 800m³ |
| Freshwater | 350m³ plus 8m³ /day water maker |
| Fuel oil, incl. service tanks and overflow | 700t approx |
| Fuel, Useful for 100 % Consumption | 550t |

Page 21 of 23

| | |
|---|---|
| Navtex Receiver | JRC NCR333 |
| AIS ( Automatic Identification System) | JRC JHS -182 |
| BNWAS | AMI Marine KW810 |
| **E. Accommodation** | |
| Cabin Type 1 Marine crew | 11 x 1 berth |
| Cabin Type 2 Seismic crew | 15 x 2 berths |
| Cabin Type 3 Treatment room | 2 x 4 berths |
| Total Accommodation | 49+hospital |

**F. Helideck**

| | |
|---|---|
| Helicopter deck | 18m Diameter   No Certified |

**G. Vessel Fire Fighting Equipment**

| | |
|---|---|
| ENGINEROOM/CONTROL/ SWITCHBOARD | HALON SYSTEM 1301 |
| Tape Store | EXTINGUISHER |
| Cable Store | FOAM SYSTEM |
| Streamer Reels | FOAM SYSTEM |
| Helocopter Deck | APPP $ DRYPOWDER EXTINGUISHER |
| Paint Store | EXTINGUISHER |
| Main Fire Pump | 2 |
| Emergency Fire Pump | 1 |
| Fire Detection Monitoring System | 1 x SYSTEM 3      1 x CERBERUS PYROTRONICS |

**H. Vessel Safety and Survival**

| | |
|---|---|
| Lifeboats | 2 x Harding Fully Enclosed Motor Lifeboats (total 120 persons) |
| Engine of lifeboat | 30HP, NORWAY MCM-28 |
| Life rafts | 4 x Life-rafts (total 64 persons) |
| MOB (Fast Rescu Craft) | 5.30 MIDGET RESCUE BOAT |
| Engine, MOB and speed of boat | 57-75HP / 18 knots |
| Life jackets | 73 : |
| Survival suits | 64 |



# The State of Texas

### Secretary of State

Requested for use in PERU
Not for use within the United States of America
This Apostille only certifies the signature, the capacity of the signer and the seal or stamp it bears. It does not certify the content of the document for which it was issued.
Certificate Validation available at www.sos.state.tx.us

## APOSTILLE

### (Convention de La Haye du 5 Octobre 1961)

1. Country                                   United States of America

This public document
2. has been signed by                        KAROLYN RATAJCZAK

3. acting in the capacity of                 Notary Public, State of Texas

4. and bears the seal/stamp of               KAROLYN RATAJCZAK,
                                             Notary Public, State of Texas,
                                             Commission Expires: 09-30-17

## CERTIFIED

5. at Austin, Texas                          6. on October 3, 2014

7. by the Secretary of State of Texas

8. Certificate No. 10150854

9. Seal                                      10. Signature:



*NanditaBerry*

Nandita Berry
Secretary of State

GF/tl

**Supplemental Agreement No. 13**
**To**
**Master Geophysical Services Agreement**

This Supplemental Agreement No. 13 ("**Supplement 13**") is entered into as of the 17th day of January 2019, between GX Technology Corporation located at 2105 City West Boulevard, Houston, Texas 77042 ("**COMPANY**") and Cobra Energy Services, S.A. a Panamanian corporation whose registered office is at the World Trade Center, 1° Piso Area Commercial, Calle 53, Marbella, Panama City, Republica de Panama ("**CONTRACTOR**") subject to the following:

1. **Master Agreement**. This Supplement 13 is entered into pursuant to the Master Geophysical Service Agreement between COMPANY and CONTRACTOR dated July 8, 2015 (the "Master Agreement"), the terms of which are incorporated herein by reference and attached hereto.

**Content: GrandSPAN 2 Seismic Acquisition**

**This Supplement 13 consists of the following documents:**
- Scope of Work
- General Description of the Services
- Rates and Compensation
- Terms of Payment and invoicing
- Commercial Rates
- HSE
- APPENDIX 1 – Insurance Requirements
- APPENDIX 2 – Project Map
- APPENDIX 3 – Vessel Specifications
- APPENDIX 4 – Seismic Parameters
- APPENDIX 5 – GAP Analysis to be completed
- APPENDIX 6 – Local labor supplement

**The following documents will be made available to CONTRACTOR:**
- Schedule 1 – Operations Plan and Permitting Requirements
- Schedule 2 – Marine Seismic Acquisition Order
  - Seismic Specifications
  - Gravity & Magnetic Requirements
  - Onboard – QC Processing
  - Seismic Source Array

**Master Geophysical Service Agreement**
In the event of any conflict between the provisions of the above documents, they shall be given priority in the order listed above.

| COMPANY | CONTRACTOR |
|---|---|
| GX Technology Corporation | Cobra Energy Services, S.A. |
| BY: | BY: |
| NAME: Ken Williamson | NAME: Yumin Li |
| TITLE: EVP, COO | TITLE: Country Manager. CHINA |
| DATE: January 17 2019 | DATE: January 17, 2019 |

**EXHIBIT**
**Cobra 3**

**GENERAL:**

This Supplement 13 is entered into between COMPANY and CONTRACTOR (as defined above), through which CONTRACTOR agrees to deliver and make available the vessel M/V Hai Yang Shi You 760 (the "Vessel") along with the personnel and equipment necessary to acquire COMPANY's GrandSPAN 2 seismic survey offshore Canada/Newfoundland (the "Services"). The equipment and personnel needed to perform the Services are illustrated in the Appendices and Schedules attached hereto.

The GrandSPAN 2 program commencement is subject to COMPANY obtaining the proper permits required in the territory and the Vessel receiving regulatory approval from CNLOPB to operate in the proposed area.

This Supplemental Agreement is based on the terms and conditions below:

Services are related to the acquisition of approximately 10,800 FF km of 2D seismic data offshore Canada and Newfoundland. The actual line locations and line kilometers may vary from those shown in the project specific schedules (Schedule 2) as a result of environmental or permit restrictions, acquisition obstacles, and map inaccuracies, any changes in governmental agencies or lease holder restrictions or requirements.

The "Charter Period" commences immediately after the arrival of COMPANY personnel onboard the Vessel and the acceptance of Vessel, equipment and calibrations by COMPANY Representative. CONTRACTOR will need to provide all requisite Vessel specific permits, evidenced by receipt of a Maritime and Coast Guard clearance letters, customs clearance for temporary importation of crew and Vessel, visas for the crew, as well as approve all project specific security requirements including security plans, vessels, equipment and personnel required to maintain safe passage and operations.

The Charter Period continues until demobilization of the Vessel is completed, including demobilization of COMPANY provided equipment, COMPANY Representative and all copies of Survey Data at an agreed safe location.

The program will be acquired based on the terms and conditions below:

CONTRACTOR is directly responsible for the proper Vessel certification, insurance and inspections that are required to operate in the proposed project area/ waters. Specifically, CONTRACTOR will:

- Manage the daily security and ice mitigation measures in place and direct and instruct any security/guard vessels with daily instructions necessary to maintain safe operations during this Charter Period. CONTRACTOR has the authority to cease all operations immediately if security conditions are deemed unsafe to continue operations in the proposed project areas.

- At its cost, deliver the Vessel with the approved regulatory certification required to operate safely in the proposed waters. The crew shall have received any required training as per the regulatory and security requirements of the country of operation and program as set out by COMPANY, the CNLOPB, and any other governing authority regulating this program.

- Arrive with the Vessel at the first site of acquisition for the performance of work with sufficient supplies and experienced personnel to perform the Services as set out in the Scope of Work. Once acquisition begins, CONTRACTOR shall remain on the project, except for crew change, refueling and re-supplying until the survey is completed.

- Provide all information to COMPANY as outlined in the "Project Schedules" and Insurance Requirements for the proposed survey. Failure to do so could result in delay to the start of the program. Any delays caused by the failure of CONTRACTOR to produce requested documentation as stated in this Supplement 13 will not be considered chargeable to COMPANY

- Agrees to a Vessel inspection and technical audit of the seismic equipment by COMPANY, Canadian regulators, or 3rd party auditors should COMPANY request. A list of outstanding



Action items from the GAP Analysis evaluation process will be included and inserted into Appendix 5 once completed. CONTRACTOR agrees that these items will be completed and/or approved in writing to COMPANY's satisfaction prior to the acceptance of the Vessel for this survey. Time spent completing these items is not considered chargeable to COMPANY. CONTRACTOR shall be given prompt notice of any additional outstanding action items and shall have forty-five (45) days from the date of receipt of such notice to remedy and cure such items. If, after forty-five (45) day period, the items have not been remedied or cured or it is shown that CONTRACTOR has not made a commercially reasonable effort to remedy or cure the action items, then COMPANY has the right to terminate this Supplement 13. Any Vessel requested modifications or pending items listed in Appendix 5 will be to CONTRACTOR'S expense unless agreed upon in writing in advance and signed by the COMPANYS VP of operations.

- CONTRACTOR will manage fuel requirements and logistics with local distributor and make the necessary arrangements for bunkering the Vessel, including confirmation of fuel availability, Vessel consumptions and Vessel specific fuel specifications and any pre-testing of fuel samples required by the Vessel Master.

**General Description of the Services:**

Except for COMPANY provided equipment and the reimbursable services/items described herein, CONTRACTOR shall, at its cost, provide experienced operators of the seismic equipment as well as the materials necessary to perform the Services as specified in detail in Schedules 1 and 2 of the Job Book. CONTRACTOR shall undertake the acquisition of seismic and its navigation/positioning data, gravity and magnetic data, as well as onboard QC seismic processing in accordance with the technical specification requirements contained in the applicable attachments hereto and in a manner consistent with generally accepted standards of the industry, including operation of equipment within the limits of its generally accepted capability. Mitigations and Regulatory reporting requirements are listed in Schedule 1 while survey acquisition parameters and operating specifications are listed in Schedule 2. Accurate offshore positioning is the responsibility and duty of CONTRACTOR. The primary and secondary navigation systems shall be two independent DGPS systems.

CONTRACTOR agrees to provide a proper fast rescue craft with certified operators able to pass Canadian standards. The Party Chief and Captain will supervise and give instruction to its maritime crew and seismic personnel and all subcontractors concerning security issues, ice conditions, regulatory compliance and proper performance of the services: including; HSE objectives & Emergency Response Planning, project planning, Vessel tracking, quality control, work locations and security of personnel & vessels or any other matters required to perform the Services properly and cost effectively. The assigned Party Chief shall personally inspect all facets of the operation at least once every 24 hours.

CONTRACTOR agrees to provide significant spare equipment for the Vessel as per the "critical spare list" required by the Vessel's classification. There shall be a minimum of 20% of spare seismic equipment to maintain the agreed upon in-water equipment. The spare equipment list should be made available to COMPANY's on-board Rep. CONTRACTOR agrees to notify on-board Rep with any problems or delays associated the operation of the Vessel.

CONTRACTOR is responsible for ensuring the crew and CONTRACTOR's subcontractors are fully trained, properly certificated, suitably experienced and medically fit for the intended voyage and program. Copies of resumes and fitness certifications for proposed crew shall be furnished to COMPANY for review prior to program commencement or crew change. CONTRACTOR is responsible for any delay, downtime, and/or costs directly attributable to the engagement of medically unfit or improperly certificated individuals. COMPANY agrees that the class requirement language is Chinese but CONTRACTOR will ensure that the Chiefs and crew onboard the Vessel will be capable of speaking and writing in English at a conversational level. CONTRACTOR will make available a suitable translator should the level of English onboard the vessel be deemed inadequate for safe and efficient operations.

COMPANY may request replacement of any of CONTRACTOR's crew where in the opinion of COMPANY such are considered to be unsuitable for the intended voyage or program. CONTRACTOR will then promptly arrange a suitable alternate at their own cost. CONTRACTOR shall continuously inform COMPANY concerning the serviceability of the Vessel and all CONTRACTOR equipment used or likely to be used in the survey. More specifically, the Party Chief, Master, and Chief Engineer shall immediately inform COMPANY Representatives of any and all ship or equipment deficiencies affecting or potentially affecting the delivery of the program or safety of the operation.

CONTRACTOR will ensure Vessel's ability to operate in designated project area. This may include but is not limited to passing audits onboard the Vessel from local regulatory agencies, or any other requirement deemed necessary by governing agencies or operating conditions for the project area including the conditions and mitigations outlined in the GOA (Geophysical Operating Authorization). CONTRACTOR also agrees to complete to the satisfaction of the governing agencies, any non-compliance items found during the GAP Analysis prior to the start of GrandSPAN 2. All costs associated with correcting the non-compliance items found during the GAP Analysis (Appendix 5) and preparing the vessel to meet and maintain Canadian standards will be at CONTRACTOR's reasonable expense unless otherwise specified herein. This includes but is not limited to safety equipment and PPE for all crew members, general upgrades required by Canadian Authorities, installation and maintenance of working FRC, training of the crew, and any other upgrades required to bring the Vessel into and maintain compliance with Canadian regulatory standards. Any downtime of the Vessel attributable to the Vessel's inability to comply with or maintain Canadian standards shall not be chargeable to COMPANY.

**Rates and Compensation:**

**General:**

All rates, sums and prices obtained herein shall be in United States Dollars and are exclusive of local Taxes, including Withholding Taxes (WHT) and Value Added Taxes (VAT), if applicable. All other taxes are as defined in the Master Service Agreement. Rates are fixed and firm for the performance of the Services and the duration of the term of this Supplement 13.

Unless otherwise specified in this Supplement 13, the Acquisition Kilometer Rate includes all costs associated with the operation of the Vessel and the agreed equipment and crew including but not limited to all supplies, accommodations and food stores.

CONTRACTOR will submit a summary of accumulated chargeable items to COMPANY upon the completion of demobilization which will be defined as the time at which COMPANY personnel and equipment have been cleared off of the Vessel.

CONTRACTOR is responsible for ensuring full compliance with Maritime crewing requirements in accordance with the Vessel and crewing specification. If there are applicable Maritime crewing requirements beyond the Vessel and crewing specification, CONTRACTOR is responsible for and in control of the negotiating and contracting process to ensure full compliance with Maritime and seismic crewing requirements.

All additional costs, if any, including those related to security and additional chase/security boats on top of what is to be provided by COMPANY, shall be approved in advance by COMPANY prior to incurring such expenses and shall be paid by COMPANY as reimbursable charges if not otherwise specified herein.

The chase/security boat may be used to provide fuel bunkering offshore to the Vessel and to deliver supplies during the survey. However, chase boats will only be used for such purposes in an emergency and only when the Party Chief and Master have given their approval. This will only be granted in an emergency as it is essential that the chase boats stay with the seismic Vessel for security purposes.

CONTRACTOR operations are based on resupply in port, at a 6 week schedule unless otherwise dictated by local requirements.

**Terms of Invoicing and Payment:**

For the performance of the work, COMPANY shall pay to CONTRACTOR the amounts as specified herein.

CONTRACTOR will submit all invoices to COMPANY monthly on the last day of each month or within five (5) businesses days of the following month. Any claims put forward after the fifth (5th) business day of the following month will however still be valid and payable to CONTRACTOR. CONTRACTOR shall present all claims for compensation under this Supplement 13 within 180 days after the expiry of Charter Period.

COMPANY and CONTRACTOR have agreed to a finance/shared revenue arrangement under which all invoices will be payable to CONTRACTOR. Payments will be based on the following terms:

- CONTRACTOR's invoices shall be paid from Net Revenue received from license sales of the GrandSPAN 2 project as follows:
- "Net Revenue" is defined as cash received by COMPANY from license sales of GrandSPAN 2 less any government royalties.

Cost Recovery:

- Revenue sharing from the project revenue: sixty percent (60%) of the revenue to COMPANY and forty percent (40%) of the revenue to CONTRACTOR.
- [COMPANY shall backstop fifty percent (50%) of CONTRACTOR's costs related to the project no later than twelve (12) months after completion of the project.
- COMPANY shall backstop one hundred percent (100%) of CONTRACTOR's costs related to the project no later than twenty-four (24) months after the completion of the project
- CONTRACTOR's "costs" shall be defined as the sum of approved invoices received by COMPANY from CONTRACTOR for the GrandSPAN 2 project.
- CONTRACTOR's costs outstanding after 12 months will incur 7.5% interest per annum
- CONTRACTOR will be provided within 10 business days following quarter end a statement outlining all sales of GrandSPAN 2 data in a format mutually agreed by the parties.
- CONTRACTOR will be provided all executed copies of sales orders, or proof otherwise, within 10 days of execution, for any sales of the GrandSPAN 2 data.
- In the case of the GrandSPAN 2 data being packaged with any other data sold by the COMPANY a minimum sales price of [          ] will be used to value the GrandSPAN 2 data unless mutually agreed upon by both parties.

All funds received from data sales shall be sent to CONTRACTOR within 30 days from the end of the month in which the funds were received.

Before project commencement the Terms of Invoicing and Payments will be reviewed and if economic conditions warrant the terms may be converted to a fee for service or financing arrangement as agreed mutually by both parties.

In case of disputed amounts COMPANY can only withhold disputed amounts, the undisputed invoice amount shall be paid by due date. A deferred payment finance fee of 1.5% per month will be charged for each undisputed and unpaid invoice after the due date.

## Reporting:

Prior to commencing Work COMPANY will provide to CONTRACTOR an estimated delivery schedule for the following, based on the estimated date of demobilization by the Vessel:

- Navigation Merged Shot Records
- PSTM
- PSDM

After the demobilization the COMPANY will provide monthly updates as to any changes to the estimated delivery schedules for the data deliveries listed above.

The COMPANY will send to CONTRACTOR monthly the following reports.
- Sales report showing any new sales of data, by sale and cumulatively
- Revenue for the current month per customer on a line by line basis
- Revenue distribution for the current month for COMPANY, CONTRCTOR, and Host Government

## Evidence of Insurance:

Before performing any of the Services, CONTRACTOR shall provide COMPANY or its designee with certificate or other documentary evidence satisfactory to COMPANY of the insurance and endorsements required under Section 13 of Master Geophysical Services Agreement. COMPANY's acceptance of this certificate does not constitute a waiver, release or modification of any of the insurance coverage's and endorsements required under this Section 13. CONTRACTOR acknowledges that failure to provide a certificate or copy of a policy or other evidence as required by this Appendix 1 will lead to non-payment of CONTRACTOR's invoices.

- COMPANY AND CONTRACTOR hereby agree that the insurance as described in Annex 1 hereto is the insurance that CONTRACTOR will require Vessel Owners to provide for the purposes of this Supplemental Agreement.

## Commercial Rates:

CONTRACTOR shall be paid the applicable Full-Fold per Kilometer rate, for full fold kilometers approved and accepted by COMPANY during the entire Charter Period for the performance of the work/ services.

All Full Fold Kilometers must be approved & signed by COMPANY'S on-board client QC representative daily.

Any decision to retrieve equipment or discontinue shooting due to CONTRACTOR'S inability to meet TECHNICAL SPECIFICATIONS must be approved in-advance by COMPANY'S onboard QC representative.

Unless otherwise specified in this Supplement 13, the mobilization and demobilization fees are inclusive of all costs associated with the Transit of the Vessel and Personnel expenses including but not limited to the following:

- Port call related cost for crew changes, vessels and personnel.
- Fuel consumption during mobilization and demobilization.
- All temporary Vessel importation costs including all agent fees required to operate in the proposed country.
- All personnel visa and training requirements necessary to operate in the proposed country.

## Mobilization, Transit & Demobilization Rate:



**Mobilization Fee:**

**Demobilization Fee:**

The Mobilization Fee is a lump sum and covers all costs incurred by CONTRACTOR, including but not limited to mobilization of all personnel, seismic equipment, consumables necessary to perform the Services, from the time CONTRACTOR is given written approval to commence Mobilization by COMPANY and until the first five (5) kilometers of acquisition is accepted by COMPANY'S Representative of the GrandSPAN 2 survey as described in this Supplement 13.

CONTRACTOR further agrees that the above Demobilization Fee of _____ will be paid only if the Vessel does not proceed directly, or within a mutually agreed timeframe, to another GX Technology project. If the Vessel does proceed to another GX Technology project, then the Demobilization Fee described above will be waived in favor of the Mobilization Fee for the next project. The Mobilization Fee for the next program will be outlined in the next Supplement.

Any delays or time lost, within reasonable control of CONTRACTOR, prior to the Vessel's arrival to or during its departure from the survey area as a result of failure to reasonably complete acceptance tests, place qualified operators on board the Vessel, or as a result of CONTRACTOR failing to provide requisite information requested in this Supplement 13 or necessary for timely acquisition of any visa's, permits or clearances, will not be payable by COMPANY.

Demobilization shall commence immediately on completion of seismic data acquisition to be defined as the last accepted shot point, and will be completed upon disembarking of COMPANY Representative and all survey data. Any time spent carrying out post-survey navigation checks shall be included in demobilization.

## Acquisition Kilometer Rate:

**Per Kilometer Full Fold Rate:**

For the performance of the Services, CONTRACTOR shall be compensated at a Full Fold Kilometer rate for all COMPANY accepted full fold kilometers acquired.

The Per Kilometer Full Fold Rate will commence immediately when the first five (5) kilometers of acquisition is accepted by COMPANY'S Representative. The acquisition shall anyway be deemed accepted when performed in conformity with the technical requirements set out in this Supplement 13.

The Per Kilometer Full Fold Rate is inclusive of all design and operation of the proposed equipment, agency fees, local port charges, import and export of the Vessel, fuel & lubricants and associated logistics thereof, supplies, food supplies, QC processing, tapes, integrated navigation system of CONTRACTOR with operators (including two independent systems (DGPS), all personnel costs and expenses, and all related communications charges from the Vessel and all equipment and materials necessary to perform the Services.

The Per Kilometer Full Fold Rate shall also apply for:

- Time associated with seismic recording and line changes
  - o Line change time is considered chargeable for time in excess of an average of 9 hours per line change accumulated over the total acquisition of the project, and based on a minimum Vessel speed of 4.0 knots. (e.g. 9 hours/line change x the total number of line changes made for the project = the accumulated non-chargeable line change time. Any time in excess of this accumulated total time will be considered chargeable, in so far as it not a result of downtime within CONTRACTOR'S control). CONTRACTOR will maintain as high

a speed as equipment will allow, based on the above description and in so far as industry standard tension levels are maintained.

- Time spent configuring or re-balancing the streamers after mobilization
- Onboard navigation data processing and seismic QC data processing
- All time associated with scheduled crew changes, including Pilot, harbor dues, agent fees and shore rep cost.
- Onboard processing QC equipment and personnel for the provision of onboard seismic QC data processing through brute stack.
- All associated crew cost, food, supplies and shipping expenses unless otherwise stated in this Supplement 13
- All costs for agents, including Vessel, equipment, personnel, supplies and appropriate permits and clearances.

CONTRACTOR shall ensure all tapes are shipped, and shall fully insured against the total costs of re-shooting the data recorded thereon, if both original and copy tape set are lost or unusable. All such cost of insurance is reimbursable to CONTRACTOR. If COMPANY declines to pay for such insurance CONTRACTOR is not obligated to obtain such insurance cover.

The above rates are based on a fuel cost of less than $1,000 USD per metric ton of MGO. Any cost of fuel consumed by the vessels engaged in the survey in excess of this capped value will be reimbursed to CONTRACTOR by COMPANY at cost. This will apply to the fuel consumed by all the vessels engaged in the project, the seismic survey vessel but also the chase vessel(s), from the port of mobilization and back to the port of demobilization.

## Local Content

Local marine crew labor content requirements are estimated as follows and will be billed back at cost plus 3.5%. COMPANY will approve local content provider and costs prior to CONTRACTOR incurring costs per local regulations.

CONTRACTOR will also ensure a Canadian Technical Representative will ride the Vessel during the duration of the project. The initial Representative will be Gaston Sheehy at this time.

## Standby Rate:

## Standby Rate:

The Standby Rate shall apply during time periods data cannot be recorded in accordance with TECHNICAL SPECIFICATIONS in (Schedule 2) due to reasons or conditions considered to be outside the reasonable control of CONTRACTOR and with COMPANY Representatives prior approval, including but not limited to the following reasons:

- Inclement weather, currents or atmospheric conditions preventing the safe recording of data.
- Time spent recording data which are subsequently rejected in accordance with TECHNICAL SPECIFICATIONS in (Schedule 2) ) due to reasons or conditions considered to be outside the reasonable control of CONTRACTOR and with COMPANY Representatives prior approval, including but not limited to the following reasons:
    - Interference from other seismic vessels or oilfield activity.
    - Interference caused by fishing activities, including fishing vessels, fishing equipment, or marine traffic.
    - Interference from any security threat deemed necessary by mutually agreed upon security plan
- Time lost due to restrictions imposed by governmental or military agencies (including neighboring countries) and third party pressure groups, provided CONTRACTOR has not caused the restrictions

to be imposed; any downtime associated with non-compliance with the GOA or CNLOPB requirements will not be chargeable.
– Delays caused by proximity of wildlife (marine mammals and other protected species) as a result of stipulations provided in project specific permits, regulatory requirements, or local regulations
– Time lost due to Vessel and Crew having to maneuver away from a specific security threat. COMPANY's onboard QC representative will be advised immediately on any potential threat.
– Time spent during scouting (to include time spent scouting the survey area prior to Vessel acquiring data as part of mobilization agreement).
– Navigation stand-by occasioned by inappropriate satellite geometry or by the inherent operating constraints of positioning system, including sky wave, weather interference or other atmospheric effects.
– Delays caused by collision of in-water seismic equipment with flotsam, jetsam and other debris and time spent repairing damages caused by same provided damages were not the result of CONTRACTOR or CONTRACTOR's subcontractor's negligence.
– Third party interference including but not limited to vessel activity, static hazards and extraneous sources of acoustic noise, notwithstanding efforts of chase/escort vessel to minimize the same.
– Time spent awaiting environmental restrictions.
– Time lost as a result of damages to in-sea equipment caused by uncharted obstructions.
– Time lost due to default or damage to COMPANY provided equipment.
– Equipment recovery before any of the above occurrences and also re-streaming, returning and re-calibration after such periods.
– Time spent on port call requested by COMPANY, for any reason other than to remedy a CONTRACTOR downtime situation.
– Excess time spent on extended line changes, as described above
– The first 72 hours for alternating crew change port calls based on the Canadian regulated 28 day crew rotation mandate. On all other crew changes the 1st 24 hours will be chargeable standby. This clause will not apply if the six – week exemption is granted by Canadian authorities.
– If the clause above does not apply due to the exemption given by Canadian authorities the 1st 24 hours during regular port calls due approximately every six weeks will be chargeable

During periods of standby at Standby Rate and subject to acceptance from COMPANY, CONTRACTOR may perform necessary maintenance and repair of equipment so long as it does not extend the standby time past that required by the original event.

The Standby Rate shall not apply if Data cannot be recorded due to reasons regarded as Technical Downtime Periods, and the Standby Rate shall in such situations commence (if no other day rate is applicable) after the Technical Downtime Period ceases and COMPANY has been returned to an equally favorable position.

Notwithstanding the above, the Standby Rate shall apply during time periods CONTRACTOR is prevented from making repairs by virtue of one or more of the standby conditions listed above (and then the Standby Rate shall apply in lieu of the Technical Downtime Period from the point in time CONTRACTOR is prevented from making such repairs. Once the standby condition has cleared, the Standby rate shall cease and the Technical Downtime Period shall commence again, until and COMPANY has been returned to an equally favorable position from the time the initial Technical Downtime Period began.)

## Technical Downtime Periods:

Except as otherwise set out in this Supplement 13, the Mobilization/Demobilization Fee, Standby Rate, and/ or Per Kilometer Full Fold Rate shall not apply during time periods of "Technical Downtime" within CONTRACTOR'S control, and no compensation will be paid to CONTRACTOR during such periods.

"Technical Downtime Period" is time lost due to CONTRACTOR'S Vessel, Vessel equipment, recording electronics, seismic cables, airgun source, cable handling equipment, system software or navigation

equipment or any other equipment, systems, or software that are inoperable or fail to meet survey specifications, unless approved by COMPANY'S onboard QC representative.

Any delays or time lost, within reasonable control of CONTRACTOR, prior to the Vessel's arrival to or during its departure from the survey area as a result of failure to reasonably complete acceptance tests, place qualified operators on board the Vessel, or as a result of CONTRACTOR failing to provide requisite information necessary for timely acquisition of any visa's, permits or clearances, will be recognized as "Technical Downtime Period".

### The Acquisition Kilometer Rate and Standby Rate shall NOT include:
– Technical Downtime Periods as described above
– Delays caused by collision of Vessel with any obstructions, catastrophic failures, or any time spent repairing resultant damages. (including engines, compressor, or hull failures etc.) Catastrophic failures are defined as interruptions or significant slowdowns in crew performance due to breakdown of Vessel or machinery including but not limited to compressors; Vessel propulsion, steering or ship's power.
– Re-shoots due to CONTRACTOR error or negligence
– CONTRACTOR engaging in time-sharing or standby time without the expressed consent of COMPANY QC representative.
– CONTRACTOR not receiving prior approvals from COMPANY's on-board rep for extended periods of downtime

CONTRACTOR agrees to draft third party contracts to reflect extended periods of downtime. Extended periods of downtime due to CONTRACTOR's Vessel, equipment or catastrophic failures will not be reimbursable cost to CONTRACTOR.

### Reimbursable Charges:

Where the following additional services are provided by CONTRACTOR, the reimbursable charges will be paid by COMPANY monthly and will be billed at cost +5% to COMPANY, unless otherwise stated, in accordance with the terms set out above. Items requested by COMPANY in writing for logistics purposes such as specifically requested agency services, shipping of third party equipment, or other pass through charges will be invoiced separately from other charges monthly and is payable within 30 days.

All reimbursable items provided at the request of COMPANY must be approved in writing (e-mail acceptable) by COMPANY prior to incurring such expense, and CONTRACTOR shall not be obliged to provide such reimbursable services/ items before approved by COMPANY in writing.

Unless, otherwise described above, reimbursable charges will consist of:

- All items provided at the request of COMPANY.
- Additional personnel at the request of COMPANY or due to regulatory requirements.
- Fuel charges in excess of ▮▮▮▮▮▮, for acquisition and standby periods (at cost, without markup).
- Tape Shipment:
  - CONTRACTOR shall insure all tapes shipped, and shall fully insure against the total costs of re-shooting the data recorded thereon, if both original and copy tape set are lost or unusable. All such cost of insurance is reimbursable to CONTRACTOR.
  - All navigation and streamer/source positioning data tapes shall be shipped to COMPANY.
- Tape copies charged at ▮▮▮▮▮▮▮▮
- Communications:
  - VSAT communications charges up to ▮▮▮▮▮▮▮▮

**Notifications:**

Any notifications in regards to this this Supplement shall be made to the following:

**Cobra Energy Services**
**10550 Bissonnet, Suite 100**
**Houston, Texas 77099**
**Attn: Mr. Marcus Pullicino**
**713-728-6266**

**GX Technology Corporation**
**2105 CityWest Blvd #400**
**Houston, TX. 77042**
**Attn: Shawn M Rice**
**1-281-781-1080**

## HSE:

CONTRACTOR agrees to perform a Comprehensive Project Risk and Hazard Assessment that takes in account the hazards of operating in the project specific areas the hazards and control measures should be agreed upon by subcontractors and any third party service providers.

COMPANY may undertake an independent HSE and technical audit whilst the Vessel is in port and/or when in an operational condition on location. COMPANY may refuse to accept the Vessel if the HSE audit reveals major deficiencies.

As a minimum requirement, CONTRACTOR shall comply with the standards set by the OGP (formerly E&P Forum) Health and Safety Schedules and training guidelines, the IAGC Safety Manual for Marine Geophysical Operations, the Canada-Newfoundland and Labrador Offshore Petroleum Board standards, and Geophysical Operations Authorization requirements.

CONTRACTOR shall be solely responsible for the security of the Vessel and personnel in addition to the health and safety of its agents, employees and subcontractors' employees engaged in the work. CONTRACTOR and its subcontractors shall comply with all applicable health, environment and safety standards, codes and regulations; whether defined by the Government/Federal regulatory bodies, COMPANY or COMPAMNY's clients (whichever are the most stringent). If such standards, codes or regulations do not adequately protect against hazards arising from the work, CONTRACTOR shall adopt appropriate practices.

CONTRACTOR shall take all reasonable precautions to protect the environment during the performance of work as outlined in the contract. The responsibilities of CONTRACTOR shall include, but not be limited to the prevention of pollution caused by CONTRACTOR'S equipment and materials, as well as protection of marine mammals and other wildlife.

CONTRACTOR shall exercise due care, skill and diligence and take all necessary measures and precautions to ensure that in the execution of the work, safe working practices are observed and that human life and property is not destroyed, injured, or put in any danger. Consequently, CONTRACTOR's responsibilities include but shall not be limited to:

- Implementation of a management strategy directed at providing a safe operations at the worksite;
- Safety of its Vessel and Personnel;
- Training of its personnel to ensure safe operations;
- Maintenance of its equipment and materials in safe running order and regular inspection of the same to ensure safe and uninterrupted operations; and
- Compliance with all applicable laws & regulations.

CONTRACTOR shall promptly furnish COMPANY full reports of any incidents involving CONTRACTOR'S agents, employees or property connected with the work and shall update such reports as reasonable necessary. Such reports and updates shall contain a description of the circumstance of any personal

GrandSpan 2                          Page 11 of 20                          January 17, 2019

injury, treatment provided, number of restricted or lost work days, and the date of return to work and description of any lasting impairment. CONTRACTOR shall endeavor to provide similar reports to COMPANY for all its subcontractors.

## APPENDIX 1: Insurance Requirements

Without limiting the indemnity obligations or liabilities of CONTRACTOR or its insurers, CONTRACTOR at their sole expense, shall maintain the following insurances as long as this Agreement is in force:

(1) Hull and Machinery insurance shall be provided for the Vessel by the Owner, including the equipment to be supplied in the performance of Services with navigation limits adequate for the Vessel's, in an amount equal to the full market value of the Vessel on a form at least equivalent to the American Institute Hull Clauses 6-2-77 Form (including 4/4 Collision Liability and damage to fixed or floating objects unless otherwise provided under Protection and Indemnity Insurance).

(2) Full Form Protection and Indemnity Liability or Marine Liability insurance including coverage for injuries to or death of masters, mates, and crew, collision liabilities, damage to fixed and floating objects not covered under Hull and Machinery and pollution liabilities in an amount equivalent to the cover provided by members of the International Group of Protection and Indemnity Associations. The obligation to insure for loss of life or bodily injury to crew of Vessel may be covered by extension of Workers' Compensation and Employer's Liability insurance.

(3) Civil Liability – Insurance pursuant to Article 7 of the International Convention on Civil Liability for Bunker Oil Pollution Damage (2001) evidenced in the form of a certificate issued in favor of Canada-Newfoundland & Labrador Offshore Petroleum Board to be provided by Vessel Owner.

(4) Worker's Compensation and Employer's Liability Insurance in compliance with the laws of all jurisdictions in which the Services under this Agreement are performed covering all persons employed in the performance of such Services by each party.

Owner is required to provide Canada-Newfoundland & Labrador Offshore Petroleum Board with a certificate of insurance evidencing each of the coverage's above. Each certificate shall provide that a Waiver of Subrogation is granted in favor of Canada-Newfoundland & Labrador Offshore Petroleum Board and is subject to the policy terms, conditions and exclusions. Certificates are required to indicate that should the described policy be cancelled before the expiration date thereof, notice will be delivered to the Board in accordance with the policy provisions.

**APPENDIX 2: Project Map**





**APPENDIX 3: Vessel Specifications**



Hai Yang Shi You 760 is built with the typically high standard at Shanghai shipyards in 2015. It has an overall length of 84.8 meters and width 18.4 meters. It is equipped with the latest proven equipment.

HYSY760 is equipped for 1×15000 meters or 4×8000 meters streamers and has maximum capacity of 8 strings with high-pressure air guns. Propulsion and compressors are all diesel
-driven, with all rotating machinery resiliently mounted to ensure hydro-acoustic noise is kept to a minimum. The hull and propulsion system is designed specifically for extremely low noise level.

The specification gives extra importance on the seismic equipment and the related seismic systems onboard.

## 1.1. GENERAL SPECIFICATION

### 1.1.1. Flag & Port of Registry

The Vessel is flying under the flag state and Port or Registry of China-Tianjin.

### 1.1.2. Classification

The Vessel is registered and shall be maintained to meet the minimum requirements of CCS, CSA research ship Ice Class B3 Helicopter Facilities Clean.

### 1.1.3. Regulations

The Vessel shall be maintained in full compliance with all International Conventions, Resolutions and their latest amendments, in addition to applicable flag state requirements. These includes, but not limited to:

(A). National Authorities rules and regulations for unlimited trades.

(b). Safety requirements regarding general arrangement, mechanism and safety equipment for seagoing Vessels.

(c). SOLAS 1997 with later amendments including ISPS code. (d). Load Line Convention 1966,
with amendments.

(e). MAPROL 1973/1978 Regulations, with amendments. (f). International Safety
Management Code.

(g). International Convention on Tonnage Measurements 1969.

(h). International Convention for Preventing Collision at Sea 1972, with amendments.

Page 15 of 20



(i). STCW 1995, with amendment.

(j). Rules and regulations governing navigation through the Panama Canal and Suez Canal, including its Tonnage Regulations.

(k) The Vessel shall be equipped for area A3 acc. to GMDSS rules, and according to International registration 1973 and Radio regulations 1982.

(l). All necessary certificates in original forms will be kept on board. Copies to be made available in shore based office.

## Project Overview

| | General Information | |
|---|---|---|
| 1. | Project name | GrandSPAN 2 |
| 2. | Client name | GX Technology |
| 3. | Contractor name | China Oilfield Services (COSL) |
| 4. | Vessel(s) | M/V HAI YANG SHI YOU 760 |
| 5. | Location | Atlantic Ocean Canada (Offshore Labrador) |
| 6. | Water depths | 200 – 4000 meters |
| 7. | Desired acquisition time period | June-2019 to October-2019 |
| 8. | Estimated project duration | 4 months |

## APPENDIX 4: Seismic Parameters

### Project Summary

| | Parameter | Specification |
|---|---|---|
| 1. | Acquisition method | Streamer |
| 2. | Number of vessels | 1 |
| 3. | Vessel configuration | 2D / 1C |
| 4. | Survey type | 2D (Basin reconnaissance) |
| 5. | Nominal fold coverage | 120 |
| 6. | Acquisition speed (planned) | Not to exceed 4.8 knots (BSP) |
| 7. | Time zone for reporting | UTC |
| 8. | Comments: Vessel speed (BSP) limited to minimize noise from source wrap-around. Vessel speed limitations maybe modified at discretion of COMPANY SUPERVISOR. | |

## Recording System & Streamers

| | System / Parameter | Specification |
|---|---|---|
| 1. | Manufacturer and type | Sercel SEAL Sentinel (SSAS) |
| 2. | Number of streamers | 1 |
| 3. | Active Streamer Length | 12,000 m |
| 4. | Length of active section | 150 m |
| 5. | Receiver Group Interval | 12.5 m |
| 6. | Nominal Streamer Depth | 15.0 m |
| 7. | Number of active sections per streamer | 80 |
| 8. | Number of receiver groups per section | 12 |
| 9. | Number of receiver groups per streamer | 960 |
| 10. | Hydrophone type | Sercel flexible hydrophone |
| 11. | Number of Hydrophones per group | 8 |
| 12. | Group Sensitivity | -194.1 dB re 1 V/µPa ±1 dB (19.7 V/bar) |
| 13. | Comments: | |

## Recording Parameters

| | System / Parameter | Specification |
|---|---|---|
| 1. | Acquisition System | Sercel SEAL 408 (software v5.2.17) |
| 2. | Number of Seismic Channels | 960 |
| 3. | Number of AUX channels | Maximum= 60 |
| 4. | Record length | 18,100 milliseconds (including 100ms delay) |
| 5. | Continuous recording required | N/A |
| 6. | Start of data delay | 100 milliseconds (in order to capture rise in pulse on NFH) |
| 7. | Sample rate | 2 milliseconds |
| 8. | Low-cut filter (Analog) | 3Hz – 6dB/Oct (SEAL active sections) |
| 9. | Low-cut filter (Digital IIR) | OUT |
| 10. | Low-cut filter (Combined) | 3Hz – 6dB/Oct |
| 11. | DC Offset | On |
| 12. | Anti-alias filter | 0.8 Nyquist (200 Hz, 370 dB/octave) |
| 13. | Anti-alias filter type | Linear |
| 14. | Pre-amplifier gain | 0dB |
| 15. | Polarity | SEG Standard |
| 16. | Seismic data media | IBM 3592 compatible |
| 17. | Seismic data format | SEGD 8058 IEEE Floating Point |
| 18. | External header size | 4096 bytes |
| 19. | Comments: External header to include concatenation of information from INS | |

Energy Source
**Technical Specifications**

| | System / Parameter | Specification |
|---|---|---|
| 1. | Source controller manufacturer and type | DigiShot |
| 2. | Airgun manufacturer and type | Sercel GII-Gun |
| 3. | Air compressors | 3 x LMF 51 / 138-207 D (1801cfm ea.) |
| 4. | Number of source arrays | 1 |
| 5. | Number of sub-arrays per source | 4 |
| 6. | Nominal source array volume | 4860 cubic inches |
| 7. | Nominal operating pressure | 2000 psi |
| 8. | Peak-to-Peak Output (DFS-V: Out – 128Hz 72dB/Oct) | 155.4 bar-m (at 20°C water temperature) |
| 9. | Peak-to-Bubble Ratio (DFS-V: Out – 128Hz 72dB/Oct) | 21.4  (at 20°C water temperature) |
| 10. | Shot point interval | 50 m |
| 11. | Nominal inline seismic offset (COS-CNG) | 120 m or less |
| 12. | Centre of source array separation | N/A |
| 13. | Sub-array cross-line separation | 8.0 m |
| 14. | Nominal source array depth | 10.0 m |
| 15. | Number of pressure indicators per sub-array | Minimum 1 per sub-array |
| 16. | Number of depth indicators per sub-array | Minimum 3 per sub-array |
| 17. | Number of near field hydrophones per sub-array | 1 per gun station or cluster preferred (minimum 3 NFH per sub-array) |
| 18. | Number of RGPS units per sub-array | Minimum 1 per sub-array |
| 19. | Number of acoustic devices per sub-array | N/A |
| 20. | Firing sensor type | Solenoid / MP Time Break |
| 21. | Timing resolution | 0.1 ms |
| 22. | Synchronization | Tolerance based on individual gun volume: <200cuin better than ± 1.0ms >200cuin better than ± 2.0ms |
| 23. | Near Field Hydrophone data | Recorded by Sercel system and appended to seismic data AUX channels |
| 24. | NFH record length | >9 seconds (or as per system limitations) |
| 25. | NFH sample rate | 2 milliseconds |
| 26. | NFH polarity | SEG |
| 27. | NFH data format | SEGD 8058 IEEE Floating Point |
| 28. | Comments: Near field hydrophone data shall be appended to seismic data shot records as AUX channels | |

**Source Drop-Out Criteria**

| | Parameter | Specification |
|---|---|---|
| 1. | Filter settings | SEAL 3/6 - 200/370 |
| 2. | Allowed loss in peak amplitude | ≤ 10% |
| 3. | Allowed change in peak-bubble-ratio | ≤ 15% |

| | | |
|---|---|---|
| 4. | Normalized cross-correlation coefficient | ≥ 0.998 |
| 5. | Average spectral deviation (0-70Hz) | ≤ ± 1.50 dB |
| 6. | Maximum spectral deviation (0-70Hz) | ≤ ± 2.50 dB |
| 7. | Drop-out table | Refer to Appendix 5 |

Page 19 of 20

**Appendix 5: GAP Analysis – Ship Owners outstanding actions to be addressed prior to the acceptance of the Vessel for this survey.**

## Supplemental Agreement No. 5
## To
## Master Geophysical Services Agreement No. <u>11195</u>

 **ORIGINAL**

This Supplemental Agreement No. 5 ("Supplement 5") is entered into as of the 21ˢᵗ day of April, 2014, between GX Technology Corporation located at 2105 City West Boulevard, Houston, Texas 77042 (the **"COMPANY"**) and Cobra Energy Services, S.A. a Panamanian corporation whose registered office is at the World Trade Center, 1° Piso Area Commercial, Calle 53, Marbella, Panama City, Republica de Panama (the **"CONTRACTOR"**) subject to the following:

1. **Master Agreement**. This Supplement 5 is entered into pursuant to the Master Geophysical Service Agreement between the COMPANY and CONTRACTOR dated 22ⁿᵈ July, 2011 **(**the "Master Agreement"), the terms of which are incorporated herein by reference and attached hereto.

**Content: ComorosSPAN**

**This Supplement 5 consists of the following documents;**
- Scope of Work
- General Description of the Services
- Rates and Compensation
- Terms of Payment and invoicing
- Commercial Rates
- HSE
- APPENDIX 1- Insurance Requirements
- APPENDIX 2- Project Map
- APPENDIX 3- Recording Parameters, Source, Navigation System and Vessel Specification

**The following documents will be made available to CONTRACTOR:**
- Schedule 2: Marine Seismic Acquisition Order
  - Seismic Specifications
  - Gravity & Magnetic Requirements
  - Onboard – QC Processing
  - Airgun Array
- Schedule 3: Project QHSE Policies & Reporting Requirements

**Master Geophysical Service Agreement**
In the event of any conflict between the provisions of the above documents, they shall be given priority in the order listed above.

| COMPANY | CONTRACTOR |
|---|---|
| GX Technology Corporation | Cobra Energy Services, S.A. |
| BY: | BY: |
| NAME: KEN WILLIAMSON | NAME: |
| TITLE: GVP + COO GGeventures | TITLE: Consultant |
| DATE: 04/21/2014 | DATE: 4/15/2014 |

**EXHIBIT**
**Cobra 4**

**Scope of Work:**

**GENERAL:**

This Supplement 5 is entered into between COMPANY and CONTRACTOR (as defined above), through which the CONTRACTOR agrees to deliver and make available the vessel M/V Discoverer (the "Vessel") and equipment listed in Appendix 2 below and the attached schedules 2 and 3. The equipment and services needed to acquire a regional seismic program offshore East Africa "ComorosSPAN" consisting of approximately 6,930 kilometers as illustrated in Appendix (2).

This Supplemental Agreement is based on the terms and conditions below:

The actual line locations and line kilometers may vary from those shown in the project specific schedules (Schedule 2) as a result of environmental or permit restrictions, acquisition obstacles, and map inaccuracies, any changes in governmental agencies or lease holder restrictions or requirements.

The "Charter Period" commences immediately upon departure from Durban, South Africa to transit to the project area. CONTRACTOR will need to provide all requisite Vessel specific permits and, evidenced by receipt of a Maritime and Coast Guard clearance letters, customs clearance for temporary importation of crew and Vessel, visas for the crew, and all project specific security requirements including security plans, vessels, equipment and personnel required to maintain a safe passage and efficient operations.

The Charter Period continues until demobilization of the Vessel is completed, including demobilization of COMPANY provided equipment, Company Representative and Survey Data at an agreed safe port or at such port as shall be mutually agreed.

The program will be acquired based on the terms and conditions below:

CONTRACTOR is directly responsible for the proper Vessel certification, insurance and inspections that are required to operate in the proposed project area/ waters. Specifically, the CONTRACTOR will:

- The CONTRACTOR will manage the daily security requirements and direct and instruct the security guards and vessels with daily instructions necessary to maintain safe operations during this Charter Period. CONTRACTOR has the authority to cease all operations immediately if security conditions are deemed unsafe to continue operations in the proposed project areas.

- CONTRACTOR shall, at its cost deliver the MV Discoverer with approved regulatory certification required to operate safely in the proposed waters. The crew will have received the required training –if required as per the regulatory requirements.

- CONTRACTOR'S Vessel shall arrive at the first site of acquisition for the performance of work with sufficient supplies and experienced personnel to perform the services as set out in the Scope of Work. Once acquisition begins, CONTRACTOR shall remain on the project, except for crew change, refueling and re-supplying until the survey is completed.

- CONTRACTOR will provide information to COMPANY as outlined in the "Project Schedules" for the proposed survey.



– CONTRACTOR agrees to a Vessel inspection and Technical audit of the seismic equipment by COMPANY or 3rd party auditors.

**General Description of the Services:**

Except for the Company Provided Equipment and the reimbursable services/items, the CONTRACTOR shall, at its cost, provide experienced operators of the seismic equipment as well as the materials necessary to perform the Services as specified in detail in Schedules 2 and 3. CONTRACTOR shall undertake the acquisition of seismic and its navigation/positioning data, gravity and magnetic data, as well as onboard QC seismic processing in accordance with the technical specification requirements contained in the applicable attachments hereto and in a manner consistent with generally accepted standards of the industry, including operation of equipment within the limits of its generally accepted capability. Survey acquisition parameters and operating specifications are listed in Schedule 2. Accurate offshore positioning is the responsibility and duty of the CONTRACTOR. The primary and secondary navigation systems shall be two independent DGPS systems.

CONTRACTOR agrees to provide a proper workboat with certified operators to maintain in-water seismic equipment at all times. The Party Chief and Captain will supervise and give instruction to its maritime crew and seismic personnel and all Sub-Contractors concerning security issues, regulatory compliance and proper performance of the services: including; HSE objectives & Emergency Response Planning, project planning, vessel tracking, quality control, work locations and Security of personnel & vessels or any other matters required to perform the Services properly and cost effectively. The assigned Party Chief shall personally inspect all facets of the operation at least once every 24 hours.

CONTRACTOR agrees to provide significant spare equipment for the Vessel as per the "critical spare list "required by the Vessel's classification. There shall be 20% of spare seismic equipment to maintain the agreed upon in-water equipment. The spare equipment list should be made available to COMPANY's on-board Rep. CONTRACTOR agrees to notify on-board Rep with any problems or delays associated the operation of the Vessel.

CONTRACTOR is responsible for ensuring the Vessel and her complement are in all regards adequate and in full compliance with the regulatory requirements that are applicable to the Vessel and her operation in the intended waters. This includes Vessel and Port and operational security requirements, Vessel documentation, logistical support and similar expenses unless otherwise specifically provided for in this supplement.

CONTRACTOR is responsible for ensuring the crew and CONTRACTOR's subcontractors are fully trained, properly certificated, suitably experienced and medically fit for the intended voyage and program. Copies of resumes and fitness certifications for proposed crew shall be furnished to COMPANY for review prior to program commencement or crew change. The CONTRACTOR is responsible for any delay, downtime, and/or costs directly attributable to the engagement of medically unfit or improperly certificated individuals.

COMPANY may request replacement of any of CONTRACTOR's crew where in the opinion of COMPANY such are considered to be unsuitable for the intended voyage or program. CONTRACTOR will then promptly arrange a suitable alternate.

CONTRACTOR shall continuously inform COMPANY concerning the serviceability of the Vessel and all CONTRACTOR equipment used or likely to be used in the survey. More specifically, the Party Chief, Master, and Chief Engineer shall immediately inform the COMPANY



Representatives of any and all ship or equipment deficiencies affecting or potentially affecting the delivery of the program.

CONTRACTOR will ensure Vessel's ability to operate in designated project area under Comoros standards- if required. This will include but is not limited to passing audits onboard the Vessel from Local Regulatory agencies, or any other requirement deemed necessary by governing agencies for operations in the project area. Cost associated with preparing the vessel to meet these standards will be at CONTRACTOR's expense.

**Rates and Compensation:**

**General:**

All rates, sums and prices obtained herein shall be in United States Dollars and are exclusive of local Taxes, including Withholding Taxes (WHT) and exclusive of Value Added Taxes (VAT) tied to CONTRACTOR Revenue or COMPANY expense for acquisition, if applicable. All other taxes are as defined in the Master Service Agreement. Rates are fixed and firm for the performance of the services and the duration of the term of this Supplemental 5.

Unless otherwise specified in this Supplement 5, the Acquisition Kilometer Rate includes all costs associated with the operation of the Vessel and the agreed equipment and crew including all supplies, accommodations and food stores.

CONTRACTOR will submit a summary of accumulated Chargeable items to COMPANY on the last day of each month or within five (5) businesses days of the following month.

CONTRACTOR is responsible for ensuring full compliance with Maritime crewing requirements in accordance with the Vessel and crewing Specification. If there are applicable Maritime crewing requirements beyond the Vessel and Crewing Specification, CONTRACTOR is responsible for and in control of the negotiating and contracting process to ensure full compliance with Maritime crewing requirements.

Accommodations and office space for on-board COMPANY Representative(s) must be provided for a 24 hour on-call duty, the location will be agreed upon prior to Vessel departure.

- Bunk space required will include one GXT Rep, one Grav/Mag operator, one HSE, two MMO's and up to two PAM operators

CONTRACTOR is responsible for planning, coordinating, and implementing the requisite security operation and is in control of all aspects of said operation with regards for the safe and efficient acquisition of the Scope of Work.

All costs, if any, related to Security and Chase boats shall be approved in advance by COMPANY prior to incurring such expenses and shall be paid by COMPANY as reimbursable charges. The Chase boat shall safeguard the operations performed by the Vessel in accordance with instructions from the Party Chief of the Vessel.

The Chase boat may be used to provide fuel bunkering offshore to the Vessel and to deliver supplies during the survey. However, Chase boat will only be used for such purposes and only when the Party Chief and Master have given their approval. This will only be granted in an emergency as it is essential that the chase boat stays with the seismic Vessel.



CONTRACTOR operations are based on resupply in port, at a 6 week schedule.

## Terms of Invoicing and Payment:

For the performance of the work, the COMPANY shall pay to the CONTRACTOR the amounts as specified herein.

CONTRACTOR will submit all invoices to COMPANY monthly on the last day of each month or within five (5) businesses days of the following month. Any claims put forward after the fifth business day of the following month will however still be valid and payable to CONTRACTOR. CONTRACTOR shall present all claims for compensation under this Supplement 5 within 90 days after the expiry of Charter Period.

Option 1:

All invoices will be payable to CONTRACTOR within forty-five days (45) of receipt by COMPANY. In case of disputed amounts COMPANY can only withhold disputed amounts, the undisputed invoice amount shall be paid by due date. A deferred payment finance fee of 1% per month will be charged for each undisputed and unpaid invoice after the due date.

If COMPANY has not exercised this option by C.O.B., 40 days following receipt of the first acquisition invoice for ComorosSPAN from CONTRACTOR, then Option 2 will automatically apply.

Option 2:

COMPANY and CONTRACTOR have agreed to a finance/shared revenue arrangement under which all invoices will be payable to CONTRACTOR. Payments will be based on the following terms:

- CONTRACTOR will carry all costs associated with the Vessel, Crew, and Vessel Operations, and approved reimbursables, which shall be invoiced monthly as described above.
- COMPANY will carry other 3rd party costs, including Chase Vessel, Gravity & Magnetic acquisition and processing, 3rd Party Security, MMO's, PAM, QC, and HSE personnel ("COMPANY'S Cost").
- COMPANY shall license the ComorosSPAN project to third parties and CONTRACTOR's invoices shall be paid from Net Revenue. Net Revenue is defined as the income received from licensing the ComorosSPAN project.
- The Parties shall share all Net Revenue received from the sale of licenses to the ComorosSPAN as follows:
  - CONTRACTOR receives 80% of Net Revenue until CONTRACTOR's Cost Recovery is achieved. ("CONTRACTOR's Cost Recovery shall be defined as when the sum of the approved invoices received from CONTRACTOR for this project plus a 5% premium equals the share of revenue due to CONTRACTOR).
  - COMPANY receives 20% of Net Revenue until CONTRACTOR's Cost Recovery is achieved.
  - Following CONTRACTOR's Cost Recovery, COMPANY shall receive 100% of Net Revenues until COMPANY's Cost Recovery is achieved. COMPANY's Cost Recovery shall be deemed to occur when all ComorosSPAN revenue due to COMPANY is equal to COMPANY's Cost.



- o Following COMPANY's Cost Recovery, CONTRACTOR will receive a 20% trailing royalty on all additional net revenues received for ComorosSPAN.

- Option. COMPANY has the Option to buy the trailing royalty from CONTRACTOR under the following terms:
  - o COMPANY pays CONTRACTOR for all approved invoices as described above, plus a 10% premium.
  - o Option period will terminate on COB, January 1, 2015.
  - o If COMPANY has not exercised the Option by COB, January 1, 2015, then the terms of the trailing royalty as described above will remain in full effect.
- Any and all revenues generated from the licenses of the ComorosSPAN data acquired under this agreement, will be recognized for their proper value (a minimum sale price is defined as US$350/km) with respect to CONTRACTOR cost recovery and/or trailing royalty obligations, including but not limited to reduced pricing deals, packaged or other licenses, or give-away arrangements.
- The COMPANY will try to sell user licenses for the Seismic Data at the minimum sale price of $350/km, but reserves the right to sell them at lower price depending on the specific and general conditions of the market with notification to the CONTRACTOR.

CONTRACTOR will be paid within thirty days (30) of receipt by COMPANY of license fees associated with this project.

COMPANY will provide CONTRACTOR with a monthly sales statement for all data licensed for the ComoroSPAN project.

In case of disputed amounts COMPANY can only withhold disputed amounts, the undisputed invoice amount shall be paid by due date. A deferred payment finance fee of 1% per month will be charged for each undisputed and unpaid invoice after the due date.

**Evidence of Insurance:**

Before performing any of the Services, CONTRACTOR shall provide COMPANY or its designee with certificate or other documentary evidence satisfactory to COMPANY of the insurance and endorsements required under Section 13 of Master Geophysical Services Agreement. COMPANY's acceptance of this certificate does not constitute a waiver, release or modification of any of the insurance coverage's and endorsements required under this Section 13. CONTRACTOR acknowledges that failure to provide a certificate or copy of a policy or other evidence as required by this Appendix 1 will lead to non-payment of CONTRACTOR's invoices.

- – COMPANY AND CONTRACTOR hereby agree that the insurance as described in Annex 1 hereto is the insurance that CONTRACTOR will require Vessel Owners to provide for the purposes of this Supplemental Agreement.

**Commercial Rates:**

CONTRACTOR shall be paid the applicable Full-Fold per Kilometer rate, for full fold kilometers approved and accepted by COMPANY during the entire Charter Period for the performance of the work/ services.



All Full Fold Kilometers must be approved & signed by COMPANY'S on-board client QC rep daily.

Any decision to retrieve equipment or discontinue shooting due to CONTRACTOR'S inability to meet TECHNICAL SPECIFICATIONS must be approved in-advance by the COMPANY'S onboard QC representative.

Unless otherwise specified in this Supplement 5, the Mobilization and De-mobilization fees are inclusive of all costs associated with the Transit of the Vessel and Personnel expenses including the following:

- Port call related cost for crew changes, vessels and personnel.
- Fuel consumption during mobilization and demobilization.
- All temporary Vessel importation costs including all agent fees required to operate in the proposed country.
- All personnel visa and training requirements necessary to operate in the proposed country.

### Mobilization & Demobilization Rate:

**Mobilization Fee:**                          (lump sum)

**Demobilization Fee:**                        (lump sum)

The Mobilization/Demobilization is a lump sum and should cover all costs incurred by CONTRACTOR, including but not limited to mobilization of all personnel, seismic equipment, consumables necessary to perform the Services, from point of origin to the survey area, calibration of all instrumentation necessary for the performance of the Services, navigation system offshore calibration in the survey area, deployment of the guns and streamers in the survey area, streamer balancing and source testing.

Demobilization shall commence immediately on completion of seismic data acquisition in the survey area and will be completed upon disembarking of the COMPANY Representative and all survey data. Any time spent carrying out post-survey navigation checks shall be included in demobilization.

CONTRACTOR agrees that the above Demobilization Fee                          will only be paid if the vessel proceeds directly to another GXT Project and can be credited against mobilization to that next project. If for whatever reason the next project does not follow directly, or within a mutually agreeable time period, then COMPANY agrees to pay a demobilization fee equal to

### Acquisition Rate:

**Per Kilometer Full Fold Rate:**              **per full fold kilometer (acquired and accepted)**

For the performance of the Acquisition Services, CONTRACTOR shall be compensated at a Full Fold Kilometer rate for all COMPANY accepted full fold kilometers acquired.



The Per Kilometer Full Fold Rate will commence immediately when the first five (5) kilometers of acquisition is accepted by COMPANY'S Representative. The acquisition shall anyway be deemed accepted when performed in conformity with the technical requirements set out in this Supplement 5.

The Per Kilometer Full Fold Rate is inclusive of all supplies, stores, fuel & lube and tape copying, CONTRACTOR's integrated navigation system with experienced operators, (including dual independent DGPS), agent fees, all personnel costs and expenses, and all related communications charges from the Vessel and all equipment and materials necessary to perform the Services.

The Per Kilometer Full Fold Rate shall also apply for:

- Time associated with seismic recording and line changes
- Time spent configuring or re-balancing the streamers after mobilization
- Onboard navigation data processing and Seismic data QC processing
- All time associated with scheduled crew changes, including Pilot, harbor dues, agent fees and shore rep cost, unless as otherwise described below.
- Onboard processing QC equipment and personnel for the provision of onboard seismic QC Data Processing thru brute stack.
- All associated crew cost, food, supplies and shipping expenses
- All costs for agents, including Vessel, equipment, personnel, supplies and appropriate permits and clearances.

CONTRACTOR shall insure all tapes shipped, and shall fully insure against the total costs of re-shooting the data recorded thereon, if both original and copy tape set are lost or unusable. All such cost of insurance is reimbursable to CONTRACTOR. If COMPANY declines to pay for such insurance CONTRACTOR is not obligated to obtain such insurance cover.

**Standby Rate:**

**Standby Rate:** ▮▮▮▮▮▮▮▮ **per hour**

The Standby Rate shall apply during time periods data cannot be recorded in accordance with TECHNICAL SPECIFICATIONS in (Schedule 2) due to reasons or conditions considered to be outside the reasonable control of CONTRACTOR and with COMPANY Representatives prior approval, including but not limited to the following reasons:

- Inclement weather, currents or atmospheric conditions preventing the safe recording of data.
- Time spent recording data which are subsequently rejected in accordance with TECHNICAL SPECIFICATIONS in (Schedule 2) ) due to reasons or conditions considered to be outside the reasonable control of CONTRACTOR and with COMPANY Representatives prior approval, including but not limited to the following reasons:
    - Interference from other seismic vessels or oilfield activity.
    - Interference caused by fishing activities, including fishing vessels, fishing equipment, or marine traffic.



- Time lost due to restrictions imposed by governmental or military agencies (including neighboring countries) and third party pressure groups, provided Contractor has not caused the restrictions to be imposed;

- Delays caused by proximity of wildlife (marine mammals and other protected species) as a result of stipulations provided in project specific permits or regulatory requirements. local regulations

- Time lost due to Vessel and Crew having to maneuver away from a specific security threat. COMPANY's onboard QC will be advised immediately on any potential threat.

- Time spent during scouting (to include time spent scouting the survey area prior to Vessel acquiring data as part of mobilization agreement)

- Navigation stand-by occasioned by inappropriate satellite geometry or by the inherent operating constraints of positioning system, including sky wave, weather interference or other atmospheric effects.

- Delays caused by collision of in-water seismic equipment with flotsam, jetsam and other debris and time spent repairing damages caused by same.

- Third party interference including but not limited to vessel activity, static hazards and extraneous sources of acoustic noise, notwithstanding efforts of chase/escort vessel to minimize the same.

- Time spent awaiting environmental restrictions.

- Time lost as a result of damages to in-sea equipment caused by uncharted obstructions.

- Time lost due to default or damage to COMPANY provided Equipment.

- Equipment recovery before any of the above occurrences and also re-streaming, returning and re-calibration after such periods.

- Time spent on port call requested by Company, for any reason other than to remedy a Contractor downtime situation.

- Incremental transit time beyond 24 hours each way, required to travel to a mutually agreed alternate Port for a scheduled crew change in the event a more local port is not available.

During periods of standby at Standby Rate and subject to acceptance from COMPANY, CONTRACTOR may perform necessary maintenance and repair of equipment.

The Standby Rate shall not apply if data cannot be recorded due to reasons regarded as Technical Downtime Periods, and the Standby Rate shall in such situations commence (if no other day rate is applicable) after the Technical Downtime Period ceases and COMPANY has been returned to an equally favorable position.

Notwithstanding the above, the Standby Rate shall apply during time periods CONTRACTOR is prevented from making repairs by virtue of one or more of the standby conditions listed above (and then the Standby Rate shall apply in lieu of the Technical Downtime Period from the point in time CONTRACTOR is prevented from making such repairs. Once the standby condition has cleared, the Standby rate shall cease and the Technical Downtime period shall commence again, until and COMPANY has been returned to an equally favorable position from the time the initial Technical Downtime Period began.)



**Technical Downtime Periods:**

Except as otherwise set out in this Supplement 5, the Mobilization Fee, Standby Rate, and/ or Per Kilometer Full Fold Rate shall not apply during time periods of "Technical Downtime" within CONTRACTOR'S control, and no compensation will be paid to CONTRACTOR during such periods.

"Technical Downtime" is time lost due to CONTRACTOR'S Vessel, Vessel equipment, recording electronics, seismic cables, airgun source, cabling handling equipment, system software or navigation equipment or any other equipment, systems, or software that are inoperable or fail to meet survey specifications, unless approved by COMPANY'S onboard QC Representative.

Any delays or time lost, within reasonable control of CONTRACTOR, prior to the Vessel's arrival to or during its departure from the survey area as a result of failure to reasonably complete acceptance tests, place qualified operators on board the Vessel, or as a result of CONTRACTOR failing to provide requisite information necessary for timely acquisition of any visa's, permits or clearances, will be recognized as "Technical Downtime".

**The Acquisition and Standby Rates shall NOT include:**

- Technical Downtime periods as described above
- Fuel charges in excess of ▉▉▉▉ per metric ton.
- Delays caused by collision or vessel with any obstructions, catastrophic failures, or any time spent repairing resultant damages. (including engines, compressor, or hull failures etc.) Catastrophic failures are defined as interruptions or significant slowdowns in crew performance due to breakdown of Vessel or machinery including but not limited to compressors; Vessel propulsion, steering or ship's power.
- Re-shoots due to CONTRACTOR error or negligence
- CONTRACTOR engaging in time-sharing or standby time without the expressed consent of the COMPANY QC representative.
- CONTRACTOR not receiving prior approvals from COMPANYS on-board rep for extended periods of downtime
- CONTRACTOR port call periods and time spent conducting crew changes.

**Reimbursable Charges:**

Where the following additional services are provided by the Contractor, the reimbursable charges will be paid by Company monthly and will be billed at cost plus five per cent (5%), unless otherwise stated, in accordance with the terms set out above.

All Reimbursable items provided at the request of COMPANY must be approved in writing (e-mail acceptable) by COMPANY prior to incurring such expense, and CONTRACTOR shall not be obliged to provide such reimbursable services/ items before approved by COMPANY in writing.

CONTRACTOR agrees to draft 3rd Party contracts to reflect extended periods of downtime. Extended periods of downtime due to CONTRACTORS Vessel, equipment or catastrophic failures will not be reimbursable cost to Contractor.



**Reimbursable Items to CONTRACTOR:**

Unless, otherwise described above:

- All items provided at the request of the COMPANY
- Additional personnel at the request of the COMPANY or due to regulatory requirements
- Fuel charges in excess of ▮▮▮▮/MT, for acquisition and standby periods.
- Tape Shipment:
    - ○ CONTRACTOR shall insure all tapes shipped, and shall fully insure against the total costs of re-shooting the data recorded thereon, if both original and copy tape set are lost or unusable. All such cost of insurance is reimbursable to CONTRACTOR.
    - ○ All navigation and streamer/source positioning data tapes shall be shipped to COMPANY at cost plus five percent (5%).
- Tape copies charged at ▮▮▮▮/Km
- Communications;
    - ○ VSAT communications charges up to $1,000.00 per day

## Notifications:

Any notifications regards this Supplement shall be made to the following:

**Cobra Energy Services**
**10550 Bissonnet, Suite 100**
**Houston, Texas 77099**
**Attn: Mr. Ted Cooper**
**(713) 728-6266**

**GX Technology**
**2015 CityWest Blvd., Suite 900**
**Houston, Texas 77042**
**Attn: Mr. Shawn L. Rice**
**(713) 789-7250**

## HSE:

CONTRACTOR agrees to perform a Comprehensive Project Risk and Hazard Assessment that takes in account the hazards of operating in the project specific areas the hazards and control measures should be agreed upon by sub-contractors and Security Companies providing chase or security vessels and guards to protect personnel and Vessels. (When drawing up such an assessment, it is appropriate to make use of professional advisers (such as project management companies, private security companies, risk management consultants and the local police or Navy).

CONTRACTOR is obliged to comply with COMPANY's HSE (Health, Safety and Environment) policies as outlined in Schedule 3

COMPANY may undertake an independent HSE audit whilst the Vessel is in port and/or when in an operational condition on location. COMPANY may refuse to accept the Vessel if the HSE audit reveals major deficiencies.

As a minimum requirement, the CONTRACTOR shall comply with the standards set by the OGP (formerly E&P Forum) Health and Safety Schedules and training guidelines, the IAGC Safety Manual for Marine Geophysical Operations and the IAGC Environmental Manual. Additional HSE requirements are provided in Schedule 3 of the signed contract document.

CONTRACTOR shall be solely responsible for the Security of the Vessel and personnel in addition to the health and safety of its agents, employees and subcontractors' employees

engaged in the work. CONTRACTOR and its subcontractors shall comply with all applicable health, environment and safety standards, codes and regulations; whether defined by the Government/Federal regulatory bodies, ION or ION's clients (whichever are the most stringent). If such standards, codes or regulations do not adequately protect against hazards arising from the work, CONTRACTOR shall adopt appropriate practices.

CONTRACTOR shall take all reasonable precautions to protect the environment during the performance of work as outlined in the contract. The responsibilities of the CONTRACTOR shall include, but not be limited to the prevention of pollution caused by Contractor's equipment and materials, as well as protection of marine mammals and other wildlife.

CONTRACTOR shall exercise due care, skill and diligence and take all necessary measures and precautions to ensure that in the execution of the work, safe working practices are observed and that human life and property is not destroyed, injured, or put in any danger. Consequently, the CONTRACTOR's responsibilities include but shall not be limited to:

- Implementation of a management strategy directed at providing a safe operations at the worksite;
- Safety of its Vessel and Personnel;
- Training of its personnel to ensure safe operations;
- Maintenance of its equipment and materials in safe running order and regular inspection of the same to ensure safe and uninterrupted operations;
- Compliance with all applicable laws & regulations

CONTRACTOR shall promptly furnish Company full reports of any incidents involving Contractor's agents, employees or property connected with the work and shall update such reports as reasonable necessary. Such reports and updates shall contain a description of the circumstance of any personal injury, treatment provided, number of restricted or lost work days, and the date of return to work and description of any lasting impairment. Contractor shall endeavor to provide similar reports to Company for all its subcontractors.



## APPENDIX 1: Insurance Requirements

Without limiting the indemnity obligations or liabilities of Cobra or its insurers, Cobra or its Vessel Owner, Shanghai Offshore Petroleum Geophysical Corporation, at their sole expense, shall maintain the following insurances as long as this Agreement is in force:

(1)   Hull and Machinery insurance shall be provided for the vessel by the Owner, including the equipment to be supplied in the performance of Services with navigation limits adequate for the vessel's trade to include Ice Region , in an amount equal to the full market value of the vessel on a form at least equivalent to the American Institute Hull Clauses 6-2-77 Form (including 4/4 Collision Liability and damage to fixed or floating objects unless otherwise provided under Protection and Indemnity Insurance).

(2)   Full Form Protection and Indemnity Liability or Marine Liability insurance including coverage for injuries to or death of masters, mates, and crew, collision liabilities, damage to fixed and floating objects not covered under Hull and Machinery  and pollution liabilities in an amount equivalent to the cover provided by members of the International Group of Protection and Indemnity Associations.  The obligation to insure for loss of life or bodily injury to crew of vessel may be covered by extension of Workers' Compensation and Employer's Liability insurance.

(3)   Civil Liability – Insurance pursuant to Article 7 of the International Convention on Civil Liability for Bunker Oil Pollution Damage (2001) evidenced in the form of a certificate issued in favor of Canada-Newfoundland & Labrador Offshore Petroleum Board to be provided by vessel Owner.

(4)   Worker's Compensation and Employer's Liability Insurance in compliance with the laws of all jurisdictions in which the Services under this Agreement are performed covering all persons employed in the performance of such Services by each party.

Owner is required to provide COMPANY with a certificate of insurance evidencing each of the coverage's above. Certificates are required to indicate that should the described policy be cancelled before the expiration date thereof, notice will be delivered to COMPANY in accordance with the policy provisions.



## APPENDIX 2: Project Map
*(Approx. 6,930 2D kms)*



**APPENDIX 3**: Seismic Acquisition Parameters

# *SECTION 1. SURVEY DESCRIPTION*

*1.1.     Program Overview*

| | General Information | |
|---|---|---|
| 1. | Survey Name: | ComorosSPAN |
| 2. | Operating Company: | GX Technology |
| 3. | Operating Contractor: | SOPGC |
| 4. | Vessel(s): | M/V Discoverer |
| 5. | Location: | Offshore Comoros |
| 6. | Type of Survey: | 2D Streamer |
| 7. | Desired acquisition time period | April-June 2014 |
| 8. | Estimated survey duration | 70 days |

| | Survey Size | |
|---|---|---|
| 9. | Full-fold line length (km) | 6,930 |
| 10. | Number of Lines | 38 |

## *1.2.     Service Requirements*

The primary services will consist of the following:

| | Service Description | Required? |
|---|---|---|
| 1. | Seismic Acquisition | Yes |
| 2. | Field QC Processing | Yes |
| 3. | Field Extended Processing | No |
| 4. | Gravity Acquisition | Yes |
| 5. | Magnetometer Acquisition | Yes |
| 6. | Gradiometry Acquisition | No |
| 7. | Multibeam Bathymetry Acquisition | No |
| 8. | Raw GPS Observations (Rinex format) | No |
| 9. | ION Declinometer | Yes |
| 10. | Other | No |

## SECTION 2.     ACQUISITION PARAMETERS

Company requires that Contractor conduct the seismic acquisition with the following parameters.

*2.1.     Seismic Acquisition Parameters*

| | Acquisition Geometry | |
|---|---|---|
| 1. | Acquisition method | Streamer |
| 2. | Configuration (2D,3D,4D / 1C,2C,3C,4C) | 2D / 1C |

| | Recording Geometry | |
|---|---|---|
| 3. | Number of cables | 1 |
| 4. | Cable Length | 10,050 m |
| 5. | Group Interval | 25 m |



| 6. | Number of Channels | 408 |
|----|--------------------|-----|
| 7. | Cable Depth | 9.5 m |
| 8. | Nominal Near Trace Offset | 150 m or less |
| 9. | Shot interval | 50 m |
| 10. | Source depth | 8.5 m |

| | Recording Parameters | |
|----|--------------------|-----|
| 11. | Instrument type | Sercel SEAL |
| 12. | Tape format | SEG-D 8058 |
| 13. | Record length | 18 seconds |
| 14. | Sample rate | 2 milliseconds |
| 15. | Recording filter: Lo-cut | Out (3 Hz, 6 dB/octave) |
| 16. | Recording filter: Hi-cut | 86% Nyquist (200 Hz/ 370 dB per Octave) |
| 17. | Filter Phase | Linear |
| 18. | Recording media | IBM 3590E |
| 19. | Dual recording / tapes copies required? | Yes |
| 20. | Auxiliary channel recording requirements | time break, near field hydrophones |

| | Source Parameters | |
|----|--------------------|-----|
| 21. | Airgun type | Bolt 1500LL, Sleeve 1 & 2 |
| 22. | Number of source arrays | 1 |
| 23. | Number of sub-arrays per source | 4 |
| 24. | Sub-array spacing | 10/12/10 m |
| 25. | Total volume per source | 6040 cu. in. |
| 26. | Bar meter output (out-128/72 filter) p-p | 144.4 bar-m |
| 27. | Peak/Bubble ratio (out-128/72 filter) | 12:1 |
| 28. | Source operating pressure | 2000 psi |
| 29. | Number of pressure indicators per sub-array | 1 |
| 30. | Number of depth indicators per sub-array | Minimum of two, three preferred |
| 31. | Near fields to be recorded? | Yes if available, but not required |

| | Binning Parameters | |
|----|--------------------|-----|
| 32. | CMP Bin Size | 12.5 m |
| 33. | Nominal Fold | 102 |
| 34. | Calculate fold coverage? | Yes |
| 35. | Require infill? | No, follow technical specs |
| 36. | Offset Ranges to be evaluated for coverage | 4 equal ranges non-overlapping |
| 37. | Unique Offset Increment | 100 meters |
| 38. | No. of Azimuth Segments | 1 |
| 39. | Group 1 range / minimum fold | 0-2550 m / 23 |
| 40. | Group 2 range / minimum fold | 2550-5100 m / 23 |
| 41. | Group 3 range / minimum fold | 5100-7650 m / 23 |
| 42. | Group 4 range / minimum fold | 7650-10200 m / 23 |
| 43. | All offsets / minimum fold | 0-10200 m / 86 |

## 2.2. Navigation Acquisition Parameters

| | Navigation System | |
|---|---|---|
| 1. | INS software | Orca |
| 2. | Post Processing software | NRT / Sprint |

| | Primary GPS Navigation | |
|---|---|---|
| 3. | System type | C-Nav1 |
| 4. | Receiver Mfg/Model | FS2050G |
| 5. | Reference station | N/A, PPP |
| 6. | Corrections via | L1 band |
| 7. | Providing company | C&C Technologies |
| 8. | Position QC | Orca |

| | Secondary GPS Navigation | |
|---|---|---|
| 9. | System type | C-Nav2 |
| 10. | Receiver Mfg/Model | FS2050G |
| 11. | Reference station | N/A, PPP |
| 12. | Corrections via | L1 band |
| 13. | Providing company | C&C Technologies |
| 14. | Position QC | Orca |

| | Tertiary GPS Navigation | |
|---|---|---|
| 15. | System type | PosNet |
| 16. | Receiver Mfg/Model | Novatel |
| 17. | Reference station | N/A |
| 18. | Corrections via | N/A |
| 19. | Providing company | PBX Systems |
| 20. | Position QC | Orca |

| | In-water Equipment Requirements | |
|---|---|---|
| 21. | Compass / leveller spacing | One every 300m with redundancy at head and tail |
| 22. | Cable diverters | N/A |
| 23. | Tail buoy | Yes, rGPS |
| 24. | Gun pods | Yes, minimum of 2 active rGPS |
| 25. | Head acoustic network | No, but desired if no water break avail. |
| 26. | Velocimeter | No, but desired if routine TS-Dip measurements unavailable |
| 27. | Fathometer | Max depth range 1000m (if water depths exceed fathometer capabilities, water depths will be picked from the seismic data and P1-90 files updated with this depth) |



## SECTION 3.    REPORTS AND DELIVERABLES SUMMARY

### 3.1.    Pre-Survey Deliverables

| | Pre-Survey Products | Supplied by |
|---|---|---|
| 1. | Survey Project Plan (including mobilization schedule) | GXT/Contractor |
| 2. | Cables and spares listing and history | Contractor |
| 3. | Tape media and format descriptions for all data types | Contractor |
| 4. | Detailed format description of sensors | Contractor |
| 5. | Gun drop-out specifications | GXT |
| 6. | Instrument specifications | Contractor |
| 7. | Monthly instrument test procedures and sample results | Contractor |
| 8. | Representative sample of all onboard QC products | Contractor |
| 9. | System timing, data flow, and control diagrams | Contractor |
| 10. | Test communication link to GXT office with seismic and navigation test files | GXT Rep |
| 11. | Pre-plot listing, map and UKOOA files | GXT |
| 12. | Positioning Quality Plan | Contractor |
| 13. | Onboard Processing Project Plan | Contractor |
| 14. | Detailed Project Safety Plan | Contractor |
| 15. | Drug and Alcohol Testing Program | Contractor |
| 16. | Local Medical Services information | Contractor |
| 17. | Crew Training Matrix Summary | Contractor |
| 18. | Preliminary Project Risk Assessment | GXT and Contractor |
| 19. | Incident Report Format | GXT |
| 20. | Emergency Response Plan | Contractor |
| 21. | Interface Management Plan (Bridging Document) | GXT and Contractor |
| 22. | Third Party QHSE Audit Report | GXT |
| 23. | Other QHSE details | Contractor |

### 3.2.    Deliverables at Start-Up

| | Start-Up Products | Delivery To |
|---|---|---|
| 1. | Source calibration and verification results | GXT Rep |
| 2. | Instrumentation test results to include recording system timing verification and instrument acceptance tests | GXT Rep |
| 3. | Multi-vessel timing tests | GXT Rep |
| 4. | Cable/sensor test results | GXT Rep |
| 5. | Calibration reports to include gyrocompass and streamer compass calibration reports, GPS position check and acoustic network reports, GPS procedures and base station descriptions | GXT Rep |
| 6. | Bin center pre-plot & P6/98 grid definition (3D) | N/A |
| 7. | First line instrument tests (SEG-D) | S&R Services |
| 8. | First line navigation tests (P2-94) | CSL |

### 3.3.    Deliverables during Survey

| | Survey Products | Deliver To | Upload To |
|---|---|---|---|
| 1. | Observer logs | GXT Rep | GXT FTP |
| 2. | Monthly instrument tests results | GXT Rep | GXT FTP |
| 3. | Daily instrument test results | GXT Rep | |
| 4. | Navigation logs | GXT Rep | GXT FTP |
| 5. | End of line reporting (Orca logs, QC products, noise analyses, etc.) | GXT Rep | GXT FTP |

| | Survey Products | Deliver To | Upload To |
|---|---|---|---|
| 6. | Orca SBS and STS logs | GXT Rep | GXT FTP |
| 7. | Raw ION Declinometer logs | GXT Rep | GXT FTP |
| 8. | Gun logs | GXT Rep | GXT FTP |
| 9. | Configuration diagrams | GXT Rep | GXT FTP |
| 10. | Weekly onboard processing status report | GXT Rep | GXT FTP |
| 11. | Final P1-90 data for each sequence | GXT Rep | GXT FTP |
| 12. | Final P1-90 source records for each sequence (S cards only) | GXT Rep | GXT FTP |
| 13. | Raw P2/94 data for each sequence | GXT Rep | GXT FTP |
| 14. | Onboard processing QC plots for each sequence | GXT Rep | GXT FTP |
| 15. | Decimated SEG-Y stack (100m trace spacing) | GXT Rep | GXT FTP |
| 16. | Tape Logs and Data Transmittals | GXT Rep | GXT FTP |

### 3.4.  *Post-Survey Deliverables*

| | Post-Survey Products | Deliver To | Qty | Format | Media |
|---|---|---|---|---|---|
| 1. | Field (SEGD) tapes          Line archive       Sequence archive | GXT   Hold on boat | 1   1 | SEG-D   SEG-D | 3590 |
| 2. | Observer logs | GXT | 1 | XLS | CD/DVD |
| 3. | Monthly instrument tests | GXT | 1 | SEG-D | 3590 |
| 4. | Daily instrument tests results | GXT | 1 | XLS/DOC | CD/DVD |
| 5. | Raw navigation data | GXT | 1 | P2-94 | 8mm or DVD |
| 6. | Survey-wide Navigation Statistics | GXT | 1 | PDF | CD/DVD |
| 7. | Processed navigation data | GXT | 2 | P1-90 | 8mm or DVD |
| 8. | Backup of QC Node | GXT | 1 | .raw | CD/DVD |
| 9. | Brute stacks | GXT | 1 | SEG-Y | CD/DVD |
| 10. | Brute stacks | GXT | 1 | Paper | Paper |
| 11. | Single trace plots | GXT | 1 | Paper | Paper |
| 12. | Monitor records | GXT | 1 | Paper | Paper |
| 13. | Nav-seis merged SEGY data (no nmo) | GXT | 0 | SEG-Y | 3590 |
| 14. | Stacking velocities | GXT | 1 | ASCII | CD/DVD |
| 15. | Navigation logs | GXT | 1 | XLS/DOC | CD/DVD |
| 16. | Post-Plot maps in WGS-84 & Local Datum | GXT | 1 | Paper | Paper |
| 17. | Acquisition Bin-Grid Definition (3D) | GXT | 1 | P6/98 | CD/DVD |
| 18. | Final Seismic Operations & Navigation Report | GXT | 3 | DOC | CD/DVD |
| 19. | Final Onboard Seismic Processing Report | GXT | 3 | DOC | CD/DVD |
| 20. | Ancillary digital data (grav, mag, ...) | FGMS | 1 | Misc | CD/DVD |



**APPENDIX 3:** *continued....*
**(Vessel Specifications)**



**A. Vessel Detail**

| | |
|---|---|
| VESSEL NAME | DISCOVERER |
| Owner | Shanghai Offshore Petroleum Bureau |
| Maritime operator | Shanghai Offshore Petroleum Geophysical Corporation |
| Flag | Bahamas |
| Port Of Registry | Nassau |
| Year of Build | 1980 |
| Year of Rebuilt | 1988 |
| Class | DNV + IAI ICE-C SUPPLY VESSEL SF |
| IMO number | 7623928 |
| Call sign | C6CZ2 |
| **Vessel Dimensions** | |
| Length over all | 72.07m |
| Length between p.p. | 72m |
| Breadth mould | 16.0m |
| Air draught | 30m |
| Draught (mean)/Design draught | 3.61m |
| Scantling draught /Max Draft | 5.25m |
| **Vessel Tonnage** | |
| Gross Tonnage | 2747 |
| Net Reg Tonnage | 824 |
| Deadweight at scantling draught | 1800t |
| **Vessel Capacities** | |
| Ballast water | 800m³ |
| Freshwater | 350m³ plus 8m³ /day water maker |
| Fuel oil, incl. service tanks and overflow | 700t approx |
| Fuel, Useful for 100 % Consumption | 550t |

Page 20 of 22

| | |
|---|---|
| Pulling Capacity, 5 knots | 40 t |
| Speed, Max. In calm sea | 11 knots |
| Speed, Trancit economy, DITTO | 10 knots |
| Consumption of fuel, full speed | 10t |
| Consumption of fuel, economy speed | 9t |
| Operational Endurance | 50 days |
| Endurance of fuel during survey | 45 days |
| Consumption of fuel in port | 2t |
| SAFETY EQUIPMENT CERTIFICATE | Yes |

**B.Main Propulsion& Secondary Propulsion**

| | |
|---|---|
| Main Engines | 2 x MLW-ALCO 251 V12 Total 5480 BHP |
| AUX Engines (Generator drive) | #1 &2 gen sets,440/220V, 60 Hz driven by two Caterpillar 3412 TA 445 HP<br>#3 gen set, 440/220V, 60 Hz driven by CAT C18 engine, 550KW |
| Generators/Alternators | 3 x BBC 485KVA 440/220V, 60 Hz |
| Propeller Type, MAIN PROPULSION | The vessel's propulsion is direct drive to variable pitch propellers. (Liaaen/Hjelset ACG77/600 CP.) |
| Bow thruster | 2 x 600 BHP Brunvoll |
| Generators for LMF1040 Air Compressor | 2x CAT C-32 /994KW |
| for LMF1100 Air Compressor | 1x CAT 3508 |

**C. Communication**

| | |
|---|---|
| INMARSAT- C MMSI | 430966611 |
| DSC ID | 309666000 |
| Radios | 406 EPIRB<br>VHF DSC Radios<br>MF/HF DSC Radios<br>Portable VHF<br>Helicopter Radios   Radar Transponder |
| Navtex Receiver | NAV5 |
| VSAT Phone | +1 954 4995033   Bridge<br>+1 954 4995034   Client Cabin<br>+1 954 4995035   Radio Room<br>+1 954 4995036   Party chief Cabin |
| Iridium Phone | +88 1632529975 |

**D.Bridge Navigation Equipment**

| | |
|---|---|
| Radar | Sperry Marine BRIDGE MASTER(E)<br>FURUNO MU201CR |
| Auto pilot | SIMRAD AP50 |
| Gyro Compass | SR-180 MK1<br>SIMRAD GC80 (either used for survey) |
| Echo sounder | FURUNO 951 |
| Navigation | FURUNO GPS Navigator GP-150 |
| RADIO'S, VHF | SAILOR RT5022 |
| WEATHER FACSIMILE | JRC JAX 9A |

Navtex Receiver                                              JRC NCR333
AIS ( Automatic Identification System)                       JRC JHS -182
BNWAS                                                       AMI Marine KW810
**E.  Accommodation**
Cabin Type 1 Marine crew                                     11 x 1 berth
Cabin Type 2 Seismic crew                                    15 x 2 berths
Cabin Type 3 Treatment room                                  2 x 4 berths
Total Accommodation                                          49+hospital


**F. Helideck**
Helicopter deck                                             16m Diameter   No Certified


**G. Vessel Fire Fighting Equipment**
ENGINEROOM/CONTROL/ SWITCHBOARD                              HALON SYSTEM 1301
Tape Store                                                  EXTINGUISHER
Cable Store                                                 FOAM SYSTEM
Streamer Reels                                             FOAM SYSTEM
Helicopter Deck                                             APPP $ DRYPOWDER EXTINGUISHER
Paint Store                                                 EXTINGUISHER
Main Fire Pump                                              2
Emergency Fire Pump                                         1
Fire Detection Monitoring System                            1 x SYSTEM 3     1 x CERBERUS PYROTRONICS


**H. Vessel Safety and Survival**
Lifeboats                                                   2 x Harding Fully Enclosed Motor Lifeboats (total 120 persons)
Engine of lifeboat                                          30HP, NORWAY MCM-28
Life rafts                                                  4 x Life-rafts (total 64 persons)
MOB (Fast Rescu Craft)                                      5.30 MIDGET RESCUE BOAT
Engine, MOB and speed of boat                               57-75HP / 18 knots
Life jackets                                                73
Survival suits                                              64



## ACKNOWLEDGEMENT LETTER RE: SCRIVENER'S ERROR

This Acknowledgement Letter (this "**Letter**") is entered into as of July 8, 2019, by and between GX Technology Corporation, a Texas corporation located at 2105 CityWest Boulevard, Suite 100, Houston, Texas 77042 ("**COMPANY**") and Cobra Energy Services, S.A., a Panamanian corporation located at the World Trade Center, 1° Piso Area Commercial, Calle 53, Marbella, Panama City, Republica de Panama ("**CONTRACTOR**"). Each of COMPANY and CONTRACTOR are referred to herein as a "**Party**" and collectively as, the "**Parties**".

WHEREAS, the Parties entered into that certain Master Geophysical Service Agreement dated July 22, 2011 (the "**Master Agreement**"), the terms of which are incorporated herein by reference;

WHEREAS, the Parties have entered into several Supplemental Agreements (as defined in the Master Agreement), including the following: (i) Supplemental Agreement No. 10 dated June 8, 2017; (ii) Supplemental Agreement No. 11 dated March 5, 2018; (iii) Supplemental Agreement No. 12 dated June 8, 2018; and (iv) Supplemental Agreement No. 13 dated January 17, 2019 (collectively, the "**Supplemental Agreements**"); and

WHEREAS, the Parties wish to correct a scrivener's error in the Supplemental Agreements.

NOW, THEREFORE, the Parties hereto acknowledge and agree that, being a party to the Master Agreement and the Supplemental Agreements, the date "July 8, 2015" incorrectly attributed to the Master Agreement in each of the Supplemental Agreements is a scrivener's error and the correct date to be included in the Supplemental Agreements is July 22, 2011 and all reference thereto in the Supplemental Agreements are hereby modified accordingly;

FURTHERMORE, the Parties hereto acknowledge and agree that, notwithstanding anything appearing to the contrary in this Letter, the scrivener's error in the Supplemental Agreements and the correction provided for in this Letter shall not be a violation of the Supplemental Agreements or the Master Agreement.

IN WITNESS WHEREOF, this Letter has been signed and acknowledged by the duly authorized representatives of the Parties effective as of the date set forth below.

**COMPANY**

GX Technology Corporation

BY:

NAME: Ken Williamson

TITLE: EVP + COO

DATE: 07/24/2019

**CONTRACTOR**

Cobra Energy Services, S.A.

BY:

NAME: Yumin Li

TITLE: Country Manager, CHINA

DATE: 07.23.2019

**EXHIBIT**
**Cobra 5**



**Cobra Acquisition Services, S.A.**
0830-01390, San Francisco
Panama, Republic of Panama

October 25, 2021

**GX Technology Corporation**
2105 City West Boulevard
Suite 900
Houston, TX 77042

Attention: Messrs. Chris Usher, Mike Morrison, Ken Williamson
Via: Electronic E-mail (October 25, 2021)

*Re: Notice of Default and Reservation of Rights*

Dear Sirs,

We write to inform you that GX Technology Corporation (the "Company") is on payment default under the Master Geophysical Services Agreement ("MSA"), dated July 22, 2011, and Supplemental Agreement No. 13 ("Supplement No. 13") dated January 17, 2019.

The Company has failed to pay compensation to Cobra Acquisition Services S.A. ("Cobra") in breach of Section 3 ("Compensation") of the MSA and Supplement No. 13 in the total sum of US\$ 4,674,028.78 plus applicable interest of US\$ 350,552.16, finance fees, and late payment penalties. This outstanding balance is due to Cobra as of today.

Further, considering that the Company has failed to make payments for fifty (50) days from invoice receipt and according to Clause 7(b) para. 2 of the MSA, Cobra notifies and proceeds to exercise its right to retain the Work Product concerning Supplement No. 13. Please note that until the Company meets their payment obligations, the Company has no right to use the Work Product and therefore is prohibited from commercially exploiting the Work Product, including but not limited to licensing or selling the Work Product or continuing to license or sell the Work Product to third parties. This right is enforceable through injunctive relief granted in the MSA. We strongly advise you to inform all of the Companies' customers of these limitations on the customers' ability to use the Work Product.

Per section 15(b)(i) of the MSA, the Company has the right to cure this breach within seven (7) calendar days as of the date of this Notice to avoid any further remedies. If the Company fails to comply with its payment obligations within that term, Cobra will be entitled to terminate the contractual relationship between the parties and recover payments due plus interest in addition to



EXHIBIT
**Cobra 6**

any other remedies available under the MSA and Supplement No. 13 or at law. We note that under Texas Law—the law applicable to the MSA and the Supplements—the losing party must pay the prevailing party all its costs, including attorneys' fees.

Cobra reserves all rights to pursue all remedies available either by contract, law or equity.

We remain available to discuss any questions that may arise from this notice.

Respectfully,

**Cobra Acquisition Services S.A.**

Marcus Pullicino

Director



**DONALD R. LOOPER**
dlooper@loopergoodwine.com
Direct Dial: (713) 335-8602

**OFFICES:**
Houston, TX
New Orleans, LA

January 14, 2022

Mr. Matt Powers, General Counsel
GXT Technology Corporation
2105 City West Boulevard, Suite 900
Houston, Texas 77042

### RE: GXT Notice of Default; Retaining Work Product

Dear Mr. Powers:

We write to inform you that GX Technology Corporation (the "Company") is on payment default under the Master Geophysical Services Agreement ("MSA"), dated July 22, 2011. The Company has failed to pay compensation to Cobra Acquisition Services S.A. ("Cobra") in breach of Section 3 ("Compensation") of the MSA on multiple Supplements. The amounts due include amounts due under those Supplements plus applicable interest, finance fees, and late payment penalties.

The Company has failed to make payments for fifty (50) days from invoice receipt. According to Clause 7(b) para. 2 of the MSA, Cobra has the right to retain its Work Product in such event, "notwithstanding the foregoing" stated obligations under the MSA that would otherwise give the Company the right to exclusive ownership and use to that Work Product. Thus, Cobra can retain ownership of the Work Product as long as the total amount due under the MSA is not paid in full. Cobra hereby notifies the Company of the Default and that Cobra may and can now proceed to exercise its right to retain the Work Product concerning all Supplements 1,2,3,4,5,6,7,8,9,10,11,12,13,14 under the MSA. Moreover, under that paragraph of Clause 7(b), the Company is prohibited from challenging Cobra's retention of such Work Product. Please note that until the Company meets their payment obligations in full, the Company has no right to use the Work Product and therefore is prohibited from commercially exploiting the Work Product, including but not limited to licensing or selling the Work Product or continuing to license or sell the Work Product to third parties. This right is enforceable through injunctive relief granted in the MSA. We strongly advise you to inform all of the Companies' customers of these limitations on the customers' ability to use the Work Product.

Per section 15(b)(i) of the MSA, the Company has the right to cure this breach within seven (7) calendar days as of the date of this Notice to avoid any further remedies. We note that

**EXHIBIT**

**Cobra 7**

Looper Goodwine P.C. | 1300 Post Oak Boulevard, Suite 1250 | Houston, Texas 77056 | P: 713.335.8600 | F: 713.335.8601 | loopergoodwine.com

310769v1



Mr. Matt Powers, General Counsel
January 14, 2020
Page 2


under Texas Law—the law applicable to the MSA and the Supplements—the losing party must pay the prevailing party all its costs, including attorneys' fees.

Cobra reserves all rights to pursue all remedies available either by contract, law or equity.

Very truly yours,

Donald R. Looper

DRL:tjb

cc:    Tom Kirkendall, The Law Office of Tom Kirkendall

### AMERICAN ARBITRATION ASSOCIATION / INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION

In the Matter of the Arbitration Between:

Cobra Acquisition Services, S.A.

("Cobra")

**Claimant**

v.

GX Technology Corporation

("GX Technology")

**Respondent**

January 19, 2022

### AMENDED DEMAND FOR ARBITRATION

## I. INTRODUCTION

1.        Claimant, Cobra Acquisition Services S.A. ("Cobra"), hereby files this Amended Demand for Arbitration pursuant to Rule 4 of the AAA Commercial Arbitration Rules (the "Rules") against GX Technology Corporation ("GX Technology" and, together with Cobra, the "Parties").[1]  As detailed below, this case concerns GX Technology's breach of contract for seismic data services ("Services") rendered under a master services agreement and its supplements.  Cobra seeks in this proceeding compensation for all amounts owed, including finance fees, late payment penalties, pre- and post- award interest, and attorneys' fees and arbitration costs.

2.        The Parties to this arbitration, Cobra and GX Technology, entered into a Master Geophysical Services Agreement ("MSA") on July 22, 2011.[2]  Under the MSA, Cobra was obliged to periodically provide the Services to GX Technology.  In consideration for the Services, GX

---

[1]    In accordance with Rule 4(a) of the Rules, Cobra files its Demand for Arbitration along with the administrative filing fee and a copy of the applicable arbitration agreement.

[2]    **Exhibit 1**, Master Geophysical Services Agreement executed between GX Technology Corporation and Cobra Energy Services, on July 22, 2011 ("MSA").  Note that the original parties to the MSA were Cobra Energy Services, S.A, as "Contractor" and GX Technology Corporation as "Company."  On July 25, 2019, Cobra informed GX Technology that its rights and obligations under the MSA were assigned to a separate group entity named "Cobra Acquisition Services S.A."  Save for the bank account and wiring details, the MSA remained unaltered.  A copy of the relevant Assignment and Assumption Agreement between Cobra Energy Services S.A., and Cobra Acquisition Services, S.A., as well as Cobra's letter informing GX Technology of the assignment, are attached as **Exhibit 2**.

EXHIBIT

C

Technology was obliged to compensate Cobra as agreed by the Parties for each project undertaken under the MSA.

3.      The Services were divided into projects and memorialized in separate agreements ("Supplements") entered into under the umbrella of the MSA.  To date, the MSA has been supplemented numerous times.  Each supplement corresponds to individual energy projects in which GX Technology required from Cobra a specific set of seismic data.

4.      The relevant Supplements to this dispute are Supplements Nos. 6 and 13.  GX Technology is in Payment Default for services provided under Supplement No. 13 as of the date of this Demand for Arbitration, and also owes an additional amount under Supplement No. 6.

5.      Over the course of the last year-plus, Cobra has sent various good-faith communications to GX Technology informing of its defaults and inviting GX Technology to explore various avenues to settle the dispute.  While GX Technology has (i) acknowledged these communications, (ii) recognized most of the amounts owed, (iii) partially paid some of the amounts owed, and (iv) agreed to a restructured payment schedule, it has defaulted on its obligation to pay US$ 5,024,581.18 (plus interest) under the MSA and corresponding Supplement No. 13, and also owes an additional US$ 2,909,363 under the MSA and corresponding Supplement No. 6.  Cobra is left with no choice but to protect its rights and seek rightful compensation through this arbitration proceeding.

## II.     JURISDICTION AND PARTIES TO THE DISPUTE

### a.   The Arbitration Agreement

6.      The Parties have agreed in the MSA to arbitration administered by the American Arbitration Association ("AAA") and the AAA Rules, as reflected in Article 20:

> 20. **Applicable Law; Dispute Resolution:** This Agreement shall be governed by and construed in accordance with the laws of the State of Texas, excluding applicable conflict-of-law rules or principles. Either Party shall have the right to apply to a court to enjoin any breach of this Agreement.  Excepting the right of a Party to seek such relief, all claims, disputes and matters in question arising out of this Agreement or the relationship between the Parties created by this Agreement, whether sounding in contract, tort or otherwise, shall be resolved by binding arbitration in Houston, Texas, administered by the American Arbitration Association (the "AAA") using the AAA rules for commercial disputes.  If the claim under the dispute is US$ 1,000,000 or less, then the arbitration shall be conducted by one arbitrator.  If the claim under the dispute is more than US$ 1,000,000, the arbitration shall be conducted by a panel of three arbitrators.  Each party shall designate a representative, who

2

need not be neutral, within 30 days of receiving notification of the filing with the AAA of a demand for arbitration. The two representatives so designated shall elect the arbitrator(s) from a panel of independent arbitrators proposed by the AAA. If the Contractor fails to designate a representative within the time specified or the Parties' representatives fail to designate the arbitrator(s) within 30 days of the representatives' appointments, the arbitrator(s) shall be appointed by the AAA. The Parties agree that the terms of this arbitration agreement are enforceable under the United States Federal Arbitration Act. The Parties further agree that any disputes relating to or in connection with the enforceability of this arbitration agreement shall be brought only in a Federal Court in Houston, Texas, and each Party consents to the exclusive jurisdiction of the Federal courts in Houston, Texas for that purpose.

7.     In sum, the Parties have agreed to the following arbitration terms:

Applicable Law to the MSA and Supplements: Texas.
Arbitration Rules: AAA Commercial Arbitration Rules (effective as of October 1, 2013).
Arbitration Locale: Houston, Texas.
Characteristics of Arbitral Tribunal: Panel of three arbitrators.

### b.  The Parties and Counsel

8.     The Claimant is Cobra Acquisition Services, S.A.

9.     Cobra is an entity organized under the laws of Panama. Cobra is a specialized provider of seismic data for off-shore energy projects.

10.    Cobra is represented in this arbitration by King & Spalding LLP. All required notifications shall be sent to:

Marcus Pullicino – marcus.pullicino@cobracorp.com
Cobra Energy Services, S.A.
5555 San Felipe, Suite 2100
Houston, Texas 77056

Craig S. Miles – cmiles@kslaw.com
Arturo Oropeza Casas – aoropeza@kslaw.com
Jason Peters – jpeters@kslaw.com
Daniela E. Bravo – dbravo@kslaw.com

King & Spalding LLP
1100 Louisiana, Suite 4000
Houston, Texas 77002
(713) 751-3200

11.     The Respondent is GX Technology Corporation.  GX Technology is a seismic imaging services provider.  The company's services include seismic acquisition, time processing, pre-stack depth and time imaging, 4D, and multi-component services.  GX Technology markets to oil & gas companies.

12.     At this time, Cobra is not aware of any external counsel representing GX Technology but understands that GX Technology may be reached at:

Matthew Powers - matt.powers@iongeo.com
Christopher T. Usher - chris.usher@iongeo.com
Michael Morrison - mike.morrison@iongeo.com
ION Geophysical Corporation
2105 CityWest Blvd., Suite 100
Houston, Texas 77042

## III.     APPOINTMENT OF CO-ARBITRATORS

13.     Cobra and GX Technology must appoint their respective co-arbitrators within 30 days of Cobra's initial filing on December 20, 2021, as set forth in Clause 20 of the MSA.  The co-arbitrators shall then select the chair from the AAA's National Roster or the ICDR's international roster.

## IV.     FACTUAL BACKGROUND AND NATURE OF CLAIM

### a.   The MSA

14.     The commercial relationship between Cobra and GX Technology is governed by the MSA executed on July 22, 2011.  The MSA was entered into to provide seismic data services for the development of individual energy projects.  Under the MSA, Cobra is obliged to perform certain duties to provide the Services. In so doing, Cobra is to provide all personnel, equipment, and materials necessary to provide the Services.

15.     In consideration for the Services, GX Technology is obliged to pay consideration as determined in each Supplement.  The terms and conditions of the MSA control over the individual Supplements.

16.     While the MSA gives GX Technology general intellectual property rights over the Work Product,[3] Cobra has the right to retain such Work Product in the event GX Technology has not

---

[3]     **Exhibit 1**, MSA, Art. 7 (b). ("All information, drawings, plans, specifications, designs, reports, computations, calculations and other documents prepared by or on behalf of the Contractor or its Representatives in furtherance of or in connection with the Services (collectively the 'Work Product') … For purposes of this Agreement 'Work Product' also includes inventions (including but not limited to, improvements, inventions, designs, formulas, works of authorship, trade secrets, technology, mask works, circuits, layouts, algorithms, computer programs, ideas, processes, techniques, know-how and data, whether or not patentable) that the Contractor makes, conceives,

4

paid Cobra in accordance with the payment terms of the relevant Supplement for fifty (50) days from invoice receipt.

### b.   The Supplements

17.     The Supplements are meant to govern individual projects undertaken under the MSA. Accordingly, the Supplements set forth specific terms and conditions agreed by the Parties for the performance of the Services.  Between July 2011 and October 2020, the Parties entered into 14 different Supplements, with the objective of providing specific data for select energy projects.  The Supplements relevant to this dispute are Supplement No. 6[4] and Supplement No. 13.[5]  Under Supplement No. 6, Cobra was to make available the vessel M/V Discoverer and necessary equipment to allow GX Technology to acquire a 2D seismic program offshore Peru.  Under Supplement 13, Cobra was to make available the vessel M/V Hai Yang Shi You 760 and necessary equipment to allow GX Technology to acquire its GrandSPAN 2 seismic survey offshore Newfoundland, Canada.

### c.   GX Technology's defaults under the MSA

18.     Cobra complied with all obligations under both Supplements.  GX Technology, by contrast, did not.  Under Supplement 13, GX Technology was obliged to make a payment to Cobra of US$ 4,674,029 (plus a finance charge of US$ 350,522.18, for a total of US$ 5,024,581.18) on October 24, 2021.  GX Technology expressly recognized this obligation in an email dated October 21, 2021, in which it proposed to pay down this amount over a series of installments through June 2022.[6]  Cobra did not agree to this restructured payment schedule and proceeded to issue a default notice.  In any event, GX Technology did not comply with its proposed restructuring, and missed its first proposed partial payment on December 15, 2021.  Thus, the full amount is and remains due, with interest accruing from October 24, 2021.

19.     With respect to Supplement No. 6, Cobra is reimbursed its costs through a combination of revenue sharing and cost recovery.  Cobra incurred costs of US$ 5,123,594, and has only been reimbursed US$ 2,214,231, leaving a deficit due and owing of US$ 2,909,363.  GX Technology wrongfully disputes its obligation to pay this amount, arguing that it is contingent on sales, but neither the terms of the MSA nor Supplement No. 6 impose any such condition on GX Technology's obligation to reimburse all of Cobra's costs incurred under Supplement No. 6.

---

reduces to practice or develops (in whole or in part, either alone or jointly with others) during the term of this Agreement in connection with performing Services or that relate to any other Work Product.").

[4]     Attached as **Exhibit 3**.

[5]     Attached as **Exhibit 4**.  Supplement No. 13 contains a scrivener's error reciting the date of the MSA as July 8, 2015, instead of the correct date of July 22, 2011.  The parties entered into an Acknowledgement Agreement Re: Scriveners Error on July 8, 2019.  *See* **Exhibit 5.**

[6]     **Exhibit 6**, E-mail from Mike Morrison to Marcus Pullicino, Oct. 21, 2021, with attached proposed payment schedule.

## V.   REQUEST FOR RELIEF

20.     Once an Arbitral Tribunal is constituted, Cobra will respectfully request an award granting it the following relief:

a)  A declaration that GX Technology has breached the MSA and the Supplements.

b)  A declaration that until GX Technology has paid all amounts due under the MSA and the Supplements, GX Technology is infringing Cobra's intellectual property associated with the Work Product for all Supplements.

c)  An order from the Tribunal directing GX Technology to pay all due amounts under the MSA and the Supplements, including pre- and post- award compound interest.

d)  All costs of this proceeding, including attorneys' fees and expenses.

Respectfully submitted, January 19, 2022

Craig S. Miles – cmiles@kslaw.com
Arturo Oropeza Casas – aoropeza@kslaw.com
Jason Peters – jpeters@kslaw.com
Daniela Bravo – dbravo@kslaw.com

King & Spalding LLP
1100 Louisiana, Suite 4000
Houston, Texas 77002
(713) 751-3200